NON-CONFIDENTIAL VERSION

## IN THE UNITED STATES COURT OF INTERNATIONAL TRADE

<table>
<tr><td>

GRUPO ACERERO S.A. de CV.,
GRUPO SIMEC S.A.B. de C.V., et al.,

           Plaintiffs,

    and

GERDAU CORSA, S.A.P.I de C.V.,

           Plaintiff-Intervenor,

    v.

UNITED STATES,

           Defendant,

    and

REBAR TRADE ACTION COALITION,

           Defendant-Intervenor.

</td><td>

Before: Hon. Stephen Alexander Vaden,
      Judge

Consol. Court No. 22-00202

**NON-CONFIDENTIAL VERSION**

Business Proprietary Information Removed from Pages: 10, 13, 14, 19, 20, 31, 32, and Exhibits 2, 3

</td></tr>
</table>

## DEFENDANT-INTERVENOR'S RESPONSE TO MOTION FOR PRELIMINARY INJUNCTION AGAINST CASH DEPOSITS

Alan H. Price, Esq.
John R. Shane, Esq.
Maureen E Thorson, Esq.
Jeffrey O. Frank, Esq.
Paul J. Coyle, Esq.

**WILEY REIN LLP**
**2050 M Street, NW**
**Washington, DC 20036**
**(202) 719-7000**

*Counsel to the Rebar Trade Action Coalition*

Dated: December 28, 2022

Consol. Ct No. 22-00202                                    NON-CONFIDENTIAL VERSION

## TABLE OF CONTENTS

Page

I.      INTRODUCTION ................................................................................................ 1

II.     PROCEDURAL BACKGROUND....................................................................... 1

III.    THE COURT SHOULD DENY SIMEC'S MOTION ........................................ 5

        A.      Legal Standards Governing Injunctions Against the Collection of
                Cash Deposits........................................................................................... 5

        B.      Simec Fails to Demonstrate Irreparable Harm......................................... 8

        C.      The Balance of Hardships Does Not Favor Simec ................................. 13

        D.      Simec's Proposed Injunction is Not in the Public Interest ................... 15

        E.      Simec Has Not Shown a Likelihood of Success on the Merits............... 16

                1.      Simec's Arguments are Misplaced ............................................. 16

                2.      An Injunction would Not Be Merited Even if Simec Could
                        Demonstrate a Likelihood of Success........................................ 31

                3.      Conclusion .................................................................................. 31

IV.     CONCLUSION.................................................................................................. 31

Consol. Ct No. 22-00202                          NON-CONFIDENTIAL VERSION

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*ArcelorMittal USA LLC v. United States*,
    399 F. Supp. 3d 1271 (Ct. Int'l Trade 2019) ...........................................25

*Chilean Nitrate Corp. v. United States*,
    11 CIT 538 (1987) .............................................................................7, 9, 11

*Companhia Braseileira Carbureto de Calcio v. United States*,
    18 CIT 215 (1994) ..................................................................................11

*Corus Grp. PLC v. Bush*,
    26 CIT 937, 217 F. Supp. 2d 1347-49 (Ct. Int'l Trade 2002)......................8

*Decca Hosp. Furnishings, LLC v. United States*,
    30 CIT 357, 427 F. Supp. 2d 1249 (2006)........................................6, 7, 9

*Dongtai Peak Honey Indus. v. United States*,
    777 F.3d 1343 (Fed. Cir. 2015).................................................................25

*Gujarat Fluorochemicals Ltd. v. United States*,
    578 F. Supp. 3d 1346 (Ct. Int'l Trade 2022) .............................................7

*Inmax Sdn. Bhd. v. United States*,
    Ct. No. 17-00205, slip op. 17-101 (Ct. Int'l Trade Aug. 8, 2017)............15

*Nippon Steel Corp. v. United States*,
    337 F.3d 1373 (Fed. Cir. 2003).........................................................22, 23

*Olympia Indus., Inc. v. United States*,
    30 CIT 12 (2006) ...................................................................................7, 8

*Peer Bearing Co.-Changshan v. United States*,
    766 F.3d 1396 (Fed. Cir. 2014)................................................................23

*Pro-Team Coil Nail Enter. v. United States*,
    419 F. Supp. 3d 1319 (Ct. Int'l Trade 2019) ...........................................24

*PSC VSMPO–Avisma Corp. v. United States*,
    688 F.3d 751 (Fed. Cir. 2012)..................................................................25

*Queen's Flowers de Colom. v. United States*,
    20 CIT 1122, 947 F. Supp. 503 (1996) ..............................................7, 8, 9

Consol. Ct No. 22-00202                                    NON-CONFIDENTIAL VERSION

*Shandong Huarong Gen. Grp. Corp. v. United States,*
    24 CIT 1279, 122 F. Supp. 2d 1367 (2000) ................................................................ *passim*

*Shanghai Tainai Bearing Co. v. United States,*
    582 F. Supp. 3d 1299 (Ct. Int'l Trade 2022) ........................................... 7, 11, 12, 14

*Shree Rama Enters. v. United States,*
    21 CIT 1165, 983 F. Supp. 192 (1997) .................................................. 7, 10, 15, 31

*Sunpreme Inc. v. United States,*
    145 F. Supp. 3d 1271 (Ct. Int'l Trade 2016) ............................................... 7, 15

*Sunpreme Inc. v. United States,*
    181 F. Supp. 3d 1322 (Ct. Int'l Trade 2016) ................................................... 7

*Tel Sanayi A.S. v. United States,*
    557 F. Supp. 3d 1348 (Ct. Int'l Trade 2022) ................................................ 29

*Wheatland Tube Co. v. United States,*
    495 F.3d 1355 (Fed. Cir. 2007) ..................................................................... 16

**Statutes**

19 U.S.C. § 1671f ........................................................................................................ 8

19 U.S.C. § 1673d(c)(1)(B) ........................................................................................ 5

19 U.S.C. § 1673d(c)(1)(B)(ii) ................................................................................... 8

19 U.S.C. § 1673e(a)(3) .............................................................................................. 8

19 U.S.C. § 1673f ................................................................................................... 8, 13

19 U.S.C. § 1675(a)(1) ........................................................................................... 6, 8

19 U.S.C. § 1675(a)(2)(B)(iii) .................................................................................... 8

19 U.S.C. § 1675(a)(2)(C) .......................................................................................... 8

19 U.S.C. § 1677e(d)(1)(B) ...................................................................................... 28

19 U.S.C. §1677e(d)(2)(B) ....................................................................................... 29

19 U.S.C. § 1677e(d)(3) ............................................................................................ 29

19 U.S.C. § 1677g ................................................................................................. 8, 13

19 U.S.C. § 1677m(d) .......................................................................................... 26, 27

Consol. Ct No. 22-00202                    NON-CONFIDENTIAL VERSION

19 U.S.C. § 1677m(e) ...................................................................26, 27

**Regulations**

19 C.F.R. § 351.212(a).....................................................................6

19 C.F.R. § 351.212(b) .....................................................................6

19 C.F.R. § 351.212(c).....................................................................6

19 C.F.R. § 351.213(b) .....................................................................6

**Administrative Materials**

*Steel Concrete Reinforcing Bar From Mexico,*
    82 Fed. Reg. 27,233 (Dep't Commerce June 14, 2017) .........................1, 23

*Steel Concrete Reinforcing Bar From Mexico,*
    84 Fed. Reg. 35,599 (Dep't Commerce July 24, 2019) .........................2, 23

*Steel Concrete Reinforcing Bar from Mexico,*
    85 Fed. Reg. 71,053 (Dep't Commerce Nov. 6, 2020).........................2, 23

*Steel Concrete Reinforcing Bar From Mexico,*
    79 Fed. Reg. 22,802 (Dep't Commerce Apr. 24, 2014).........................2

*Steel Concrete Reinforcing Bar From Mexico,*
    87 Fed. Reg. 75,032 (Dep't Commerce Dec. 7, 2022) ...................11, 12

*Steel Concrete Reinforcing Bar From Mexico,*
    86 Fed. Reg. 50,527, 50,528 (Dep't Commerce Sept. 9, 2021)................14

*Steel Concrete Reinforcing Bar From Mexico,*
    79 Fed. Reg. 65,925 (Dep't Commerce Nov. 6, 2014).........................16

*Steel Concrete Reinforcing Bar From Mexico,*
    79 Fed. Reg. 54,967 (Dep't Commerce Sept. 15, 2014).......................28

**Other Authorities**

Trade Preferences Extension Act of 2015,
    P.L. 114-27 Sec. 502, 129 Stat. 362  (June 29, 2015)...........................28

NON-CONFIDENTIAL VERSION

## I.   <u>INTRODUCTION</u>

On behalf of the Rebar Trade Action Coalition ("RTAC"), Defendant-Intervenor in this consolidated action, we respectfully submit this response opposing the December 7, 2022 motion for preliminary injunction filed by plaintiffs Grupo Simec S.A.B. de C.V.; Aceros Especiales Simec Tlaxcala, S.A. de C.V.; Compania Siderurgica del Pacifico S.A. de C.V.; Fundiciones de Acero Estructurales, S.A. de C.V.; Grupo Chant S.A.P.I. de C.V.; Operadora de Perfiles Sigosa, S.A. de C.V.; Orge S.A. de C.V.; Perfiles Comerciales Sigosa, S.A. de C.V.; RRLC S.A.P.I. de C.V.; Siderúrgicos Noroeste, S.A. de C.V.; Siderurgica del Occidente y Pacifico S.A. de C.V.; Simec International 6 S.A. de C.V.; Simec International, S.A. de C.V.; Simec International 7 S.A. de C.V.; and Simec International 9 S.A. de C.V. (collectively, "Simec"). *See* Pl. Simec's Mot. for Prelim. Inj. (Dec. 7, 2012), ECF No. 32 ("Simec's Motion").

RTAC respectfully submits that Simec's motion fails to provide a proper factual basis for its claim that it will suffer irreparable harm without an injunction. Moreover, the injunction that Simec seeks would represent an unwarranted departure from the statutory requirement of cash deposits, a requirement that serves vital interests. This departure would be contrary to law, public policy interests, and harmful to Simec's domestic and foreign competitors, including RTAC. Accordingly, and for the reasons discussed below, Simec's motion should be denied.

## II.   <u>PROCEDURAL BACKGROUND</u>

This action arises from the 2019-2020 administrative review of the antidumping duty order on Mexican steel concrete reinforcing bar ("rebar"). *See* Compl. (Aug. 8, 2022), ECF No. 8 at 2. Simec requested a review of its entries during the review period. *See id.* at 4. The U.S. Department of Commerce ("Commerce") selected Simec as a mandatory respondent, *id.*, as it did in the 2014-2015, 2016-2017, and 2017-2018 administrative reviews. *See Steel Concrete Reinforcing Bar From Mexico*, 82 Fed. Reg. 27,233 (Dep't Commerce June 14, 2017) (final results of antidumping

duty admin. rev.; 2014-2015) ("*Rebar from Mexico* AR 14-15 Final Results"); *Steel Concrete Reinforcing Bar From Mexico*, 84 Fed. Reg. 35,599 (Dep't Commerce July 24, 2019) (final results of antidumping duty admin. rev.; 2016-2017) ("*Rebar from Mexico* AR 16-17 Final Results"); *Steel Concrete Reinforcing Bar from Mexico*, 85 Fed. Reg. 71,053 (Dep't Commerce Nov. 6, 2020) (final results of antidumping duty admin. rev.; 2017-2018) ("*Rebar from Mexico* AR 17-18 Final Results").[1] Simec also participated in the original investigation as a voluntary respondent. Preliminary Decision Memorandum accompanying *Steel Concrete Reinforcing Bar From Mexico*, 79 Fed. Reg. 22,802 (Dep't Commerce Apr. 24, 2014) (prelim. deter. of sales at less than fair value, prelim. affirm. deter. of critical circumstances, and postponement of final deter.) at 2. Thus, not only did Simec request a review of its 2019-2020 entries, but it was a seasoned respondent with significant experience in responding to Commerce's questionnaires.

Commerce issued Simec an initial set of questionnaires on February 8, 2021, the same day that the agency selected mandatory respondents. *See* Preliminary Decision Memorandum accompanying *Steel Concrete Reinforcing Bar From Mexico*, 86 Fed. Reg. 68,632 (Dep't Commerce Dec. 3, 2021) (prelim. results of antidumping duty admin. rev.; 2019-2020), P.R. 166 at 2 ("PDM"), excerpts attached as **Exhibit 1**.[2] The agency identified a "significant number of deficiencies" in Simec's initial responses, requiring the agency to pose more than two hundred supplemental questions over two supplemental questionnaires. *Id.* at 4-5; *see also* Issues and Decision Memorandum accompanying *Steel Concrete Reinforcing Bar From Mexico*, 87 Fed. Reg.

---

[1]     As in the review at bar, Simec participated in the 2014-2015, 2016-2017, and 2017-2018 administrative reviews as a collapsed group of related corporate entities.

[2]     For the court's convenience, RTAC has appended to this response relevant excerpts of record documents cited in the response, with the exception of excerpts from the Federal Register notice of the final results and the accompanying Issues and Decision Memorandum. Those two documents in their entirety have already been uploaded to the docket for this case, as ECF Nos. 18-4 and 18-5, respectively.

34,848 (Dep't Commerce June 8, 2022) (final results of antidumping duty admin. rev.; 2019-2020), ECF No. 18-5 at 27 ("IDM"). Commerce granted Simec several extensions of time to submit its responses to the supplemental questionnaires. PDM at 5.

Simec timely submitted responses to all questions in one of these supplemental questionnaires, but it failed to timely submit responses to the portion of the other questionnaire that concerned its downstream sales. *Id.* Commerce's review of the timely-submitted portions of the supplemental responses also indicated that Grupo Simec:

> {C}ontinued to fail to provide information Commerce requested, stated that various errors or discrepancies had been corrected but had, in fact, not corrected these issues, and provided supporting documentation which indicated that certain reported data were incorrect.

*Id.*[3] Commerce described these issues, which cut across both the company's home-market and U.S. sales reporting, at length in the PDM. *Id.* at 5-7. Commerce preliminarily determined to rely on adverse inferences, both because Simec failed to remedy errors identified in its initial questionnaire responses despite being given the opportunity to do so, and because it failed to submit certain information in accordance with the (extended) deadlines set by the agency. *Id.* at 7-8. Commerce assigned Simec the 66.70% rate that the company received in the original investigation. *Id.* at 9.

Simec argued in its case brief that Commerce should instead assign it the zero percent rate preliminarily calculated for the other mandatory respondent. *See, e.g.*, IDM at 30. In the alternative, Simec argued that it should be assigned a *de minimis* margin consistent with the company's own undisclosed calculations. *See id.* at 27, 34. Simec claimed that adverse inferences were inappropriate, because its difficulties in responding completely or timely to Commerce's

---

[3]     Nearly six weeks after the deadlines to submit its complete supplemental responses, Simec submitted what it characterized as "additional" responsive data. *See* IDM at 17. Commerce rejected this additional data as both untimely and out of conformity with the agency's "basic regulatory requirements" for submissions of factual information. *See id.*

questionnaires stemmed from the COVID-19 pandemic and the complexities of the Simec companies' internal organization. *Id.* at 4-5. It further argued that the information that Commerce identified in the PDM as missing, incomplete, or unreliable was (1) easily correctable by Commerce itself, (2) did not need correction, or (3) was immaterial or unnecessary to an accurate margin calculation. *Id.* at 21.

Commerce continued to rely on adverse inferences in the final results. *Id.* at 24-29. The agency explained that "{t}he deficiencies . . . in the initial questionnaire responses were unusually extensive and spread across virtually every part of Grupo Simec's responses." *Id.* at 8. To give Simec an opportunity to correct these widespread deficiencies, Commerce issued two supplemental questionnaires, and ultimately granted several extensions of time for Simec's responses. *Id.* at 8, 12, 15. However, Simec's supplemental responses "left a breadth of deficiencies unresolved and did not {include} responses to a portion of the supplemental questionnaire{s}." *Id.* at 20; *see also id.* at 15. Commerce acknowledged Simec's argument that the agency did not need or could self-correct certain data flagged in the PDM as missing, incomplete, or unreliable. *Id.* at 15-16. However, Commerce found that it could not reliably determine how to implement corrections to the data that Simec submitted or even be sure that any adjustments would accurately and appropriate resolve discrepancies in that data. *Id.* at 16. Moreover, without a complete record, Commerce was not in a position to reliably determine what deficient areas might be material to the margin calculation. *Id.*

Commerce published the final results of the review on June 8, 2022. *See Steel Concrete Reinforcing Bar From Mexico*, 87 Fed. Reg. 34,848 (Dep't Commerce June 8, 2022) (final results of antidumping duty admin. rev.; 2019-2020), ECF No. 18-4. Consistent with its final determination, Commerce instructed U.S. Customs & Border Protection ("CBP") to begin

collecting 66.70% cash deposits on Simec's incoming imports of rebar. *See, e.g., id.* at 34,850. Simec filed its summons and complaint on July 11, 2022 and August 8, 2022, respectively. Summons (July 11, 2022), ECF No. 1; Compl. (Aug. 8, 2022), ECF No. 8. On August 19, 2022, this Court entered an injunction against liquidation of Simec's 2019-2020 entries of rebar, preserving them for treatment consistent with the final and conclusive judicial determination in this action. Order for Statutory Inj. Upon Consent (Aug. 19, 2022), ECF No. 10. On December 7, 2022, Simec filed a motion to enjoin CBP "from collecting cash antidumping deposits upon entry" of products made or exported by Simec (as defined to comprise all of the companies that Commerce collapsed into the combined Simec entity) and subject to the antidumping duty order on Mexican rebar. *See* Simec's Motion at Proposed Order.

## III.    **THE COURT SHOULD DENY SIMEC'S MOTION**

The Court should deny Simec's motion. As detailed below, Simec has failed to make any of the four showings required for the extraordinary relief that it requests. Simec has not demonstrated that it will suffer irreparable harm absent an injunction. It has not demonstrated that either the balance of hardships or the public interest favor an injunction. It has not shown that it has a likelihood of success on the merits. Further, even if Simec could make any of these showings, the relief that it has requested is overbroad and inconsistent with the statutory scheme that Congress has enacted regarding cash deposits, as well as with the rules of the Court.

### A.    **Legal Standards Governing Injunctions Against the Collection of Cash Deposits**

When Commerce makes a final affirmative determination in an antidumping duty investigation, it instructs CBP to collect estimated duties, known as "cash deposits," on incoming entries of goods subject to the order. *See* 19 U.S.C. § 1673d(c)(1)(B). Every year subsequent to the order's publication, interested parties may request an administrative review of imports made

over the prior year. 19 U.S.C. § 1675(a)(1); 19 C.F.R. § 351.213(b). If no request is filed as to a particular subject manufacturer or exporter, Commerce will instruct CBP to liquidate (*i.e.*, conduct final duty assessment) on that manufacturer or exporter's entries at the cash deposit rate identified in the order. *See, e.g.*, 19 C.F.R. §§ 351.212(a) & (c); *see also Decca Hosp. Furnishings, LLC v. United States*, 30 CIT 357, 359, 427 F. Supp. 2d 1249, 1252 (2006). If a review is requested, Commerce will review the manufacturer or exporter's pricing and cost behavior over the prior year and use this information to update the prior estimate of dumping liability. *See, e.g.*, 19 C.F.R. § 351.212(b). Commerce will then instruct CBP to liquidate the entries made during the review period at the updated dumping margin. *Id.* The updated dumping margin also becomes the new cash deposit rate for incoming entries. *See, e.g.*, *Decca Hosp.*, 30 CIT at 359, 427 F. Supp. 2d at 1252. The new cash deposit rate remains valid until either the time for requesting the next year's administrative review expires without a relevant request, or the next administrative review is completed. *See, e.g.*, *id.*

Because final duty assessment regarding an entry (*i.e.*, liquidation) cannot typically be undone, federal statute calls for liquidation to be suspended pending the time for requesting an administrative review and "during the pendency of any such review." *See, e.g.*, *id.*, 30 CIT at 360, 427 F. Supp. 2d at 1252. This Court also may, and traditionally does, enjoin liquidation for the duration of litigation arising from a particular administrative review, thus preserving the entries made during the review period for final disposition consistent with judicial proceedings. *See id.*; *see also* Order for Statutory Inj. Upon Consent (Aug. 19, 2022), ECF No. 10.

Injunctions against cash deposit collection, by contrast, are very rare. For example, the Court has enjoined CBP's collection of cash deposits pursuant to that agency's own determination, found *ultra vires* by the Court, that particular goods are within the scope of an outstanding

antidumping duty order. *Sunpreme Inc. v. United States*, 145 F. Supp. 3d 1271, 1294-1298 (Ct. Int'l Trade 2016). Similarly, the Court has issued a writ of mandamus to compel Commerce to amend a cash deposit rate that had already been found unlawful by the Court and that Commerce itself had disavowed. *See generally Decca Hosp.*, 30 CIT 357, 427 F. Supp. 2d 1249.

An injunction against cash deposits that have not been adjudged legally erroneous, and that are being collected consistently with Commerce's directions under a statutory and regulatory scheme that calls for their collection, is almost unheard of. *Shanghai Tainai Bearing Co. v. United States*, 582 F. Supp. 3d 1299 (Ct. Int'l Trade 2022) (denying motion to enjoin collection of cash deposits at rate established in the final results of administrative review); *Gujarat Fluorochemicals Ltd. v. United States*, 578 F. Supp. 3d 1346 (Ct. Int'l Trade 2022) (same); *Shandong Huarong Gen. Grp. Corp. v. United States*, 24 CIT 1279, 122 F. Supp. 2d 1367 (2000) (same); *Shree Rama Enters. v. United States*, 21 CIT 1165, 983 F. Supp. 192 (1997) (same); *Chilean Nitrate Corp. v. United States*, 11 CIT 538 (1987) (dissolving temporary restraining order against collection of cash deposits); *see also Sunpreme Inc. v. United States*, 181 F. Supp. 3d 1322, 1330-1344 (Ct. Int'l Trade 2016) (denying motion to enjoin collection of cash deposits on entries made after Commerce's initiation of a scope inquiry); *Olympia Indus., Inc. v. United States*, 30 CIT 12 (2006) (denying motion to enjoin collection of cash deposits on entries subject to a Commerce scope ruling). Indeed, it appears that only two such injunctions have been issued, neither in the last twenty years. *See* Order, *Jiangsu Hilong Int'l Trading Co. v. United States*, CIT Ct. No. 02-00311 (June 4, 2002), ECF No. 15 ("*Jiangsu Hilong* Order"); *Queen's Flowers de Colom. v. United States*, 20 CIT 1122, 947 F. Supp. 503 (1996).

To prevail in a motion to enjoin the collection of cash deposits at the rate established by Commerce in an administrative review, a movant must demonstrate that (1) it will be irreparably

harmed in the absence of equitable relief; (2) the balance of hardships favors the injunction; (3) it is in the public interest to grant the requested relief; and (4) the movant is likely to succeed on the merits of the underlying case. Below, RTAC addresses each factor in turn, and explains why Simec has failed to demonstrate its entitlement to the requested relief.

### B.     Simec Fails to Demonstrate Irreparable Harm

Payment of cash deposits is statutorily required with respect to goods subject to antidumping and countervailing duty orders. 19 U.S.C. §§ 1673d(c)(1)(B)(ii), 1673e(a)(3), 1675(a)(I), 1675(a)(2)(B)(iii), and 1675(a)(2)(C). In addition, federal law provides for protection against economic losses sustained as a result of cash deposits by authorizing refunds with interest in the event that the antidumping or countervailing duty rate is reduced. *See* 19 U.S.C. §§ 1671f, 1673f & 1677g. Reflecting these facts, the proponent of an injunction against cash deposits "has an extremely heavy burden, particularly on the question of injury." *See Queen's Flowers*, 20 CIT at 1125, 947 F. Supp. at 506.

In the two instances in which the Court has enjoined the collection of cash deposits in an action arising from Commerce's administrative review of an antidumping duty order, it has characterized the harm required to support such injunctions as "immediate extinction" in the absence of relief, *see id.*, 20 CIT 1126, 947 F. Supp. at 506-07, or "a palpable threat of imminent bankruptcy . . . ." *See Jiangsu Hilong* Order at 15.

Subsequent case law reflects the view that "immediate" or "imminent" closure is the only harm sufficient to justify an injunction against duties or cash deposits. For example, in *Corus Grp. PLC v. Bush*, 26 CIT 937, 943-44, 217 F. Supp. 2d 1347-49, 1355 (Ct. Int'l Trade 2002), the Court denied an injunction against collection of safeguard duties, finding that while duty payment might result in operating losses, revenue shortfalls, or the possibility of "closure at some future date," the plaintiff had not established that duties would result in "imminent closure." Likewise, in *Olympia*

*Indus.*, 30 CIT at 13-14, 17, the Court refused to enter an injunction in a challenge to a scope ruling, where the plaintiff did not allege that it would be imminently forced to close in the absence of relief, but only that it had "weak" financial results, such that posting duties on its imports would "make a major difference in {the} cash flow for the company."

Nor is it sufficient to simply allege imminent closure in the absence of an injunction. Rather, the allegation must be supported by hard financial data showing, for example, that the plaintiff lacks the capital reserves to remain viable during litigation, and cannot otherwise obtain financing to sustain its business. *See, e.g.*, *Shandong Huarong*, 24 CIT at 1283-84, 122 F. Supp. 2d at 1370-1371 (rejecting customer affidavit as support for contention that movant would imminently go out of business due to customer's cancellation of orders); *Chilean Nitrate*, 11 CIT at 541.

Simec fails to meet these high standards. Simec alleges that in the absence of an injunction, it will be "completely shut out of the U.S. market" and may lose certain customers "forever." Simec's Motion at 16, 18. The type of injury required for Simec to prevail here is not that of being excluded from the U.S. market or losing customers, but "immediate extinction." *See Queen's Flowers*, 20 CIT at 1125-26, 947 F. Supp. at 506-07. While Simec cites *Decca Hospitality* as support for the proposition that exclusion from the U.S. market is sufficient, the legal and factual predicates of that case are too distinct to support Simec's position here. Specifically, the Court in *Decca Hospitality* issued a writ of mandamus after Commerce refused to amend a judicially-invalidated cash deposit rate, despite the agency's own rejection of the judicially-invalidated rate on remand. *See generally Decca Hosp.*, 30 CIT 357, 427 F. Supp. 2d 1249. A writ of mandamus, unlike a preliminary injunction, does not require a showing of irreparable harm. *See, e.g., id.*, 30

Consol. Ct No. 22-00202                                    NON-CONFIDENTIAL VERSION

CIT at 365 n.14, 427 F. Supp. 2d at 1257 n.14. Simec makes no claim to meet the distinct requirements of a writ of mandamus. *See generally* Simec's Motion.

Simec also relies on this Court's June 4, 2002 order in *Jiangsu Hilong Int'l Trading Co., Ltd. v. United States*. Simec's Motion at 18-19. But in *Jiangsu Hilong*, the movant did not simply claim to be excluded from the U.S. market, but to be on the brink of bankruptcy as a result. *Jiangsu Hilong* Order at 13. Further, it provided "a letter from the Indust{r}y & Commercial Bank of China" confirming its "dire financial circumstances." *Id.* The Court found that it was the "palpable threat of imminent bankruptcy" established by this evidence that constituted irreparable harm. *Id.* at 15.

To be sure, while the principal harms that Simec alleges appear to be its exclusion from the U.S. market and/or loss of customers and market share, it also implies that the cash deposit rate established in the 2019-2020 administrative review threatens it with "immediate economic extension {sic}." Simec's Motion at 33-34. More particularly, it alleges that the 66.70% cash deposit rate [

]. *Id.* at 19. As an initial matter, while these allegations of harm [                                ], Simec's proposed injunction would cover all of the plaintiff Simec companies. *Id.* at 19 and Proposed Order. Thus, even if Simec's evidence reliably demonstrated imminent, irreparable harm to [                ], Simec's motion would be overbroad.

Further, Simec has provided no evidence [

] beyond unsworn declarations supplied by company personnel. *Id.* at Exhibits 1 & 2. This Court has rejected evidence of this nature as insufficient to justify an injunction against cash deposits. *See, e.g.*, *Shandong Huarong*, 24 CIT at 1283-84, 122 F. Supp. 2d at 1370-71; *Shree*

Case 1:22-cv-00202-SAV   Document 36   Filed 12/28/22   Page 16 of 86

Consol. Ct No. 22-00202                              NON-CONFIDENTIAL VERSION

*Rama Enters.*, 21 CIT at 1167-68, 983 F. Supp. at 195; *Companhia Braseileira Carbureto de Calcio v. United States*, 18 CIT 215, 217 (1994); *Chilean Nitrate*, 11 CIT at 541. Nor does the harm that these declarations allege appear reasonably "imminent," a term that the Court has construed as requiring "immedia{te}" or "instant" occurrence. *Shanghai Tainai*, 582 F. Supp. 3d at 1309. For example, the declarations refer to certain lost revenue amounts estimated to manifest over the next 6-7 months, and to market share that may deteriorate over the next year and a half. Simec's Motion at Exhibit 1, paras. 6 & 8.

Notably, even if the conditions that Simec envisions developing over the next six-plus months can reasonably be considered "imminent," Simec's cash deposit rate is scheduled to change by April 6, 2023. Simec is participating in the ongoing 2020-2021 administrative review of the order. *See Steel Concrete Reinforcing Bar From Mexico*, 87 Fed. Reg. 75,032 (Dep't Commerce Dec. 7, 2022) (prelim. results of antidumping duty admin. rev.; 2020-2021). Commerce has already issued the preliminary results of that review, and final results – with a new cash deposit rate applicable to Simec's incoming entries after the publication date of those results – are due to be issued no later than 120 days thereafter. *See id.* at 75,033. Accordingly, even if Simec could show irreparable harm, an injunction does not appear necessary in order to provide it relief pursuant to its own time-table.[4]

Beyond the two declarations from its personnel, Simec provides two letters from U.S. customers. Simec's Motion at Exhibits 3 & 4. These letters do not indicate how much of any Simec

---

[4]     For that matter, Simec's proposed injunction order would prohibit CBP from collecting *any* cash deposits on Simec's rebar pending the final and conclusive outcome of this litigation. *See* Simec's Motion at Proposed Order. The proposed injunction would thus not only affect entries impacted by 2019-2020 review, it would extend to entries subject to the final results of an ongoing and as-yet-unappealed administrative review. This underscores the degree to which Simec's motion is overbroad, and would inappropriately displace the statutory scheme for the enforcement of trade remedy orders.

plaintiff company's U.S. or overall sales volume depends on these customers, and thus do not reasonably support a claim of imminent bankruptcy or extinction. *Id.*; *see also Shandong Huarong*, 24 CIT at 1283-84, 122 F. Supp. 2d at 1370-71 (rejecting, as evidence of irreparable harm, a customer affidavit that did not demonstrate with particularity how loss of that customer would affect the movant). Rather, the letters indicate that these customers – who are not parties to this appeal – face long lead times when trying to purchase from other Mexican rebar producers, or higher prices when purchasing domestically. Simec's Motion at Exhibits 3 & 4. While these letters imply that Simec's decision to cease importing is inconvenient for these customers, they provide no support for the notion that Simec faces an imminent threat of irreparable harm. They do not even support the assertion that Simec has, or is imminently likely to, permanently lose these customers, as they appear eager to resume purchasing from the company. *Id.*

Simec argues that it need not demonstrate that it is on the brink of bankruptcy in order to demonstrate irreparable harm, citing a case in which a company infringing a patent was preliminarily enjoined from continuing its infringing activity. *Id.* at 19-20. But the harm required to support an injunction against cash deposits cannot reasonably be compared with the harm required to support a preliminary injunction against patent infringement. There is no federal law that calls for the infringement of patents. By contrast, the requirement that an importer of goods covered by a trade remedy order pay cash deposits is a "typical inconvenience" that is "envisioned by the statutory scheme." *Shanghai Tainai*, 582 F. Supp. 3d at 1311. Movants requesting injunctions against cash deposits "bear{} an extremely heavy burden" precisely because "paying deposits pending Court review is an ordinary consequence of the statutory scheme" that Congress has created for trade remedy orders. *Shandong Huarong*, 24 CIT at 1282, 1286, 122 F. Supp. 2d at 1369, 1372.

BUSINESS PROPRIETARY INFORMATION
HAS BEEN DELETED

In sum, Simec has not shown that it faces harm of the immediacy and quality that this Court has found supportive of the extraordinary remedy of an injunction against cash deposits. Indeed, the forthcoming final results of the 2020-2021 antidumping duty review stand to alter its cash deposit rate significantly before the harm that it alleges (but has not proven) can fully manifest.

### C.     <u>The Balance of Hardships Does Not Favor Simec</u>

The issue of balance of hardships is closely tied to that of irreparable harm. In the most common type of preliminary injunction motion to come before this Court, the plaintiff asks the Court to suspend liquidation of entries, thus preserving judicial review. In the absence of an injunction, plaintiff will suffer irreparable harm; on the other hand, the Government and domestic injury must merely await liquidation for a while. In such a situation, the balance clearly favors the movant.

Here, however, the situation is quite different. Simec is not asking the Court to prevent an event (liquidation) that would legally deprive the Court of jurisdiction. *See* Simec's Motion at 34-35. Rather, in the interest of preserving its American sales and [               ], it requests that it be allowed to import without the duties necessary to protect the U.S. industry, or to make the Government whole in the event that Simec's challenge fails. *Id.* In this case, the balance is clearly not in Simec's favor.

As detailed above, Simec has not adequately demonstrated irreparable harm. Moreover, Simec's interests are already protected by statute. Under 19 U.S.C. §§ 1673f & 1677g, importers that post cash deposits may reclaim any amount later determined to be owed to them as a result of either court or agency action, with interest. On the other hand, were the Court to grant the relief requested here, RTAC would be unfairly deprived of the results of the administrative review before any judicial determination as to its appropriateness had been handed down. The Government would also risk the inability to collect the full amount owed on Simec's imports of subject goods.

Consol. Ct No. 22-00202                                    NON-CONFIDENTIAL VERSION

This is no small matter. Simec estimates that it will lose [      ] million in [      ] sales revenue

from the date of its motion through June of 2023 in the absence of an injunction, an amount that

corresponds to [      ] million in duties at the 66.70% rate. Simec's Motion at Exhibit 1, para 6.[5]

Even if just four months of sales are under consideration (given the expected April 6, 2023 final

results of the 2021-2022 administrative review, which will alter the deposit rate), the duty amount

would be more than [      ] million.[6]

Notably, while Simec argues that the customs bond on file for its entries will protect the

Government, Simec's Motion at 34, this is not at all clear. As this Court has previously noted,

standard customs bonds are set at an amount equal to 10% of the duties that an importer has paid

on imports over the prior year. *Shanghai Tainai*, 582 F. Supp. 3d at 1311. Given that Simec has

not imported any rebar over the past six months, and its cash deposit rate immediately prior to the

final results of the 2019-2020 administrative review was 4.93%, it appears unlikely that Simec's

existing customs bond would be sufficient to make the government whole. *See* Simec's Motion

at 19; *Steel Concrete Reinforcing Bar From Mexico*, 86 Fed. Reg. 50,527, 50,528 (Dep't

Commerce Sept. 9, 2021) (final results of antidumping duty admin. rev. and final deter. of no

shipments; 2018-2019).

Simec's motion also fails to acknowledge USCIT Rule 65(c). *See generally* Simec's

Motion. That rule states that the Court may issue a preliminary injunction "only if the movant

---

[5]      Simec states that it lost [      ] million in U.S. sales in June and July of 2022. Assuming
that Simec would otherwise ship [      ] million in rebar to the U.S. market each month, its sales
from December 2022 through June 2023 would equal $[      ] million.

[6]      Again, RTAC notes that Simec has drafted its proposed injunction not simply to enjoin the
collection of cash deposits through the final results of the 2020-2021 administrative review but the
collection of any cash deposits through the end of this litigation. *See* note 4, *supra*. While RTAC
respectfully submits that no injunction is merited here, the lengthy injunction that Simec seeks is
utterly at odds with the statutory scheme.

gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." USCIT R. 65(c). The Court has previously refused to issue preliminary injunctions in disregard of this rule. *See Inmax Sdn. Bhd. v. United States*, Ct. No. 17-00205, slip op. 17-101 at 7 (Ct. Int'l Trade Aug. 8, 2017); *Sunpreme v. United States*, 145 F. Supp. 3d at 1298. Simec has not offered to post a bond in any amount, much less one reasonably calculated to make the Government whole should Simec not succeed on the merits of its case.

In sum, Simec does not persuade that the balance of hardships weighs in favor of its motion.

**D.       Simec's Proposed Injunction is Not in the Public Interest**

Simec argues briefly that the public interest will be served by an injunction, stating that the public interest is served by "meaningful judicial review of an unlawful administrative action," as well as by preserving its U.S. customers' ability to access Simec's rebar. Simec's Motion at 33-34. These assertions are unavailing.

Congress has clearly expressed its desire that imported goods subject to trade remedy orders be subject to cash deposits, in order to protect the revenue and the petitioning domestic industry. *See, e.g.*, *Shree Rama*, 21 CIT at 1168, 983 F. Supp. at 196 (recognizing that the statutory cash deposit requirement reflects the public interest in "protecting the government from default"); *Shandong Huarong*, 24 CIT at 1285-86, 122 F. Supp, 2d at 1372 (same). As such, any relief that puts the revenues at jeopardy should be granted only sparingly, upon showing of the most serious and irreparable harm. As discussed at length above, Simec has not made that showing. While Simec alleges that its existing customs bond can protect the revenue, this is far from evident, and Simec does not even acknowledge the bonding requirements of USCIT R. 65(c). *See* discussion *supra* at 14.

Further, the antidumping laws – inclusive of their requirements that importers of goods subject to trade remedy orders post cash deposits – exist to "to prevent harm to {the} domestic industry's bottom line." *See Wheatland Tube Co. v. United States*, 495 F.3d 1355, 1364 (Fed. Cir. 2007). Mexican manufacturers of rebar, including Simec, have previously been found to materially injure the bottom lines of U.S. producers such as RTAC's members through their sales at dumped prices. *See, e.g.*, *Steel Concrete Reinforcing Bar From Mexico*, 79 Fed. Reg. 65,925 (Dep't Commerce Nov. 6, 2014) (antidumping duty order). Simec, however, would have RTAC go without the relief that Congress has provided for by law.

In this situation, it is clear that the public interest would not be best served by entry of injunctive relief that risks the public revenue, leaves the domestic rebar industry without relief due to it, and that cannot be said to promote the effective administration of the trade laws.

### E.    Simec Has Not Shown a Likelihood of Success on the Merits

Simec devotes the majority of the brief supporting its motion toward arguing that it is likely to prevail on the merits. *See* Simec's Motion at 20-33. But Simec's arguments do not establish that it has even a fair chance of success. Further, even if Simec could show a fair chance of success on the merits, this would not justify an injunction here, given its failure to (1) demonstrate that it stands to suffer immediate, irreparable harm, (2) show that the balance of hardships favors the injunction, and (3) show that the public interest would best be served by injunctive relief.

#### 1.    Simec's Arguments are Misplaced

Simec does not establish even a fair likelihood of success. As noted above, Simec is an experienced respondent that was selected for individual examination in several prior administrative reviews of the order, and which requested a review of its 2019-2020 imports. Upon receiving Commerce's initial questionnaires – which were consistent with the agency's initial questionnaires generally and those that Simec had received as a mandatory respondent in prior reviews – Simec

was given multiple extensions of time to respond to them. IDM at 7. Yet, it provided initial responses reflecting "unusually extensive" deficiencies that affected "virtually every part" of the questionnaires. *Id.* at 8, 27; PDM at 4-5. To give Simec the opportunity to cure such broad-based deficiencies, Commerce was forced to issue more than 200 supplemental questions. *Id.* at 8, 27; PDM at 4-5. The agency granted multiple extensions of time for Simec's responses, but Simec (1) failed to correct many of the originally-identified deficiencies, while affirming at times that it had done so, and (2) failed to timely file responses to questions on its downstream sales. IDM at 27-29. As Commerce noted, this left "the home market and U.S. sales data {} riddled throughout with deficiencies to such an extent that it {was} simply impossible {} to calculate an accurate dumping margin using the data submitted." *Id.* at 28. The agency thus applied adverse inferences pursuant to 19 U.S.C. § 1677b(e). *See id.* at 29.

Simec argues that it has a likelihood of success on the merits for six reasons. Simec's Motion at 21-33. First, it argues that Commerce abused its discretion in applying adverse inferences, because the agency (1) failed to identify gaps in the record with particularity, (2) much of the information it identified as missing or unreliable was present and usable, and (3) other gaps or discrepancies were either minor or irrelevant. *Id.* at 21-25. Second, Simec argues that Commerce failed to adequately support the conclusion that Simec did not cooperate to the best of its ability with the agency's requests for information. *Id.* at 25-26. Third, Simec argues that Commerce's rejection of new factual information that Simec submitted on October 18, 2021 was contrary to law. *Id.* at 26-28. Fourth, Simec argues that Commerce failed to adequately notify it of alleged deficiencies in its questionnaire responses or provide an opportunity to cure them. *Id.* at 28-29. Fifth, Simec argues that the 66.70% adverse rate was unreasonable and unlawfully punitive. *Id.*

at 29-30. Sixth, Simec argues that Commerce abused its discretion in rejecting Simec's requests for extensions of time in which to submit questionnaire responses. *Id.* at 31-33.

As detailed below, Simec does not have a fair likelihood of success with respect to any of these claims.

> a.    *Simec Does Not Persuade That Commerce Abused its Discretion in Applying Adverse Inferences*

First, Simec argues that Commerce abused its discretion in applying adverse inferences, because (1) the agency failed to identify gaps in the record with particularity, (2) much of the information it identified as missing or unreliable was present and usable, and (3) other gaps or discrepancies were either minor or irrelevant. *Id.* at 21-25. In this regard, Simec argues that Commerce made only broad, unsupported assertions as to the gaps in the record. *Id.* at 21-23. Simec also argues that, to the extent that the agency identified gaps, those identifications were erroneous (because the information was in fact on the record), or irrelevant and immaterial. *Id.* at 23-25. Simec concludes that the only actual gap on the record is the lack of timely responses to questions regarding downstream sales data, *id.* at 23, a gap that it characterizes as insufficient to justify the application of total adverse inferences.

Simec's arguments are without merit.[7] Commerce identified multiple, broad areas of deficiency that left it without any reliable "sales-related information that can be used as a basis for conducting a dumping analysis." PDM at 5-7. In its motion, Simec cherry-picks specific

---

[7]    RTAC notes that the parties have separately briefed the question of whether the administrative record should be amended to include and reflect the "Deficiencies Memorandum" that is referenced multiple times in the IDM. *See, e.g.*, IDM at 15-16, 24-26. As indicated in RTAC's reply to Defendant's motion for leave to correct the administrative record, RTAC believes that the document is already legally part of the administrative record, as a document that Commerce prepared and considered simultaneously with the IDM. However, because the controversy has not yet been resolved, RTAC has not relied on the Deficiencies Memorandum in making its arguments here.

Consol. Ct No. 22-00202                                   NON-CONFIDENTIAL VERSION

deficiencies flagged in Commerce's PDM, arguing that it either actually provided the requested data or that the deficiencies are minor or irrelevant. Simec's Motion at 22-25. This cherry-picking ignores the majority of the identified deficiencies, including those that are "potential drivers of a margin," such as discrepancies in payment terms and a failure to demonstrate that the correct universe of U.S. sales was reported. IDM at 16; PDM at 5-6.

Moreover, even with respect to its cherry-picked examples, Simec does not persuade that Commerce erred. For example, Simec claims that it appropriately responded to Commerce's request that Simec explain why it had reported what appeared to be quantity adjustments as price adjustments. Simec's Motion at 22; PDM at 5. But it did not do so. Simec reported its [

] in its original questionnaire response. *See* Letter from Squire Patton Boggs (US) LLP to Sec'y Commerce, re: *Steel Concrete Reinforcing Bar from Mexico* (Mar. 31, 2021), C.R. 23-30, P.R. 61-62 at 21 and Exhibit B-1 ([

]) ("Section B QR"), excerpts attached as **Exhibit 2**. Commerce requested that Simec explain whether this was a really a quantity adjustment, and if so, to update the reporting to no longer reflect a change in the unit price. *See* Letter from SBA Strategy Consulting LLP to Sec'y Commerce, re: *Steel Concrete Reinforcing Bar from Mexico: Submission of Section ABC Supplemental Questionnaire Response* (Sept. 8, 2021), C.R. 125-165, P.R. 106-130 at 25 ("A-C Supp. QR"), excerpts attached as **Exhibit 3**. Simec admitted that it was a quantity adjustment and claimed to have amended its reporting accordingly. *Id.* But in fact, Simec merely changed the name of the adjustment from BILLADJH to QTYADJH, while [                                            ]. In particular, the information reported under BILLADJH in its first home-market sales database was [                    ] as the information reported under QTYADJH in its revised home-market sales database: [                              ]. *Compare* [                    ] in Section B QR at Exhibit B-1 (HM

Consol. Ct No. 22-00202                                          NON-CONFIDENTIAL VERSION

sales database), *with* A-C Supp. QR at Exhibit SQ1B-14 (HM sales database). Likewise, the

reported quantity for this sale [                    ]. *Id.* Thus, as the Department stated in its preliminary

results, while it requested that Simec update its reporting to reflect a quantity adjustment, Simec

did not do this.

The situation is similar with respect to Simec's argument regarding its failure to correct the

discrepancy between its yield strength and Control Number ("CONNUM")[8] reporting for two

sequence numbers in its home-market sales database. Simec's Motion at 24. As an initial matter,

Simec reported to Commerce that it corrected its reporting for these sequence numbers, as

requested in Question 27d of the supplemental Sections A-C questionnaire. *See* A-C Supp. QR

at 16-17. In its motion, Simec does not claim to have actually corrected the database (despite telling

Commerce otherwise), but characterizes its failure as minor in light of the overall number of

sequence numbers in the database. Simec's Motion at 24. But not only did Simec claim to have

made corrections that it did not in fact make, Simec ignores the fact that it also failed to update its

database to resolve other discrepancies between its yield strength and CONNUM reporting, as

identified in Questions 27a-c. *Compare* A-C Supp. QR at 16-17 *with* Exhibit SQ1B-14 (HM sales

database).

Simec argues that even if it did not make requested corrections to its databases, Commerce

could have made its own updates consistent to reflect information that Simec provided narratively,

such as the manufacturer identity for rebar sold by Sigosa in Mexico. Simec's Motion at 22-23.

---

[8]     CONNUMS are a concatenation of various codes relating to the characteristics of particular
product models. The CONNUMs for this case included codes mapping on to the yield strength
of the rebar that respondents sold in their home and U.S. markets. Proper (and internally consistent)
CONNUM and characteristics reporting is fundamental to accurate margin calculations, as
Commerce uses this reporting to ensure that U.S. sales are compared with home-market sales of
identical goods, or the most similar goods possible.

But it is not Commerce's job to amend the databases; it is the respondent's job to make the corrections requested – and particularly where it actively states in its narratives that it has done so. *See* A-C Supp. QR at 37 (asserting to Commerce that Simec had updated its reporting of manufacturer identity for Sigosa's home-market sales) and Exhibit SQ1B-14 (HM sales database) (failing to reflect corrections asserted to have been made). Simec also fails to recognize that is not the only deficiency that Commerce identified regarding Sigosa's sales reporting. *See* PDM at 6.

Simec asserts that certain deficiencies identified by Commerce are irrelevant, because they relate to data that would not be used in the margin calculations. Simec's Motion at 24-25. But as Commerce explained, information that is not ultimately used in the margin calculations may nonetheless be used to identify clear errors in other information that is, in fact, used in the calculations. PDM at 5 (regarding delivery terms and movement expenses). Further, without complete and accurate responses to its questions, Commerce cannot determine whether certain categories of information are actually immaterial. IDM at 24. Simec's speculations regarding potential materiality ignore its failure to cure multiple deficiencies, and thus to provide the agency with a reliable record.

Finally, Simec argues that the only actual gap in the record relates to its failure to submit any response to Questions 71-75 of the supplemental questionnaire, concerning downstream sales. Simec's Motion at 23. Simec characterizes this failure as insufficient to justify adverse inferences. But as discussed above and in Commerce's memoranda, this is far from the only gap or discrepancy in the record. PDM at 5-7; IDM at 15-16. Nor can the failure to submit downstream sales data be waived aside. Downstream sales can have a significant impact on margin calculations; without full and complete reporting on these sales, it was impossible for Commerce to accurately determine their impact or otherwise perform an accurate dumping calculation. PDM at 6 (noting

that Simec had not reported the expenses associated with downstream sales, thus making it impossible to accurately figure those sales into the margin calculations).

In sum, Simec does not persuade that Commerce failed to identify gaps in the record with particularity, or that the identified gaps were non-existent or immaterial. As such, Simec's arguments in this regard do not support its claim to a likelihood of success on the merits.

> b.     *Simec Does Not Persuade That it Acted to the Best of Its Ability*

Second, Simec argues that Commerce failed to adequately support its finding that Simec did not cooperate to the best of its ability to comply with agency information requests. Simec's Motion at 25-26. Simec argues that 19 U.S.C. § 1677e(b)'s "best of its ability" standard does not require "perfection" on the part of a respondent. *Id.* at 25. Simec also points to what it calls its "near-constant" communication with Commerce as evidence of its compliance with the "best of its ability" standard. *Id.* at 26.

Simec's claim to have complied with the standard is not convincing. The "best of its ability" standard "assumes that {respondents} are familiar with the rules and regulations" and "does {not} require findings of motivation or intent." *Nippon Steel Corp. v. United States*, 337 F.3d 1373, 1382-83 (Fed. Cir. 2003). Rather, to find non-compliance with the standard, Commerce must only determine that (i) "a reasonable and responsible {respondent} would have known that the requested information was required to be kept and maintained under the applicable statutes, rules, and regulations"; and (ii) that the respondent under investigation has failed to cooperate by either "failing to keep and maintain all required records, or . . . failing to put forth its maximum efforts to investigate and obtain the requested information from its records." *Id.* As the Court of Appeals for the Federal Circuit has made clear, this standard:

> {A}ssumes that {parties} are familiar with the rules and regulations that apply to the import activities undertaken and requires that {parties}, to avoid a risk of an adverse inference determination in responding to Commerce's inquiries: (a) take

Case 1:22-cv-00202-SAV   Document 36   Filed 12/28/22   Page 28 of 86

Consol. Ct No. 22-00202                           NON-CONFIDENTIAL VERSION

> reasonable steps to keep and maintain full and complete records documenting the
> information that a reasonable {party} should anticipate being called upon to
> produce; (b) have familiarity with all of the records it maintains in its possession,
> custody, or control; and (c) conduct prompt, careful, and comprehensive
> investigations of all relevant records that refer or relate to the imports in question
> to the full extent of the {parties'} ability to do so.

*Id.* at 1382; *see Peer Bearing Co.-Changshan v. United States*, 766 F.3d 1396, 1399-1400 (Fed.

Cir. 2014). The "best of its ability" standard "does not condone inattentiveness, carelessness, or

inadequate record keeping." *Nippon Steel*, 337 F.3d at 1382. "It is presumed that respondents are

familiar with their own records," and "{i}t is not an excuse that the employee assigned to prepare

a response does not know what files exist, or where they are kept, or did not think – through

inadvertence, neglect, or otherwise to look beyond the files immediately available." *Id.* at 1383.

Simec was an experienced respondent that had responded to questionnaires – including

questionnaires covering multiple affiliates and production locations – in prior reviews. *See, e.g.*,

*Rebar from Mexico* AR 14-15 Final Results, 82 Fed. Reg. at 27,233; *Rebar from Mexico* AR 16-

17 Final Results, 84 Fed. Reg. at 35,599; *Rebar from Mexico* AR 17-18 Final Results, 85 Fed. Reg.

at 71,053. As such, Simec knew what types of information would be required of it, having provided

such information multiple times in the past. The fact that it was unable to provide information of

the sort that it had previously reported multiple times indicates that the company failed to keep

adequate records of its sales for the 2019-2020 review period. Moreover, having requested a review

of its sales for 2019-2020, Simec should reasonably have anticipated being called upon to preserve

and organize those records.[9] Yet it filed initial questionnaire responses that were so riven with

---

[9]      Notably, one of the bases that Simec cited for needing extensions of time was the
complicated nature of its own internal organization. IDM at 4-5. But Simec has maintained a multi-
company structure for many years, and has previously been able to provide timely, complete
questionnaire responses regardless. *Rebar from Mexico* AR 14-15 Final Results, 82 Fed. Reg.
27,233 (noting Simec's status as a collapsed, multi-company entity).

deficiencies as to require Commerce to issue more than 200 supplemental questions. IDM at 27. It then failed to file timely responses to certain of these questions, while filing responses to others that did not cure the deficiencies. *Id.* at 15-16, 27. In light of the above, Simec's claim to have met the "best of its ability" standard does support its overall claim to a likelihood of success.

c.   *Simec Does Not Persuade That Commerce Erred in Rejecting Simec's New Factual Information*

Third, Simec argues that Commerce acted contrary to law in rejecting new factual information that Simec submitted on October 18, 2021. Simec's Motion at 26-28. Simec's October 18, 2021 submissions contained information related to issues raised in the supplemental questionnaires (such as downstream sales), but were made six weeks after its supplemental questionnaire responses were due (a date already extended by Commerce multiple times). IDM at 19-20. In making these submissions, Simec failed to follow the requirements for submitting new factual information, inasmuch as it neither identified the classification of the new information under the applicable regulations, or explained why submission was timely in accordance with those regulations. *Id.* at 17-19.

Simec nonetheless claims that judicial precedent required Commerce to accept the October 18, 2021 submissions as "corrective" information, but it fails to persuade on this point. Simec's Motion at 26-28. A comparison of the facts here with those underlying *Pro-Team Coil Nail Enter. v. United States*, 419 F. Supp. 3d 1319 (Ct. Int'l Trade 2019) is instructive. The court in *Pro-Team Coil* remanded Commerce's application of total adverse inferences based on rejection, as untimely, of a single schedule of data that "summarized information already on the record" and otherwise confirmed assertions that the respondent had already made. *Pro-Team Coil*, 419 F. Supp. 3d at 1332. Simec's rejected submissions, by contrast, contained entirely new

Case 1:22-cv-00202-SAV   Document 36   Filed 12/28/22   Page 30 of 86

Consol. Ct No. 22-00202                                    NON-CONFIDENTIAL VERSION

information; they were also far more extensive than a mere summary schedule of pre-existing information. *See* IDM at 17-20.

Further, Commerce was not required to waive its deadlines for submission of this new information. "{S}trict enforcement of time limits and other requirements is neither arbitrary nor an abuse of discretion when Commerce provides a reasoned explanation of its decision." *ArcelorMittal USA LLC v. United States*, 399 F. Supp. 3d 1271, 1279 (Ct. Int'l Trade 2019) (quoting *Maverick Tube Corp. v. United States*, 107 F. Supp. 3d 1318, 1331 (Ct. Int'l Trade 2015)). Commerce provided such an explanation here. IDM at 17-20. Nor was this rejection unusual. Rather, "Commerce . . . routinely *rejects* untimely-filed submissions" where, as here, a respondent fails to demonstrate good cause for their acceptance. *Dongtai Peak Honey Indus. v. United States*, 777 F.3d 1343, 1351–52 (Fed. Cir. 2015) (emphasis in original); *see also* IDM at 17-18. Further, Commerce does not err in rejecting untimely filed factual data where the respondent had the opportunity to submit it timely. *PSC VSMPO–Avisma Corp. v. United States*, 688 F.3d 751, 760-62 (Fed. Cir. 2012). Here, Simec cannot plausibly claim that it was unaware of the deadline for filing information responsive to the agency's questionnaires; indeed, it was given multiple extensions of time in which to submit such information. *See* discussion *infra* at 29 (noting that Simec was granted four extensions of time in which to submit its supplemental Sections A-C responses, inclusive of downstream sales data).

Finally, Simec appears to presume that Commerce would not have applied adverse inferences if it had accepted the untimely October 18, 2021 information. Simec's Motion at 26-28. But as Commerce explained, this is not so. Even if the untimely information had been submitted timely, it "would not have resolved the other outstanding deficiencies on the record . . . ." IDM at 20. Thus, even if Simec's arguments regarding Commerce's rejection of the October 18, 2021

NON-CONFIDENTIAL VERSION

were compelling (which they were not), they would be insufficient to reasonably call into question Commerce's application of adverse inferences. As such, these arguments do not support Simec's claim to a likelihood of success on the merits.

> d.    *Simec Does Not Persuade That Commerce Failed to Notify it of Deficiencies or Provide an Opportunity to Cure Them*

Fourth, Simec argues that Commerce failed to adequately notify it of deficiencies in its questionnaire responses or provide an opportunity to cure them. Simec's Motion at 28-29. Simec notes that 19 U.S.C. § 1677m(d) requires Commerce to provide notice of deficiencies, and an opportunity to remedy or explain them, prior to application of adverse inferences. *Id.* at 28. Simec complains that while Commerce's preliminary decision notes that Simec's supplemental responses raised new issues, Commerce did not issue an additional set of questionnaires to provide the company with an opportunity to address these new issues. *Id.* at 29; *see also* PDM at 5. Simec, however, misunderstands 19 U.S.C. § 1677m(d), which states that:

> If the administering authority or the Commission determines that a response to a request for information under this subtitle does not comply with the request, the administering authority or the Commission (as the case may be) shall promptly inform the person submitting the response of the nature of the deficiency and shall, to the extent practicable, provide that person with an opportunity to remedy or explain the deficiency in light of the time limits established for the completion of investigations or reviews under this subtitle. If that person submits further information in response to such deficiency and either—
>
> (1) the administering authority or the Commission (as the case may be) finds that such response is not satisfactory, or
>
> (2) such response is not submitted within the applicable time limits,
>
> then the administering authority or the Commission (as the case may be) may, subject to subsection (e), disregard all or part of the original and subsequent responses.

For its part, 19 U.S.C. § 1677m(e) requires Commerce to rely on "necessary" information that "does not meet all the applicable requirements" established by the agency, but only where the

information is (a) timely, (b) verifiable, (c) reliable, (d) the submitter has acted to the best of its abilities to provide all of the information and meet all applicable requirements, and (e) the information can be used without undue difficulties.

While Simec appears to read 19 U.S.C. § 1677m(d) as requiring Commerce to issue additional supplemental questionnaires upon receiving unsatisfactory responses to previous supplemental questionnaires, this is not so. Rather, the statute requires Commerce to advise respondents of deficiencies in their initial questionnaire responses, and provide an opportunity to cure these. Commerce did just that here, advising Simec of the pervasive issues cutting across its initial responses, and providing an opportunity – inclusive of multiple extensions of time – to submit corrective and explanatory information. PDM at 5-7; IDM at 15-16. However, as 19 U.S.C. §§ 1677m(d)(1)-(2) state, once Commerce has offered this opportunity for correction of initial responses, it is permitted to disregard any unsatisfactory or untimely supplemental response – and indeed, to the extent that the supplemental information is unsatisfactory/untimely, even the initial information. *See, e.g.*, IDM at 16. The only exception to this is for data that meets five pre-requisites, including timeliness, reliability, not requiring undue difficulty to use, and submission by a respondent that has acted to the best of its ability. 19 U.S.C. § 1677m(e).

While Commerce gave Simec an opportunity to correct and supplement its initial questionnaire responses, the supplemental data was "not satisfactory" within the meaning of 19 U.S.C. § 1677m(d), inasmuch as Simec failed to meaningfully address many deficiencies and in fact introduced new inconsistencies into its reporting. PDM at 5-7. Nor did Simec's initial and supplemental responses meet the five prerequisites of 19 U.S.C. § 1677m(e). As Commerce explained, these responses were so "incomplete, unreliable, and unsupported" that the record lacked "any sales-related information that can be used as a basis for conducting a dumping

analysis." *Id.* at 7; *see also* IDM at 25-26. The data were also submitted by a respondent that failed to act to the best of its ability, by not remedying errors identified in its initial responses despite being given an opportunity to do so, as well as by failing to submit requested data by established deadlines. PDM at 8. Commerce was also unable to use the data without undue difficulties, as it would have been forced to make unsupported assumptions and adjustments, without knowing whether those would in fact enhance or detract from its calculations' accuracy. IDM at 26; *see also* PDM at 5-7. Accordingly, Simec's arguments that Commerce erred in declining to issue additional supplemental questionnaires do not support its claim to a likelihood of success.

> ### e.   *Simec Does Not Persuade That the Adverse Rate is in Error*

Fifth, Simec claims that the 66.70% adverse rate assigned to it was unreasonable and unlawfully punitive. Simec's Motion at 29-30. It argues that an adverse rate must be no higher than required to induce respondents to provide complete and accurate data, and that a high degree of scrutiny must be applied where an adverse rate appears "punitive" or to be substantially in excess of the rate applied to cooperative companies. *Id.* These arguments are unconvincing.

In making them, Simec relies primarily on case law that precedes 2015 amendments to the statutory provisions for adverse inferences. *See id.* These amendments expressly authorized Commerce to employ, as an adverse rate, any dumping margin from a prior segment of a proceeding. 19 U.S.C. § 1677e(d)(1)(B); *see also* Sec. 502 of the Trade Preferences Extension Act of 2015, P.L. 114-27, 129 Stat. 362, 383-84 (June 29, 2015). The 66.70% rate applied to Simec here was from the original investigation; indeed, it was applied to Simec in that investigation, making it particularly appropriate in this instance. *See Steel Concrete Reinforcing Bar From Mexico*, 79 Fed. Reg. 54,967, 54,968 (Dep't Commerce Sept. 15, 2014) (final deter. of sales at less than fair value and final affirm. deter. of critical circumstances).

The 2015 amendments also gave Commerce the discretion to apply the "highest" margin from any prior segment of the proceeding. 19 U.S.C. §1677e(d)(2)(B). The amended statute also clarifies that Commerce is under no requirement to select an adverse rate that reflects a respondent's supposed "commercial reality" or the rate that it would have likely received had it cooperated. 19 U.S.C. § 1677e(d)(3).[10] As such, Simec's claim that the 66.70% rate was unlawful does not support its overall argument that it has a likelihood of success on the merits.

> f.    *Simec Does Not Persuade That Commerce Abused its Discretion in Rejecting Simec's Requests for Extensions of Time*

Sixth and finally, Simec argues that Commerce abused its discretion in rejecting Simec's requests for extensions of time in which to submit supplemental questionnaire responses, relying primarily on *Celik Halat ve Tel Sanayi A.S. v. United States*, 557 F. Supp. 3d 1348 (Ct. Int'l Trade 2022). Simec's Motion at 31-33. In that case, the Court found unreasonable Commerce's application of total adverse inferences after rejecting the entirety of a company's initial Sections B and C questionnaire responses because a single exhibit to the responses was filed 21 minutes late. *See Celik Halat*, 557 F. Supp. 3d at 1349.

*Celik Halat* is inapposite. As an initial matter, this is not a case in which Commerce outright refused to grant extensions of time. All told, four extensions of time were granted as to the supplemental Sections A-C questionnaire, while five extensions were granted as to the supplemental Sections A& D questionnaire.[11] Accordingly, while Commerce ultimately denied

---

[10]     Tellingly, while Simec appears to accept that an adverse rate should be sufficient to induce further cooperation, Simec's Motion at 29-30, it does not posit any alternative to the 66.70% rate. Indeed, the only rate for which it advocated at the agency was zero or *de minimis*, notwithstanding its failure to provide cure deficiencies, provide reliable or accurate data, or timely respond to all agency questions. *See* IDM at 27.

[11]     *See Extension of Time for Grupo Simec's Supplemental Questionnaire Responses* (Aug. 10, 2021), P.R. 83 attached as **Exhibit 4**; *Extension of Time for Grupo Simec's Supplemental Questionnaire Responses* (Aug. 23, 2021), P.R. 89, attached as **Exhibit 5**; *Extension of Time for*

two additional extension requests that Simec filed just before and on the extended due date for the

supplemental Sections A-C questionnaire, it did so only after offering multiple extensions of time.

*See* IDM at 10-11; *see also Extension of Time for Grupo Simec's Supplemental Questionnaire*

*Responses* (Sept. 7, 2021), P.R. 103, attached as **Exhibit 12**; *Response to Request for Extension of*

*Time for Grupo Simec's Supplemental Questionnaire Responses* (Sept. 9, 2021), P.R. 133,

attached as **Exhibit 13**. Further, while Commerce rejected Simec's attempt to untimely submit

certain responsive data, Simec only made this attempt six weeks after the extended deadline had

passed, and well beyond its own last-requested due date for the information. *See* IDM at 17-18.

Simec's reliance on *Celik Halat* is further misplaced because this case does not present a

situation in which adverse inferences were applied solely because a respondent failed to timely file

responses to particular questions posed by Commerce. As Commerce explains, while Simec failed

to timely submit certain data requested in the supplemental questionnaires, it also failed to correct

widespread deficiencies identified in the initial responses. *See* IDM at 20, 24; *see also* PDM at 4-7.

Indeed, even if it had timely submitted the late-filed data, those data "would not have resolved the

other outstanding deficiencies on the record." IDM at 20.

In sum, Simec's argument that Commerce abused its discretion in rejecting the company's

fifth and sixth requests for an extension of time in which to submit responses to certain questions

---

*Grupo Simec's Supplemental Questionnaire Responses* (Aug. 30, 2021), P.R. 94, attached as
**Exhibit 6**; *Extension of Time for Grupo Simec's Supplemental Questionnaire Responses* (Sept. 1,
2021), P.R. 97, attached as **Exhibit 7**; *Extension of Time for Grupo Simec's Supplemental*
*Questionnaire Responses* (Aug. 16, 2021), P.R. 87, attached as **Exhibit 8**; *Extension of Time for*
*Grupo Simec's Supplemental Questionnaire Responses* (August 31, 2021), P.R. 95, attached as
**Exhibit 9**; *Extension of Time for Grupo Simec's Supplemental Questionnaire Responses* (Sept. 3,
2021), P.R. 100, attached as **Exhibit 10**; *Extension of Time for Grupo Simec's Supplemental*
*Questionnaire Responses* (Sept. 9, 2021), P.R. 135, attached as **Exhibit 11**.

BUSINESS PROPRIETARY INFORMATION
HAS BEEN DELETED

Consol. Ct No. 22-00202                                    NON-CONFIDENTIAL VERSION

in the Supplemental Sections A-C questionnaire does not support its overall claim to a likelihood of success on the merits.

### 2.    An Injunction would Not Be Merited Even if Simec Could Demonstrate a Likelihood of Success

Even where the proponent of an injunction against cash deposits can show a likelihood of success on the merits, this is insufficient to justify an injunction in the absence of the other factors. For example, where a plaintiff has not demonstrated irreparable injury, an injunction should not issue, "even assuming a likelihood of success on the merits . . . ." *Shree Rama Enters.*, 21 CIT 1168, 983 F. Supp. 192 at 196. As discussed previously, Simec has not adequately demonstrated its claim of injury sufficient to support the extraordinary injunctive relief that it seeks. Further, the balance of hardships and the public interest – as clearly represented by Congress's desire that importers of goods subject to trade remedy orders pay cash deposits pending appeal – do not favor its claim. Thus, even if a likelihood of success were simply assumed here, an injunction should not issue.

### 3.    Conclusion

Simec does not persuade that it is likely to succeed on the merits of its case. Simec's claims that Commerce erred in assigning a rate based on adverse inferences are not compelling. Further, even if its substantive claims had merit, this would not be enough to justify the extraordinary relief that it seeks.

## IV.    <u>CONCLUSION</u>

For the foregoing reasons, this Court should deny Simec's motion for a preliminary injunction to enjoin cash deposits. In the event that the Court is inclined to grant Simec some form of injunction, that injunction should be narrowly tailored to cover only [

Consol. Ct No. 22-00202                                    NON-CONFIDENTIAL VERSION

] and to dissolve upon Commerce's publication of

the final results of the 2020-2021 administrative review.

Respectfully submitted,

*/s/ John R. Shane*
Alan H. Price, Esq.
John R. Shane, Esq.
Maureen E Thorson, Esq.
Jeffrey O. Frank, Esq.
Paul J. Coyle, Esq.

**WILEY REIN LLP**
2050 M Street, NW
Washington, DC 20036
(202) 719-7000

*Counsel to the Rebar Trade Action Coalition*

Dated: December 28, 2022

<u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to Chamber Procedure 2(B)(1), the undersigned certifies that this response complies with the word limitation requirement. The word count for Defendant-Intervenor Rebar Trade Action Coalition's Response to Motion for Preliminary Injunction Against Cash Deposits, as computed by Wiley Rein LLP's word processing system (Microsoft Word 2021), is 10,494 words.

<u>/s/ John R. Shane</u>
(Signature of Attorney)

<u>John R. Shane</u>
(Name of Attorney)

<u>Rebar Trade Action Coalition</u>
(Representative Of)

<u>December 28, 2022</u>
(Date)

NON-CONFIDENTIAL VERSION

## TABLE OF EXHIBITS

| Exhibit | Document | Pages | Record Document |
|---|---|---|---|
| 1 | Issues and Decision Memorandum accompanying *Steel Concrete Reinforcing Bar From Mexico*, 86 Fed. Reg. 68,632 (Dep't Commerce Dec. 3, 2021) (prelim. results of antidumping duty admin. rev.; 2019-2020) (excerpts) | 1-9 | P.R. 166 |
| 2 | Letter from Squire Patton Boggs (US) LLP to Sec'y Commerce, re: *Steel Concrete Reinforcing Bar from Mexico* (Mar. 31, 2021) (excerpts) | 20-21, Exhibit B-1 | P.R. 61-62 |
| 3 | Letter from SBA Strategy Consulting LLP to Sec'y Commerce, re: *Steel Concrete Reinforcing Bar from Mexico: Submission of Section ABC Supplemental Questionnaire Response* (Sept. 8, 2021) (excerpts) | 16-17, 25, 37, and Exhibit SQ1B-14 | P.R. 106-130 |
| 4 | *Extension of Time for Grupo Simec's Supplemental Questionnaire Responses* (Aug. 10, 2021) | All | P.R. 83 |
| 5 | *Extension of Time for Grupo Simec's Supplemental Questionnaire Responses* (Aug. 23, 2021) | All | P.R. 89 |
| 6 | *Extension of Time for Grupo Simec's Supplemental Questionnaire Responses* (Aug. 30, 2021) | All | P.R. 94 |
| 7 | *Extension of Time for Grupo Simec's Supplemental Questionnaire Responses* (Sept. 1, 2021) | All | P.R. 97 |
| 8 | *Extension of Time for Grupo Simec's Supplemental Questionnaire Responses* (Aug. 16, 2021) | All | P.R. 87 |
| 9 | *Extension of Time for Grupo Simec's Supplemental Questionnaire Responses* (August 31, 2021) | All | P.R. 95 |
| 10 | *Extension of Time for Grupo Simec's Supplemental Questionnaire Responses* (Sept. 3, 2021) | All | P.R. 100 |

**Consol. Ct No. 22-00202**                                     **NON-CONFIDENTIAL VERSION**

| 11 | *Extension of Time for Grupo Simec's Supplemental Questionnaire Responses* (Sept. 9, 2021) | All | P.R. 135 |
|----|----|----|----|
| 12 | *Extension of Time for Grupo Simec's Supplemental Questionnaire Responses* (Sept. 7, 2021) | All | P.R. 103 |
| 13 | *Response to Request for Extension of Time for Grupo Simec's Supplemental Questionnaire Responses* (Sept. 9, 2021) | All | P.R. 133 |

# EXHIBIT 1

Barcode:4186374-02 A-201-844 REV - Admin Review 11/1/19 - 10/31/20

UNITED STATES DEPARTMENT OF COMMERCE
International Trade Administration
Washington, D.C. 20230

A-201-844
Administrative Review
POR: 11/1/2019-10/31/2020
**Public Document**
E&C/OIII:  DL/KC

November 29, 2021

**MEMORANDUM TO:**      Ryan Majerus
Deputy Assistant Secretary
 for Policy and Negotiations,
  performing the non-exclusive functions and duties of the
  Assistant Secretary for Enforcement and Compliance

**FROM:**      James Maeder
Deputy Assistant Secretary
 for Antidumping and Countervailing Duty Operations

**SUBJECT:**      Decision Memorandum for the Preliminary Results of the
Administrative Review on the Antidumping Duty Order of Steel
Concrete Reinforcing Bar from Mexico; 2019-2020

## I.      SUMMARY

The Department of Commerce (Commerce) is conducting an administrative review of the antidumping duty (AD) order on steel concrete reinforcing bar (rebar) from Mexico in accordance with section 751(a) of the Tariff Act of 1930, as amended (the Act).  The period of review (POR) is November 1, 2019, through October 31, 2020.  The review covers 18 producers or exporters of the subject merchandise, of which we selected Deacero S.A.P.I. de C.V. (Deacero), and Grupo Simec as the mandatory respondents.[1]  We preliminarily determine that Deacero did not make sales of subject merchandise at prices below normal value (NV) during the POR.  Additionally, Commerce has preliminarily assigned Grupo Simec an AD margin based on the application of adverse facts available.

---

[1] *See Initiation of Antidumping Duty and Countervailing Duty Administrative Reviews*, 85 FR 3014 (January 17, 2020) (*Initiation Notice*).  In the 2018-19 review, Commerce collapsed 15 of the 18 firms listed in the *Initiation Notice* (*i.e.*, Aceros Especiales Simec Tlaxcala; Compania Siderurgica del Pacifico S.A. de C.V.; Fundiciones de Acero Estructurales, S.A. de C.V.; Grupo Chant, S.A.P.I. de C.V.; Grupo Simec; Operadora de Perfiles Sigosa, S.A. de C.V.; Orge S.A. de C.V.; Perfiles Comerciales Sigosa, S.A. de C.V.; RRLC S.A.P.I. de C.V.; Siderurgicos Noroeste, S.A. de C.V.; Siderurgica del Occidente y Pacifico S.A. de C.V.; Simec International, S.A. de C.V.; Simec International 6 S.A. de C.V.; Simec International 7, S.A. de C.V.; and Simec International 9 S.A. de C.V.) into the single entity "Grupo Simec."  *See, e.g., Steel Concrete Reinforcing Bar from Mexico:  Final Results of Antidumping Duty Administrative Review and Final Determination of No Shipments; 2018-2019*, 86 FR 50527 (September 9, 2021) (*2018-2019 AR Mexico Rebar Final*).



Barcode:4186374-02 A-201-844 REV - Admin Review 11/1/19 - 10/31/20

## II.      BACKGROUND

On November 6, 2014, Commerce published the *Order* in the *Federal Register*.[2]  On November 3, 2020, Commerce published a notice of opportunity to request an administrative review of the *Order*.[3]

Pursuant to section 751(a)(a) of the Act, and 19 CFR 351.213(b), on November 30, 2020, the petitioners[4] filed a request that Commerce conduct an administrative review of 17 entities.[5] Additionally, on November 30, 2020, Commerce received requests on behalf of individual producers and exporters for requests of Deacero, Sidertul S.A. de C.V., and Grupo Simec.[6]  On January 17, 2020, in accordance with 19 CFR 351.221(c)(1)(i), Commerce published a notice of initiation for this administrative review.[7]

In the *Initiation Notice*, we stated our intention that, in the event we limited the number of respondents for individual examination, to select respondents based on U.S. Customs and Border Protection (CBP) data.[8]  The petitioners and Deacero submitted comments on respondent selection and the CBP entry data placed on the record of the instant review.[9]  On February 8, 2021, we selected Deacero and Grupo Simec, the two largest exporters and/or producers of subject merchandise by volume during the POR, for individual examination as mandatory respondents.[10]  Commerce issued the initial questionnaire to Deacero and Grupo Simec on February 8, 2021, with responses submitted between March 11, 2021 and April 14, 2021.[11]

---

[2] *See Steel Concrete Reinforcing Bar from Mexico:  Antidumping Duty Order*, 79 FR 65925 (November 6, 2014) (*Order*).

[3] *See Antidumping or Countervailing Duty Order, Finding, or Suspended Investigation; Opportunity to Request Administrative Review*, 85 FR 69586 (November 3, 2020).

[4] The petitioners are the Rebar Trade Action Coalition (RTAC) and its individual members, Nucor Corporation, Ameristeel US Inc., Commercial Metals Company, Cascade Steel Rolling Mills, Inc. and Byer Steel Corporation (the petitioners).

[5] *See* Petitioners' Letter, "Steel Concrete Reinforcing Bar from Mexico:  Request for Administrative Review," dated November 30, 2020.

[6] *See* Deacero's Letter, "Steel Concrete Reinforcing Bar from Mexico – Request for Administrative Review," dated November 30, 2020; *see also* Grupo Simec's Letter, "Steel Concrete Reinforcing Bar from Mexico – Request for Administrative Review," dated November 30, 2020; and Sidertul's Letter, "Steel Concrete Reinforcing Bar from Mexico:  Request for Review – 2019-20 AD Review Period," dated November 30, 2020.

[7] *See Initiation Notice*.

[8] *Id.*

[9] *See* Petitioners' Letter, "Steel Concrete Reinforcing Bars from Mexico:  Comments on CBP Import Data," dated January 26, 2021; *see also* Deacero's Letter, "Steel Concrete Reinforcing Bar from Mexico – Comments on CBP Data," dated January 26, 2021.

[10] *See* Memorandum, "2019-2020 Antidumping Duty Administrative Review of Steel Concrete Reinforcing Bar from Mexico:  Respondent Selection," dated February 8, 2021.

[11] *See* Commerce's Letter, "Antidumping Duty Questionnaire," dated March 4, 2021 (Initial Questionnaire); *see also* Deacero's Letter, "Steel Concrete Reinforcing Bar from Mexico – Section A Questionnaire Response," dated March 11, 2021 (Deacero AQR); Grupo Simec's Letter, "Steel Concrete Reinforcing Bar from Mexico – Extension Request," dated March 8, 2021; Deacero's Letter, "Steel Concrete Reinforcing Bar from Mexico – Sections B and C Questionnaire Response," dated April 1, 2021; Grupo Simec's Letter, "Steel Concrete Reinforcing Bar from Mexico," dated March 31, 2021 (Grupo Simec BCQR); Deacero's Letter, "Steel Concrete Reinforcing Bar from Mexico – Section D Questionnaire Response," dated April 7, 2021; Grupo Simec's Letter, "Steel Concrete Reinforcing Bar from Mexico," dated April 7, 2021; and Grupo Simec's Letter, "Steel Concrete Reinforcing Bar from Mexico," dated April 14, 2021 (Grupo Simec Downstream QR).

Filed By: Kyle Clahane, Filed Date: 11/30/21 1:23 PM, Submission Status: Approved

Between September 7, 2021 and November 3, 2021, we issued supplemental questionnaires to Deacero, with timely responses filed between September 20, 2021 and November 10, 2021.[12] Further, on July 27, 2021, and August 8, 2021, we issued supplemental questionnaires to Grupo Simec, receiving responses between September 8 and 10, 2021.[13]

On November 9, 2021, and November 15, 2021, the petitioners and Deacero, respectively, filed comments in advance of the preliminary results.[14]

On July 2, 2021, we extended the deadline for the preliminary results to November 30, 2021.[15]

## III.   SCOPE OF THE *ORDER*

The scope of this *Order* covers steel concrete reinforcing bar imported in either straight length or coil form (rebar) regardless of metallurgy, length, diameter, or grade.  The subject merchandise is classifiable in the Harmonized Tariff Schedule of the United States (HTSUS) primarily under item numbers 7213.10.0000, 7214.20.0000, and 7228.30.8010.

The subject merchandise may also enter under other HTSUS numbers including 7215.90.1000, 7215.90.5000, 7221.00.0017, 7221.00.0018, 7221.00.0030, 7221.00.0045, 7222.11.0001, 7222.11.0057, 7222.11.0059, 7222.30.0001, 7227.20.0080, 7227.90.6085, 7228.20.1000, and 7228.60.6000.  Specifically excluded are plain rounds (*i.e.,* non-deformed or smooth rebar). Also excluded from the scope is deformed steel wire meeting ASTM A1064/A1064M with no bar markings (*e.g.,* mill mark, size or grade) and without being subject to an elongation test. HTSUS numbers are provided for convenience and customs purposes; however, the written description of the scope remains dispositive.

On June 8, 2020, Commerce determined that, effective October 18, 2019, otherwise straight rebar bent on one or both ends (hooked rebar) from Mexico that is produced and/or exported by

---

[12] *See* Deacero's Letters, "Administrative Review of the Antidumping Duty Order on Steel Concrete Reinforcing Bar from Mexico, 2019 - 2020:  First Supplemental Questionnaire," dated September 7, 2021; "Administrative Review of the Antidumping Duty Order on Steel Concrete Reinforcing Bar from Mexico, 2019 - 2020:  Second Supplemental Questionnaire," dated September 21, 2021; "Administrative Review of the Antidumping Duty Order on Steel Concrete Reinforcing Bar from Mexico, 2019 - 2020:  Third Supplemental Questionnaire," dated November 3, 2021; "Steel Concrete Reinforcing Bar from Mexico – First Supplemental Questionnaire Response," dated September 20, 2021 (Deacero SQR1), "Steel Concrete Reinforcing Bar from Mexico – Second Supplemental Questionnaire Response," dated October 18, 2021; and "Steel Concrete Reinforcing Bar from Mexico – Third Supplemental Questionnaire Response," dated November 10, 2021 (Deacero's SQR3).

[13] *See* Commerce Letters, "2019-2020 Antidumping Duty Administrative Review of Steel Concrete Reinforcing Bar from Mexico – First Supplemental Questionnaire," dated July 27, 2021 (Grupo Simec ABC SQ); and "Antidumping Duty Administrative Review of Steel Concrete Reinforcing Bar from Mexico," dated August 4, 2021.  *See also* Grupo Simec's Letters, "Steel Concrete Reinforcing Bar from Mexico: Submission of Section ABC Supplemental Questionnaire Response," dated September 8, 2021 (Grupo Simec ABC SQR); and "Steel Concrete Reinforcing Bar from Mexico: Submission of Section A&D Supplemental Questionnaire Response," dated September 10, 2021 (Grupo Simec A&D SQR).

[14] *See* Petitioners' Letters, "Steel Concrete Reinforcing Bar from Mexico:  Pre-Preliminary Comments," dated November 8, 2021; and "Steel Concrete Reinforcing Bar from Mexico:  Pre-Preliminary Comments as to Simec," dated November 9, 2021; *see also* Deacero's Letter, "Steel Concrete Reinforcing Bar from Mexico – Response to RTAC's Pre-Preliminary Comments," dated November 15, 2021.

[15] *See* Memorandum, "Extension of Deadline for Preliminary Results," dated July 2, 2021.

Deacero was circumventing the *Order*. Specifically, Commerce determined that Deacero's shipments to the United States of such rebar constitute merchandise altered in form or appearance in such minor respects that it should be included within the scope of the *Order*.[16]

## IV.    APPLICATION OF FACTS AVAILABLE AND USE OF ADVERSE INFERENCES

In accordance with sections 776(a) and (b) of the Act, we determine that the use of facts available with adverse inferences (AFA) is appropriate for these preliminary results with respect to Grupo Simec.

### A.    Application of Facts Available

Sections 776(a)(1) and 776(a)(2)(A)-(D) of the Act provide that, if necessary information is not available on the record, or if an interested party: (1) withholds information requested by Commerce; (2) fails to provide such information by the deadlines for submission of the information, or in the form and manner requested, subject to subsections (c)(1) and (e) of section 782 of the Act; (3) significantly impedes a proceeding; or (4) provides such information but the information cannot be verified as provided in section 782(i) of the Act, Commerce shall use, subject to section 782(d) of the Act, facts otherwise available in reaching the applicable determination. Section 782(c)(1) of the Act states that Commerce shall consider the ability of an interested party to provide information upon a prompt notification by that party that it is unable to submit the information in the form and manner required, and that party also provides a full explanation for the difficulty and suggests an alternative form in which the party is able to provide the information. Section 782(e) of the Act states further that Commerce shall not decline to consider submitted information if all of the following requirements are met: (1) the information is submitted by the established deadline; (2) the information can be verified; (3) the information is not so incomplete that it cannot serve as a reliable basis for reaching the applicable determination; (4) the interested party has demonstrated that it acted to the best of its ability; and (5) the information can be used without undue difficulties.

Finally, where Commerce determines that a response to a request for information does not comply with the request, section 782(d) of the Act provides that Commerce will so inform the party submitting the response and will, to the extent practicable, provide that party an opportunity to remedy or explain the deficiency. If the party fails to remedy or satisfactorily explain the deficiency within the applicable time limits, subject to section 782(e) of the Act, Commerce may disregard all or part of the original and subsequent responses, as appropriate.

In the instant review, an analysis of Grupo Simec's initial questionnaire responses resulted in Commerce identifying a significant number of deficiencies. These deficiencies covered all aspects of Grupo Simec's responses and included issues such as failure to provide supporting documentation, unexplained calculations, and errors and discrepancies within and between the data and supporting documentation. Commerce subsequently issued two supplemental questionnaires, providing Grupo Simec an opportunity to remedy these deficiencies. While the

---

[16] *See Steel Concrete Reinforcing Bar from Mexico: Final Affirmative Determination of Circumvention of the Antidumping Duty Order*, 85 FR 34705 (June 6, 2020).

Barcode:4186374-02 A-201-844 REV - Admin Review 11/1/19 - 10/31/20

Grupo Simec A&D SQR was submitted with all questions completed, the Grupo Simec ABC SQR failed to provide any responses to the questions related to downstream sales. Moreover, analysis of the information that was submitted revealed that, among other issues, Grupo Simec continued to fail to provide information Commerce requested, stated that various errors or discrepancies had been corrected but had, in fact, not corrected these issues, and provided supporting documentation which indicated that certain reported data were incorrect. Below, we discuss the specific deficiencies and issues.

*Home Market Sales Data*

The initial questionnaire instructed Grupo Simec to submit information regarding sales transaction, expenses and other information. In the Grupo Simec BCQR, we identified a number of issues in the home market sales data that cut across a significant portion of the reported data. For example, we identified discrepancies between the reported control numbers (CONNUMs) and the individual physical characteristics, found a number of errors in the data (*e.g.*, text in fields where numbers or dates should appear), and determined that delivery terms were not always consistent with reported movement expenses. Commerce issued an extensive supplemental questionnaire on all of the identified issues and ultimately provided Grupo Simec with a significant amount of time, including multiple extensions, to submit its responses (*i.e.*, six weeks).

In response, the Grupo Simec ABC SQR provided additional clarification and information for some of the issues identified in the home market sales data, but we also note that, in a number of instances, Grupo Simec failed to respond or stated that it had addressed the issue but, in fact, had not. For instance, Grupo Simec stated that it had resolved the discrepancies between certain reported CONNUMs and the physical characteristics but, upon review, we note that the discrepancies continued.[17] Similarly, errors that were identified with payment dates, payment terms, credit expenses, and manufacturer were explained to have been resolved or updated but, upon review, continued to be identical to the originally-reported data.[18] In one instance, we noted that there were discrepancies between the reported terms of delivery and movement expenses; Grupo Simec's response directly contradicted the information on the record and failed to address the discrepancy.[19] Separately, we requested that Grupo Simec explain why quantity adjustments were being treated as a change in unit price, rather than an adjustment to quantity, and instructed the respondent to report it as such; Grupo Simec failed to provide a response and did not revise the reporting to correctly report quantity adjustments as a change to the sale quantity.[20] Finally, we note that the information provided in the Grupo Simec ABC SQR also resulted in a variety of new discrepancies and data issues, such as supporting documentation showing that packing expenses had been incorrectly reported, information that reported freight expenses may have been overreported, and newly-introduced payment terms that had not previously been reported or explained.[21]

---

[17] *See* Grupo Simec ABC SQR at 17.
[18] *Id*. at 18 (Question 31.a), 28 (Question 35.d), 32 (Question 40.c), 37 (Question 44).
[19] *Id*. at 28 (Question 36.a).
[20] *Id*. at 25 (Question 34.i).
[21] *Id*. at 36 (Question 43.e), 29-30 (Question 38.a), database SGSAAR20US02.

5

*U.S. Sales Data*

Similar to the issues presented above for the home market sales data, the supplemental questionnaire we issued highlighted a number of discrepancies, errors, and missing information in Grupo Simec's initial questionnaire responses and provided Grupo Simec with ample time to prepare and submit responses.

Much like the issues in the home market data, Grupo Simec's responses resulted in a number of unresolved issues.  For example, when asked to clarify why the identical value was reported for all brokerage and handling expenses when Grupo Simec stated the expenses were reported on a transaction-specific basis, Grupo Simec simply stated that it had reported a single value for all of Sigosa's U.S. sales, with no attempt to explain or document the discrepancy other than to say that the values may be similar.[22]  Similarly, for warehouse expenses, we requested that they ensure they had reported certain U.S. warehouse expenses and provide supporting documentation; their response was unclear and the supporting documentation provided appears to be unrelated to the warehousing expenses in question.[23]  Additionally, Grupo Simec's responses to a question about entry dates indicated that the respondent included cancelled sales in the U.S. sales database, in spite of express instructions not to do so in the initial questionnaire.[24]  As a result, it is unclear whether Grupo Simec correctly reported the universe of U.S. sales for the POR.  Separately, information provided to support the reported entry values of U.S. sales result in a discrepancy as the supporting documentation and the reported entry values do not match, indicating that either the entry values are incorrect or, at minimum, Grupo Simec is unable to document the reported entry values.[25]  Finally, just as with the home market sales data, we note that the information provided in the Grupo Simec ABC SQR also resulted in a variety of new discrepancies and data issues relating to the reported U.S. sales data, such as supporting documentation showing that freight to port expenses had been incorrectly reported.[26]

*Downstream Sales Data*

As part of the initial questionnaire responses, Grupo Simec submitted downstream sales data for consideration in our analysis.[27]  The initial response and data were not accompanied by any supporting documentation, calculations or other information that supported the reported information.[28]  Additionally, the database contained almost no data related to expenses, meaning that if we were to include the downstream sales into margin calculations, the data was likely to be significantly skewed.  As a result, when we issued our supplemental questionnaire, we included five questions requesting that Grupo Simec provide some additional clarification and context for how the downstream sales data was generated.[29]  Approximately 30 minutes before the deadline to submit the responses to the Grupo Simec ABC SQ (*i.e.*, 5:00 p.m. ET, September 7, 2021), Grupo Simec submitted an extension request to Commerce, asking that we grant

---

[22] *Id*. at 44 (Question 54.d).
[23] *Id*. at 46-47 (Question 57).
[24] *Id*. at 48 (Question 61); *see also* Initial Questionnaire at C-2.
[25] *See* Grupo Simec ABC SQR at 52 (Question 70).
[26] *Id*. at 46 (Question 55.e).
[27] *See* Grupo Simec Downstream QR.
[28] *Id*.
[29] *See, e.g.*, Grupo Simec ABC SQ at 14-15.

6

additional time to submit the downstream sales responses (*i.e.*, responses to Grupo Simec ABC SQ questions 71-75). As noted by Commerce later, due to the late filing time, we were unable to consider the extension request ahead of the deadline and, as such, the *Extension of Time Limits Preamble* makes clear that the deadline for submission of the downstream sales data automatically became 8:30 a.m. ET the following business day (*i.e.*, 8:30 a.m. ET, September 8, 2021).[30] However, Grupo Simec failed to submit these responses by the new deadline and, as such, did not fully respond to the questionnaire, as required by Commerce. As a result, Grupo Simec not only failed to submit the requested information within the established timeframe but, by extension, this means that Commerce has no explanations, underlying calculations, or supporting documentation for any of the downstream sales data reported initially in the Grupo Simec BC QR. As a result, Commerce cannot determine whether the information reported in the downstream sales data is accurate or supported in fact, nor does it have usable downstream sales data that could be incorporated into any possible analysis.

Taken together, Grupo Simec's multiple failures to submit or correct information on the record, as well as its continued failure to resolve various discrepancies and corroborate the sales-related information it had provided, ultimately leads Commerce to preliminarily conclude that, in accordance with section 782(e)(3) of the Act, the information Grupo Simec provided is so incomplete, unreliable and unsupported that Commerce does not have any sales-related information that can be used as a basis for conducting a dumping analysis. Accordingly, the use of facts available under sections 776(a)(2)(A), 776(a)(2)(B), and 776(a)(2)(C) of the Act is warranted. As Grupo Simec did not provide the requested information, we also find that necessary information is not available on the record pursuant to section 776(a)(1) of the Act.

### B.    Use of Adverse Inferences

Section 776(b) of the Act provides that, if Commerce finds that an interested party has failed to cooperate by not acting to the best of its ability to comply with a request for information, Commerce may use an inference adverse to the interests of that party in selecting the facts otherwise available. In addition, the Statement of Administrative Action accompanying the Uruguay Round Agreements Act (SAA) explains that Commerce may employ an adverse inference "to ensure that the party does not obtain a more favorable result by failing to cooperate than if it had cooperated fully."[31] Furthermore, affirmative evidence of bad faith on the part of a respondent is not required before Commerce may make an adverse inference.[32] It is

---

[30] *See* Commerce's Letter, "Steel Concrete Reinforcing Bar from Mexico:  Response to Request for Extension of Time for Grupo Simec's Supplemental Questionnaire Responses," dated September 9, 2021 (citing *Extension of Time Limits*, 78 FR 57790 (September 30, 2013) (*Extension of Time Limits Preamble*) at 57792).

[31] *See* Statement of Administrative Action, H.R. Rep. No. 103-316, vol. 1 (1994) (SAA) at 870*; see also Certain Polyester Staple Fiber from Korea:  Final Results of the 2005-2006 Antidumping Duty Administrative Review*, 72 FR 69663, 69664 (December 10, 2007).

[32] *See, e.g.*, *Nippon Steel Corp. v. United States*, 337 F. 3d 1373, 1382-83 (Fed. Cir. 2003); *Notice of Final Determination of Sales at Less Than Fair Value:  Circular Seamless Stainless Steel Hollow Products from Japan*, 65 FR 42985 (July 12, 2000); and *Antidumping Duties; Countervailing Duties*, 62 FR 27296, 27340 (May 19, 1997) (*Preamble*).

Commerce's practice to consider, in employing adverse inferences, the extent to which a party may benefit from its own lack of cooperation.[33]

We preliminarily find that Grupo Simec has failed to cooperate by not acting to the best of its ability in failing to remedy the errors identified by Commerce as well as failing to submit requested information within the established deadline.  Therefore, in accordance with section 776(b) of the Act, we preliminarily determine to use an adverse inference when selecting from among the facts otherwise available.[34]

### C.        Selection and Corroboration of the Adverse Facts Available Rate

Section 776(b)(2) of the Act states that Commerce, when employing an adverse inference, may rely upon information derived from the petition, the final determination from the less-than-fair-value (LTFV) investigation, a previous administrative review, or other information placed on the record.[35]  In selecting a rate based on AFA, Commerce selects a rate that is sufficiently adverse to ensure that the uncooperative party does not obtain a more favorable result by failing to cooperate than if it had fully cooperated.[36]

When using facts otherwise available, section 776(c)(1) of the Act provides that, except as provided under section 776(c)(2) of the Act, where Commerce relies on secondary information rather than information obtained in the course of an investigation, it must corroborate, to the extent practicable, information from independent sources that are reasonably at its disposal. Secondary information is defined as information derived from the petition that gave rise to the investigation or review, the final determination from the LTFV investigation concerning the subject merchandise, or any previous review under section 751 of the Act concerning the subject merchandise.[37]  The SAA clarifies that "corroborate" means that Commerce will satisfy itself that the secondary information to be used has probative value.[38]  To corroborate secondary information, Commerce will, to the extent practicable, examine the reliability and relevance of

---

[33] *See, e.g., Steel Threaded Rod from Thailand:  Preliminary Determination of Sales at Less Than Fair Value and Affirmative Preliminary Determination of Critical Circumstances*, 78 FR 79670 (December 31, 2013), and accompanying Preliminary Decision Memorandum at 4, unchanged in *Steel Threaded Rod from Thailand:  Final Determination of Sales at Less Than Fair Value and Affirmative Final Determination of Critical Circumstances*, 79 FR 14476 (March 14, 2014).

[34] *See, e.g., Large Power Transformers from the Republic of Korea:  Preliminary Results of Antidumping Duty Administrative Review*; 2017-2018, 84 FR 55559 (October 17, 2019), and accompanying Preliminary Decision Memorandum, unchanged in *Large Power Transformers from the Republic of Korea:  Final Results of Antidumping Duty Administrative Review*; 2017-2018, 85 FR 21827 (April 20, 2020);  *Circular Welded Carbon-Quality Steel Pipe from Pakistan:  Affirmative Preliminary Determination of Sales at Less Than Fair Value and Postponement of Final Determination and Extension of Provisional Measures*, 81 FR 36867 (June 8, 2016), unchanged in *Circular Welded Carbon-Quality Steel Pipe from Pakistan:  Final Affirmative Countervailing Duty Determination*, 81 FR 75045 (October 28, 2016).

[35] *See* 19 CFR 351.308(c).

[36] *See* SAA at 870.

[37] *Id.*

[38] *Id.*; *see also* 19 CFR 351.308(d).

8

the information to be used.[39]  Under section 776(c)(2) of the Act, Commerce is not required to corroborate any dumping margin applied in a separate segment of the same proceeding.

Finally, under section 776(d) of the Act, Commerce may use any dumping margin from any segment of a proceeding under an antidumping order when applying an adverse inference, including the highest of such margins.[40]  The Act also makes clear that when selecting an AFA margin, Commerce is not required to estimate what the dumping margin would have been if the interested party failing to cooperate had cooperated or to demonstrate that the dumping margin reflects an "alleged commercial reality" of the interested party.[41]

When assigning adverse rates in a review, Commerce's practice is to select as AFA the higher of:  (a) the highest dumping margin alleged in the petition; or (b) the highest calculated rate for any respondent from any segment of the proceeding.[42]  Further, under section 776(c)(2) of the Act, Commerce is not required to corroborate a dumping margin applied in another segment of the proceeding.[43]

In relying on AFA, we are preliminarily assigning Grupo Simec a dumping margin of 66.70 percent, which was the AFA rate assigned to Grupo Simec in the original investigation.[44]  Because this rate was a rate applied to Grupo Simec in a prior segment of the proceeding, there is no need to corroborate it under section 776(c)(2) of the Act.  Further, this rate is at a level which does not permit Grupo Simec to benefit from its lack of cooperation in this review.

---

[39] *See, e.g.*, *Tapered Roller Bearings and Parts Thereof, Finished and Unfinished, from Japan, and Tapered Roller Bearings, Four Inches or Less in Outside Diameter, and Components Thereof, from Japan; Preliminary Results of Antidumping Duty Administrative Reviews and Partial Termination of Administrative Reviews*, 61 FR 57391, 57392 (November 6, 1996), unchanged in *Tapered Roller Bearings and Parts Thereof, Finished and Unfinished, from Japan, and Tapered Roller Bearings, Four Inches or Less in Outside Diameter, and Components Thereof, from Japan; Final Results of Antidumping Duty Administrative Reviews and Termination in Part*, 62 FR 11825 (March 13, 1997).

[40] *See* section 776(d)(1)-(2) of the Act.

[41] *See* sections 776(d)(3)(A) and (B) of the Act.

[42] *See Diamond Sawblades and Parts Thereof from the Republic of Korea:  Preliminary Results of Antidumping Duty Administrative Review; 2010-2011*, 77 FR 73420 (December 12, 2012), unchanged in *Diamond Sawblades and Parts Thereof from the Republic of Korea:  Final Results of Antidumping Duty Administrative Review, 2010-2011*, 78 FR 36524 (June 18, 2013); *see also Administrative Review of Certain Frozen Warmwater Shrimp from the People's Republic of China:  Final Results, Partial Rescission of Sixth Antidumping Duty Administrative Review and Determination Not To Revoke in Part*, 77 FR 53856 (September 4, 2012); *Certain Cold-Rolled Flat-Rolled Carbon-Quality Steel Products from Brazil:  Final Determination of Sales at Less than Fair Value*, 65 FR 5554, 5567 (February 4, 2000); *Emulsion Styrene-Butadiene Rubber from the Republic of Korea:  Final Determination of Sales at Less than Fair Value*, 64 FR 14865, 14866 (March 29, 1999); and *Stainless Steel Sheet and Strip in Coils from the Republic of Korea:  Final Determination of Sales at Less than Fair Value*, 64 FR 30664, 30687 (June 8, 1999).

[43] *See* section 776(c)(2) of the Act.

[44] *See Steel Concrete Reinforcing Bar from Mexico:  Final Determination of Sales at Less Than Fair Value and Final Affirmative Determination of Critical Circumstances*, 79 FR 54967 (September 15, 2014).

# EXHIBIT 2



Squire Patton Boggs (US) LLP
2550 M Street, NW
Washington, D.C.  20037

O   +1 202 457 6000
F   +1 202 457 6315
squirepattonboggs.com

Peter J. Koenig
T   +1 202 626 6223
peter.koenig@squirepb.com

March 31, 2021

**VIA ACCESS**

Secretary of Commerce
Enforcement and Compliance, AD/CVD
APO/Dockets Unit, Room 18022
Administrative Review
U.S. Department of Commerce
14th Street and Constitution Avenue, NW
AD/CVD Operations Office III
Washington, DC  20230

**PUBLIC VERSION**

Case No.:  A-201-844
(11/01/2019 – 10/31/2020)
Agree To APO Release

**Re: Steel Concrete Reinforcing Bar from Mexico**

Dear Secretary of Commerce:

Simec hereby answers Sections B&C of the questionnaire. Business proprietary treatment is requested for bracketed information.  It involves prices, customers, costs and financial information normally considered proprietary.

We appreciate Commerce's consideration of this matter.

Sincerely,

Squire Patton Boggs (US) LLP

*/s/ Peter Koenig*

Peter J. Koenig

45 Offices in 20 Countries

Squire Patton Boggs (US) LLP is part of the international legal practice Squire Patton Boggs, which operates worldwide through a number of separate legal entities.

Please visit squirepattonboggs.com for more information.

shipped, provide the agreed unit sale price for the quantity that will be shipped to complete the order. This value should be the gross unit price. Discounts and rebates should be reported separately in fields numbered 19.n and 20.n, respectively.

**Response:**

**The gross unit price in the sales invoice is reported in this field in peso/MT.**

**FIELD NUMBER 18.1-n:**    **Billing Adjustments**

    FIELD NAME:        BILLADJH

    DESCRIPTION:        Report any price adjustments made for reasons other than discounts or rebates. State whether these billing adjustments are reflected in your gross unit price. Report a decrease in price as a negative figure and an increase in price as a positive figure. Report zero in this field if no adjustments were made to the price. Create a separate field for each type of billing adjustment (*e.g.*, corrections of invoicing errors, post-invoicing price adjustments).

    NARRATIVE:        Describe the nature of each type of billing adjustment that is recognized in your sales records. Describe the document flow employed to process the price changes.

**Response:**

**Simec and Sigosa report the post-sale price adjustment in this field in peso/MT.**

**Simec issues a credit note to customers for the following:**

- [

- 

- 

- 

- 

- 

- 

        ]

- **Simec grants a discount to adjust the tons invoiced to the tons actually received by customers, Simec issues a credit note in favor of the clients for each adjustments, applying the discount to the client's payment.**

**Sigosa issues a credit note to its customers for the following:**

- **BILLADJ1H: [                                                                                          ];**

- **BILLADJ2H: [                                                                    ].**

**Billing adjustments that increase price have been reported as a positive number, while billing adjustments that decrease price have been reported as a negative number. The adjustments are not reflected in the gross unit price and, thus, all billing adjustments should be added to gross unit price.**

| | |
|---|---|
| **FIELD NUMBER 19.1:** | **Early Payment Discounts** |
| FIELD NAME: | EARLPYH |
| DESCRIPTION: | Report the unit value of any discount granted to the customer for early payment. |
| NARRATIVE: | Explain your policy and practice for granting early payment discounts. Describe the basis for eligibility for such discount. If discounts vary by channel of distribution (field 7.0) or by customer category (field 6.0), provide an explanation of the discounts given to each channel or category. Explain how you calculated the per-unit discount. Where available, provide sample documentation, including sample agreements, for this type of discount. |

**Response:**

**For customers that pay within [              ] of the invoice date, Simec offers a discount of [**

**                ]. The discount does not appear on the sales invoice and instead Simec issues the customer a credit note in the amount of the early payment discount.**

**This field is not applicable to Sigosa, as it did not grant any early payment discounts on its sales of subject merchandise during the reporting period.**

**This field is reported  in peso/MT.**

| | |
|---|---|
| **FIELD NUMBER 19.2:** | **Quantity Discounts** |

Barcode:4105401-01 A-201-844 REV - Admin Review 11/1/19 - 10/31/20

**B-1**

Summaries of Databases

PUBLIC VERSION

# REMAINDER OF EXHIBIT NOT CAPABLE OF PUBLIC SUMMARY

# EXHIBIT 3

Barcode:4158727-01 A-201-844 REV - Admin Review 11/1/19 - 10/31/20

**SBA Strategy Consulting LLP**
International Trade | Litigation

Corporate Office: 215-216, Tribhuvan Complex, Ishwar Nagar,          Registered Office: 50, First Floor, Dhuleshwar Garden, Jaipur,
Mathura Road, New Delhi                                                                              Rajasthan, 302001, India
LLP ID: AAO-1356
Email: arpit.bhargava@sbaconsulting.co.in | radhika.sharma@sbaconsulting.co.in

September 8, 2021

**VIA ELECTRONIC FILING**

Case No. A-201-844

ADMINISTRATIVE REVIEW

**(POR) 11/01/2019 - 10/31/2020**

Total number of Pages:    64

AD Enforcement Office III

**Business Proprietary Information deleted on pages 4 to 55 and in Exhibit-SQ1A.1 to SQ1A-10.1, Exhibit-SQ1B-14 to Exhibit SQ1B-23, Exhibit-SQ1B-28(b) to Exhibit SQ1B-40(d), Exhibit-SQ1B-41(a) to Exhibit SQ1C-50 and Exhibit SQ1C-53(b) to SQ1C-70.2**

**PUBLIC VERSION**

The Honorable Gina M. Raimondo
Secretary of Commerce
Attention: Enforcement and Compliance
APO/Dockets Unit, Room 18022
U.S. Department of Commerce
14th Street & Constitution Avenue, N.W.
Washington, D.C. 20230

Re: *Steel Concrete Reinforcing Bar from Mexico*: **Submission of Section ABC Supplemental Questionnaire Response**

Dear Secretary Raimondo,

On behalf of **Grupo Simec and Sigosa (collectively Simec),** a foreign producers and exporters of Steel Concrete Reinforcing Bar from Mexico, we have filed BPI-Bracketing Not Final Version of Section-ABC of supplemental questionnaire in 3 Parts under the respective Bar Codes (4158517,4158487 and 4158454) on September 7, 2021. We now submit **Public Version** of Section-ABC of supplemental questionnaire corresponding to the 3 Parts of BPI-Final Version to the Department of Commerce (the "Department") in connection with the administrative review in the antidumping duty investigations of Steel Concrete Reinforcing Bar from Mexico.

**SBA Strategy Consulting LLP**
International Trade | Litigation

Corporate Office: 215-216, Tribhuvan Complex, Ishwar Nagar,        Registered Office: 50, First Floor, Dhuleshwar Garden, Jaipur,
Mathura Road, New Delhi                                                                              Rajasthan, 302001, India
LLP ID: AAO-1356
Email: arpit.bhargava@sbaconsulting.co.in | radhika.sharma@sbaconsulting.co.in

Barcode:4158727-01 A-201-844 REV - Admin Review 11/1/19 - 10/31/20

As such, this submission contains proprietary information consisting of customer names, sales channels, sales accounting documents and other internal documents of Simec that not available in public and are considered proprietary. The release of this information, in whole or in part, could cause substantial harm to Simec's competitive position; such information is considered proprietary pursuant to 19 CFR § 351.105(c)(1), (2), (3), (4), (5), (6) & (11). We therefore request that this information be treated as business proprietary information pursuant to 19 C.F.R. §351.304(a) (1) (i). All proprietary business information is designated by brackets as follows: "[  ]". Neither the proprietary information for which confidential treatment is sought, nor substantially identical information, is readily available to the public. Simec agrees to allow the business proprietary version of this response to be released under administrative protective order. A public version omitting such proprietary information will be filed concurrently with the final business proprietary version. Proprietary information susceptible to ranging has been ranged in the public version. The summary of other information is provided or is evident from the context.

                    *            *            *            *            *            *

Copies of this response have been served on the parties appearing on the Departments' service list, as indicated in the attached Certificate of Service.  Please contact the undersigned if you have any questions.

                                                            Respectfully submitted,

                                                            **Arpit Bhargava**
                                                **Partner, SBA Strategy Consulting LLP**

| Codes | Standard | Grade |
|-------|----------|-------|
| G42   | NMX-B-506 | 42   |

25.   On page 26 of the section A response, you stated that Grupo Simec sold rebar in the home market produced in accordance with NMX-C-407-ONNCCE-2001 and ASTM A615 but it does not appear that any home market sales have been reported with a SPECH for NMX-C-407-ONNCCE-2001. Please explain this discrepancy.

**It was a mistake in the narrative to report that Grupo Simec's home market sales were made per the following industry specifications: NMX-C-407-ONNCCE-2001. Grupo Simec's market sales made in the POR were made and recorded as being produced per the industry standards ASTM 615, ASTM 715, and NMX-B-506.**

26.   On page 26 of the section A response, you stated that Sigosa sold rebar in the home market produced in accordance with NMX-B-457 and ASTM A615 but you reported NMX-B506 for SPECH. Please explain this discrepancy.

**It was a mistake in the narrative to report that Sigosa's home market sales were made per the following industry specifications: NMX-B-457 and ASTM A615. Sigosa's home market sales were made and recorded in the POR per the industry standard NMX-B-506.**

27.   With respect to field MYSYTRH:

a.   You stated for Grupo Simec, home market sales were classified as ASTM A615 (code 4) and ASTM A706 (code 3). We note that the Grupo Simec database only has reported sales of code 4; code 3 has not been reported. Please explain this discrepancy between the narrative and the database.

**As noted above, Grupo Simec corrects that home markets sales made in the POR, including the sales that include ASTM 706.**

b.   Grupo Simec has reported codes 1, 4 and 7 for this field, yet the narrative only addresses code 4. Please clarify this discrepancy. If this is not an error, please provide narrative descriptions for codes 1 and 7.

**Grupo Simec reports only code 4.**

- 16 - .

c.    You state that the rebar sold by Sigosa during the POR was classified as ASTM A615 but we note that in field SPECH, it appears that you have reported the product classification as NMX-B506 instead. Please clarify this discrepancy.

**As noted above, Sigosa corrects and informs that home markets sales made in the POR were made per the industry standard NMX-B506.**

d.    The CONNUMHs reported for Grupo Simec's sales SEQH 14244 and 14327 do not match what was reported for MYSYTRH. Please explain the discrepancy or revise the database, as necessary.

**Grupo Simec revises the database. See revised home market sales database GSMCAR20HM02.**

28.    With respect to [        ]:

a.    You state on page 12 of the section B response that "Simec and Sigosa report ASTM Bar designation 12 (metric designation 38) as code "38" in the home market sales databases." We note that this has not been reported for Sigosa; please clarify this discrepancy.

**In page 12 of Section B, Grupo Simec stated that Simec and Sigosa reported the size designation ASTM Bar designation 12. However, we clarify that Simec was the only company that manufactured and sold said type of product.**

b.    Please provide the production and internal specification documentation showing the actual and nominal diameter of rebar with a metric designation 38.

**Grupo Simec does so in Exhibit SQ1B-28.b, which includes a production report from the month of March 2020 and internal specifications document from Simec's production manuals.**

c.    Provide sales documentation and product information for one home market sale which demonstrates that the customer ordered this size of rebar, including any correspondence with the customer requesting this diameter. Explain why a special size was required by the customer. Additionally, provide the mill test certificate for this sample sale.

- 17 -

Case 1:22-cv-00202-SAV    Document 36    Filed 12/28/22    Page 62 of 86

**Grupo Simec**  Barcode:4158727-01 A-201-844 REV - Admin Review 09/0... **A-201-844 AR-2 (11/1/19 - 10/31/20)**
**Section A to C SQR- September 8, 2021**                                                    **Public Version**

Simec assumes the risk in case of a robbery, bearing the costs as a result of the theft and the loss of income.

Sigosa is different. Sigosa charges insurance to their clients in each invoice, and the freight provider bears no risk. In the event of theft, Sigosa bears the costs of the material and the loss of income.

i.     Please explain why the adjustment for "short deliveries" is a change to the unit price of the product, rather than an adjustment to the quantity of the sale. If, in fact, adjustments for short deliveries are simply a change in the quantity sold because a lower-than-expected quantity was delivered to the customer, please instead report this as a quantity adjustment instead.

**Simec and Sigosa confirm that they have reported "short deliveries" and "difference in weight adjustment" under one field "QTYADJH" in their home market sales database. Please see the detailed explanation under response to Question No. 34(j) below.**

j.     Grupo Simec provides a statement on page 21 that it grants a discount to adjust the tons invoiced to the tons actually received by customers. Please clarify whether this adjustment is the same as "short deliveries" or if this is a separate adjustment field. If it is separate, please instead report this as a quantity adjustment instead, given that there appears to be no change to the unit value of the sale.

**Grupo Simec clarifies that the "short deliveries" adjustment is not a quantity discount. In fact, it is a separate quantity adjustment reported along with "difference in weight adjustment" as "QTYADJH". Grupo Simec reports this as a quantity adjustment. See [     ]    (Invoice 74974 in Exhibit SQ1B-34k, whereby Simec issued a credit note (page 1) as a result of shipping quantity that exceeded the client's order.**

k.     Provide an example of each reported adjustment type for Grupo Simec and Sigosa, along with supporting documentation (*e.g.*, invoices, credit notes, system screenshots) and any calculations needed to demonstrate the reported amount.

**Grupo Simec and Sigosa do so in Exhibit SQ1B-34(c), Exhibit SQ1B-34K (includes Simec's SEQH [     ], SEQH [     ], SEQH [     ], SEQH [     ], SEQH [     ], SIGOSA's SEQH [     ], SEQH [     ], and Exhibit SQ1B-37 (SIMEC SEQH [     ].**

- 25 - .

44.     Grupo Simec notes that for the field MFRH, that Sigosa reported a single code in this field – "SGS" – for its only rolling mill. We note that in the Sigosa home market sales database, Sigosa has instead reported codes "OPS" and "ALS" in this field. Please clarify the correct manufacturer of Sigosa's home market sales during the POR and, if necessary, submit an updated sales database with the corrected information.

> **Grupo Simec reviewed this point and clarifies that the rebar sold by Sigosa during the reporting period was produced at Sigosa's (only rolling mill, located in Matamoros, Tamaulipas, Mexico). As such, Sigosa reports a single code in this field ("SGS"). See Sigosa's revised home market database at SGSAAR20HM02.**

## Section C

45.     With respect to the Grupo Simec and Sigosa U.S. sales databases:

a.      Please ensure that the Grupo Simec and Sigosa databases have the same number of fields and the same names across all fields. For example, Grupo Simec's U.S. sales database contains the field DINLFTPU, while Sigosa's U.S. sales database does not. In these instances, please add the missing field to the respective database or, if it is not needed, remove it from both. Where you add a field, please report "0" where there is no value to report.

> **Grupo Simec and Sigosa have updated their respective databases to reflect the same number of fields with similar names. See database GSMCAR20US02 AND SGSAAR20US02 for details of changes (highlighted in yellow).**
>
> **The following fields have been deleted from the US sales database of Sigosa (SGSAAR20US02) to align fields with the Simec US sales database (GSMCAR20US02):**
>
> **30 - Marine Insurance (MARNINU)**
>
> **31 - U.S. Inland Freight from Port to Warehouse (INLFPWU)**
>
> **32 - US Warehousing Expense (USWAREHU)**

- 37 -

**Exhibit SQ1B-14**

**Simec & Sigosa HM sales database (And AP sales database)**

# REMAINDER
# OF EXHIBIT NOT
# CAPABLE OF
# PUBLIC SUMMARY

# EXHIBIT 4

Barcode:4151379-01 A-201-844 REV - Admin Review 11/1/19 - 10/31/20

UNITED STATES DEPARTMENT OF COMMERCE
International Trade Administration
Washington, D.C. 20230

A-201-844
Administrative Review
POR: 11/1/19 – 10/31/20
**Public Document**
E&C/OIII:  DL

August 10, 2021

**Grupo Simec**
c/o Peter J. Koenig
Squire Patton Boggs (US) LLP
2550 M Street, NW, Suite 300
Washington, DC 20036

Re:    Steel Concrete Reinforcing Bar from Mexico:  Extension of Time for Grupo Simec's
       Supplemental Questionnaire Responses

Dear Mr. Koenig:

This is in response to your August 9, 2021 letter submitted on behalf of Grupo Simec and Sigosa,
which requested extensions of three weeks to the July 27 and August 4, 2021, supplemental
questionnaires covering sections A-C and sections A and D that are currently due August 17 and
August 11, 2021, respectively.

We have evaluated your request and are granting the requested extensions in part.  Specifically,
we are granting a one-week extension to the deadline for submitting responses to these
questionnaires.  Accordingly, Grupo Simec and Sigosa's responses to the July 27, 2021,
supplemental questionnaire are now due no later than **5 p.m. Eastern Time, August 24, 2021,**
while the responses to the August 4, 2021, supplemental questionnaire are now due no later than
**5 p.m. Eastern Time, August 18, 2021**.

Pursuant to 19 CFR 351.302(d)(1)(i) of Commerce's regulations, any information submitted
after the applicable deadline will be considered untimely filed and may be rejected.  In such a
case, we may have to resort to the use of facts available, as required by section 776(a)(2)(B) of
the Tariff Act of 1930, as amended.

Should you need further assistance or information with regard to this review, please contact
David Lindgren at (202) 482-1671.

Sincerely,

Peter Zukowski
Program Manager
AD/CVD Operations, Office III



# EXHIBIT 5

Barcode:4154570-01 A-201-844 REV - Admin Review 11/1/19 - 10/31/20

UNITED STATES DEPARTMENT OF COMMERCE
International Trade Administration
Washington, D.C. 20230

A-201-844
Administrative Review
POR: 11/1/19 – 10/31/20
**Public Document**
E&C/OIII: DL

August 23, 2021

**Grupo Simec**
c/o Peter J. Koenig
Squire Patton Boggs (US) LLP
2550 M Street, NW, Suite 300
Washington, DC 20036

Re:     Steel Concrete Reinforcing Bar from Mexico:  Extension of Time for Grupo Simec's
        Supplemental Questionnaire Responses

Dear Mr. Koenig:

This is in response to your August 20, 2021 letters submitted on behalf of Grupo Simec and
Sigosa, which requested an extension of two weeks to the supplemental questionnaire covering
sections A-C that is currently due August 24, 2021.

We have evaluated your request and are granting a one-week extension.  Accordingly, Grupo
Simec and Sigosa's responses to the sections A-C supplemental questionnaire are now due no
later than **5 p.m. Eastern Time, August 31, 2021**.

Pursuant to 19 CFR 351.302(d)(1)(i) of Commerce's regulations, any information submitted
after the applicable deadline will be considered untimely filed and may be rejected.  In such a
case, we may have to resort to the use of facts available, as required by section 776(a)(2)(B) of
the Tariff Act of 1930, as amended.

Should you need further assistance or information with regard to this review, please contact
David Lindgren at (202) 482-1671.

Sincerely,

Peter Zukowski
Program Manager
AD/CVD Operations, Office III



# EXHIBIT 6

Barcode:4156371-01 A-201-844 REV - Admin Review 11/1/19 - 10/31/20

UNITED STATES DEPARTMENT OF COMMERCE
International Trade Administration
Washington, D.C. 20230

A-201-844
Administrative Review
POR: 11/1/19 – 10/31/20
**Public Document**
E&C/OIII:  DL

August 30, 2021

**Grupo Simec**
c/o Peter J. Koenig
Squire Patton Boggs (US) LLP
2550 M Street, NW, Suite 300
Washington, DC 20036

Re:     Steel Concrete Reinforcing Bar from Mexico:  Extension of Time for Grupo Simec's
        Supplemental Questionnaire Responses

Dear Mr. Koenig:

This is in response to your August 30, 2021 letter submitted on behalf of Grupo Simec and
Sigosa, which requested additional time to respond to the supplemental questionnaire covering
sections A-C that is currently due August 31, 2021.[1]

We have evaluated your request and are the following extensions:

- Responses to questions 13, 14 and 71-75 are now due no later than **5 p.m. Eastern Time,
  September 7, 2021.**
- All other responses to the section A-C supplemental are due no later than **5 p.m. Eastern
  Time, September 2, 2021**.

Pursuant to 19 CFR 351.302(d)(1)(i) of Commerce's regulations, any information submitted
after the applicable deadline will be considered untimely filed and may be rejected.  In such a
case, we may have to resort to the use of facts available, as required by section 776(a)(2)(B) of
the Tariff Act of 1930, as amended.

Should you need further assistance or information with regard to this review, please contact
David Lindgren at (202) 482-1671.

Sincerely,

Peter Zukowski
Program Manager
AD/CVD Operations, Office III

---

[1] We note that the portion of the extension request covering the outstanding sections A and D supplemental
questionnaire will be addressed in a separate letter once a determination is made on that part of the request.



INTERNATIONAL
**T R A D E**
ADMINISTRATION

# EXHIBIT 7

Barcode:4157267-01 A-201-844 REV - Admin Review 11/1/19 - 10/31/20

UNITED STATES DEPARTMENT OF COMMERCE
International Trade Administration
Washington, D.C. 20230

A-201-844
Administrative Review
POR:  11/1/19 – 10/31/20
**Public Document**
E&C/OIII:  DL

September 1, 2021

**Grupo Simec**
c/o Peter J. Koenig
Squire Patton Boggs (US) LLP
2550 M Street, NW, Suite 300
Washington, DC 20036

Re:    Steel Concrete Reinforcing Bar from Mexico:  Extension of Time for Grupo Simec's
         Supplemental Questionnaire Responses

Dear Mr. Koenig:

This is in response to your September 1, 2021, letter submitted on behalf of Grupo Simec and
Sigosa, which requested additional time to submit responses to the supplemental questionnaire
covering sections A-C that are currently due September 2 and 7, 2021.

We have evaluated your request and are extending the deadline for the submission of all
responses in the section A-C supplemental questionnaire until no later than **5 p.m. Eastern
Time, September 7, 2021.**  We additionally note that, given the amount of time already granted
to prepare the responses to this questionnaire, as well as the statutory and regulatory deadlines in
this case and ongoing workloads, we are unlikely to be able to accommodate any additional
extensions of time for the preparation and submission of responses to this supplemental
questionnaire.

Pursuant to 19 CFR 351.302(d)(1)(i) of Commerce's regulations, any information submitted
after the applicable deadline will be considered untimely filed and may be rejected.  In such a
case, we may have to resort to the use of facts available, as required by section 776(a)(2)(B) of
the Tariff Act of 1930, as amended.

Should you need further assistance or information with regard to this review, please contact
David Lindgren at (202) 482-1671.

Sincerely,

Peter Zukowski
Program Manager
AD/CVD Operations, Office III



# EXHIBIT 8

UNITED STATES DEPARTMENT OF COMMERCE
International Trade Administration
Washington, D.C. 20230

A-201-844
Administrative Review
POR: 11/1/19 – 10/31/20
**Public Document**
E&C/OIII: DL

August 16, 2021

**Grupo Simec**
c/o Peter J. Koenig
Squire Patton Boggs (US) LLP
2550 M Street, NW, Suite 300
Washington, DC 20036

Re:   Steel Concrete Reinforcing Bar from Mexico:  Extension of Time for Grupo Simec's
      Supplemental Questionnaire Responses

Dear Mr. Koenig:

This is in response to your August 16, 2021 letters submitted on behalf of Grupo Simec and
Sigosa, which requested an extension of two weeks to the supplemental questionnaire covering
sections A and D that is currently due August 18, 2021.

We have evaluated your request and are granting the requested extension of two weeks.
Accordingly, Grupo Simec and Sigosa's responses to the section A and D supplemental
questionnaire are now due no later than **5 p.m. Eastern Time, September 1, 2021**.

Pursuant to 19 CFR 351.302(d)(1)(i) of Commerce's regulations, any information submitted
after the applicable deadline will be considered untimely filed and may be rejected.  In such a
case, we may have to resort to the use of facts available, as required by section 776(a)(2)(B) of
the Tariff Act of 1930, as amended.

Should you need further assistance or information with regard to this review, please contact
David Lindgren at (202) 482-1671.

Sincerely,

Peter Zukowski
Program Manager
AD/CVD Operations, Office III



# EXHIBIT 9

Barcode:4156690-01 A-201-844 REV - Admin Review 11/1/19...10/31/20

UNITED STATES DEPARTMENT OF COMMERCE
International Trade Administration
Washington, D.C. 20230

A-201-844
Administrative Review
POR: 11/1/19 – 10/31/20
**Public Document**
E&C/OIII:  DL

August 31, 2021

**Grupo Simec**
c/o Peter J. Koenig
Squire Patton Boggs (US) LLP
2550 M Street, NW, Suite 300
Washington, DC 20036

Re:     Steel Concrete Reinforcing Bar from Mexico:  Extension of Time for Grupo Simec's
        Supplemental Questionnaire Responses

Dear Mr. Koenig:

This is in response to your August 30, 2021 letter submitted on behalf of Grupo Simec and
Sigosa, which requested additional time to respond to the supplemental questionnaire covering
sections A and D that is currently due September 1, 2021.[1]

We have evaluated your request and are granting an extension for all questions contained in the
section A/D supplemental questionnaire; responses to all questions are now due no later than **5
p.m. Eastern Time, September 7, 2021.**

Pursuant to 19 CFR 351.302(d)(1)(i) of Commerce's regulations, any information submitted
after the applicable deadline will be considered untimely filed and may be rejected.  In such a
case, we may have to resort to the use of facts available, as required by section 776(a)(2)(B) of
the Tariff Act of 1930, as amended.

Should you need further assistance or information with regard to this review, please contact
David Lindgren at (202) 482-1671.

Sincerely,

Peter Zukowski
Program Manager
AD/CVD Operations, Office III

---

[1] We note that the portion of the extension request covering the outstanding sections A-C supplemental
questionnaire was addressed separately in a letter dated August 30, 2021.



# EXHIBIT 10

Barcode:4157901-01 A-201-844 REV - Admin Review 11/1/19 - 10/31/20

UNITED STATES DEPARTMENT OF COMMERCE
International Trade Administration
Washington, D.C. 20230

A-201-844
Administrative Review
POR: 11/1/19 – 10/31/20
**Public Document**
E&C/OIII: DL

September 3, 2021

**Grupo Simec**
c/o Peter J. Koenig
Squire Patton Boggs (US) LLP
2550 M Street, NW, Suite 300
Washington, DC 20036

Re:     Steel Concrete Reinforcing Bar from Mexico:  Extension of Time for Grupo Simec's
        Supplemental Questionnaire Responses

Dear Mr. Koenig:

This is in response to your September 2, 2021, letter submitted on behalf of Grupo Simec and
Sigosa, which requested additional time to submit responses to the supplemental questionnaire
covering sections A and D that are currently due September 7, 2021.

We have evaluated your request and are extending the deadline for the submission of all
responses in the section A and D supplemental questionnaire until no later than **5 p.m. Eastern
Time, September 9, 2021.**  We additionally note that, given the amount of time already granted
to prepare the responses to this questionnaire, as well as the statutory and regulatory deadlines in
this case and ongoing workloads, we are unlikely to be able to accommodate any additional
extensions of time for the preparation and submission of responses to this supplemental
questionnaire.

Pursuant to 19 CFR 351.302(d)(1)(i) of Commerce's regulations, any information submitted
after the applicable deadline will be considered untimely filed and may be rejected.  In such a
case, we may have to resort to the use of facts available, as required by section 776(a)(2)(B) of
the Tariff Act of 1930, as amended.

Should you need further assistance or information with regard to this review, please contact
David Lindgren at (202) 482-1671.

Sincerely,

Peter Zukowski
Program Manager
AD/CVD Operations, Office III



# EXHIBIT 11

Barcode:4159336-01 A-201-844 REV - Admin Review 11/1/19 - 10/31/20

UNITED STATES DEPARTMENT OF COMMERCE
International Trade Administration
Washington, D.C. 20230

A-201-844
Administrative Review
POR: 11/1/19 – 10/31/20
**Public Document**
E&C/OIII: DL

September 9, 2021

**Grupo Simec**
c/o Peter J. Koenig
Squire Patton Boggs (US) LLP
2550 M Street, NW, Suite 300
Washington, DC 20036

Re:     Steel Concrete Reinforcing Bar from Mexico:  Extension of Time for Grupo Simec's
        Supplemental Questionnaire Responses

Dear Mr. Koenig:

This is in response to your September 9, 2021, letter submitted on behalf of Grupo Simec and
Sigosa, which requested additional time to submit responses to the supplemental questionnaire
covering sections A and D that are currently due September 9, 2021.

We have evaluated your request and are extending the deadline for the submission of all
responses in the section A and D supplemental questionnaire until no later than **5 p.m. Eastern
Time, September 10, 2021.**  We additionally note that, given the amount of time already granted
to prepare the responses to this questionnaire, as well as the statutory and regulatory deadlines in
this case and ongoing workloads, we are unlikely to be able to accommodate any additional
extensions of time for the preparation and submission of responses to this supplemental
questionnaire.

Pursuant to 19 CFR 351.302(d)(1)(i) of Commerce's regulations, any information submitted
after the applicable deadline will be considered untimely filed and may be rejected.  In such a
case, we may have to resort to the use of facts available, as required by section 776(a)(2)(B) of
the Tariff Act of 1930, as amended.

Should you need further assistance or information with regard to this review, please contact
David Lindgren at (202) 482-1671.

Sincerely,

Peter Zukowski
Program Manager
AD/CVD Operations, Office III



# EXHIBIT 12

Barcode:4158116-01 A-201-844 REV - Admin Review 11/1/19 - 10/31/20

UNITED STATES DEPARTMENT OF COMMERCE
International Trade Administration
Washington, D.C. 20230

A-201-844
Administrative Review
POR:  11/1/19 – 10/31/20
**Public Document**
E&C/OIII:  DL

September 7, 2021

**Grupo Simec**
c/o Peter J. Koenig
Squire Patton Boggs (US) LLP
2550 M Street, NW, Suite 300
Washington, DC 20036

Re:    Steel Concrete Reinforcing Bar from Mexico:  Extension of Time for Grupo Simec's
       Supplemental Questionnaire Responses

Dear Mr. Koenig:

This is in response to your September 6, 2021, letter submitted on behalf of Grupo Simec and
Sigosa, which requested additional time to submit a portion of its responses to the supplemental
questionnaire covering sections A-C that are currently due September 7, 2021.

We note that, to date, Grupo Simec and Sigosa have been provided six weeks to prepare and
submit their responses.  The above-referenced request for additional time provides no detailed
justification for why the preparation of responses for questions 70-75 or the window period sales
requires additional time beyond the six weeks already allotted.  Accordingly, we have
determined that no additional time will be granted for the section A-C supplemental
questionnaire response.

Pursuant to 19 CFR 351.302(d)(1)(i) of Commerce's regulations, any information submitted
after the applicable deadline will be considered untimely filed and may be rejected.  In such a
case, we may have to resort to the use of facts available, as required by section 776(a)(2)(B) of
the Tariff Act of 1930, as amended.

Should you need further assistance or information with regard to this review, please contact
David Lindgren at David.Lindgren@trade.gov.

Sincerely,

Peter Zukowski
Program Manager
AD/CVD Operations, Office III



# EXHIBIT 13

Barcode:4159298-01 A-201-844 REV - Admin Review 11/1/19 - 10/31/20

UNITED STATES DEPARTMENT OF COMMERCE
International Trade Administration
Washington, D.C. 20230

A-201-844
Administrative Review
POR:  11/1/19 – 10/31/20
**Public Document**
E&C/OIII:  DL

September 9, 2021

**Grupo Simec**
c/o Peter J. Koenig
Squire Patton Boggs (US) LLP
2550 M Street, NW, Suite 300
Washington, DC 20036

Re:     Steel Concrete Reinforcing Bar from Mexico:  Response to Request for Extension of
        Time for Grupo Simec's Supplemental Questionnaire Responses

Dear Mr. Koenig:

This is in response to your September 7, 2021, letter submitted on behalf of Grupo Simec and
Sigosa, which requested additional time to submit responses to questions 70-75 of the
supplemental questionnaire covering sections A-C that were due September 7, 2021.

The above-referenced extension was filed with Commerce at 4:30 p.m. Eastern Time on
September 7, 2021, a short time before the 5 p.m. deadline for submission of the supplemental
questionnaire responses.  As discussed in the *Extension of Time Limits Preamble*, the likelihood
of an extension being granted will decrease the closer the extension request is filed to the
applicable time limit because the Department of Commerce (Commerce) needs time to consider
the request.[1]  Moreover, parties should not assume that they will receive an extension if they
have not received a response from Commerce.[2]  The *Extension of Time Limits Preamble* does
note that Commerce may issue a verbal response before the time limit expires, with a written
response provided as soon as practicable.[3]  Due to the short notice, Commerce was unable to
consider and issue a decision on the extension request, verbally or in writing, ahead of the
deadline for submission of the responses.  Therefore, as established in the *Extension of Time
Limits Preamble*, if Commerce is unable to notify a party of a decision on its extension request
by a deadline of 5 p.m., then the submission deadline becomes 8:30 a.m. the next business day.[4]
Accordingly, the deadline for the submission of responses to questions 70-75 in the section A-C
supplemental questionnaire was 8:30 a.m., September 8, 2021.

Further, Commerce provided three additional weeks for Grupo Simec and Sigosa to respond to
Commerce's supplemental questionnaire covering sections A-C, and we previously denied

---

[1] *See Extension of Time Limits*, 78 FR 57790 (September 30, 2013) (*Extension of Time Limits Preamble*) at 57792.
[2] *Id.*
[3] *Id.*
[4] *Id.*



Grupo Simec and Sigosa's request for an extension for responses to questions 70-75.[5]  In response to Grupo Simec and Sigosa's September 7, 2021, letter again requesting an extension for responses to questions 70-75, we are similarly denying the requested extension.  Pursuant to 19 CFR 351.302(d)(1)(i) of Commerce's regulations, any information submitted after the applicable deadline will be considered untimely filed and may be rejected.  In such a case, we may have to resort to the use of partial or total facts available, as required by section 776(a) of the Tariff Act of 1930, as amended (the Act), which may include adverse inferences, pursuant to section 776(b) (2)(B) of the Act.

Should you need further assistance or information with regard to this review, please contact David Lindgren at David.Lindgren@trade.gov.

Sincerely,

Peter Zukowski
Program Manager
AD/CVD Operations, Office III

---

[5] *See* Memorandum, "Steel Concrete Reinforcing Bar from Mexico: Extension of Time for Grupo Simec's Supplemental Questionnaire Responses," dated September 7, 2021.

2