## UNITED STATES COURT OF INTERNATIONAL TRADE

**BEFORE:  THE HONORABLE STEPHEN A. VADEN, JUDGE**

| | |
|---|---|
| GRUPO ACERERO S.A. de C.V., <br> GRUPO SIMEC S.A.B. de C.V., *et al.*, <br><br> Plaintiffs, <br><br> and <br><br> GERDAU CORSA, S.A.P.I. de C.V., <br><br> Plaintiff-Intervenor, <br><br> v. <br><br> UNITED STATES, <br><br> Defendant, <br><br> and <br><br> REBAR TRADE ACTION COALITION, <br><br> Defendant-Intervenor. | ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br><br> Consol. Court No. 22-00202 <br><br> PUBLIC VERSION <br> Business Proprietary Information <br> redacted in brackets [ ] on pages 9, <br> 11-13, 18, and 24 |

## DEFENDANT'S OPPOSITION TO PLAINTIFFS' <br> MOTION FOR A PRELIMINARY INJUNCTION

BRIAN M. BOYNTON <br>
Principal Deputy Assistant Attorney General

PATRICIA M. McCARTHY <br>
Director

L. MISHA PREHEIM <br>
Assistant Director

OF COUNSEL: <br>
IAN A. MCINERNEY <br>
Attorney <br>
Office of the Chief Counsel <br>
for Trade Enforcement & Compliance <br>
U.S. Department of Commerce

KARA M. WESTERCAMP <br>
Trial Attorney <br>
Commercial Litigation Branch <br>
Civil Division, U.S. Department of Justice <br>
P.O. Box 480, Ben Franklin Station <br>
Washington, D.C.  20044

December 28, 2022

Attorneys for Defendant

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................ ii

BACKGROUND ...............................................................................................................3

ARGUMENT ....................................................................................................................5

I.      Standard Of Review ...............................................................................................5

II.     Grupo Simec Has Failed To Demonstrate Immediate Irreparable Harm ...........................7

III.    Grupo Simec Has Not Shown A Likelihood Of Success On The Merits .........................18

IV.     The Balance Of Hardships And Public Interest Factors Compel Denial ..........................22

V.      Grupo Simec Should Be Required To Post Security Should An Injunction Issue ...........24

CONCLUSION ...............................................................................................................25

# TABLE OF AUTHORITIES

## Cases

*Am. Inst. for Imported Steel Inc. v. United States*,
  600 F. Supp. 204 (Ct. Int'l Trade 1984) ................................................................ 7

*Atari Games Corp. v. Nintendo of Am., Inc.*,
  897 F.2d 1572 (Fed. Cir. 1990) ............................................................................ 10

*Carolina Tobacco Co., Inc. v. United States*,
  402 F.3d 1345 (Fed. Cir. 2005) ............................................................................ 23

*Celsis In Vitro, Inc. v. CellzDirect, Inc.*,
  664 F.3d 922 (Fed. Cir. 2012) .............................................................................. 17

*Corus Grp. PLC v. Bush*,
  217 F. Supp. 2d 1347 (Ct. Int'l Trade 2002) ............................................. 7, 13, 14

*Decca Hosp. Furnishings, LLC v. United States*,
  391 F. Supp. 2d 1298 (Ct. Int'l Trade 2005) ....................................................... 15

*Decca Hosp. Furnishings, LLC v. United States*,
  29 CIT 1504 (2005) .............................................................................................. 15

*Decca Hospitality Furnishings, LLC v. United States*,
  427 F. Supp. 2d 1249 (Ct. Int'l Trade 2006) ................................................. 15, 16

*Decca Hosp. Furnishings, LLC v. United States*,
  185 F. App'x 945 (Fed. Cir. 2006) ....................................................................... 15

*Dongtai Peak Honey Indus. Co. v. United States*,
  777 F.3d 1343 (Fed. Cir. 2015) ............................................................................ 21

*Elkem Metals Co. v. United States*,
  135 F. Supp. 2d 1324 (Ct. Int'l Trade 2001) ................................................... 7, 11

*Essar Steel, Ltd. v. United States*,
  678 F.3d 1268 (Fed. Cir. 2012) ............................................................................ 20

*Estado de Sinaloa, A.C. v. United States*,
  389 F. Supp. 3d 1386 (Ct. Int'l Trade 2019) ....................................................... 14

*GPX Int'l Tire Corp. v. United States*,
  587 F. Supp. 2d 1278 (Ct. Int'l Trade 2008) ..................................................... 6, 9

*Int'l Custom Prods., Inc. v. United States,*
    30 CIT 21 (2006) ............................................................................................ passim

*Int'l Fresh Trade Corp. v. United States,*
    26 F. Supp. 3d 1363 (Ct. Int'l Trade 2014) ............................................. 14

*J. Conrad LTD v. United States,*
    457 F. Supp. 3d 1365 (Ct. Int'l Trade 2020) ............................................. 6

*Kwo Lee, Inc. v. United States,*
    24 F. Supp. 3d 1322 (Ct. Int'l Trade 2014) ............................................. 6

*Kwo Lee, Inc. v. United States,*
    70 F. Supp. 3d 1369 (Ct. Int'l Trade 2015) ........................................... 24

*MacMillan Bloedel Ltd. v. United States,*
    16 CIT 331 (1992) .......................................................................................... 2

*Mazurek v. Armstrong,*
    520 U.S. 968 (1997) ...................................................................................... 5

*Miranda v. Garland,*
    34 F.4th 338 (4th Cir. 2022) ...................................................................... 22

*Munaf v. Geren,*
    553 U.S. 674 (2008) ...................................................................................... 5

*Nken v. Holder,*
    556 U.S. 418 (2009) .................................................................................... 22

*Olympia Indus., Inc. v. United States,*
    30 CIT 12 (2006) ..................................................................................... passim

*Otter Prods., LLC v. United States,*
    37 F. Supp. 3d 1306 (Ct. Int'l Trade 2014) .................................. 6, 7, 12

*Premier Trading, Inc. v. United States,*
    144 F. Supp. 3d 1354 (Ct. Int'l Trade 2016) ......................................... 14

*Queen's Flowers de Colombia v. United States,*
    947 F. Supp. 503 (Ct. Int'l Trade 1996) ............................... 6, 17, 19, 20

*Reebok Int'l Ltd. v. J. Baker,*
    32 F.3d 1552 (Fed. Cir. 1994) ..................................................................... 3

*S.J. Stile Assoc. v. Snyder,*
    646 F.2d 522 (C.C.P.A. 1981) ........................................................................... 7

*Shandong Huarong Gen. Grp. v. United States,*
    122 F. Supp. 2d 143 (Ct. Int'l Trade 2000) ................................................. 6, 14

*Shandong Huarong Gen. Grp. v. United States,*
    122 F. Supp. 2d 1367 (Ct. Int'l Trade 2000) ............................................... 7, 8

*Shanghai Tainai Bearing Co., Ltd. v. United States,*
    582 F. Supp. 3d 1299 (Ct. Int'l Trade 2022) ............................................ passim

*Shree Rama Enters. v. United States,*
    983 F. Supp. 192 (Ct. Int'l Trade 1997) ........................................................ 13

*Sumecht NA, Inc. v. United States,*
    331 F. Supp. 3d 1408 (Ct. Int'l Trade 2018), *aff'd*, 923 F.3d 1340 (Fed. Cir. 2019) ................ 6

*Valeo N. Am., Inc. v. United States,*
    277 F. Supp. 3d 1361 (Ct. Int'l Trade 2017) ............................................. 2, 10

*Winter v. Nat. Res. Def. Council, Inc.,*
    555 U.S. 7 (2008) ................................................................................... passim

*Yakus v. United States,*
    321 U.S. 414 (1944) ....................................................................................... 23

*Zenith Radio Corp. v. United States,*
    710 F.2d 806 (Fed. Cir. 1983) ......................................................................... 7

## **Statutes**

19 U.S.C. § 1516a ................................................................................................ 8, 21

19 U.S.C. § 1671e(a) ................................................................................................ 21

19 U.S.C. § 1673(c) ............................................................................................. 3, 23

19 U.S.C. § 1675(a) ......................................................................................... 2, 3, 23

19 U.S.C. § 1677g(a) ............................................................................................... 13

28 U.S.C. § 2412(d) ................................................................................................ 16

28 U.S.C. § 2639(a) ................................................................................................ 22

28 U.S.C. § 2645(c) ........................................................................................................ 16

**Rules**

USCIT Rule 65(c) ........................................................................................................... 23

**Regulations**

19 C.F.R. § 351.205(d) ..................................................................................................... 3

19 C.F.R. § 113.12(a) ..................................................................................................... 25

**Other Authorities**

*Steel Concrete Reinforcing Bar From Mexico*,
    79 Fed. Reg. 54,967 (Dep't of Commerce Sep. 15, 2014) ...................................... 10

*Initiation of Antidumping Duty and Countervailing Duty Administrative Reviews*,
    86 Fed. Reg. 511 (Dep't of Commerce Jan. 6, 2021) .............................................. 3

*Steel Concrete Reinforcing Bar From Mexico*,
    86 Fed. Reg. 68,632 (Dep't Commerce Dec. 3, 2021) ............................................ 4

*Steel Concrete Reinforcing Bar from Mexico*,
    87 Fed. Reg. 34,848 (Dep't of Commerce June 8, 2022) ........................................ 2

**UNITED STATES COURT OF INTERNATIONAL TRADE**

**BEFORE:  THE HONORABLE STEPHEN A. VADEN, JUDGE**

| | |
|---|---|
| GRUPO ACERERO S.A. de C.V.,<br>GRUPO SIMEC S.A.B. de C.V., *et al.*,<br><br>      Plaintiffs,<br><br>and<br><br>GERDAU CORSA, S.A.P.I. de C.V.,<br><br>      Plaintiff-Intervenor,<br><br>    v.<br><br>UNITED STATES,<br><br>      Defendant,<br><br>    and<br><br>REBAR TRADE ACTION COALITION,<br><br>      Defendant-Intervenor. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) Consol. Court No. 22-00202<br>)<br>)  PUBLIC VERSION<br>) Business Proprietary<br>) Information redacted in<br>) brackets [ ] on pages 9, 11-<br>) 13, 18, and 24<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

**DEFENDANT'S OPPOSITION TO PLAINTIFFS'
MOTION FOR A PRELIMINARY INJUNCTION**

   Pursuant to Rule 65 of the Rules of the United States Court of International Trade,

defendant, the United States, respectfully submits this response in opposition to the motion for a

preliminary injunction filed by plaintiffs Grupo Simec S.A.B. de C.V.; Aceros Especiales Simec

Tlaxcala, S.A. de C.V.; Compania Siderurgica del Pacifico S.A. de C.V.; Fundiciones de Acero

Estructurales, S.A. de C.V.; Grupo Chant S.A.P.I. de C.V.; Operadora de Perfiles Sigosa, S.A. de

C.V.; Orge S.A. de C.V.; Perfiles Comerciales Sigosa, S.A. de C.V.; RRLC S.A.P.I. de C.V.;

Siderúrgicos Noroeste, S.A. de C.V.; Siderurgica del Occidente y Pacifico S.A. de C.V.; Simec

1

International 6 S.A. de C.V.; Simec International, S.A. de C.V.; Simec International 7 S.A. de C.V.; and Simec International 9 S.A. de C.V. (collectively, Grupo Simec). *See* Confidential Am. Mot. Prelim. Inj., ECF No. 32 (Grupo Simec Mot.).

As set forth below, Grupo Simec's motion falls far short of meeting the standard to grant the extraordinary relief of a preliminary injunction against the collection of cash deposits at the rate established by the United States Department of Commerce in the final results of the most recent administrative review of the antidumping duty order covering steel concrete reinforming bar from Mexico. *See Steel Concrete Reinforcing Bar from Mexico*, 87 Fed. Reg. 34,848 (Dep't of Commerce June 8, 2022) (final admin. review) (P.R. 212), and accompanying Issues and Decision Memorandum (IDM) (P.R. 208).  Not only does Grupo Simec provide *no* probative evidence to establish the accuracy of the assertions in the declarations submitted in support of the motion for likelihood of irreparable harm, but Grupo Simec both overstates its case on the merits and overlooks aspects of the record that undercut its position.  As we explain below, Commerce extensively detailed its determination to apply total facts available with an adverse inference on the basis of Grupo Simec's failure to fully respond to Commerce's questionnaires.

Further, neither the public interest nor balance of harms favors Grupo Simec.  It is well-settled that "'paying deposits pending court review is an ordinary consequence of the statutory scheme.'"  *Valeo N. Am., Inc. v. United States*, 277 F. Supp. 3d 1361, 1366 (Ct. Int'l Trade 2017) (quoting *MacMillan Bloedel Ltd. v. United States*, 16 CIT 331, 333 (1992)).  Indeed, Grupo Simec does no more than seek relief from the same garden variety circumstance that countless importers face daily.  In contrast, the statute directs that the final results, among other things, "*shall* be the basis . . . for deposits of estimated duties."  19 U.S.C. § 1675(a)(2)(C) (emphasis added).  Congress has directed the United States Customs and Border Protection (CBP) to collect

cash deposit rates to protect the United States' interests in the determination of anti-dumping duties.  *See* 19 U.S.C. §§ 1675(a)(2)(C), 1673(c)(1)(B)(ii); 19 C.F.R. § 351.205(d) (providing for importers to pay cash deposits higher than what is finally determined they owe, relying on subsequent mechanisms to return excess collections).  As this Court has explained in the context of a request to enjoin the collection of cash deposits, "if a preliminary injunction is granted, the public's interest in collecting antidumping revenue may be placed in the kind of jeopardy both the statutes and the regulations are designed to prevent.  This is a more than theoretical possibility."  *Olympia Indus., Inc. v. United States*, 30 CIT 12, 18–19 (2006).  "Against {Grupo Simec's} speculative and unsupported claims, the public's greater interest lies in following Congress's legislative enactments in the normal course and ensuring that {CBP} collects cash deposits sufficient to protect the public fisc."  *Shanghai Tainai Bearing Co., Ltd. v. United States*, 582 F. Supp. 3d 1299, 1312 (Ct. Int'l Trade 2022) (citing 19 U.S.C. §§ 1673(c)(1)(B)(ii), 1675(a)(2)(C)).

At bottom, Grupo Simec "must establish *both* a likelihood of success on the merits and irreparable harm" to obtain the rare and extreme relief it seeks.  *Reebok Int'l Ltd. v. J. Baker, Inc.*, 32 F.3d 1552, 1556 (Fed. Cir. 1994) (emphasis added).  It cannot.  Because Grupo Simec also fails to establish that the balance of harms and public interest weighs in its favor, the Court should deny the motion.

## **BACKGROUND**

On January 6, 2021, Commerce initiated an administrative review of the antidumping duty order covering steel concrete reinforcing bar (rebar) from Mexico.  *See Initiation of Antidumping Duty and Countervailing Duty Administrative Reviews*, 86 Fed. Reg. 511 (Dep't of Commerce Jan. 6, 2021) (P.R. 16).  A month later, Commerce selected Deacero S.A.P.I. de C.V.

3

(Deacero) and Grupo Simec, the two largest exporters and/or producers of rebar by volume during the period of review, for individual examination as mandatory respondents.[1]  *See Steel Concrete Reinforcing Bar From Mexico*, 86 Fed. Reg. 68,632 (Dep't Commerce Dec. 3, 2021) (P.R. 170) (*Preliminary Results*), and accompanying Preliminary Issues and Decision Memorandum at 2 (PDM) (P.R. 166).

Commerce issued initial questionnaires to Deacero and Grupo Simec on February 8, 2021, and received timely responses between March 11, 2021, and April 14, 2021.  *See* Deacero Initial Questionnaire (P.R. 26); Grupo Simec Initial Questionnaire (P.R. 28); PDM at 2-3. Commerce issued supplemental questionnaires to Grupo Simec on July 27, 2021, and August 8, 2021, and received timely responses between September 8 and 10, 2021.  *See* Grupo Simec 1st SQ (P.R. 80); Grupo Simec Sec. D SQ (P.R. 81); Grupo Simec Sec. A-C SQR (C.R. 125 through C.R. 165); Grupo Simec Sec. A&D SQR (C.R. 166 through C.R. 190).

On December 3, 2021, Commerce issued its preliminary results.  Commerce preliminarily assigned Grupo Simec an antidumping duty rate of 66.70 percent based on facts available with an adverse inference.  This rate was the adverse facts available rate assigned to Grupo Simec in the original investigation.  PDM at 9.  In the preliminary results, Commerce identified a significant number of deficiencies in Grupo Simec's initial questionnaire responses, such as failure to provide supporting documentation and errors within provided data and supporting documentation.  *See id.* at 4-5.  Indeed, in its supplemental questionnaire response, Grupo Simec admitted that there were "{a} lot of clerical errors in the exhibits submitted with the initial questionnaire response."  Grupo Simec Sec. A-C SQR Part 1.1 at 53 (PDF p. 61) (C.R.

---

[1]  In the final results, Commerce determined that Deacero did not make sales of rebar to the United States at prices below normal value during the period of review.  IDM at 1.

125); *see also* PDM at 4-5.  In the preliminary results, Commerce explained that after it had

issued two supplemental questionnaires and had provided Grupo Simec opportunities to correct

these identified deficiencies, multiple deficiencies remained in Grupo Simec's responses.  *See*

PDM at 4-5.  For example, Grupo Simec had failed to answer any of the questions related to

downstream sales.  *Id*.

On June 8, 2022, Commerce published the final results, in which it continued to

determine that Grupo Simec's final margin should be based on facts available with an adverse

inference and applied the same 66.70 percent rate.  IDM at 1.  Two days later, on June 10, 2022,

CBP issued cash deposit instructions in message number 2161401, establishing a 66.70 percent

rate for Grupo Simec's entries.[2]

Following publication of the final results, on July 11, 2022, Grupo Simec commenced

this action.  *See* Summons ECF No. 1.  Relevant here, on August 19, 2022, this Court granted

Grupo Simec's Proposed Order for Statutory Injunction Upon Consent, enjoining the United

States and its delegates, during the pendency of this litigation, including any appeals, from

issuing liquidation instructions with respect to Grupo Simec's entries covered by the final results.

*See* Form 24 Order for Statutory Injunction Upon Consent, ECF No. 10.  Thereafter, on

December 7, 2022, over five months after Commerce issued cash deposit instructions, Grupo

Simec brought this motion.

## ARGUMENT

### I.    Standard Of Review

Injunctive relief is "an extraordinary and drastic remedy, one that should not be granted

unless the movant, *by a clear showing*, carries the burden of persuasion."  *Mazurek v. Armstrong*,

---

[2] CBP instructions are available at https://aceservices.cbp.dhs.gov/adcvdweb/
#messageDetails.

520 U.S. 968, 972 (1997) (citation omitted).  A preliminary injunction is "never awarded as of

right."  *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008) (citing *Munaf v. Geren*, 553

U.S. 674, 689–90 (2008)).  To obtain a preliminary injunction, a party must establish each of

four elements:  "(1) that it will be immediately and irreparably injured; (2) that there is a

likelihood of success on the merits; (3) that the public interest would be better served by the

relief requested; and (4) that the balance of hardship on all the parties favors the {movant}."

*Otter Prods., LLC v. United States*, 37 F. Supp. 3d 1306, 1314 (Ct. Int'l Trade 2014) (citation

omitted); *see also Winter*, 555 U.S. at 20–21.

     Pertinent here, because the movant "must establish" all four factors, the failure to prove

any one of them compels the denial of injunction relief.  *See Winter*, 555 U.S. at 20; *Shandong

Huarong Gen. Grp. v. United States*, 122 F. Supp. 2d 143, 145 (Ct. Int'l Trade 2000) ("If

Plaintiff fails to prove any one of these factors, its motion must fail").  Although some courts

have previously employed a "sliding scale" in evaluating the four injunctive factors, "{i}nsofar

as the sliding scale standard relaxes the necessary showing of irreparable harm to something less

than a likelihood, that standard is no longer viable after *Winter*."  *J. Conrad LTD v. United

States*, 457 F. Supp. 3d 1365, 1374 (Ct. Int'l Trade 2020); *see also Winter*, 555 U.S. at 22 ("Our

frequently reiterated standard requires plaintiffs seeking preliminary relief to demonstrate that

irreparable injury is *likely* in the absence of an injunction").  Specifically, an injunction against

the collection of cash deposits will be granted "only in the rarest of instances."  *GPX Int'l Tire

Corp. v. United States*, 587 F. Supp. 2d 1278, 1284 (Ct. Int'l Trade 2008) (quoting *Queen's

Flowers de Colombia v. United States*, 947 F. Supp. 503, 506 (Ct. Int'l Trade 1996)).

II.    **Grupo Simec Has Failed To Demonstrate Immediate Irreparable Harm**

Grupo Simec has not demonstrated that it will suffer immediate irreparable harm absent injunctive relief.  A plaintiff seeking an injunction bears an "extremely heavy burden" to establish irreparable injury.  *Shandong Huarong*, 122 F. Supp. 2d at 146.  To satisfy this standard, plaintiffs must offer more than "speculative" evidence; they must demonstrate that they face an "immediate and viable" threat of irreparable harm.  *Otter Prods.*, 37 F. Supp. 3d at 1315 (quoting *Kwo Lee, Inc. v. United States*, 24 F. Supp. 3d 1322, 1326 (Ct. Int'l Trade 2014)); *Sumecht NA, Inc. v. United States*, 331 F. Supp. 3d 1408, 1412 (Ct. Int'l Trade 2018), *aff'd*, 923 F.3d 1340 (Fed. Cir. 2019) (failure to demonstrate immediate irreparable harm compels denial of request for preliminary injunction) (citing *Zenith Radio Corp. v. United States*, 710 F.2d 806, 809 (Fed. Cir. 1983)).

As the Federal Circuit has explained: "A preliminary injunction will not issue simply to prevent a mere possibility of injury, even where prospective injury is great.  A presently existing actual threat must be shown." *Zenith*, 710 F.2d at 809-10 (quoting *S.J. Stile Assoc. v. Snyder*, 646 F.2d 522, 525 (C.C.P.A. 1981)) (holding that a preliminary injunction barring the liquidation of entries subject judicial challenge is appropriate because damages from liquidation prior to Court review "would not be economic only" but rather would "eliminate the only remedy available to Zenith for an incorrect review determination.").  And, as this Court recognized in *Otter*, "{t}he threat of irreparable harm must be 'demonstrated by probative evidence,'" and "'cannot be determined by surmise.'"  37 F. Supp. 3d at 1315 (quoting *Am. Inst. for Imported Steel Inc. v. United States,* 600 F. Supp. 204, 209 (Ct. Int'l Trade 1984) and *Elkem Metals Co. v. United States,* 135 F. Supp. 2d 1324, 1331 (Ct. Int'l Trade 2001)).  Courts "must deny a preliminary

injunction where the plaintiff fails to present evidence that the alleged injuries are likely to occur." *Id*.

Moreover, the Court has repeatedly declined to find irreparable harm based merely on claims of financial losses. *See, e.g.*, *Corus Group PLC v. Bush*, 217 F. Supp. 2d 1347, 1355 (Ct. Int'l Trade 2002) (concluding that threat of "economic injury" does not constitute irreparable harm). In *Corus*, despite testimony that "sound business principles would require {the company} to close the plant rather than operate at a loss," the Court concluded that the plaintiff failed to establish irreparable harm because there was no evidence the plant was "in danger of imminent closure." *Id.* And, in *Shandong Huarong*, the Court concluded that the plaintiff failed to establish irreparable harm when it submitted an affidavit from its "major customer" in the United States stating that it would cancel all existing and future orders if cash deposits were required. 122 F. Supp. 2d at 1369-70. Noting that "affidavits submitted by interested parties are weak evidence, unlikely to justify a preliminary injunction," the Court found that the plaintiff did not meet its burden because the affidavits were not supported by evidence "indicating exactly how and when these lost sales would force it out of business." *Id.*; *see also Shanghai Tainai*, 582 F. Supp. 3d at 1309 (observing that company president and declarant "provides no evidence of either a harm akin to an imminent plant closure or of specific customers threatened by the involuntary cessation of their business practices.").

With respect to this motion, it bears repeating that Grupo Simec's request to enjoin the collection of cash deposits is unusual and is unlike most motions for preliminary injunction filed with this Court, which typically seek to enjoin the liquidation of entries, *not* the collection of cash deposits. Indeed, by statute, Commerce is required to issue updated cash deposit instructions at the conclusion of an administrative review which apply to as-yet-unreviewed

8

entries, and those instructions remain in effect even if the administrative review is subject to litigation before this Court. *See* 19 U.S.C. § 1516a. Although this Court routinely issues statutory injunctions enjoining the *liquidation* of previously-reviewed entries, the statute does not envision the Court enjoining Commerce from instructing CBP to collect cash deposits at a certain rate. *See id.* § 1516a(c)(2) (providing that the Court "may enjoin the *liquidation* of some or all entries of subject merchandise covered by a determination . . .") (emphasis added). And this makes sense given the corresponding statutory requirement to collect cash deposits affecting future, as-yet-unreviewed entries when Commerce issues an antidumping duty order. *See id.* § 1671e(a)(3). Therefore, this matter is no different than any other in which a party believes its cash deposit rate should be lower: a party may either challenge the final results (as Grupo Simec has done) upon which the cash deposit instructions are based (in which case Commerce will update the instructions if it reaches a new decision not in harmony with the final results), or request an administrative review of the suspended entries for which the cash deposits are paid. The Court should not permit Grupo Simec's attempt to bypass the statutory structure via this motion. *See GPX*, 587 F. Supp. 2d at 1284; *Shanghai Tainai*, 582 F. Supp. 3d at 1312.

Here, even overlooking the unusual nature of its request, Grupo Simec does not meet its "heavy burden" to establish immediate and irreparable harm. It identifies two main forms of harm it will allegedly suffer: (1) reputational harm and lost future business and (2) lost revenue and [███████████████████████████████]. *See* Grupo Simec Mot. at 16–20, Ex. 2. But despite making broad claims of harm, Grupo Simec's assertions are speculative and unsupported by probative evidence. The *only* evidentiary support for Grupo Simec's position are: (1) two unsworn declarations, one from Mario Moreno, the Head of Finance of Grupo Simec, and another from Hector Lizarraga, a Foreign Trade Manager of Grupo Simec; and

9

(2) two letters from representatives of two companies that claim to have business relationships with Grupo Simec.  *See* Grupo Simec's Mot., Ex. 1-4.  These self-serving declarations and letters, however, are not otherwise substantiated, are conclusory, and do not establish immediate and irreparable harm.  And neither has Grupo Simec offered to make these company representatives available for deposition and/or cross-examination.  *See Atari Games Corp. v. Nintendo of Am., Inc.*, 897 F.2d 1572, 1575 (Fed. Cir. 1990) ("As a general rule, a preliminary injunction should not issue on the basis of affidavits alone.").

*First*, on reputational harm and lost future business, Grupo Simec claims it has made no shipments of rebar to the United States since June 8, 2022.  Grupo Simec Mot. at 18.  Grupo Simec also claims that because it will have to await completion of this litigation before obtaining relief from the 66.70 percent rate, its customers "may be lost forever" and it might have to find other suppliers.  *Id*.  Although Grupo Simec argues that the cash deposit rates will negatively impact its ability to sell rebar in the United States, it overlooks that the same could be true for *any* cash deposit rate.  Indeed, "paying deposits pending court review," is not a hardship warranting an injunction; it is merely "an ordinary consequence of the statutory scheme."  *Valeo N. Am., Inc.*, 277 F. Supp. 3d at 1366.

Further, neither unsworn declaration provides details on Grupo Simec's total assets or investment capital that remains available notwithstanding these cash deposits.  Instead, Grupo Simec merely offers a series of speculative and unfounded assertions, contending it "likely" or "may" be forced to find new customers, or that its competitors "likely" will take over Grupo Simec's share of the American market over the next 18 months.  *See* Grupo Simec's Mot. at 16-20, Ex. 1.  Even putting aside Grupo Simec's failure to demonstrate why the higher antidumping

duty rate will cause it to lose all of its customers, Grupo Simec offers no probative evidence to support this speculative argument.

Relatedly, the unsworn declarations Grupo Simec attached to its motion do not demonstrate that antidumping duties have impacted the long-term relationship with its customers to the degree that Grupo Simec contends. For example, in one of the provided customer letters, that customer has already experienced the 66.70 percent cash deposit rate set in the original investigation, due to its stated 15-year relationship with Grupo Simec. *See id*. at Ex. 4.; *see also* PDM at 9. Indeed, it is difficult to understand why the 66.70 percent rate would not have caused this customer to abandon Grupo Simec eight years ago but would now, suddenly, cause it to cease future purchases from Grupo Simec (to the extent it even planned to do so). Grupo Simec Mot. at Ex. 4; *see also Steel Concrete Reinforcing Bar From Mexico*, 79 Fed. Reg. 54,967, 54,968 (Dep't of Commerce Sep. 15, 2014) (final admin. review) (noting that Grupo Simec's rate after the completion of the original investigation was 66.70 percent and that this rate remained in effect until the first administrative review was completed in June of 2017, a nearly three-year period). Additionally, though Grupo Simec claims it has lost [         ] in sales during the months of June and July 2022, since the imposition of the 66.70 percent rate and that it will [                              ] by the following year, neither Grupo Simec nor its customers identify any contract that has been lost or negatively affected. *See* Grupo Simec's Mot. at Ex. 1-4. This clearly undermines Grupo Simec's position and underscores that its speculative fears of *potential* loss of future business "cannot provide the basis for a finding of irreparable injury." *Elkem Metals Co.*, 135 F. Supp. 2d at 1331–32 (rejecting "speculative and conclusory" statements on future harm).

Indeed, Grupo Simec provides no exhibits to resolve these issues. The statements in the unsworn declarations largely parrot the conclusory assertions Grupo Simec makes in its brief. Although Mr. Lizarraga, the foreign trade manager of Grupo Simec, adds that Grupo Simec may have to [████████████████████] if it is unable to fulfill orders with certain U.S. customers, Grupo Simec's Mot., Ex. 2 ¶ 5, he fails to explain how Grupo Simec will ever be in that position, much less quantify how many orders it will not be able to meet. Mr. Lizarraga also fails to explain when [████████████████████████████████] and fails to explain in any real detail how any of the assertions made in his letter will come to pass.

Critically, even if these vague and speculative assertions were substantiated with evidence, which they are not, Grupo Simec does not explain how the injunction could remedy any alleged "damage," as Grupo Simec was previously subjected to an antidumping duty rate of 66.70 percent, and, again, at least one of its customers purchased rebar from it at that rate. *See* Grupo Simec Mot. at Ex. 4 (explaining the customer has purchased from Grupo Simec for 15 years). Indeed, the common thread in the two customer letters that Grupo Simec attached to its motion, is that Grupo Simec produces 3/8" steel rebar, which is the smallest diameter rebar in the market and is not always available from U.S. manufacturers. *Id.* ("US mills do produce all diameters but fail to keep the one size (3/8" diameter) available all the time."); Grupo Simec Mot. at Ex. 3 (describing the 3/8" diameter as "difficult" to procure). Thus, the Court should discount Grupo Simec's assertion that its customer relationships will be damaged by the 66.70 percent cash deposit rate when its long-time customers have professed how valued Grupo Simec's product is to their businesses.

*Second*, Grupo Simec argues that the increased antidumping duty rate will "undercut" its commitments to its customers and cause it to lose "new relationships with U.S. customers"

leading it to "lose large amounts of money on each shipment to the U.S."  Grupo Simec Mot. at Ex. 2.  But again, Grupo Simec offers no probative evidence in support of these speculative and conclusory assertions.  *See id.*  In addition, it fails to articulate why its business plans must be adjusted because of the higher antidumping duty rate or specify how its plans will change. Notably, it offers no explanation on how these possible future changes will result in irreparably lost business.

　　　　To the extent Grupo suggests that it will lose money and potentially [███████████], it has plainly failed to show as much.  Grupo Simec provides no contracts—not an example or even the pertinent terms thereof—or other evidence to reveal the framework of its agreements to enable the Court to assess how the current antidumping duty rate may lead to these purported losses.  Instead, Grupo Simec points only to Mr. Moreno's and Mr. Lizarraga's conclusory assertions and unsubstantiated numbers in their unsworn declarations, which do not provide the missing details.  And even if Grupo Simec's current contracts and/or sales commitments would lead to a financial loss under the current 66.70 percent rate in the antidumping duty order, allegations of harm to potential future business relations are too speculative to constitute irreparable harm.  *See Otter*, 37 F. Supp. 3d at 1315.

　　　　Further, even if Grupo Simec's assertions were substantiated, which they are not, it fails to show that this purported economic burden stemming from paying cash deposits will be *irreparable*.  Indeed, if the 66.70 percent antidumping duty deposit rate is ultimately set aside or reduced as a result of judicial review, Grupo Simec will receive a refund with interest.  *See* 19 U.S.C. § 1677g(a) ("Interest shall be payable on overpayments . . . of amounts deposited on merchandise entered, or withdrawn from warehouse, for consumption . . . .").  In other words, if Grupo Simec succeeds on the merits of its currently pending claims concerning the

administrative review, it will get its money back, with interest.  Similarly, Grupo Simec fails to explain how relationships with its customers would be *irreparable* when it has managed to maintain relationships with its customers since before the initiation of the original investigation and into the current administrative review.  *See* Grupo Simec's Mot. at Ex. 4.

Indeed, under similar circumstances, where a plaintiff failed to substantiate its claims, this Court has repeatedly declined to find irreparable harm.  For example, in *Shree Rama Enterprises v. United States*, the plaintiffs submitted six affidavits that included "customer letters" and "descriptions of conversations with customers" showing that the customers "have switched or will switch suppliers," yet the Court still found such proof "insufficient."  983 F. Supp. 192, 195 (Ct. Int'l Trade 1997).  Deeming affidavits from interested parties "weak evidence," the Court denied the motion to enjoin the collection of deposits at the increased rates, explaining that, if it were to grant the motion "on so little documentary evidence, it would essentially be holding that any substantial increase in deposit rates before a final court decision constitutes irreparable harm *per se*."  *Id.* at 195–96.

In *Corus Group PLC v. Bush*, despite evidence that the plaintiff "may suffer an adverse economic impact," the Court held that it failed to establish irreparable harm because there was insufficient evidence that the plant at issue was "in danger of imminent closure."  217 F. Supp. 2d 1347, 1354–55 (Ct. Int'l Trade 2002).  The Court reasoned that, because "{e}very increase in duty rate will necessarily have an adverse {e}ffect on foreign producers and importers," finding irreparable harm on these facts would "effectively create a *per se* irreparable harm rule in similar challenges—a result likely contrary to the extraordinary nature of the remedy."  *Id.* at 1355.  Grupo Simec has similarly presented a paucity of evidence in support of its claimed likelihood of irreparable harm.  *See* Grupo Simec Mot. at Exs. 1-4.

Numerous other decisions are in accord with *Shree Rama* and *Corus* and confirm that

Grupo Simec's weak evidentiary showing fails to satisfy the irreparable harm factor.  *See, e.g.*:

- *Shanghai Tainai*, 582 F. Supp. 3d at 1308-09 (denying motion to enjoin collection of deposits at increased rate where movant could not demonstrate immediacy of the harm and the reliance on observations from a customer demonstrated that the "allegations {of harm} are substantially less potent than those adduced by other failed injunction applicants");

- *Shandong Huarong*, 122 F. Supp. 2d at 145–49 (denying motion to enjoin collection of deposits at increased rate where evidence consisted solely of an affidavit from plaintiff's "major customer" and was not bolstered "through independent evidence indicating exactly how and when" the lost sales "would force it out of business");

- *Confederacion de Asociaciones Agricolas del Estado de Sinaloa, A.C. v. United States*, 389 F. Supp. 3d 1386, 1398–1403 (Ct. Int'l Trade 2019) (rejecting plaintiffs' claim that it would suffer lost sales, loss of goodwill, and loss of business opportunities despite submission of several declarations and other documents because evidence was "unspecific," "inconclusive," and "too speculative");

- *Premier Trading, Inc. v. United States*, 144 F. Supp. 3d 1354, 1359 (Ct. Int'l Trade 2016) (concluding the record did not establish irreparable harm where plaintiff relied on a single affidavit of a company manager that contained "bald assertions without accompanying support");

- *Int'l Fresh Trade Corp. v. United States*, 26 F. Supp. 3d 1363, 1368 (Ct. Int'l Trade 2014) (rejecting claim of irreparable harm where plaintiff produced no independent evidence and submitted only two affidavits from its vice president);

- *Int'l Custom Prod., Inc. v. United States*, 30 CIT 21, 24-29 (2006) (finding plaintiff failed to demonstrate irreparable harm where it relied almost entirely on a conclusory declaration from its president and submitted "no financials, contracts, or other proof to make its case");

- *Olympia Indus., Inc.*, 30 CIT at 17 (holding plaintiff did not show it will face immediate and irreparable injury even though it demonstrated it will suffer "some economic loss should the demand for cash deposits be enforced").

Further, Grupo Simec's cited authority are inapposite.  *See* Grupo Simec's Mot. at 16, 18-

19.  For example, in *Decca Hospitality Furnishings, LLC v. United States*, although the Court

found the irreparable harm factor satisfied in that case, the factual scenario is not comparable to

this case.  427 F. Supp. 2d 1249, 1254 (Ct. Int'l Trade 2006) (*Decca II*) (citing *Decca Hosp. Furnishings, LLC v. United States*, 391 F. Supp. 2d 1298 (Ct. Int'l Trade 2005) (*Decca I*)).  In *Decca I*, the Court held that Decca Hospitality Furnishings, LLC (Decca) did not receive actual notice of its filing requirements for filing a separate rate, and ordered Commerce to consider whether Decca should have received a separate rate of 6.65 percent, rather than the China-wide entity rate of 198.08 percent.  391 F. Supp. 2d at 1310-11, 1317.  Upon remand, Commerce determined that Decca had not, in fact, received actual notice of the filing requirements and pursuant to the Court order, determined that Decca was eligible for a separate rate.  *Decca Hosp. Furnishings, LLC v. United States*, 29 CIT 1504, 1504 (2005).

However, the defendant-intervenor appealed (which was ultimately voluntarily dismissed), which delayed the final judgment that would ultimately determine which rate would be applied to Decca.  *See Decca Hosp. Furnishings, LLC v. United States*, 185 F. App'x 945 (Fed. Cir. 2006) (granting unopposed motion to voluntarily dismiss appeal).  At the time of *Decca II*, procedurally, the rate applicable to Decca was the 6.65 percent separate rate, but Commerce could not legally apply that rate until *after* Commerce issued cash deposit instructions to CBP, which could not occur until after *final* judgment.  *See Decca II*, 427 F. Supp. 2d at 1254-55; *see also* 28 U.S.C. § 2645(c) ("A decision of the Court of International Trade is final and conclusive, unless . . . an appeal is taken to the Court of Appeals for the Federal Circuit . . . ."); 28 U.S.C. § 2412(d)(2)(G) (" 'final judgment' means a judgment that is final and not appealable . . . .").

The Court in *Decca II*, while it did not have the benefit of knowing that the appeal of *Decca I* would ultimately be dismissed, acknowledged the unique factual scenario before it: "Finally, and importantly, given the low probability that Decca's goods will be liquidated at the

extraordinary 198.08 {percent} rate, and Commerce's decision not to appeal this court's decision, granting relief is appropriate here." *Decca II*, 427 F. Supp. 2d at 1264 (internal citations omitted). Therefore, Decca, in *Decca II*, already had a favorable judgment in hand, the rate applied to it had already been called into question, and Decca's likelihood of succeeding on the merits was high. In contrast, the legality of the rate Commerce assessed for Grupo Simec has yet to be fully litigated and, as discussed in greater detail below, Grupo Simec's likelihood of success on the merits is low. Thus, Grupo Simec has not established that it is in a similar position as Decca.

*Jiangsu Hilong International Trading Co., Ltd. v. United States*, Ct. No. 02-00311, Order Granting Preliminary Injunction ECF No. 15 (Ct. Int'l Trade June 4, 2002) (*Jiangsu* Order), is also inapposite. Grupo Simec Mot. at 18-19. In *Jiangsu*, Commerce determined that Jiangsu Hilong International Trading Co., Ltd. (Jiangsu) and Ningbo Nanlian Frozen Foods Company, Ltd.'s (Ningbo) were affiliated parties in the production and export of freshwater crawfish tail from China. In a subsequent proceeding where Jiangsu had no shipments but Ningbo did have shipments, because of their affiliated status, both parties received a 62.51 percent margin. *See Jiangsu* Order at 4. While the assessment of the 62.51 percent margin or cash deposit rate alone would not be sufficient to demonstrate irreparable harm, additional facts demonstrated imminent irreparable harm. Specifically, the European Union banned imports of freshwater crawfish, and Jiangsu provided probative evidence from a bank that pointed directly to the imminent bankruptcy of the company. On those unique facts, the Court held that there was the threat of immediate and irreparable injury. *Id.* at 4, 10, 13. Grupo Simec has provided no evidence of any similar circumstances.

While Grupo Simec cites *Celsis In Vitro, Inc. v. CellzDirect, Inc.*, 664 F.3d 922, 930 (Fed. Cir. 2012), for support that "proof of imminent bankruptcy {is not} a prerequisite for a showing of irreparable injury in the context of a preliminary injunction," Grupo Simec Mot. at 19-20, that case is also inapposite.  Indeed, the *Celsis* court found no "clear error" in the district court's grant of a preliminary injunction against a patent *infringer*, because the infringer's "losses were the result of its own calculated risk in selling a product with knowledge of Celsis' patent."  *Celsis*, 664 F.3d at 931.

Similarly, in *Queen's Flowers*, the Court found that eight companies had established irreparable harm by showing that they would face "immediate extinction."  947 F. Supp. at 506–07.  Notably, in *Queen's Flowers*, despite other companies showing they would be "seriously compromised by the new deposit rate," those companies had *not* established irreparable harm because their sales of non-subject merchandise would permit them to "survive."  *Id.* at 507.  In contrast to these cases, Grupo Simec does not contend it faces immediate or even eventual extinction, [█████████████████████████████████████████████████████ ████████████████████████████████████████████████], placing this case on the other end of the spectrum.

Accordingly, the Court should find that Grupo Simec's speculative and unsupported claims fail to establish immediate irreparable injury.  On this basis alone, the Court should deny the request for a preliminary injunction.  *See Winter*, 555 U.S. at 20–21.

**III.     <u>Grupo Simec Has Not Shown A Likelihood Of Success On The Merits</u>**

In light of Grupo Simec's failure to demonstrate irreparable harm, as well as Grupo Simec's shortcomings on the other factors, as we explain below, the Court need not address the merits.  Nonetheless, Grupo Simec has failed to demonstrate a likelihood of success on the merits.  *See* Grupo Simec Mot. at 20-33.

Grupo Simec first argues that Commerce erred by applying a rate based on total facts available with an adverse inference. *See id.* at 21. On the one hand, Grupo Simec argues that "{t}o the extent Commerce does attempt to identify specific gaps in the Preliminary and Final IDM, it does so in error," *id.* at 22, but then argues in the alternative that Commerce should have applied only *partial* adverse facts available for its failure to answer several questions, and not total adverse facts available. *Id.* at 22-25. Relatedly, Grupo Simec argues that Commerce failed to adequately notify it of any alleged deficiencies. *Id.* at 28-29. Because it cannot show that Commerce's final results are contrary to law or unsupported by substantial evidence, Grupo Simec's arguments fail to demonstrate a likelihood of success on the merits.

First, as Commerce explained in the final results, it "did provide an explanation of {Grupo Simec's} deficiencies in the *Preliminary Results*, and also has presented a more robust discussion of the individual issues in the Deficiencies Memorandum that accompanies this decision memorandum, as well as how the deficiencies {Commerce} identified in the *Preliminary Results* call into question the overall accuracy of Grupo Simec's data." IDM at 24.[3] Commerce also explained its determination to apply total, rather than partial, adverse facts available because "Grupo Simec's submissions show a systemic series of deficiencies that undermine the data's reliability in its entirety." *Id.* at 27. Commerce further articulated its concern with "the fact that the home market and U.S. sales data are riddled throughout with

---

[3] We also note that the Court has not yet ruled on our motion to correct the administrative record to include the Deficiencies Memorandum, which provides more information about why Commerce determined to apply facts available with an adverse inference. *See* Def.'s Mot. for Leave to Correct the Administrative Record, ECF No. 28 (Nov. 18, 2022); *see also* IDM at 25 ("{Commerce} reiterate{s} that, as discussed in the Deficiencies Memorandum, Grupo Simec failed to cure a variety of deficiencies *with the data that it submitted*") (emphasis added); *id.* ("as discussed in the Deficiencies Memorandum, *some of the information that Grupo Simec submitted* was either not supported or, in certain instances, even conflicted with other information on the record.") (emphasis added).

deficiencies to such an extent that it is simply impossible for Commerce to calculate an accurate dumping margin using the data submitted." *Id.* at 28; *see id.* at 8 ("as demonstrated by the length of the supplemental questionnaires {Commerce} issued in this case, the deficiencies that Commerce encountered in the initial questionnaire responses were unusually extensive and spread across virtually every part of Grupo Simec's responses"). Thus, substantial evidence supports Commerce's determination to apply total facts available with an adverse inference because despite repeated requests to Grupo Simec, Commerce determined that its responses were inadequate and it could not rely on the data that Grupo Simec had provided. *See Essar Steel Ltd. v. United States*, 678 F.3d 1268, 1276 (Fed. Cir. 2012) ("Because Commerce lacks subpoena power, Commerce's ability to apply adverse facts is an important one.").

Second, Grupo Simec argues that Commerce abused its discretion by rejecting an October 18, 2021, filing as untimely and by denying various extension requests. Grupo Simec Mot. at 26-28, 31-33. In the final results, Commerce explained that it "provided Grupo Simec with all the time it requested to submit responses to the initial sections B, C, and D questions," and that it "ultimately granted Grupo Simec approximately six weeks to prepare and submit its {supplemental} responses." IDM at 9. And as for rejecting a final extension request, Commerce explained that Grupo Simec had filed an extension request for a "significant amount of additional time" on the deadline to submit the Section A and C supplemental questionnaires, and had failed to "provide a rationale for the extension it requested{.}" *Id.* at 10-11; *see also id.* at 14 ("The record demonstrates that Commerce made every attempt to accommodate Grupo Simec's challenges and that Grupo Simec had more than sufficient time to prepare and submit its supplemental questionnaire responses.").

With respect to the October 18 filing, Commerce explained that it had rejected the filing because Grupo Simec "not only failed to comply with basic regulatory requirements, but {it} was also an attempt to submit untimely questionnaire responses, described as 'additional information.'" *Id.* at 17.  Not only was the filing six weeks late, as Commerce explained, but Grupo Simec did not "attempt to show that it qualified for the information to be accepted on the basis of Commerce's regulatory provisions for extraordinary circumstances." *Id.* at 18-19; *see also id.* at 33 ("it simply tried to submit the data disguised as unrelated, additional information, though it was obvious from the submission that it was simply an attempt to answer the questions and provide the requested downstream data.").  Thus, it was not an abuse of discretion for Commerce to reject untimely factual information, or to not grant further extensions.  *See Dongtai Peak Honey Indus. Co. v. United States*, 777 F.3d 1343, 1351 (Fed. Cir. 2015) ("Here, Commerce properly exercised its discretion in rejecting Dongtai Peak's extension requests and Supplemental Responses because (1) the extension requests were submitted after the established deadline in violation of 19 C.F.R. § 351.302(c), and (2) Appellant failed to show 'good cause' for an extension as required by § 351.302(b).").

Finally, Grupo Simec argues that Commerce erred in finding that it had failed to cooperate and that the rate applied is unduly punitive.  Grupo Simec Mot. at 25-26, 29-30.  These arguments are meritless.  Commerce explained in the final results that Grupo Simec "failed to cooperate to the best of its ability when it did not remedy the questionnaire deficiencies within the allotted time frame, despite Commerce effectively granting {it} all the additional time it requested prior to the deadline."  IDM at 28.  Indeed, "{r}egardless of the reasons as to why Grupo Simec was unable to submit the correct information within the unusually long timeframe allotted by Commerce, the inability to provide accurate data from its own records cannot support

21

a conclusion that {it} cooperated to the best of its ability." *Id.* at 29; *see also id.* ("Grupo Simec's motivation or intent is irrelevant here; what matters is whether Grupo Simec was able to review its records and provide Commerce with the corrected information it requested in the timeframe that was established."). With respect to the rate, Commerce determined to apply the 66.70 percent rate from the investigation, and even noted in the final results that this rate was "in response to a very similar set of facts" as those then present in the investigation. *Id.* at 33-34. Further, "beyond arguing that the selected rate was calculated several years ago," Commerce explained that "none of the interested parties have differentiated the facts of this case from those of the last case where this rate was selected." *Id.* at 34.

Thus, the Court should find that Commerce supported its determination with substantial evidence, and Grupo Simec is unlikely to succeed on the merits.

## IV.   The Balance Of Hardships And Public Interest Factors Compel Denial

The remaining factors do not weigh in Grupo Simec's favor. The "balance of the equities and the public interest . . . 'merge when the Government is the opposing party.'" *Miranda v. Garland*, 34 F.4th 338, 365 (4th Cir. 2022) (citing *Nken v. Holder*, 556 U.S. 418, 435 (2009)). When assessing the balance of hardships, courts "must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." *Winter*, 555 U.S. at 24 (citation omitted). Grupo Simec argues the balance of hardships tips in its favor because Grupo Simec would be "shut out of the American market during the pendency of this litigation" without its requested injunction. Grupo Simec's Mot. at 35. Grupo Simec also argues that Commerce's authority and decision here was "arbitrary" and that "U.S. construction and other projects involving Simec's rebar may be jeopardized," whereas the United States will allegedly suffer "no hardship." *Id.* at 34. But as explained above, Grupo Simec failed to substantiate its claims of irreparable harm, undercutting its position on these factors.

Grupo Simec also argues that an injunction will cause the United States "no hardship," Grupo Simec Mot. at 34, but enjoining the collection of cash deposits at the ordered rate—relief not contemplated by 19 U.S.C. § 1516a(c)(2)—would alter the status quo and suspend the effect of the statute requiring such collection. *See* 19 U.S.C. § 1671e(a)(3). As a consequence, the revenue to which the statutory scheme is directed would be left unprotected because there is always a risk to the public fisc by unsecured entries—an unequivocal hardship to the United States. *See Int'l Custom*, 30 CIT at 31 (finding hardship factor did not favor plaintiff where the United States faced potential loss of revenue, despite plaintiff having to pay a higher duty and find a domestic source for its merchandise). Grupo Simec also overlooks the hardship to the domestic industry. Its request for an injunction against paying cash deposits at the ordered rate runs counter to the determination at the core of this matter: that the ordered duty is necessary to offset injury to the domestic industry as is provided for by the statutory scheme.

On the other hand, the statutory scheme empowering Commerce and CBP to enforce the antidumping duty laws of the United States makes clear that the balance of hardship and public interest are with the United States. First, it is well-settled that CBP is empowered to collect amounts sufficient to protect the revenue of the United States. *See generally Carolina Tobacco Co., Inc. v. United States*, 402 F.3d 1345 (Fed. Cir. 2005). The antidumping duty statute further requires that importers post cash deposits of estimated antidumping duties. *See* 19 U.S.C. §§ 1675(a)(2)(C) and 1673(c)(1)(B)(ii).

Congress, thus, has made it clear that Commerce may assign cash deposit rates going forward and that CBP must protect the interests of the United States by the collection of cash deposits, and it has been long recognized that "public interest" is the policy underlying specific legislation. *Yakus v. United States*, 321 U.S. 414 (1944). As this Court explained when

considering whether to issue a preliminary injunction against the collection of cash deposits, "if a preliminary injunction is granted, the public's interest in collecting antidumping revenue may be placed in the kind of jeopardy both the statutes and the regulations are designed to prevent.  This is a more than theoretical possibility."  *Olympia Indus.*, 30 CIT at 18-19; *see also Shanghai Tainai*, 582 F. Supp. 3d at 1312 ("the public's greater interest lies in following Congress's legislative enactments in the normal course and ensuring that {CBP} collects cash deposits sufficient to protect the public fisc.").

Indeed, the potential harm to the public fisc is more than theoretical.  For example, Grupo Simec admits that it invested approximately ███████ ] in "its equipment and workforce to increase capacity of its rebar productions lines" beginning in 2020.  Grupo Simec Mot. at Ex. 1 ¶ 3.  It also estimates that, barring an injunction, it will lose ████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████ *Id.* ¶ 6.  Grupo Simec did not provide any information in the declarations as to its overall sales revenue or what percentage of its annual revenue is derived from sales to the United States.  Thus, similar to *Olympia*, there is a legitimate concern that Grupo Simec may not be able to meet its financial obligations, including any ultimately assessed antidumping duties.  *See Shanghai Tainai*, 582 F. Supp. 3d at 1312.

Because Grupo Simec has failed to establish that the balance of harms and public interest are in its favor, its motion for a preliminary injunction should be denied.

## V.      Grupo Simec Should Be Required To Post Security Should An Injunction Issue

If the Court were to issue injunctive relief, USCIT Rule 65(c) requires "the movant {to} give{}security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained."  Here, should the

24

Court grant a preliminary injunction, we respectfully request that the Court require a bond in an amount equal the amount of duties that Grupo Simec would otherwise deposit.[4]  Cash deposits of estimated antidumping duties are collected by CBP at rates ordered by Commerce as provided by law.  19 U.S.C. § 1675(a)(2)(C).  In order to ensure that, should the importing party cease operations before liquidation, or fail to pay any outstanding bills, CBP is nevertheless able to collect the antidumping duties that are owed.  Absent a bond sufficient to cover the amount of duties owed, the entire purpose of antidumping and countervailing subsidies stands to be frustrated, resulting in damage to the very domestic industries the laws exist to protect.  *Kwo Lee, Inc. v. United States*, 70 F. Supp. 3d 1369, 1375-76 (Ct. Int'l Trade 2015).  Indeed, that nothing short of the full amount of the duties as established in the final results will sufficiently protect the United States underscores the purpose of cash deposits in the first place.

## CONCLUSION

For these reasons, we respectfully request that the Court deny Grupo Simec's motion for a preliminary injunction.

Respectfully submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

PATRICIA M. McCARTHY
Director

s/L. Misha Preheim
by s/Tara K. Hogan
L. MISHA PREHEIM
Assistant Director

---

[4]  Alternatively, the Court could order that Grupo Simec post single transaction bonds in an amount equal to the cash deposit rate.  Should the Court consider this as an injunctive measure, we would confer with the appropriate CBP official for administrability.  19 C.F.R. § 113.12(a).

OF COUNSEL:                                    s/ Kara M. Westercamp
IAN A. MCINERNEY                               KARA M. WESTERCAMP
Attorney                                       Trial Attorney
Office of the Chief Counsel                    Commercial Litigation Branch
 for Trade Enforcement & Compliance            Civil Division
U.S. Department of Commerce                    U.S. Department of Justice
                                               P.O. Box 480
                                               Ben Franklin Station
                                               Washington, D.C.  20044


December 28, 2022                              Attorneys for Defendant

## **CERTIFICATE OF COMPLIANCE**

Pursuant to Rule 2(b) of the Court's Standard Chambers Procedures, defendant's counsel certifies that this brief complies with the Court's type-volume limitation rules.  According to the word count calculated by the Microsoft Word processing system used to prepare this brief, I certify that this brief contains 7,851 words.

/s/ Kara M. Westercamp

## UNITED STATES COURT OF INTERNATIONAL TRADE

## BEFORE:  THE HONORABLE STEPHEN ALEXANDER VADEN, JUDGE

| | |
|---|---|
| GRUPO ACERERO S.A. de C.V.,<br>GRUPO SIMEC S.A.B. de C.V., *et al.*,<br><br>Plaintiffs,<br><br>and<br><br>GERDAU CORSA, S.A.P.I. de C.V.,<br><br>Plaintiff-Intervenor,<br><br>v.<br><br>UNITED STATES,<br><br>Defendant,<br><br>and<br><br>REBAR TRADE ACTION COALITION,<br><br>Defendant-Intervenor. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br> Consol. Court No. 22-00202 |

## __ORDER__

Upon consideration of the Motion for a Preliminary Injunction filed by plaintiffs, defendant's opposition thereto, and all other pertinent papers, it is hereby,

ORDERED that Plaintiffs' Motion for a Preliminary Injunction is DENIED.

SO ORDERED.

_____
Judge

Dated: _____, 2022
          New York, New York

1