### UNITED STATES COURT OF INTERNATIONAL TRADE

|  |  |
|---|---|
| **GRUPO ACERERO, S.A. de C.V. and GRUPO SIMEC S.A.B. de C.V., et.al.;**<br><br>       **Plaintiffs,**<br><br>    **and**<br><br>**GERDAU CORSA, S.A.P.I. de C.V.,**<br><br>       **Plaintiff-Intervenor,**<br><br>  **v.**<br><br>**UNITED STATES,**<br><br>       **Defendant,**<br><br>    **and**<br><br>**REBAR TRADE ACTION COALITION,**<br><br>       **Defendant-Intervenor.** | Consol. Court No. 22-cv-00202<br><br>**PUBLIC DOCUMENT** |

### PLAINTIFF SIMEC'S RULE 56.2 MOTION
### FOR JUDGMENT ON THE AGENCY RECORD

Pursuant to Rule 56.2 of the Rules of the U.S. Court of International Trade, and for the reasons set forth in the accompanying Memorandum in Support of Plaintiff Simec's Motion for Judgment on the Agency Record, Plaintiffs Grupo Simec S.A.B. de C.V.; Aceros Especiales Simec Tlaxcala, S.A. de C.V.; Compania Siderurgica del Pacifico S.A. de C.V.; Fundiciones de Acero Estructurales, S.A. de C.V.; Grupo Chant S.A.P.I. de C.V.; Operadora de Perfiles Sigosa, S.A. de C.V.; Orge S.A. de C.V.; Perfiles Comerciales Sigosa, S.A. de C.V.; RRLC S.A.P.I. de C.V.; Siderúrgicos Noroeste, S.A. de C.V.; Siderurgica del Occidente y Pacifico S.A. de C.V.; Simec International 6 S.A. de C.V.; Simec International, S.A. de C.V.; Simec International 7 S.A. de C.V.; and Simec International 9 S.A. de C.V. (collectively, "Simec") hereby submit their Motion for Judgment on the Agency Record with regard to the Final Results in the fifth administrative

review conducted by the Department of Commerce of the antidumping order on steel concrete reinforcing bar from Mexico. *See Steel Concrete Reinforcing Bar from Mexico: Final Results of Antidumping Duty Administrative Review*; 2019-2020, 87 Fed. Reg. 34848 (Dep't. Commerce, June 8, 2022), Appx007781-007784.

Simec submits that Commerce's determination as set forth in the Final Results was an abuse of discretion, arbitrary, capricious, unwarranted by the facts, not supported by substantial evidence nor in accordance with the law. Simec respectfully requests that this Court enter an Order remanding the Final Results to Commerce with instructions to reconsider those Results by overturning its finding of adverse facts available, permitting Simec sufficient time to provide any information that Commerce believes is missing from the record, and recalculating Simec's dumping margin based on the data submitted by Simec. Simec further requests whatever relief on remand that the Court may deem just and proper.

Respectfully Submitted,


/s James L. Rogers, Jr.
James L. Rogers, Jr.
Nelson Mullins Riley & Scarborough LLP
2 W. Washington Street, Suite 400
Greenville, SC 29601
(864) 373-2300

*Counsel for Grupo Simec*

April 26, 2023

# UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| **GRUPO ACERERO, S.A. de C.V. and GRUPO SIMEC S.A.B. de C.V., et.al.;** | |
| **Plaintiffs,** | |
| **and** | |
| **GERDAU CORSA, S.A.P.I. de C.V.,** | Consol. Court No. 22-cv-00202 |
| **Plaintiff-Intervenor,** | **PUBLIC DOCUMENT** |
| **v.** | |
| **UNITED STATES,** | |
| **Defendant,** | |
| **and** | |
| **REBAR TRADE ACTION COALITION,** | |
| **Defendant-Intervenor.** | |

## MEMORANDUM IN SUPPORT OF PLAINTIFF SIMEC'S RULE 56.2 MOTION FOR JUDGMENT ON THE RECORD

**TABLE OF CONTENTS**

ADMINISTRATIVE DETERMINATION SOUGHT TO BE REVIEWED................................. 1

ISSUES OF LAW PRESENTED ................................................................................................ 1

SUMMARY OF ARGUMENT ................................................................................................. 2

STATEMENT OF FACTS ........................................................................................................ 4

STANDARD OF REVIEW ..................................................................................................... 15

ARGUMENT .......................................................................................................................... 18

I.    Commerce's Failure to Grant Simec's Extension Requests Was an Abuse of
      Discretion, Not Supported by Substantial Evidence and Not in Accordance with the
      Law. .....................................................................................................................18

II.   Commerce's Refusal to Accept Simec's Proposed October 18th Filing Was an Abuse
      of Discretion, Not Supported by Substantial Evidence and Not in Accordance with
      the Law.................................................................................................................22

III.  Commerce's Decision to Bypass the Record and Resort to Facts Available Was an
      Abuse of Discretion, Not Supported by Substantial Evidence and Not in Accordance
      with the Law. .......................................................................................................27

IV.   Commerce's Decision to Apply an Adverse Inference in Selecting From Facts
      Available Was An Abuse of Discretion, Not Supported by Substantial Evidence and
      Not in Accordance with the Law. ........................................................................32

V.    Commerce's Decision to Apply Total Facts Available Was an Abuse of Discretion,
      Not Supported by Substantial Evidence and Not in Accordance with the Law. .........35

VI.   Even if Commerce Could Apply an Adverse Inference, the Dumping Margin Selected
      by Commerce Was an Abuse of Discretion, Not Supported by Substantial Evidence
      and Not in Accordance with the Law. ..................................................................36

CONCLUSION....................................................................................................................... 40

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*BlueScope Steel Ltd. v. United States*,
 548 F. Supp. 3d 1351 (Ct. Int'l Trade 2021) ............................................................. 27, 29, 35
*BMW of N. Am. LLC v. United States*,
 926 F.3d 1291 (Fed. Cir. 2019)....................................................................................... 37, 39, 40
*Bosun Tools Co. v. United States*,
 405 F. Supp. 3d 1359 (Ct. Int'l Trade 2019) ...................................................................... 37, 39
*Bowe-Passat v. United States*,
 17 C.I.T. 335 (1993)................................................................................................................. 31
*Bowman Transp., Inc. v. Ark.-Best Freight System, Inc.*,
 419 U.S. 281 (1974) ................................................................................................................. 16
*Canadian Solar Inc. v. United States*,
 537 F. Supp. 3d 1380 (Ct. Int'l Trade 2021) ........................................................................... 33
*Celik Halat ve Tel Sanayi A.S. v. United States*,
 557 F. Supp. 3d 1348 (Ct. Int'l Trade 2022)........................................................ 20, 21, 22, 39
*Celik II*, 557 F. Supp. 3d 1363 ............................................................................................... 39
*China Kingdom Import & Export Co., Ltd. v. United States*,
 507 F. Supp. 2d 1337 (Ct. Int'l Trade 2007)............................................................................ 30
*China Steel Corp. v. United States*,
 264 F. Supp. 2d 1339 (Ct. Int'l Trade 2003)............................................................................ 29
*Consol. Edison Co. v. NLRB*,
 305 U.S. 197 (1938) ................................................................................................................. 16
*Dongtai Peak Honey Indus. Co. v. United States*,
 971 F. Supp. 2d 1234 (Ct. Intl. Trade 2014) ........................................................................... 17
*Dupont Teijin Films v. United States*,
 931 F. Supp. 2d 1297 (Ct. Int'l Trade 2013) ........................................................................... 18
*Essar Steel Ltd. v. United States*,
 678 F.3d 1268 (Fed. Cir. 2012).............................................................................................. 33
*Fischer S.A. Comercio, Industria and Agricultura v. United States*,
 34 C.I.T. 334, 346 F. Supp. 2d 1364 (2010) ...................................................................... 23, 24
*Foshan Shunde Yongjian Housewares & Hardware Co. v. United States*,
 35 C.I.T. 1398 (2011)............................................................................................................... 35
*Foshan Shunde Yongjian Housewares & Hardwares Co. v. United States*,
 896 F. Supp. 2d 1313 (Ct. Int'l Trade 2013)...................................................................... 17, 26
*Gallant Ocean (Thailand) Co. v. United States*,
 602 F.3d 1319 (Fed. Cir. 2010)............................................................................................ 36, 39
*Gerald Metals, Inc. v. United States*,
 132 F.3d 716 (Fed. Cir. 1997)............................................................................................... 16
*Green Country Mobilephone, Inc. v. FCC*,
 765 F.2d 235, 246 U.S. App. D.C. 366 (D.C. Cir. 1985)......................................................... 26
*Grobest & I-Mei Industrial (Vietnam) Co., Ltd. v. United States*,

815 F. Supp. 2d 1342 (Ct. Int'l Trade 2012) ................................................................ 23, 24, 26

*Hitachi Energy USA Inc. v. United States,*
34 F.4th 1375 (Fed. Cir. 2022) ............................................................................................ 29, 30

*Hontex Enters. v. United States,*
27 Ct. Int'l Trade 272, 248 F. Supp. 2d 1323 (Ct. Int'l Trade 2003) ...................................... 16

*Jiangsu Jiasheng Photovoltaic Tech. Co., Ltd. v. United States,*
28 F. Supp. 3d 1317 (Ct. Int'l Trade 2014) .......................................................................... 17

*Motor Vehicle Mfrs. Ass'n, Inc. v. State Farm Mutual Auto. Ins. Co.,*
463 U.S. 29, 57, 103 S. Ct. 2856, 77 L. Ed. 2d 443 (1983) ...................................................... 17

*Nakornthai Strip Mill Pub. Co. v. United States,*
32 CIT 1272, 587 F. Supp. 2d 1303 (2008) .......................................................................... 26

*Nat'l Nail Corp. v. United States,*
390 F. Supp. 3d 1356 (Ct. Int'l Trade 2019) ........................................................................ 35

*Nippon Steel Corp. v. United States,*
458 F.3d 1345 (Fed. Cir. 2006) .......................................................................................... 16

*Nippon Steel Corp. v. Unites States,*
337 F.3d 1373 (Fed. Cir. 2003) ................................................................................ 32, 33, 34

*NMB Sing. Ltd. v. United States,*
557 F.3d 1316 (Fed. Cir. 2009) .......................................................................................... 17

*NTN Bearing Corp. v. United States,*
74 F. 3d 1204 (Fed. Cir. 1995) .......................................................................... 18, 23, 24, 25, 27

*Oman Fasteners, LLC v. United States,*
No. 22-00348, 2023 WL 2233642 (Ct. Int'l Trade Feb. 15, 2023) .......................................... 39

*POSCO v. United States,*
296 F. Supp. 3d 1320 (Ct. of Int'l Trade 2018) .................................................................... 37

*Pro-Team Coil Nail Enter., Inc. v. United States,*
419 F. Supp. 3d 1319 (Ct. Int'l Trade 2019) ............................................................ 23, 25, 34

*Saha Thai Steel Pipe Pub. Co. v. United States,*
605 F. Supp. 3d 1348 (Ct. Int'l Trade 2022) ...................................................................... 30

*Save Domestic Oil, Inc. v. United States,*
357 F.3d 1278 (Fed. Cir. 2004) .......................................................................................... 16

*Shelter Forest Int'l Acquisition, Inc. v. United States,*
497 F. Supp. 3d 1388 (Ct. Int'l Trade 2021) ...................................................................... 27

*SKF USA Inc. v. United States,*
263 F.3d 1369 (Fed. Cir. 2001) .................................................................................... 18, 30

*Star Fruits S.N.C. v. United States,*
393 F.3d 1277 (Fed. Cir. 2005) .......................................................................................... 18

*Timken U.S. Corporation and Timken Nadellager, GMBH v. United States,*
434 F.3d 1345 (Fed. Cir. 2006) ............................................................................ 3, 23, 24, 25

*Transactive Corp. v. United States,*
91 F.3d 232, 319 U.S. App. D.C. 428 (D.C. Cir. 1996) ........................................................ 17

*U.K. Carbon & Graphite Co. v. United States,*
931 F. Supp. 2d 1322 (Ct. Int'l Trade 2013) ...................................................................... 17

iv

*Universal Camera Corp. v. NLRB,*
  340 U.S. 474 (1951) ................................................................................ 16
*WelCom Prods., Inc. v. United States,*
  36 CIT 1366, 865 F. Supp. 2d 1340 (2012) ............................................ 18
*Wheatland Tube Co. v. United States,*
  161 F.3d 1365 (Fed. Cir. 1998) .............................................................. 17
*Wuhu Fenglian Co., Ltd. v. United States,*
  836 F. Supp. 2d 1398 (Ct. Int'l Trade 2012) ...................................... 18, 23
*Xiping Opeck Food Co., Ltd. v. United States,*
  34 F. Supp. 3d 1331 (Ct. Int'l Trade 2014) ............................................ 17
*Yangzhou Bestpak Gifts & Crafts Co. v. United States,*
  716 F.3d 1370 (Fed. Cir. 2013) .......................................................... 16, 27
*Zhejiang Dunan Hetian Metal Co. v. United States,*
  652 F.3d 1333 (Fed. Cir. 2011) .............................................................. 35

**Statutes**

19 U.S.C. § 1677(7)(F)(ii) .......................................................................... 16
19 U.S.C. § 1677e ...................................................................................... 32
19 U.S.C. § 1677e(a) ................................................................................. 29
19 U.S.C. § 1677e(b) ................................................................................. 13
19 U.S.C. § 1677e(b)(1) ....................................................................... 32, 33
19 U.S.C. § 1677e(b)(1)(A) ....................................................................... 32
19 U.S.C. § 1677e(d)(2) ............................................................................ 37
19 U.S.C. § 1677m(d) ................................................................ 29, 30, 31, 34
19 U.S.C. §1516a(b)(1)(B) ........................................................................ 15
19 U.S.C. 1677f(i)(3)(A) ........................................................................... 17
19 U.S.C. 1677m(d) ................................................................................ 3, 27

**Regulations**

19 C.F.R. § 351.302(c) ............................................................................... 22

**Administrative Determinations**

*Circumvention Enquiry in Antidumping and Countervailing Duty Orders on Certain Collated
  Steel Staples from the People's Republic of China (A-A-570-112)* ......................... 19
*Countervailing Duty Administrative Review of Phosphate Fertilizers from the Kingdom of
  Morocco:* Third Extension of Time to File Third Supplemental Questionnaire Response (C-
  714-001) ........................................................................................... 19
*Extension of the Deadline to Submit a Supplemental Questionnaire Response for Pokarna
  Engineered Stone Limited (A-533-889)* .................................................. 20
*Steel Concrete Reinforcing Bar From Mexico: Antidumping Duty Order*, 79 Fed. Reg. 65,926
  (Dep't of Commerce Nov. 6, 2014) ........................................................... 4
*Steel Concrete Reinforcing Bar from Mexico: Final Results of Antidumping Duty Administrative
  Review; 2014-2015*, 82 Fed. Reg. 27233 .................................................. 14

v

*Steel Concrete Reinforcing Bar from Mexico*: *Final Results of Antidumping Duty Administrative Review; 2014-2015*, 82 Fed. Reg. 27233 (Dep't. Commerce, June 14, 2017)............................ 14

*Steel Concrete Reinforcing Bar from Mexico*: *Final Results of Antidumping Duty Administrative Review; 2014-2015*, 82 Fed. Reg. 27233 (Dep't. of Commerce, June 14, 2017) ..................... 14

*Steel Concrete Reinforcing Bar from Mexico*: *Final Results of Antidumping Duty Administrative Review; 2015-2016*, 83 Fed. Reg. 27754 (Dep't. of Commerce, June 14, 2018) ..................... 14

*Steel Concrete Reinforcing Bar from Mexico*: *Final Results of Antidumping Duty Administrative Review; 2016-2017*, 84 Fed. Reg. 35599 (Dep't. of Commerce, July 24, 2019) ...................... 14

*Steel Concrete Reinforcing Bar from Mexico*: *Final Results of Antidumping Duty Administrative Review; 2017-2018*, 85 Fed. Reg. 71053 (Dep't. of Commerce, Nov. 6, 2020)....................... 14

*Steel Concrete Reinforcing Bar from Mexico*: *Final Results of Antidumping Duty Administrative Review; 2018-2019*, 86 Fed. Reg. 50527 (Dep't. of Commerce, Sept. 9, 2021)....................... 14

*Steel Concrete Reinforcing Bar from Mexico*: *Final Results of Antidumping Duty Administrative Review; 2019-2020*, 87 Fed. Reg. 34848, (Dep't. Commerce, June 8, 2022).............................. 1

*Steel Concrete Reinforcing Bar from Mexico: Preliminary Results of Antidumping Duty Administrative Review; 2020-2021;* 87 Fed. Reg. 75032 (Dep't. Commerce, Dec. 7, 2022).... 14

**MEMORANDUM IN SUPPORT OF RULE 56.2 MOTION FOR JUDGMENT
ON THE AGENCY RECORD BY PLAINTIFF GRUPO SIMEC**

Plaintiffs Grupo Simec S.A.B. de C.V.; Aceros Especiales Simec Tlaxcala, S.A. de C.V.; Compania Siderurgica del Pacifico S.A. de C.V.; Fundiciones de Acero Estructurales, S.A. de C.V.; Grupo Chant S.A.P.I. de C.V.; Operadora de Perfiles Sigosa, S.A. de C.V.; Orge S.A. de C.V.; Perfiles Comerciales Sigosa, S.A. de C.V.; RRLC S.A.P.I. de C.V.; Siderúrgicos Noroeste, S.A. de C.V.; Siderurgica del Occidente y Pacifico S.A. de C.V.; Simec International 6 S.A. de C.V.; Simec International, S.A. de C.V.; Simec International 7 S.A. de C.V.; and Simec International 9 S.A. de C.V. (collectively, "Simec") submit this Memorandum in support of their Motion for Judgment on the Agency Record.

## ADMINISTRATIVE DETERMINATION SOUGHT TO BE REVIEWED

This is an appeal from the final results issued by the U.S. Department of Commerce, International Trade Administration ("Commerce") in the fifth administrative review of the antidumping ("AD") order on steel concrete reinforcing bar from Mexico, for the period November 1, 2019-October 31, 2020. *See,* Final Results, Appx007781-007784; Issues and Decisions Memorandum Accompanying the Final Results, Appx007713-007757; and Deficiencies Memorandum, Appx007817-007841, Appx091515-091539.

## ISSUES OF LAW PRESENTED

1.   Did Commerce abuse its discretion in denying Simec's extension requests?

2.   Did Commerce abuse its discretion in rejecting Simec's October 18, 2021, filing?

3.   Was Commerce's decision to bypass the record and resort to facts available ("FA") supported by substantial evidence and in accordance with the law?

4.   Was Commerce's decision to apply an adverse inference in selecting from the facts available supported by substantial evidence and in accordance with the law?

1

5.      Was Commerce's decision to apply total adverse facts available ("AFA") supported by substantial evidence and in accordance with the law?

6.      Even if Commerce could apply total adverse facts available, was the margin it selected supported by substantial evidence and in accordance with the law?

## **SUMMARY OF ARGUMENT**

Commerce issued its initial questionnaire to Simec on February 8, 2021. Simec timely submitted its responses to that questionnaire on or before April 12, 2021. Three and a half months later, on July 27 and August 4, 2021, Commerce issued two voluminous supplemental questionnaires to Simec. Simec faced a number of severe and unprecedented challenges in preparing its responses to these supplemental questionnaires, many Covid-related. Simec made Commerce aware of these challenges when Simec requested a number of brief extensions to respond. Although Commerce granted some of Simec's extension requests, the agency ultimately only gave Simec until September 10, 2021, just over five weeks, to submit all responses. Five weeks was not enough time to submit complete, fulsome and accurate responses to the supplemental questionnaires, as Simec advised Commerce contemporaneously. Commerce nonetheless made September 10, 2021, a "drop dead" deadline for Simec despite the fact that its preliminary results were not to be published for months afterward. In fact, from September 10, 2021, until publication of the Final Results on June 8, 2022, a period of almost nine months, Commerce refused to notify solicit or accept any further factual information from Simec.

The primary reason provided by Commerce for denying Simec's request for more time to respond to its questionnaires was that Commerce felt it had already given Simec enough time. Commerce took this position while at the same time granting to the other mandatory respondent, Deacero, more time to respond to its supplemental questionnaires (due later in the review).

On October 18, 2021—over six weeks before the preliminary results deadline—Simec attempted to file corrective information pertaining to the review. Commerce rejected that October 18, 2021, filing solely because it was "untimely," without adequately addressing the factors Commerce is required to consider in determining whether to accept such a filing. The Federal Circuit has repeatedly held that Commerce's refusal to accept corrective information submitted early in a review—even new information submitted to correct an omission—is an abuse of discretion and grounds for remand. *See, e.g., Timken U.S. Corporation and Timken Nadellager, GMBH v. United States*, 434 F.3d 1345 (Fed. Cir. 2006); *NTN Bearing Corp. v. United States*, 74 F.3d 1204 (Fed. Cir. 1995).

In spite of this Federal Circuit precedent, during the almost three-month period between September 10, 2021, and issuance of the preliminary results, Commerce refused to issue any additional questionnaires to Simec, refused to permit Simec to submit corrective information, and refused to accept any additional factual information whatsoever from Simec. Commerce did, however, accept responses to supplemental questionnaires from the other mandatory respondent Deacero during this very same time frame.

As a result of alleged deficiencies in Simec's questionnaire responses that were the result of Commerce's above-described abuses of discretion and failure to comply with the notice and remedy provisions set forth in 19 U.S.C. 1677m(d) (explained in more detail below), Commerce ultimately rejected all information submitted by Simec during the administrative review, consisting of 229 pages of narrative responses and approximately 5,100 pages of Exhibits. Commerce improperly decided to apply a total adverse inference against Simec, in selecting from facts otherwise available, based on Commerce's assertion that Simec had not properly responded to its supplemental

questionnaires. Commerce then fixed Simec's dumping margin at a punitive 66.7%. Commerce did so despite the fact that the vast majority of Simec's information was reliable and usable.

Given these facts, Commerce's decision to apply total adverse facts available against Simec for failure to cooperate was unsupported by substantial evidence, not in accordance with the law and an abuse of discretion.

## STATEMENT OF FACTS

The antidumping order entered at the conclusion of the investigation underlying this matter was published in the Federal Register on November 6, 2014. *See Steel Concrete Reinforcing Bar From Mexico: Antidumping Duty Order*, 79 Fed. Reg. 65,926 (Dep't of Commerce Nov. 6, 2014) ("AD Order").

On January 6, 2021, the U.S. Department of Commerce ("Commerce") published a notice of initiation of an administrative review relating to parties subject to the AD Order for the period from November 1, 2019, through October 31, 2020. *See* Initiation Notices, Appx001040-001046.

On February 8, 2021, Commerce selected Simec and Deacero S.A.P.I. de C.V. ("Deacero") as mandatory respondents in the administrative review. *See* Commerce's Respondent Selection Memorandum, Appx001088-001093, Appx080043-080048. In selecting Simec as a mandatory respondent, Commerce collapsed all of the Simec entities named as Plaintiffs in this Complaint into a single group known as "Grupo Simec," as it had done in prior administrative reviews. Commerce also issued Initial Questionnaires to Simec and Deacero on February 8, 2021. *Id.*

In order to respond to its Initial Questionnaire, Simec had to gather responses from 14 separate legal entities. *See, e.g.,* Simec Case Brief, Appx007486, Appx090842; *see also* Simec's March 26, 2021, extension request, Appx003778-003780. These fourteen entities did not have common accounting or management software. *Id.* They were divided into five separate and

geographically dispersed operating units, each with different management and accounting systems and software. Simec thus needed to prepare fourteen separate responses to Commerce's Initial Questionnaire and then integrate, reconcile and collapse those responses into a single set of responses in order to respond to Commerce's Questionnaires. *Id.*

Simec's difficulty in responding to the Initial Questionnaires was further exacerbated by COVID-19 restrictions, which resulted in a lack of personnel at Simec's facilities and precluded travel between Simec's geographically dispersed companies to review voluminous on-site records, manually compile data and coordinate a single response to the questionnaire. *Id.*

Further, in February 2021, a severe winter storm caused a blackout in Texas which resulted in a shortage of natural gas for electricity in Mexico. *See, e.g.,* Simec's March 19, 2021, extension request, Appx003707-003709. Simec's facilities in Matamoros, Tamaulipas, Mexicali and its U.S. distributor, Sigosa Steel, were affected. *Id.* There was no power, heat or internet, all of which severely harmed the preparation of Simec's responses throughout February 2021. *Id.*

During the time frame for responding to Commerce's initial and supplemental questionnaires, several of Simec's personnel working on the responses also contracted COVID-19. *See, e.g.,* Simec's March 8, 2021, extension request, Appx003526-003527; Simec's March 26, 2021, extension request, Appx003778-003780; Simec's second August 16, 2021, extension request, Appx004910-004913. In fact, Simec lost three accountants on its antidumping response team to death from COVID-19. *See, e.g.,* Simec Case Brief, Appx007486, Appx090842. These accountants were central to the questionnaire response process. *Id.* The death of these three individuals was devastating to Simec's ability to respond to Commerce's detailed and complex questionnaires. *Id.* Simec had to find new people to fill these roles, which was a very difficult task

during the global COVID-19 pandemic health crisis. *Id.* These new hires then had to learn antidumping law, Simec's company protocols and company records. *Id.*

Simec made Commerce aware of the above-described challenges. After receiving from Commerce brief extensions of time to respond to the Initial Questionnaire, Simec timely submitted all of its responses to the Initial Questionnaire by April 12, 2021, 63 days after receiving it. *See* Simec's Section A Response, Appx001414-001447, Appx080049-080082 (filed March 8, 2021); Simec's Section B-C Response, Appx-003787-004003, Appx083240-Appx083461 (filed March 31, 2021); Simec's Appendix VI, Appx004261-004265, Appx083828-083832 (filed April 5, 2021); Simec's Section D Response, Appx004266-004427, Appx083833-083996 (filed April 7, 2021); and Simec's Section B Affiliates Sales Response, Appx004710-004727, Appx084417-084436 (filed April 12, 2021). In total, Simec's response to the Initial Questionnaire included over 130 pages of narrative responses and over 2200 pages of exhibits.

On July 27, 2021—roughly three and a half months after receiving Simec's responses to Commerce's Initial Questionnaire—Commerce issued an extensive first supplemental questionnaire to Simec ("ABC SQR"). *See* ABC SQR, Appx004873-004889, Appx084649-084665. Simec's response to the ABC SQR was originally due on August 17, 2021, giving Simec just 20 days to respond. *Id.*

One week later, on August 4, 2021, Commerce issued a second, extensive supplemental questionnaire to Simec regarding Sections A and D of the Initial Questionnaire ("A&D SQR"). *See* A&D SQR, Appx4890-004903, Appx084666-084679. Responses from Simec to the A&D SQR were originally due on August 11, 2021, giving Simec just 7 days to respond. *Id.*

Including subparts, the ABC SQR and A&D SQR contained 275 questions stretched across twenty-nine single space pages, many of which requested production of voluminous supporting

documentation and required intensive manual review and compilation of data. Given the extensive nature of the supplemental questionnaires, the short original response deadlines, and the challenges Simec continued to face in preparing its responses, Simec requested a number of brief extensions from Commerce in order to respond.

On August 9, 2021, Simec requested a three-week extension to respond to both supplemental questionnaires, which would have moved the deadline to respond to the ABC SQR from August 17, 2021, to September 7, 2021, and the deadline to respond to the A&D SQR from August 4, 2021, to September 1, 2021. *See* Simec's August 9, 2021, extension request, Appx004904-004906. Commerce only partially granted Simec's request, providing one additional week to respond to each supplemental questionnaire. *See* Commerce's Response to Simec's August 9, 2021, extension request, Appx004907. Over the course of the next several weeks, Simec repeatedly communicated to Commerce the obstacles it faced in completing the supplemental questionnaires, including the following:

- At the time Simec was working to prepare its responses, Mexico was experiencing a severe outbreak of the COVID-19 Delta variant and had travel and work restrictions in place. *See, e.g.*, Simec's August 9, 2021, extension request, Appx004904-004906; Simec's second August 16, 2021, extension request, Appx004910-004913; Simec's September 7, 2021, extension request, Appx004959-004961.

- The finance team at Simec and Sigosa is geographically dispersed 5 or 6 locations and needs continuous coordination to answer Commerce's requests, which was significantly hampered by the COVID restrictions in place at the time. *Id.* For example, Simec personnel preparing the responses were forced to work from home, which precluded communication and made document collection and review challenging. *Id.* The

necessary, manual scrutiny of records needed to complete the responses was also much more burdensome with the COVID restrictions in place and the limited availability of staff at the office of the distributors. *Id.*

- Indian counsel retained by Simec to aid in preparing Simec's questionnaire responses was also constrained by COVID travel restrictions. *See, e.g.,* Simec's second August 16, 2021, extension request, Appx004910-004913.

- As noted above, three Simec accountants working to prepare Simec's responses contracted COVID-19 and eventually passed away during the time in which Simec was preparing its responses. *See, e.g.*, Simec's third August 16, 2021, extension request, Appx004914-004915; Simec Case Brief, Appx007486, Appx090842. As a result, Simec had to use inexperienced accountants to help prepare its responses. *See* Simec Case Brief, Appx007486, Appx090842.

In addition to the foregoing challenges, Simec also requested extensions because responses to the supplemental questionnaires were voluminous and time consuming to prepare. The ABC SQR included 139 questions (including sub questions) and the A&D SQR included 136 questions (including sub questions). As mentioned above, many of the responses to the supplemental questionnaires also required manual scrutiny of records and consolidating data from all of the Simec's collapsed entities. *See, e.g.,* Simec's September 7, 2021, extension request, Appx004959-004961.

Simec therefore requested minor extensions of time to respond to the supplemental questionnaires on August 16, 20, 30, 31 and September 1, 2, 6, 7, and 9, 2021.[1] Despite the serious

---

[1] Simec's first August 16, 2021, extension request, Appx004908-004909; Simec's second August 16, 2021, extension request, Appx004910-004913; Simec's third August 16, 2021, extension request, Appx004914-004915; Simec's August 20, 2021, extension request, Appx004917-004920;

challenges that Simec faced, in most instances Commerce either denied[2] or only partially granted[3] Simec's requests. Then, in response to Simec's September 1, 2021, extension request, Commerce preemptively signaled that it was unlikely to grant any further extensions, stating:

> We additionally note that, given the amount of time already granted to prepare the responses to this questionnaire, as well as the statutory and regulatory deadlines in this case and ongoing workloads, we are unlikely to be able to accommodate any additional extensions of time for the preparation and submission of responses to this supplemental questionnaire.

Commerce's September 1, 2021, letter partially granting Simec's extension request, Appx004944.

The above-quoted language essentially foreclosed the possibility of any further extensions regardless of the circumstances. This language was included by Commerce in each of its responses to Simec's extension requests from September 1, 2021, onward. *See id;* Commerce's September 3, 2021, letter partially granting Simec's extension request, Appx004953. Thus, on September 6, 2021, Simec filed a letter with Commerce indicating that, because "Commerce said don't expect further extensions," Simec intended to file its responses to the Supplemental Questionnaires by the September 7th and September 9th deadlines, even though both Simec and Commerce recognized that some portions of Simec's responses would be incomplete and/or inaccurate. Simec's September 6, 2021, letter to Commerce and request for extension, Appx004954-004956.  Simec's

---

Simec's August 30, 2021, extension request, Appx004932-004933; Simec's August 31, 2021, extension request, Appx004926-004927; Simec's September 1, 2021, extension request, Appx004942-004943; Simec's September 2, 2021, extension request, Appx004945-004947; Simec's September 6, 2021, extension request, Appx004954-004956; Simec's September 7, 2021, extension request, Appx004959-004961; Simec's September 9, 2021, extension request, Appx006284-006286.

[2] Commerce's September 7, 2021, denial of Simec's extension request, Appx004958; Commerce's September 9, 2021, denial of Simec's extension request, Appx006282-006283.

[3] Commerce's August 10, 2021, letter partially granting Simec's extension request, Appx004907; Commerce's August 23, 2021, letter partially granting Simec's extension request, Appx004921; Commerce's August 30, 2021, letter partially granting Simec's extension request, Appx004939; Commerce's September 1, 2021, letter partially granting Simec's extension request, Appx004944; Commerce's September 3, 2021, letter partially granting Simec's extension request, Appx004953.

September 6, 2021, letter further requested an additional two weeks to respond to those specific portions of the Supplemental Questionnaires it knew to be incomplete, including (a) questions 70-75 of the First Supplemental Questionnaire regarding Simec's affiliated downstream sales and (b) Simec's responses related to window period sales. *Id.* Simec also sought this additional two weeks in order to review Simec's to-be-submitted responses as to any needed corrections and supplements, given that insufficient time had been granted to respond. *Id.* At 11:46 am on September 7, 2021, Commerce denied Simec's September 6, 2021 extension request, claiming that Simec had failed to provide detailed justification for its request and that, in Commerce's view, Simec had already been given enough time to respond. *See* Commerce's September 7, 2021, denial of Simec's extension request, Appx004958. Just a few hours later, Simec filed a letter containing additional justification as to why it was seeking the extension. *See* Simec's September 7, 2021 extension request, Appx004959-004961. Commerce did not respond on September 7, 2021, so Simec proceeded to file its ABC SQR on September 8, 2021. *See* Simec's ABC SQR responses, Appx004973-006276, Appx084691-086712. Simec's responses to the ABC SQR included 55 pages of narrative responses and over 2,000 pages of exhibits. *Id.*

After receiving a final, one-day extension from Commerce to respond to the A&D SQR[4], Simec timely filed its responses to the A&D SQR on September 10, 2021. *See* Simec's A&D SQR responses, Appx006288-006514, Appx086713-Appx087666. Simec's responses to the Second Supplemental Questionnaire included an additional 49 pages of narrative responses and nearly 900 pages of exhibits. *Id.*

In sum, even with the brief extensions granted by Commerce, Simec had just over five weeks in total to respond to the 275 supplemental questions presented by Commerce and to provide

---

[4] *See* Commerce's September 10, 2021, letter granting one day extension, Appx006287.

extensive supporting documentation for same. Although Simec informed Commerce that it would be unable to submit all the information requested in the supplemental questionnaires unless Commerce granted Simec an additional extension (Appx004954-004956), Commerce never did so although publication of the Preliminary Results was still almost three months away. Still, despite the challenges Simec faced and Commerce's unwillingness to provide adequate time for Simec to prepare its responses, Simec did timely submit to Commerce 229 pages of narrative responses and over 5,100 pages of exhibits by the September 10, 2021 "drop dead" deadline.

In an inexplicable deviation from its standard practice, Commerce failed to issue any additional follow-up questionnaires to Simec during the remainder the administrative review even though the preliminary results were not published for 84 days following the September 10 deadline (on December 3, 2021) and the administrative review, itself, was not completed until almost nine months later (June 2, 2022). *See* Preliminary Results, Appx007269-007272, Final Results, Appx007781-007784. Commerce did subsequently issue a Second Supplemental Questionnaire to the other mandatory respondent, Deacero, on September 22, 2021, (Appx006589-006600, Appx088546-088557) and a *Third* Supplemental Questionnaire to Deacero on November 3, 2021, (Appx007120-007122, Appx089246-089317) well after denying to Simec any further opportunity to respond to Commerce's questionnaires.

On October 18, 2021—the deadline for Deacero to submit its responses to Commerce's Second Supplemental Questionnaire—Simec submitted a request for Commerce to accept certain information related to just seven (7) of the more than 275 questions included in Commerce's Supplemental Questionnaire. *See* Proposed October 18[5] Filing, Appx006619-006624; Simec's

---

[5] Because Commerce rejected Simec's Proposed October 18th Filing, the actual documents comprising the Filing are not on the record. Instead, there are slip sheets at Appx006619-006624 indicating that Commerce rejected the Filing and that the Filing was removed from the record.

request to accept proposed October 18th filing, Appx006625-006628. More specifically, Simec's Proposed October 18th Filing included (1) information related to affiliated and downstream sales (responsive to Questions 70-75 of Commerce's First Supplemental Questionnaire); (2) additional information on cost allocation methodology; and (3) Spanish-to-English translations that had been embedded in documents previously submitted by Simec but were inadvertently stripped by computer operation during the process of filing the information on Commerce's ACCESS site. *See* Simec's request to accept the Proposed October 18th Filing, Appx006625-006628.

Simec requested that Commerce accept the additional information in the Proposed October 18th Filing because of the numerous challenges Simec had faced in preparing its responses to Commerce's earlier Supplemental Questionnaires and because Commerce was still accepting new factual information from Deacero. *Id.*

On October 19, 2021, Commerce completely rejected Simec's Proposed October 18th Filing. *See* Commerce's rejection and removal notice, Appx007109. Commerce stated that it was rejecting Simec's proposed filing as untimely because the information in that filing had been requested in the ABC SQR directed to Simec, responses to which were due September 7, 2021. *See* Commerce's rejection memorandum, Appx007108. Commerce rejected the corrective and additional information despite the fact that the preliminary results deadline was still months away and despite the fact that Commerce continued accepting information from Deacero up until November 10, 2021—twenty days before the Preliminary Results were issued and 23 days after Commerce had rejected Simec's Proposed October 18th Filing. *See* Deacero's responses to Commerce's third supplemental questionnaire, Appx007162-007199, Appx089246-089329. In

---

However, Simec's letter requesting that Commerce accept the Proposed October 18th, 2021, Filing gives some information about the contents of the Filing. *See* Simec's request to accept the Proposed October 18th Filing, Appx006625-006628.

fact, Commerce even granted Deacero an extension to respond to its Third Supplemental Questionnaire on November 5, 2021. *See* Commerce's November 5, 2021 letter granting Deacero's extension request, Appx007123-007125.

On December 3, 2021, the Preliminary Results of the administrative review were published in the Federal Register. Preliminary Results, Appx007269-007272. The Issues and Decisions Memorandum accompanying the Preliminary Results ("Preliminary IDM") was filed on ACCESS on November 29, 2021. *See* Preliminary IDM, Appx007218-007237.

Despite the massive amount of information in Simec's responses to Commerce's initial and supplemental questionnaires, and despite Commerce rejecting Simec's attempts to submit even more information in its Proposed October 18th Filing, Commerce stated in the Preliminary IDM that it would ignore all of the information provided by Simec and instead apply total adverse facts available ("AFA") against Simec under 19 U.S.C. § 1677e(b). *See* Preliminary IDM, Appx007224.

As explained in greater detail below, in resorting to total AFA Commerce ignored data that Simec submitted merely because it was not presented in the precise form requested by Commerce; ignored additional explanations provided by Simec in its supplemental questionnaire responses; failed to give Simec notice and opportunity to cure issues that Commerce raised for the first time in the Preliminary IDM; failed to sufficiently identify gaps in Simec's questionnaire responses that would permit Commerce to resort to the use of partial AFA, let alone total AFA; and failed to substantiate its finding that Simec did not act to the best of its ability. Commerce's determination to apply total AFA was therefore an abuse of discretion and unsupported by substantial evidence.

Commerce assigned Simec a rate of 66.7% in the preliminary results simply because it was the rate determined at the conclusion of Commerce's original investigation in 2014, and because "this rate is at a level which does not permit Grupo Simec to benefit from its lack of cooperation

in this review." Preliminary IDM, Appx007226. Commerce assigned the punitive 66.7% dumping rate despite the fact that, in the very first administrative review following the investigation, the actual dumping rate to be paid by Simec was determined to be 0.00%. *See Steel Concrete Reinforcing Bar from Mexico*: *Final Results of Antidumping Duty Administrative Review; 2014-2015*, 82 Fed. Reg. 27233 (Dep't. Commerce, June 14, 2017) (assigning Grupo Simec a rate of 0.00%). In each of the subsequent reviews, the actual rate paid by Simec never exceeded 4.93%.[6] In fact, the average antidumping rate paid by <u>all</u> respondents in the Mexican rebar matter since the conclusion of the investigation in 2014 has been 3.56%, demonstrating that the 66.7% dumping rate has no bearing whatsoever on any level of actual dumping of Mexican rebar which may have occurred in the American market.[7] Moreover, Commerce filed the Preliminary Results of its 2020-2021 administrative review (for the Period of Review following the POR at issue here) on December 1, 2022, assigning Grupo Simec a rate of 6.35% and further underlining the extreme outlier nature of the 66.7% rate. *See Steel Concrete Reinforcing Bar from Mexico: Preliminary Results of Antidumping Duty Administrative Review; 2020-2021;* 87 Fed. Reg. 75032 (Dep't. Commerce, Dec. 7, 2022).

---

[6] *See Steel Concrete Reinforcing Bar from Mexico*: *Final Results of Antidumping Duty Administrative Review; 2014-2015*, 82 Fed. Reg. 27233 (Dep't. Commerce, June 14, 2017) (assigning Grupo Simec a rate of 0.00%); *Steel Concrete Reinforcing Bar from Mexico*: *Final Results of Antidumping Duty Administrative Review; 2015-2016*, 83 Fed. Reg. 27754 (Dep't. Commerce, June 14, 2018) (finding that Grupo Simec made no shipments during the period of review); *Steel Concrete Reinforcing Bar from Mexico*: *Final Results of Antidumping Duty Administrative Review; 2016-2017*, 84 Fed. Reg. 35599 (Dep't. Commerce, July 24, 2019) (assigning Grupo Simec a rate of 3.65%); *Steel Concrete Reinforcing Bar from Mexico*: *Final Results of Antidumping Duty Administrative Review; 2017-2018*, 85 Fed. Reg. 71053 (Dep't. Commerce, Nov. 6, 2020) (assigning Grupo Simec a rate of 1.46%); *Steel Concrete Reinforcing Bar from Mexico*: *Final Results of Antidumping Duty Administrative Review; 2018-2019*, 86 Fed. Reg. 50527 (Dep't. Commerce, Sept. 9, 2021) (assigning Grupo Simec a rate of 4.93%).
[7] *Id.*

Following issuance of the Preliminary Results, Grupo Acerero S.A. de C.V. and Simec filed administrative case briefs with Commerce challenging the Preliminary Results on various grounds, including Commerce's use of total AFA as to Simec and the resulting total AFA rate. *See* Grupo Acerero's Case Brief, Appx007455-007460, Appx090888-090893; Simec's Case Brief, Appx007476-007518, Appx090832-090874; Simec's Rebuttal Brief, Appx007559-007565, Appx090895-090901. Simec's Case Brief and Rebuttal Brief raised the issues discussed herein at the agency level.

On June 2, 2022, Commerce issued the Final Results, which were published in the Federal Register on June 8, 2022. *See* Final Results, Appx007781-007784. The Issues and Decision Memorandum accompanying the Final Results ("Final IDM") was filed by Commerce on June 1, 2022. *See* Final IDM, Appx007713-007757. The Deficiencies Memorandum accompanying the Final Results was filed by Commerce on October 18, 2022. *See* Decisions Memorandum, Appx007817-007841; Appx091515-091539.

In the Final Results, Commerce continued to apply total AFA to Simec and affirmed the 66.7% antidumping duty rate it had assigned to Simec. *See* Final Results, Appx007782-007783.

On July 11, 2022, Simec filed a Summons in this Court commencing the present action challenging the Final Results. Simec timely filed its Complaint on August 8, 2022. *See* Simec Summons, July 11, 2022, ECF No. 1; Simec Compl., Aug. 8, 2022, ECF No. 8.  This Court issued an order enjoining liquidation on August 19, 2022. Ct.'s Order, Aug. 10, 2022, ECF No. 10.

## **STANDARD OF REVIEW**

This Court evaluates whether Commerce's decisions are "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. §1516a(b)(1)(B). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to

support a conclusion." *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 217 (1938). Substantial evidence requires more than mere assertion of "evidence which in and of itself justified {the determination}, without taking into account contradictory evidence or evidence from which conflicting inferences could be drawn." *Gerald Metals, Inc. v. United States*, 132 F.3d 716, 720 (Fed. Cir. 1997). Rather "the substantiality of evidence must take into account whatever in the record fairly detracts from its weight." *Id.* (quoting *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488 (1951).

For decisions to be supported by substantial evidence, "Commerce may not base that determination 'on the basis of mere conjecture or supposition.' {19 U.S.C.} § 1677(7)(F)(ii). Nor may Commerce explain the absence of evidence by invoking procedural difficulties that were at least in part a creature of its own making." *Yangzhou Bestpak Gifts & Crafts Co. v. United States*, 716 F.3d 1370, 1378 (Fed. Cir. 2013). Rather, Commerce is obligated to "articulate a rational connection between the facts found and the choice made." *Bowman Transp., Inc. v. Ark.-Best Freight System, Inc.*, 419 U.S. 281, 285-86 (1974). Substantial evidence review therefore requires that the court assess whether the agency action is reasonable given the record as a whole. *Nippon Steel Corp. v. United States*, 458 F.3d 1345, 1350-51 (Fed. Cir. 2006). Compliance with both statute and regulation is required for an agency action to be "in accordance with law." *See, e.g., Hontex Enters. v. United States*, 27 Ct. Int'l Trade 272, 293, 248 F. Supp. 2d 1323, 1340 (Ct. Int'l Trade 2003).

A decision is not arbitrary or capricious if, *inter alia*, it reflects a "logically reasoned and well-researched approach." *Save Domestic Oil, Inc. v. United States*, 357 F.3d 1278, 1289 (Fed. Cir. 2004). Thus, "{c}ourts 'look for a reasoned analysis or explanation for an agency's decision as a way to determine whether a particular decision is arbitrary, capricious, or an abuse of

discretion.'" *U.K. Carbon & Graphite Co. v. United States*, 931 F. Supp. 2d 1322, 1328 (Ct. Int'l Trade 2013) (quoting *Wheatland Tube Co. v. United States*, 161 F.3d 1365, 1369 (Fed. Cir. 1998)). Further, "{a}n 'agency action is arbitrary when the agency offers{s} insufficient reasons for treating similar situations differently.'" *Foshan Shunde Yongjian Housewares & Hardwares Co. v. United States*, 896 F. Supp. 2d 1313, 1325 (Ct. Int'l Trade 2013) (quoting *Transactive Corp. v. United States*, 91 F.3d 232, 237, 319 U.S. App. D.C. 428 (D.C. Cir. 1996) (citing *Motor Vehicle Mfrs. Ass'n, Inc. v. State Farm Mutual Auto. Ins. Co.*, 463 U.S. 29, 57, 103 S. Ct. 2856, 77 L. Ed. 2d 443 (1983)).

By statute, each "determination by Commerce must include an explanation of the basis for its determination." *See NMB Sing. Ltd. v. United States*, 557 F.3d 1316, 1320 (Fed. Cir. 2009) (quoting 19 U.S.C. 1677f(i)(3)(A)). Thus, "{w}here the Department has reached important conclusions that are not fully explained with reference to record evidence {and relevant statutes or regulations}, remand is appropriate for Commerce to explain its rationale . . . such that a court may follow and review its line of analysis, its reasonable assumptions, and other relevant considerations." *Xiping Opeck Food Co., Ltd. v. United States*, 34 F. Supp. 3d 1331, 1343-1344 (Ct. Int'l Trade 2014).

Where the agency is vested with discretion to set the procedures by which it administers its governing statute, the court reviews such decisions for abuse of discretion. *Jiangsu Jiasheng Photovoltaic Tech. Co., Ltd. v. United States*, 28 F. Supp. 3d 1317, 1323 (Ct. Int'l Trade 2014) (*See, e.g., Dongtai Peak Honey Indus. Co. v. United States*, 971 F. Supp. 2d 1234, 1239 (Ct. Intl. Trade 2014). "An abuse of discretion occurs where the decision is based on an erroneous interpretation of the law, on factual findings that are not supported by substantial evidence, or represent an unreasonable judgment in weighing relevant factors." *Id.* (quoting *WelCom Prods.,*

*Inc. v. United States*, 36 CIT 1366, 1340, 865 F. Supp. 2d 1340, 1344 (2012) (citing *Star Fruits S.N.C. v. United States*, 393 F.3d 1277, 1281 (Fed. Cir. 2005))). In abuse of discretion review, "an agency action is arbitrary when the agency offers insufficient reasons for treating similar situations differently." *See SKF USA Inc. v. United States*, 263 F.3d 1369, 1382 (Fed. Cir. 2001).

## <u>ARGUMENT</u>

**I.    Commerce's Failure to Grant Simec's Extension Requests Was an Abuse of Discretion, Not Supported by Substantial Evidence and Not in Accordance with the Law.**

Commerce's refusal to grant Simec's extension requests and afford Simec sufficient time to respond to Commerce's supplemental questionnaires was not supported by substantial evidence, not in accordance with the law and an abuse of discretion that resulted in wildly inaccurate dumping margins.

Although Commerce has discretion to set and enforce deadlines, that discretion is not without limits. Rather, it must be exercised in a reasonable and fair manner. *See, e.g., Dupont Teijin Films v. United States*, 931 F. Supp. 2d 1297, 1304 (Ct. Int'l Trade 2013). As this Court has previously stated, "while Commerce clearly has the discretion to regulate administrative filings, that discretion is bounded at the outer limits by the obligation to carry out its statutory duty of 'determin{ing} dumping margins as accurately as possible.'" *Wuhu Fenglian Co., Ltd. v. United States*, 836 F. Supp. 2d 1398, 1403 (Ct. Int'l Trade 2012), quoting *NTN Bearing Corp. v. United States*, 74 F. 3d 1204, 1208 (Fed. Cir. 1995).

Here, Commerce issued two supplemental questionnaires to Simec on July 27, 2021 (ABC SQR), and August 4, 2021 (A&D SQR). *See* ABC SQR, Appx004873-004889, Appx084649-084665; A&D SQR, Appx4890-004903, Appx084666-084679. Given the voluminous nature of the supplemental questionnaires and the severe challenges Simec continued to face it preparing its

responses, Simec requested a number of brief extensions from Commerce. Commerce granted some of Simec's extension requests, but ultimately denied Simec's final request to extend the deadline to respond to the ABC SQR until September 20, 2021. *See* Commerce's denial of Simec's extension request, Appx004958. Even after Simec subsequently submitted a lengthy letter detailing the reasons Simec needed the additional time (Appx004959-004961), Commerce continued to deny Simec's request to extend the ABC SQR deadline to September 20, 2021. *See* Commerce's denial of Simec's extension request, Appx006282-006283.

Commerce continued to deny Simec's request despite the fact that: (1) the requested extension was brief (two weeks); (2) the requested September 20, 2021, deadline would still result in Simec submitting its responses more than *two months* prior to the preliminary results deadline; and (3) Commerce was expressly aware via Simec's September 6, 2021 extension request that if Commerce did not afford Simec the brief extension, Simec would be forced to submit responses that could be incomplete. At the time, the sole reason provided by Commerce for continuing to deny Simec's request to extend the deadline to respond to the ABC Supplemental Questionnaire until September 20, 2021 was that Commerce believed it had already given Simec sufficient time to prepare its responses. *See* Commerce's September 7, 2021 Denial Letter, Appx004958 and Commerce's September 9, 2021 Denial Letter, Appx006282-006283.

In numerous cases, however, Commerce has granted extensions of more than 2 weeks to a respondent.[8] Therefore, denial of Simec's extension requests almost three months before the

---

[8] *See Circumvention Enquiry in Antidumping and Countervailing Duty Orders on Certain Collated Steel Staples from the People's Republic of China* (A-A-570-112), where Commerce gave three extensions to the respondents VN Fasteners Co (Access Barcode: 4364768-01) cumulatively allowing more than 3 weeks to file reply to one questionnaire; *Countervailing Duty Administrative Review of Phosphate Fertilizers from the Kingdom of Morocco:* Third Extension of Time to File Third Supplemental Questionnaire Response (C-714-001), where similar extensions were granted for one questionnaire (Access Barcode: 4363975-01). *See also Extension of the Deadline to Submit*

deadline for issuance of the Preliminary Results was arbitrary and capricious, particularly when Commerce's failure to issue supplemental questionnaires promptly was one of the primary reasons for compression of the timeline for issuance of the Preliminary Results.

Had Commerce afforded Simec the brief, two-week extension that Simec had requested to respond to the ABC Supplemental Questionnaire, Simec would have been able to submit more fulsome and complete responses. Indeed, every alleged deficiency that Commerce claims to have identified is from Simec's ABC SQR that Simec was arbitrarily and improperly denied sufficient time to complete. *See* Deficiencies Memorandum, Appx007817-007841; Appx091515-091539.

The recent case of *Celik Halat ve Tel Sanayi A.S. v. United States*, 557 F. Supp. 3d 1348 (Ct. Int'l Trade 2022) is instructive on this point. In *Celik Halat*, following the conclusion of an antidumping investigation Commerce calculated an estimated dumping margin of 53.65% and an adjusted cash deposit rate of 44.60% against the Plaintiff Celik Halat. Commerce did so based on its decision to reject in its entirety the responses of Celik Halat to Sections B and C of Commerce's initial questionnaire. *Id.* at 1349. Commerce rejected these responses because the respondent filed a single exhibit to the Section B response 21 minutes after the 5:00 pm filing deadline. The Court set aside Commerce's action as an abuse of agency discretion. *Id.*

While recognizing Commerce's statutory right to use "facts otherwise available" and an "adverse inference" in certain circumstances, the Court in *Celik Halat* ruled that "the purpose of section 1677e(b) is provide respondents with an incentive to cooperate, not to impose punitive, aberrational, or uncorroborated margins." *Id.* at 1353. The Court elaborated:

> Here, Commerce based its use of facts otherwise available and an adverse inference on what was no more than a minor incident of non-compliance with an ACCESS

---

*a Supplemental Questionnaire Response for Pokarna Engineered Stone Limited* (A-533-889), where Commerce granted full extensions to respondent granting more than 40 days for response to parts of the questionnaire (Access Barcode: 4344149-01.

> filing requirement that had no appreciable effect on the antidumping duty investigation. Commerce reached this decision despite record evidence that Celik Halat timely requested extensions to file the submission in question, which Commerce in large part denied.

*Id.* at 1357.

As in Simec's case, the respondent had anticipated that it would have difficulty meeting the filing deadline for its questionnaire responses and had therefore made repeated extension requests before the deadline. *Id.* at 1358. The *Celik Halat* court found that Commerce's statement that it would not grant any further extensions of deadlines for questionnaire responses in advance of the filing deadline was, *in and of itself*, an abuse of discretion. *Id.* at 1359-60. In Simec's case, Commerce likewise stated in each of its responses to Simec's extension requests from September 1, 2021, onward that Commerce was unlikely to accommodate any further extensions of time. *See* Commerce's September 1, 2021, letter to Simec, Appx004944; Commerce's September 3, 2021 letter to Simec, Appx004953; Commerce's September 9, 2021 letter to Simec, Appx006287.

Commerce issued its Preliminary Determination in *Celik Halat* just 51 days after respondent made its extension request. *Celik Halat*, 557 F. Supp. 3d at 1359.  In Simec's case, by contrast, from the time Simec made its final, futile extension request on September 6, 2021, Commerce had 88 days before it would ultimately publish its Preliminary Results on December 3, 2021.  In other words, in the present case Commerce had over a month longer before it was to issue its preliminary findings than it had in *Celik Halat*, and yet Commerce refused to grant any further extensions. As the Court found in *Celik Halat*, "…there is no record evidence that doing so {granting the extension} would have delayed the issuance" of the Final Results, which in Simec's case were not published for another nine months. *Celik Halat*, 557 F. Supp. 3d at 1359.

Commerce in the *Celik Halat* case justified its refusal to grant an extension in part on grounds that the respondent had not promptly submitted a letter requesting an out-of-time

extension. *Id.* The Court, however, found that the respondent's failure to do so was reasonable given Commerce's previous indication that such efforts would have been futile. *Id.* More specifically, the Court found that Commerce's statement that "we will not be able to grant any further extension of the deadlines" unlawfully foreclosed any future extensions whatsoever, even an extension necessitated by what Commerce might itself consider "an extraordinary circumstance" as described in 19 C.F.R. § 351.302(c). *Celik Halat*, 557 F. Supp. 3d at 1360. This refusal was therefore *per se* an abuse of discretion on the part of Commerce in *Celik Halat* as in the instant case. *Id.* at 1359-60.

## II. Commerce's Refusal to Accept Simec's Proposed October 18th Filing Was an Abuse of Discretion, Not Supported by Substantial Evidence and Not in Accordance with the Law.

Commerce's refusal to accept Simec's Proposed October 18th Filing of corrective information was an abuse of discretion, not supported by substantial evidence, and not in accordance with the law. October 18, 2021 was more than six weeks before the Preliminary Results deadline and more than 8 months before the Final Results were issued. Commerce continued accepting new information and questionnaire responses from co-mandatory respondent Deacero for weeks after October 18, 2021, up to and including November 10, 2021, indicating that Commerce had sufficient time to also process additional information from Simec. *See* Deacero's responses to Commerce's third supplemental questionnaire, Appx007162-007199, Appx089246-089329.

Commerce's October 19, 2021, notice and memorandum indicate that it rejected Simec's October 18th filing because it was "untimely filed." Appx007108-007109. Before rejecting an untimely submission, however, Commerce is required to evaluate the specific circumstances of that submission to determine "whether the interests of accuracy and fairness outweigh the burden

placed on the Department and the interest in finality." *Grobest & I-Mei Industrial (Vietnam) Co., Ltd. v. United States*, 815 F. Supp. 2d 1342, 1365 (Ct. Int'l Trade 2012). Further, "{a}t the preliminary results stage, Commerce abuses its discretion where it refuses to let a respondent establish an accurate dumping margin by correcting mistakes in its response." *Fischer S.A. Comercio, Industria and Agricultura v. United States*, 34 C.I.T. 334, 346, 700 F. Supp. 2d 1364, 1375 (2010). Commerce therefore faces a high burden when it rejects a submission made before the preliminary results are issued.

CIT precedent makes clear that Commerce has vanishingly little interest in finality prior to issuance of the Preliminary Results. *See, e.g., Wuhu Fenglian Co., Ltd.*, 836 F. Supp. 2d at 1404 (quoting *NTN Bearing Corp.*, 74 F. 3d at 1208) (" …'{P}reliminary determinations are preliminary precisely because they are subject to change,' and that at the preliminary results stage, *'the tension between finality and correctness simply {does} not exist.'*") (emphasis added); *Pro-Team Coil Nail Enter., Inc. v. United States*, 419 F. Supp. 3d 1319, 1332 (Ct. Int'l Trade 2019) ("Finality concerns are not implicated because {respondent} submitted the {corrective information} before Commerce issued the Preliminary Results and almost eight months before Commerce issued the Final Results.").

Indeed, the Federal Circuit has repeatedly held that Commerce's refusal to accept corrective information submitted early in a review—even new information submitted to correct an omission—is an abuse of discretion and grounds for remand.  Two critical cases on this point are *NTN Bearing Corp. v. United States*, 74 F.3d 1204 (Fed. Cir. 1995) and *Timken U.S. Corporation and Timken Nadellager, GMBH v. United States*, 434 F.3d 1345 (Fed. Cir. 2006).

In *NTN Bearing Corp.*, the Federal Circuit held that "ITA's refusal to consider {a respondent's} request for correction of clerical errors … constituted an abuse of discretion." *NTN*

*Bearing Corp.*, 74 F.3d at 1208-1209. The Court explained that "it is unreasonable to require perfection" and said it could not "agree that draconian penalties are appropriate for the making of clerical errors in order to insure submission of proper data." *Id.* In *Timken*, the Federal Circuit found that the holding in *NTN* extended beyond mere clerical errors:

> Commerce is free to correct any type of {respondent} error—clerical, methodology, substantive, or one in judgment—in the context of making an antidumping duty determination, *provided that the {respondent} seeks correction before Commerce issues its final results and adequately proves the need for the requested corrections.*

*Timken*, 434 F.3d at 1353 (emphasis added). The *Timken* court thus held the door open for respondent's corrections until the Final Results of the review are issued. In Simec's case, Commerce completely terminated Simec's opportunity to submit factual information almost three months before the Preliminary Results were issued and nine months before the Final Results. "This court...*has never discouraged the correction of errors at the preliminary result stage*; we have only balanced the desire for accuracy in antidumping duty determinations with the need for finality at the final results stage." *Timken*, 434 F.3d at 1353 (emphasis added).

This Court has repeatedly affirmed the principles espoused in *NTN*, *Timken*, and their progeny. *See, e.g., Grobest & I-Mei Indus. (Vietnam) Co. v. United States*, 815 F. Supp. 2d 1342, 1365-1366 (Ct. Int'l Trade 2012) ("When considering whether Commerce's rejection of an untimely filing amounts to an abuse of discretion, the court is guided first by the remedial, and not punitive, purpose of the antidumping statute . . . and the statute's goal of determining margins 'as accurately as possible.'"); *Fischer S.A. Comercio, Industria and Agricultura v. United States*, 34 C.I.T. 334, 346, 700 F. Supp. 2d 1364, 1375 (Ct. Int'l Trade 2010) ("*Timken* and *NTN Bearing* both stress that, at the preliminary results stage, *Commerce abuses its discretion where it refuses*

*to let a respondent establish an accurate dumping margin by correcting mistakes in its response.*")(emphasis added).

The recent decision in *Pro-Team Coil Nail Enter., Inc. v. United States*, 419 F. Supp. 3d 1319 (Ct. Int'l Trade 2019) applied the *Timken* and *NTN Bearing* principles to facts very similar to the current case. In *Pro-Team Coil*, the Court held that Commerce's decision to disregard untimely submitted corrective information (including information to correct an omission) and apply total AFA was an abuse of discretion. As here, the respondent in *Pro-Team Coil* sought to submit the corrective information early in the proceeding—*i.e.*, before the preliminary results were issued. *Id.* at 1332. Thus, the Court found that finality concerns were simply "not implicated." *Id.*

If anything, the facts in Simec's case are even more egregious than those in *Pro-Team Coil*. Here, not only did Commerce truncate Simec's participation in the fact-gathering phase very early during the review, but Commerce did so while continuing to accept factual submissions by the only other mandatory respondent, Deacero.

Neither the Final Results, Final IDM, or Deficiencies Memorandum explain why it would have been burdensome for Commerce to incorporate the information in Simec's Proposed October 18th Filing, other than to say that because Commerce's supplemental questionnaires to Simec were "extremely extensive and required weeks of Commerce's resources to prepare… accepting late supplemental questionnaire information from Grupo Simec would have imposed a significant burden on Commerce." Final IDM, Appx007731. However, even if Commerce did spend weeks preparing Simec's supplemental questionnaires, the time spent preparing the questionnaires has no bearing on whether the Proposed October 18th Filing would have been burdensome for Commerce to incorporate into the review—particularly where the Filing was made so early in the case. In fact, this Court has remanded cases back to Commerce where the delay in submitting responses was far

longer than here. For example, in *Grobest & I-Mei Industrial (Vietnam) Co., Ltd. v. United States*, this Court weighed the interests of "accuracy and fairness" against the burden on Commerce where the exporter submitted its separate rate certification *95* days after the deadline. 815 F. Supp. 2d 1342, 1365 (Ct. Int'l Trade, 2012). The Court criticized Commerce's decision and remanded the case, requiring Commerce to assign a separate rate to the exporter. *Id.* at 1365-66.

Moreover, the final round of Deacero's responses to the supplemental questionnaires were not due on November 10, 2021—just a few weeks before the preliminary results deadline and nearly two months after Simec submitted its supplemental questionnaire responses. Commerce's acceptance of factual submissions by Deacero while simultaneously rejecting those of Simec illustrate clearly that Commerce's alleged concern that it didn't have time to digest Simec's submissions was a pretext for its abuse of discretion. Commerce's actions in applying an inconsistent standard to Simec are Deacero in this regard was also arbitrary and capricious. *See, e.g., Green Country Mobilephone, Inc. v. FCC*, 765 F.2d 235, 237, 246 U.S. App. D.C. 366 (D.C. Cir. 1985) ("We reverse the {agency} not because the strict rule it applied is inherently invalid, but rather because the {agency} has invoked the rule inconsistently. We find the {agency} has not treated similar cases similarly."); *Nakornthai Strip Mill Pub. Co. v. United States*, 32 CIT 1272, 587 F. Supp. 2d 1303, 1307 (2008) ("Agencies have a responsibility to administer their statutorily accorded powers fairly and rationally, which includes not treating similar situations in dissimilar ways." (quotation and alteration marks and citation omitted)). "{A}n 'agency action is arbitrary when the agency offers{s} insufficient reasons for treating similar situations differently.'" *Foshan Shunde Yongjian Housewares & Hardwares Co. v. United States*, 896 F. Supp. 2d 1313, 1325 (Ct. Int'l Trade 2013) (citations omitted).

The interests of fairness and accuracy also weigh heavily in favor of accepting Simec's Proposed October 18th Filing. Accepting Simec's Proposed October 18th Filing would undoubtedly have yielded more accurate dumping margins. *See Shelter Forest Int'l Acquisition, Inc. v. United States*, 497 F. Supp. 3d 1388 (Ct. Int'l Trade 2021) (finding that while Commerce has some discretion to consider resources and limit an investigation, it abused discretion by precluding Shelter Forest's submission when acceptance of submission would yield a more accurate result); *see also NTN Bearing*, 74 F.3d at 1207 ("It is well-settled that a deadline-setting regulation that is not required by statute may, in appropriate circumstances, be waived and must be waived where failure to do so would amount to an abuse of discretion.).

**III.   Commerce's Decision to Bypass the Record and Resort to Facts Available Was an Abuse of Discretion, Not Supported by Substantial Evidence and Not in Accordance with the Law.**

Before Commerce can apply facts otherwise available, it must first identify a specific gap in the record that needs to be filled. *See, e.g., BlueScope Steel Ltd. v. United States*, 548 F. Supp. 3d 1351, 1358 (Ct. Int'l Trade 2021). The substantial evidence standard, however, does not permit Commerce to base adverse inferences on alleged gaps in the record that were, at least in part, of its own making. *Yangzhou Bestpak Gifts & Crafts Co. v. United States*, 716 F.3d 1370, 1378 (Fed. Cir. 2013). To the extent any gaps do exist in Simec's questionnaire responses, such gaps cannot support Commerce's determination because they are the result of Commerce's abuses of discretion and failure to comply with 19 U.S.C. 1677m(d). More specifically, any gaps in the record are the direct result of Commerce's failure to provide Simec with adequate time to submit complete and accurate responses to its questionnaires and Commerce's failure to comply with 19 U.S.C. 1677m(d). Below are examples of Commerce's actions in this regard.

First, Commerce noted in its ABC SQR that CONNUMH numbers for 2 of the 27,000 sequence numbers in Simec's Homes Market Sales Database (SEQH 14244 and SEQH 14327) did not match the reported product characteristics for Minimum Specified Yield Strength (MSYSTRH). *See* Simec's Responses to ABC SQR question 27(d), Appx004998, Appx084715. Commerce instructed Simec to either explain the discrepancy or revise the database, and Simec's response indicated that Simec would revise the database. *Id.* However, because Simec was not afforded sufficient time to complete its responses, a clerical error resulted in the CONNUM numbers for those two sequence numbers not being updated in the Home Market Sales Database. *See* Simec's Home Market Sales Database, Appx085162.

Second, Commerce took the position that although Simec's narrative responses to the initial questionnaire indicated that Simec was reporting a code of "4" in the MSYSTRH field, Simec's home market sales database also included codes "1" and "7." *See* Simec's Responses to ABC Supplemental Questionnaire question 27(b), Appx004997, Appx084714. Commerce therefore requested clarification or correction of Simec's MSYSTRH data field. *Id.* In Simec's narrative response, Simec indicated that "Grupo Simec reports only code '4'" for the MSYSTRH field. *Id.* However, because Simec was not afforded sufficient time to complete its responses, a clerical error resulted in the database cells within the MSYSTRH field not being updated to show only a "4."

Third, Commerce's Deficiencies Memorandum notes that there were translation issues with some of Simec's responses (*See* Deficiencies Memorandum, Appx007841, Appx091539), but Simec's proposed October 18th filing would have addressed those issues. *See* Simec's request to accept proposed October 18th filing, Appx006626.

Fourth, Commerce notes that Simec's responses to questions 71-75 of the ABC Supplemental Questionnaire were deficient. *See* Final IDM, Appx007730. However, had Commerce given Simec sufficient time to respond to the ABC Supplemental Questionnaire, Simec would have been able to submit that information to Commerce by the extended deadline. Simec's responses to questions 71-75 were also offered to Commerce in Simec's Proposed October 18th Filing. *See* Simec's request to accept the Proposed October 18th Filing, Appx006625-006628. As previously discussed, Commerce rejected the Filing as "untimely filed," although the Preliminary Results were not to be published for another six weeks.

In addition, had Commerce complied with the mandatory notice and remedial requirements of 19 U.S.C. § 1677m(d), Simec would have had an opportunity to fill in many of the alleged gaps Commerce complained of. Commerce is required to comply with 19 U.S.C. § 1677m(d) before resorting to facts otherwise available. *See* 19 U.S.C. § 1677e(a); *China Steel Corp. v. United States*, 264 F. Supp. 2d 1339, 1355 (Ct. Int'l Trade 2003) ("Before resorting to facts available, however, the Department is required to comply with the notice and remedial requirements of §1677m(d).").

19 U.S.C. § 1677m(d) states that, if Commerce finds a deficiency in a response to a request for information, Commerce "*shall promptly* inform the person submitting the response of the nature of the deficiency and shall, to the extent practicable, provide that person with an opportunity to remedy or explain the deficiency." 19 U.S.C. § 1677m(d). "The statutory entitlement to notice and opportunity to remedy any deficiency is unqualified," (*Hitachi Energy USA Inc. v. United States*, 34 F.4th 1375, 1384 (Fed. Cir. 2022)), and failure to comply with 19 U.S.C. § 1677m(d) is grounds for remand. *See, e.g., BlueScope Steel Ltd. v. United States*, 548 F. Supp. 3d 1351 (Ct. Int'l Trade 2021) (finding that Commerce's reliance on facts otherwise available based on

perceived deficiencies in respondent's sales database was premature where Commerce did not first comply with the requirements of 19 U.S.C. § 1677m(d)).

Commerce waited three and a half months after receiving Simec's initial questionnaire responses before issuing supplemental questionnaires to Simec. This lengthy delay violated 19 U.S.C. § 1677m(d), particularly when paired with Commerce's subsequently taking an ultra-hard line against giving Simec adequate time to respond to the supplemental questionnaires. "With respect to notice under § 1677m(d), the Federal Circuit has said it is 'impermissible for Commerce to delay reporting that a respondent has provided insufficient information until it is too late to correct.'" *Saha Thai Steel Pipe Pub. Co. v. United States*, 605 F. Supp. 3d 1348, 1365 (Ct. Int'l Trade 2022) (quoting *Hitachi Energy*, 34 F.4th at 1384 (citing *SKF USA*, 391 F. Supp. 2d at 1336–37)). In short, Commerce violated 19 U.S.C. § 1677m(d) by failing to <u>promptly</u> notify Simec of the alleged deficiencies in its initial questionnaire responses and by refusing to provide Simec with a meaningful opportunity to address those deficiencies.

Commerce also failed to comply with 19 U.S.C. § 1677m(d) because it only alerted Simec to certain alleged deficiencies in its questionnaire responses <u>for the first time</u> in its Preliminary IDM, Appx007222 (noting that "the information provided in the Grupo Simec ABS SQR also resulted in a variety of new discrepancies and data issues"). At this point in the process, however, Commerce had made it clear to Simec that Simec would have no opportunity to augment the factual record in order to remedy any such deficiency. Failure to notify "is itself a violation of § 1677m(d)." *Saha Thai Steel Pipe Pub. Co. v. United States*, 605 F. Supp. 3d 1348, 1365 (Ct. Int'l Trade 2022); *see also China Kingdom Import & Export Co., Ltd. v. United States*, 507 F. Supp. 2d 1337, 1355-1358 (Ct. Int'l Trade 2007) (finding that where information at issue was submitted to Commerce 53 days before the preliminary determination and "more than eight months" before the

30

final results were due, "no reason is apparent why affording {the respondent}, at the least, the opportunity to explain the deficiency would have been impracticable," and Commerce committed legal error for failing to make a finding that it would not be practicable to allow the respondent to remedy the deficiency); *Bowe-Passat v. United States*, 17 C.I.T. 335, 343 (1993) (holding that Commerce cannot "sen{d} out a general questionnaire and a brief deficiency letter, then effectively retreat {} into its bureaucratic shell, poised to penalize {respondents} for deficiencies not specified in the letter that the ITA would only disclose after it was too late, i.e., after the preliminary determination. This predatory "gotcha" policy does not promote cooperation or accuracy or reasonable disclosure by cooperating parties intended to result in realistic dumping determinations.").

Finally, Commerce violated 19 U.S.C. § 1677m(d) by not providing Simec with an opportunity to remedy any further alleged deficiencies or discrepancies via an additional supplemental questionnaire. Commerce failed to do so despite indicating in the Final IDM that one of the reasons it could not give Simec additional time to respond to the supplemental questionnaires was because Commerce "made determinations about the amount of time it would grant Grupo Simec on the supplemental questionnaire *in order to also ensure time was reserved for any additional supplemental questionnaires within the time remaining ahead of the Preliminary Results*." Final IDM, Appx007731 (emphasis added).  And yet Commerce never did so. Had Commerce issued a few supplemental questions to Simec, it could have cleared a vast majority, if not all, issues raised by Commerce. For example, a number of the issues raised by Commerce in the Deficiencies Memorandum were either the result of (1) formatting errors on excel (*i.e.,* the issues with the CREDITH and PAYDATEH fields in the home market sales databases) or unclear instructions from Commerce as to what, exactly, certain questions in the supplemental

questionnaires were seeking from Simec (*i.e.,* Commerce's complaints about Simec's responses to ABC Supplemental Questionnaire 36.a and b). *See* Deficiencies Memorandum, Appx007820-007821, Appx007827-0077828, Appx091518-091519, Appx091525-091526. Unfortunately, no such additional questionnaires were ever issued to Simec.

## IV.    Commerce's Decision to Apply an Adverse Inference in Selecting From Facts Available Was An Abuse of Discretion, Not Supported by Substantial Evidence and Not in Accordance with the Law.

In the Final Results, Commerce adopted its AFA finding from the Preliminary Results and assigned Simec the punitive 66.7% dumping margin from the Petition in the original investigation. Final Results, Appx007782-007783.

Commerce is only authorized to apply adverse facts available, however, after it undertakes a two-step analysis. First, Commerce must find that use of "facts available" is needed because "necessary information is not available on the record," or "an interested party or any other person . . . withholds information that has been requested by {Commerce} . . . {or} significantly impedes a proceeding." 19 U.S.C. § 1677e. Second, Commerce must find "that an interested party has failed to cooperate by not acting to the best of its ability to comply with a request for information." 19 U.S.C. § 1677e(b)(1). "Each determination must be made separately, and each must be explained separately." *Nippon Steel Corp. v. Unites States*, 337 F.3d 1373 at 1381 (Fed. Cir. 2003). Only after making both of these two distinct findings may Commerce use an adverse inference "in selecting from among the facts otherwise available." 19 U.S.C. § 1677e(b)(1)(A).

As explained above, Commerce failed to identify any gap in the record that would justify application of total AFA. However, even if Commerce had sufficiently identified information that was missing from the record, Commerce was still only permitted to draw adverse inferences if Simec had "failed to cooperate by not acting to the best of its ability to comply with a request for

32

information." 19 U.S.C. § 1677e(b)(1); *see also Canadian Solar Inc. v. United States*, 537 F. Supp. 3d 1380, 1400 (Ct. Int'l Trade 2021).

Compliance with the 'best of its ability' standard does not mean that the respondent must perform to "perfection," but rather that Commerce is required to "examine respondents' actions and assess the extent of respondents' abilities, efforts, and cooperation in responding to Commerce's requests for information." *Nippon Steel Corp.*, 337 F.3d at 1382. Compliance is determined by assessing whether a respondent has put forth its maximum effort to provide Commerce with full and complete answers to all inquiries in an investigation. *Id.*; *see also Essar Steel Ltd. v. United States*, 678 F.3d 1268, 1275–76 (Fed. Cir. 2012).

Commerce improperly based its finding that Simec failed to act to the best of its ability on Commerce's assertion that Simec failed to remedy deficiencies in its supplemental questionnaire responses. More specifically, the Final IDM states:

> The fact that Grupo Simec's supplemental questionnaire responses contained many of the same deficiencies that were flagged in its initial questionnaire response is indicative of the fact that Grupo Simec did not put forth its best effort to remedy these issues, particularly where Grupo Simec stated that it had fixed the issue when, in fact, it had not. Regardless of the reasons as to why Grupo Simec was unable to submit the correct information within the unusually long timeframe allotted by Commerce, the inability to provide accurate data from its own records cannot support a conclusion that the respondent cooperated to the best of its ability. Rather, to the extent that a respondent such as Grupo Simec was unable to build an accurate record because of its own internal challenges, *Nippon* explains that the respondent has not cooperated to the best of its ability.

Final IDM, Appx007740-007741.

However, a mere failure to respond, without more, does *not* constitute a failure to cooperate—especially where "a respondent sought to correct its deficiencies in responding to a supplemental questionnaire." *Mannesmannrohren-Werke AG & Mannesmann Pipe & Steel Corp. v. United States*, 23 C.I.T. 826, 842 (Ct. Int'l Trade 1999); *see also Pro-Team Coil Nail Enter.,*

*Inc.*, 419 F. Supp. 3d at 1333 ("Commerce must do more than simply restate its findings ostensibly supporting the use of neutral facts available to support the use of adverse facts available."). Moreover, the "best of its ability" standard does not require that Commerce disregard the reasons why Grupo Simec was unable to submit the correct information—in fact, the opposite is true. Commerce is expressly *required* to "examine respondents' actions and assess the extent of respondents' abilities, efforts, and cooperation in responding to Commerce's requests for information." *Nippon Steel Corp.*, 337 F.3d at 1382. Whether or not Simec failed to respond to certain questions is not, in and of itself, sufficient to justify Commerce's applications of AFA.

Simec's cooperation throughout the administrative review is demonstrated by its near-constant communication with Commerce regarding the substantial challenges it faced in responding to the questionnaires and the immense amount of information and supporting documentation that Simec actually submitted prior to Commerce's final drop-dead deadline of September 10, 2021. Simec underscored its desire to cooperate by attempting to provide the information sought by Commerce on October 18, 2021, almost six weeks before Commerce issued its Preliminary Results. Simec was clearly not playing "hide the ball." Commerce nevertheless rejected Simec's Proposed October 18th Filing while continuing to accept questionnaire responses from co-mandatory respondent Deacero for more than three weeks thereafter (until November 10, 2021). There is no hint in the record that Simec withheld harmful information strategically, hoping that Commerce would overlook the omission and make a more favorable determination.

Commerce's imposition of adverse facts available is therefore contrary to the statute and grossly disproportionate to the minor errors at issue. First, any gaps in the record, to the extent Commerce has sufficiently identified them, are the result of Commerce's failure to comply with 19 U.S.C. § 1677m(d) and/or procedural difficulties that Commerce itself created. Accordingly,

34

they cannot be used to support application of AFA. Second, even if there were such gaps, there is <u>no</u> record evidence of non-cooperation by Simec. At most, Simec's errors were the result of inadvertence. Commerce's finding of adverse facts available was therefore an abuse of discretion, unsupported by substantial evidence, and not in accordance with the law.

**V.      Commerce's Decision to Apply Total Facts Available Was an Abuse of Discretion, Not Supported by Substantial Evidence and Not in Accordance with the Law.**

Even if Commerce identified a *partial* gap in Simec's responses, and even if Commerce properly found that Simec did not act to the best of its ability, Commerce still was not permitted to apply *total* AFA to Simec.

Commerce is only permitted to use total adverse facts available when "**none** of the reported data is reliable or usable," *Zhejiang Dunan Hetian Metal Co. v. United States*, 652 F.3d 1333, 1348 (Fed. Cir. 2011)(emphasis added). Commerce may not apply total AFA "in disregard of information of record that is not missing or otherwise deficient," *Id.,* and is prohibited from doing so where at least some of the information could be used. *See Nat'l Nail Corp. v. United States*, 390 F. Supp. 3d 1356, 1374 (Ct. Int'l Trade 2019); *see also BlueScope Steel Ltd*., 548 F. Supp. 3d at 1358. "{W}here some of the information could be used, or the deficiency was only 'with respect to a discrete category of information,' and a respondent is found not to have complied to the best of its ability, the use of '**partial** adverse facts available' is directed by the statute." *Nat'l Nail Corp.*, 390 F. Supp. 3d at 1375 (quoting *Foshan Shunde Yongjian Housewares & Hardware Co. v. United States*, 35 C.I.T. 1398, 1416 (2011)) (emphasis added).

In this case, the alleged deficiencies identified by Commerce all relate to discrete categories of information. For example, Commerce contends that one of the alleged gaps in Simec's responses was a discrepancy between the minimum specified yield strength ("MYSYTRH") and the control number ("CONNUMH") for two sequence numbers included in the home market sales

database (SEQH 14244 and SEQH 14327). *See* Deficiencies Memorandum, Appx007818-Appx007820, Appx091516-091518. That database, however, requested MYSYTRH and CONNUMH information for nearly <u>27,000 sequence numbers</u>, meaning the database included approximately 54,000 data inputs in the CONNUMH and MYSYTRH columns—only <u>two</u> of which contained the alleged errors. *See* Simec's Home Market Sales Database, Appx085162.

Commerce's reliance on a small number of errors of this kind to does not justify ignoring the vast trove of perfectly usable data submitted by Simec. As noted above, Simec submitted approximately 229 pages of narrative responses and over 5,100 pages of exhibits. Commerce has provided no reasonable explanation for why it disregarded <u>all</u> of this information.

**VI.    Even if Commerce Could Apply an Adverse Inference, the Dumping Margin Selected by Commerce Was an Abuse of Discretion, Not Supported by Substantial Evidence and Not in Accordance with the Law.**

Commerce erred by levying against Simec a discredited 66.7% antidumping rate drawn from the 2014 petition filed by Simec's competitor. That rate was unsupported by substantial evidence and contrary to law. Even if an adverse inference were warranted, Commerce should have selected a rate by drawing on the record of this proceeding and the five administrative reviews preceding it. Simec's <u>highest</u> rate prior to the review under appeal was 4.93%, a tiny fraction of the 66.7% rate. *See supra,* note 6.

Even when the Tariff Act permits Commerce to use an adverse inference, it does not allow Commerce to "select unreasonably high rates having no relationship to the respondent's actual dumping margin." *Gallant Ocean (Thailand) Co. v. United States*, 602 F.3d 1319, 1323 (Fed. Cir. 2010). While the Act states that Commerce may select the highest rate requested by the petition, it may do so only "based on the evaluation by {Commerce} of the situation that resulted in {the agency} using an adverse inference in selecting among the facts otherwise available." 19 U.S.C. §

1677e(d)(2). As the Federal Circuit has explained, "Commerce must consider the totality of the circumstances in selecting an AFA rate, including, if relevant, the seriousness of the conduct of the uncooperative party." *BMW of N. Am. LLC v. United States*, 926 F.3d 1291, 1302 (Fed. Cir. 2019). Moreover, "{a}n AFA rate must be a reasonably accurate estimate of the respondent's actual rate." *Id.*  Because the statutory requirement for "evaluation" was added to the "pre-existing statutory requirements for using adverse facts available, clearly some additional evaluation is required beyond that which justified the adverse inference." *POSCO v. United States*, 296 F. Supp. 3d 1320, 1349 (Ct. of Int'l Trade 2018). In other words, "{t}hat the facts merited the use of an adverse inference does not necessarily mean that those same facts merited selection of the highest rate." *Id.*

For example, the Federal Circuit rejected Commerce's AFA rate in *BMW* after finding that the agency had failed to "consider or address BMW's argument regarding its mitigating circumstances or explain why it determined that the 126.44% rate was appropriate given the unique factual circumstances." 926 F.3d at 1301.  This court has previously rejected Commerce's use of petition-based AFA rates in circumstances similar to those here. *See, e.g., Bosun Tools Co. v. United States*, 405 F. Supp. 3d 1359 (Ct. Int'l Trade 2019) (rejecting an 82.05% AFA rate based on respondent's failure to timely submit all required information).

The extraordinarily high rate levied against Simec cannot pass muster under those standards. As in *BMW,* Commerce did not adequately assess Simec's culpability. Instead, Commerce indicated in the Final IDM:

> In selecting an AFA rate, we ultimately determined that the rate of 66.70 percent from the petition was the appropriate rate. While each segment of a proceeding is unique, Commerce notes that it was in response to a very similar set of facts that Grupo Simec was assigned this rate in the investigation.

Final IDM, Appx007746. Without explaining what "very similar" factual circumstances Commerce is referencing, Commerce goes on to say that if the parties believed the 66.7% rate was too high, they should have tried to factually distinguish the circumstances in the present case from the initial investigation:

> To the extent the parties to this proceeding contend that the rate we preliminarily selected is unreasonable and/or should be restricted to only the most extreme deficiencies, we note that no rationale has been provided to distinguish the facts of this case with those of the investigation, such that we could not justify using the same rate again under these very similar circumstances.

Final IDM, Appx007746. However, Commerce's Preliminary Results never indicated that it was selecting the 66.7% AFA rate because Commerce believed the facts of the administrative review at issue to be "very similar" to those of the investigation. Instead, Commerce's Preliminary IDM states only that:

> In relying on AFA, we are preliminarily assigning Grupo Simec a dumping margin of 66.70 percent, which was the AFA rate assigned to Grupo Simec in the original investigation. Because this rate was a rate applied to Grupo Simec in a prior segment of the proceeding, there is no need to corroborate it under section 776(c)(2) of the Act. Further, this rate is at a level which does not permit Grupo Simec to benefit from its lack of cooperation in this review.

Preliminary IDM, Appx007226. Even without Commerce notifying the parties of its reasons for levying the 66.7% rate prior to the Final Results, the parties did actually provide information distinguishing the circumstances of the administrative review from the prior investigation. One key factual distinction was the ongoing COVID-19 pandemic that severely impacted Simec's ability to complete its responses and resulted in the death of three Simec accountants who were working on the responses. *See, e.g.,* Simec Case Brief, Appx007486-007587, Appx090842-090843. Commerce failed to identify what ongoing situation in 2014 was "very similar" to the global COVID-19 pandemic that impacted Simec's participation in the ongoing review.

Commerce also attempted to justify its punitive AFA rate duty rate as one which would "incentivize {Simec} to participate in future proceedings." Final IDM, Appx007746. Commerce made no effort, however, to determine whether it was "a reasonably accurate estimate of {Simec's} actual rate, albeit with some built-in increase intended as a deterrent to non-compliance." *BMW*, 926 F.3d at 1300 (internal quotation omitted).

The Federal Circuit has previously vacated Commerce's orders for selecting a discredited petition rate as an AFA rate in a subsequent review. In *Gallant Ocean*, for example, Commerce had "imposed dumping margins between 5.91% and 6.82% for the {subject} products after its initial investigation." 602 F.3d at 1323. When Commerce then changed course and, as here, selected a petition-based AFA rate (57.64% in that case), the Federal Circuit rejected that rate as "unreasonably high." *Id.* The court found that, because Commerce had calculated much lower actual dumping margins in the administrative reviews following its investigation, Commerce's selection of the petition rate was "aberrational," "uncorroborated" and "punitive." *Id.* at 1323-24. More recently, in *Celik I*, *Celik II*, and *Bosun Tools*, this Court rejected Commerce's selection of 53.65%, 158.44%, and 82.05% AFA rates as unreasonably high given the records in each case. *Celik I*, 557 F. Supp. 3d 1348; *Celik II*, 557 F. Supp. 3d 1363; *Bosun Tools*, 405 F. Supp. 3d 1359.

As noted by the Court in the recent *Oman Fasteners* case, merely stating that the highest possible rate was necessary to induce cooperation "is not an explanation," but rather "amounts to 'We chose this as the adverse rate because it is crushing.'" *Oman Fasteners, LLC v. United States*, No. 22-00348, 2023 WL 2233642, at *8 (Ct. Int'l Trade Feb. 15, 2023). The same is true here. Simec has a long history of cooperation with Commerce's antidumping proceedings which resulted in a 0.00% rate in the first administrative review and, up until the review at issue, its rate

has never exceeded 4.93%, yet Commerce inexplicably assigned a 66.7% rate in the review at issue.

An AFA rate cannot be punitive or aberrational and must "reflect{ } the seriousness of the non-cooperating party's misconduct." *BMW*, 926 F.3d at 1301. There is no plausible argument that the 66.7% rate reflects a reasonably accurate dumping margin for Simec or is necessary to induce Simec's future cooperation, given Simec's excellent record of compliance and consistently low dumping margins over the course of many years of administrative reviews.

## **CONCLUSION**

Simec's participation in the administrative review below was completely truncated almost three months before Commerce issued its Preliminary Results and nine months before issuance of the Final Results. Federal Circuit precedent mandates a finding that totally foreclosing a mandatory respondent's participation in an administrative review so early in the process is an abuse of discretion, not supported by substantial evidence and not in accordance with the law.

Whatever flaws Commerce found in Simec's questionnaire responses, Simec was entitled to an adequate amount of time to address those flaws. Allowing Simec to amend, correct or supplement its responses would have had no material impact on Commerce's timetable for completing the review as illustrated by Commerce's continuing to accept questionnaire responses from the only other mandatory respondent for *fully two months* after Commerce wholly shut down Simec's involvement. This abuse of discretion by Commerce was particularly egregious given that Simec suffered serious personnel challenges during the review due to Covid-19, including the death of three members of its antidumping team. Simec otherwise had a historical track record of responsiveness and compliance during prior administrative reviews conducted by Commerce.

For the reasons set forth above, Simec respectfully requests that this Court enter an Order remanding the Final Results to Commerce with instructions to reconsider those Results by overturning its finding of adverse facts available, permitting Simec sufficient time provide any information that Commerce believes is missing from the record, and recalculating Simec's dumping margin based on the data submitted by Simec. Simec further requests whatever relief on remand that the Court may deem just and proper.

Respectfully submitted,

<u>s/ James L. Rogers, Jr.</u>
James L. Rogers, Jr.
**Nelson Mullins Riley & Scarborough LLP**
2 W. Washington Street, Suite 400
Greenville, SC 29601
Phone: (864) 373-2216
Email:  jay.rogers@nelsonmullins.com

April 26, 2023

41

**<u>Certificate of Compliance with Standard Chambers Procedure 2(B)(1)</u>**

The undersigned hereby certifies that the foregoing brief contains 12,733 words, exclusive of the table of contents, table of authorities, signature block and certificate of counsel, and therefore complies with the maximum 14,000-word count limitation set forth in the Standard Chambers Procedures of the United States Court of Trade.

/s/ James L. Rogers

James L. Rogers

Dated: April 26, 2023

### UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| **GRUPO ACERERO, S.A. de C.V. and GRUPO SIMEC S.A.B. de C.V., et.al.;** | |
| **Plaintiffs,** | |
| **and** | |
| **GERDAU CORSA, S.A.P.I. de C.V.,** | Consol. Court No. 22-cv-00202 |
| **Plaintiff-Intervenor,** | **PUBLIC DOCUMENT** |
| **v.** | |
| **UNITED STATES,** | |
| **Defendant,** | |
| **and** | |
| **REBAR TRADE ACTION COALITION,** | |
| **Defendant-Intervenor.** | |

## <u>ORDER</u>

Upon consideration of the Rule 56.2 Motion of Plaintiffs Grupo Simec, et.al., Memorandum in Support thereof and all responses thereto, and all other relevant pleadings, papers and proceedings herein, it is hereby:

**ORDERED** that Plaintiff Grupo Simec's Rule 56.2 Motion for Judgment on the Agency Record is GRANTED; and it is further

**ORDERED** that the final determination of the U.S. Department of Commerce as set forth in *Steel Concrete Reinforcing Bar from Mexico*: *Final Results of Antidumping Duty Administrative Review;* 2019-2020, 87 Fed. Reg. 34848 (Dep't. Commerce, June 8, 2022), is remanded for disposition in a manner consistent with the judgment of this Court.

**IT IS SO ORDERED.**

_____
Stephen Alexander Vaden, Judge

Dated: _____, 2023
         New York, New York

2