UNITED STATES COURT OF INTERNATIONAL TRADE
NEW YORK, NEW YORK

BEFORE:  THE HONORABLE STEPHEN A. VADEN, JUDGE

|  |  |
|---|---|
| GRUPO ACERERO S.A. de C.V.,<br>GRUPO SIMEC S.A.B. de C.V., et al.,<br><br>        Plaintiffs,<br><br>    and<br><br>GERDAU CORSA, S.A.P.I. de C.V.,<br><br>        Plaintiff-Intervenor,<br><br>    v.<br><br>UNITED STATES,<br><br>        Defendant,<br><br>    and<br><br>REBAR TRADE ACTION COALITION,<br><br>        Defendant-Intervenor. | Consol. Court No. 22-00202<br>**NONCONFIDENTIAL VERSION** |

**MOTION FOR JUDGMENT
ON THE AGENCY RECORD**

Grupo Acerero S.A. de C.V. ("Grupo Acerero") and Gerdau Corsa S.A.P.I. de C.V. ("Gerdau Corsa"), in their respective roles as Consolidated Plaintiff and Plaintiff-Intervenor in the above-captioned consolidated action, hereby move for Judgment on the Agency Record with respect to the final results issued by the U.S. Department of Commerce in its administrative review of the antidumping duty order on steel concrete reinforcing bar from Mexico, Case No. A-201-844, for the period November 1, 2019 through October 31, 2020.  The final results were published

as *Steel Concrete Reinforcing Bar From Mexico*, 87 Fed. Reg. 34,848 (Dep't Commerce Jun. 8, 2022) (final results of antidumping duty administrative review; 2019–2020) (the "*Final Results*").

Grupo Acerero and Gerdau Corsa respectfully move, for the reasons explained in the accompanying Memorandum, for this Court to hold that the contested portions of the *Final Results* are not supported by substantial evidence and are not otherwise in accordance with law.  Grupo Acerero and Gerdau Corsa further move for the Court to remand this matter to the U.S. Department of Commerce for disposition consistent with the order and opinion of the Court.

A proposed order is attached.

Respectfully submitted,

/s/ Craig A. Lewis
Craig A. Lewis
Jonathan T. Stoel
Nicholas R. Sparks

HOGAN LOVELLS US LLP
555 Thirteenth Street, N.W.
Washington, DC 20004-1109
(202) 637-8613

*Counsel to Gerdau Corsa S.A.P.I. de C.V.*

/s/ Irene H. Chen
Irene H. Chen

VCL LAW LLP
1945 Old Gallows Road, Suite 630
Vienna, VA  22182

/s/ Mark B. Lehnardt
Mark B. Lehnardt

LAW OFFICES OF DAVID L. SIMON, LLP
1025 Connecticut Ave., Suite 1000
Washington, DC  20036

*Counsel to Grupo Acerero S.A. de C.V.*

Dated: April 27, 2023

UNITED STATES COURT OF INTERNATIONAL TRADE
NEW YORK, NEW YORK

BEFORE:  THE HONORABLE STEPHEN A. VADEN, JUDGE

| | |
|---|---|
| GRUPO ACERERO S.A. de C.V., GRUPO SIMEC S.A.B. de C.V., et al., <br><br> Plaintiffs, <br><br> and <br><br> GERDAU CORSA, S.A.P.I. de C.V., <br><br> Plaintiff-Intervenor, <br><br> v. <br><br> UNITED STATES, <br><br> Defendant, <br><br> and <br><br> REBAR TRADE ACTION COALITION, <br><br> Defendant-Intervenor. | Consol. Court No. 22-00202 <br><br> **NONCONFIDENTIAL VERSION CONFIDENTIAL INFORMATION REMOVED AT PAGES 7, 38, 43** |

<u>JOINT MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF GRUPO ACERERO S.A. DE C.V. AND GERDAU CORSA S.A.P.I. DE C.V.'S RULE 56.2 MOTION FOR JUDGMENT ON THE AGENCY RECORD</u>

Craig A. Lewis
Jonathan T. Stoel
Nicholas R. Sparks
HOGAN LOVELLS US LLP
555 Thirteenth Street, N.W.
Washington, DC 20004-1109

*Counsel to Gerdau Corsa S.A.P.I. de C.V.*


Dated: April 27, 2023

Irene H. Chen
VCL LAW LLP
1945 Old Gallows Road, Suite 630
Vienna, VA  22182

Mark B. Lehnardt
LAW OFFICES OF DAVID L. SIMON, LLP
1025 Connecticut Ave., Suite 1000
Washington, DC  20036

*Counsel to Grupo Acerero S.A. de C.V.*

TABLE OF CONTENTS

I.    RULE 56.2 STATEMENT ..........................................................................1

      A.    Administrative Decision Under Review .........................................1

      B.    Issues of Law and Reasons for Contesting ....................................2

II.   STATEMENT OF FACTS ..........................................................................4

            A.    Simec Response To Section A ...............................................5

            B.    Simec Response To Section B, Section C, And Section D.....................6

            C.    Simec Response To Supplemental Questionnaires..................9

            D.    Preliminary Results............................................................16

            E.    Final Results......................................................................18

III.  ARGUMENT...............................................................................................20

      A.    Standard of Review......................................................................20

      B.    Commerce's Application of Adverse Facts Available to Grupo
            Simec Is Not Supported by Substantial Evidence and Is Contrary to
            Law ...............................................................................................22

      C.    The Final Results Non-Selected Company Rate Fails to
            Reasonably Reflect Potential Dumping Margins for Non-
            Investigated Respondents...............................................................30

      D.    Application of a Simple Average of the Mandatory Rates is
            Unlawful in this Case ....................................................................42

IV.   CONCLUSION............................................................................................46

TABLE OF AUTHORITIES

**Cases**

*Abrutyn v. Giovanniello,*
  15 F.3d 1048 (Fed. Cir. 1994) .................................................................................. 23

*Ajmal Steel Tubes & Pipes Indus. LLC v. United States,*
  Slip Op. 21-587, 2022 Ct. Intl. Trade LEXIS 122, 2022 WL 15943670 (Oct. 28, 2022) ...... 29

*Albemarle Corp. & Subsidiaries v. United States,*
  821 F.3d 1345 (Fed. Cir. 2016) ................................................................................ 33

*Bosun Tools Co. v. United States,*
  463 F. Supp. 3d 1309 (Ct. Int'l Trade 2020) ............................................................. 39

*Burlington Truck Lines, Inc. v. United States,*
  371 U.S. 156 (1962) ................................................................................................. 22

*Caribbean Ispat Ltd. v. United States,*
  450 F.3d 1336 (Fed. Cir. 2006) ................................................................................ 21

*Carpenter Tech. Corp. v. United States,*
  33 CIT 1721 (Ct. Int'l Trade 2009) .......................................................................... 35

*Cathedral Candle Co. v. Int'l Trade Comm'n,*
  400 F.3d 1352 (Fed. Cir. 2005) ................................................................................ 21

*Chevron U.S.A., Inc. v. Natural Res. Def. Council,*
  467 U.S. 837 (1984) ................................................................................................. 21

*Daewoo Elecs. Co. v. Int'l Union of Elec., Tech., Salaried & Mach. Workers, AFL-CIO,*
  6 F.3d 1511 (Fed. Cir. 1993) .................................................................................... 22

*Fischer S.A. Comercio, Industria and Agricultura v. United States,*
  34 CIT 334, 700 F. Supp. 2d 1364 (2010) ................................................................ 23

*Gallant Ocean (Thailand) Co. v. United States,*
  602 F.3d 1319 (Fed. Cir. 2010) .......................................................................... 22, 32

*GODACO Seafood Joint Stock Co. v. United States,*
  494 F. Supp. 3d 1294 (Ct. Int'l Trade 2021) ............................................................ 33

*Grobest & I-Mei Indus. (Vietnam) Co. v. United States,*
  36 CIT 98, 815 F. Supp. 2d 1342 (2012) ...................................................... 23, 25, 27

*Husteel Co. v. United States,*
  98 F. Supp. 3d 1315 (Ct. Int'l Trade 2015) .............................................................. 35

*In re Durance*,
    891 F.3d 991 (Fed. Cir. 2018) .................................................................. 23, 24

*Mannesmannrohren-Werke AG & Mannesmann Pipe & Steel Corp. v. United States*,
    23 CIT 826 (1999) ................................................................................... 28

*Nan Ya Plastics Corp., LTD. v. United States*,
    810 F.3d 1333 (Fed. Cir. 2016) ................................................................ 37

*Nippon Steel Corp. v. United States*,
    337 F.3d 1373 (Fed. Cir. 2003) ................................................................ 28

*NLRB v. Columbian Enameling & Stamping Co.*,
    306 U.S. 292 (1939) ................................................................................. 22

*NTN Bearing Corp. v. United States*,
    74 F.3d 1204 (Fed. Cir. 1995) .............................................................. 23, 35

*Pro-Team Coil Nail Enter., Inc. v. United States*,
    419 F. Supp. 3d 1319 (Ct. Int'l Trade 2019) ............................................. 28

*Rhone Poulenc, Inc. v. United States*,
    899 F. 2d 1185 (Fed. Cir. 1990) ............................................................... 32

*SKF USA Inc. v. United States*,
    630 F.3d 1365 (Fed. Cir. 2011) ................................................................ 24

*SNR Roulements v. United States*,
    402 F.3d 1358 (Fed. Cir. 2005) ................................................................ 32

*Timex V.I., Inc. v. United States*,
    157 F.3d 879 (Fed. Cir. 1998) .................................................................. 21

*Timken United States Corp. v. United States*,
    434 F.3d 1345 (Fed. Cir. 2006) ............................................................. 23, 25

*Universal Camera Corp. v. NLRB*,
    340 U.S. 474 (1951) ................................................................................. 21

*Usinor Sacilor v. United States*,
    18 CIT 1155, 872 F. Supp. 1000 (1994) ................................................... 25

*Yangzhou Bestpak Gifts & Crafts Co., Ltd. v. United States*,
    716 F.3d 1370 (Fed. Cir. 2013) ......................................................... 32, 35, 36

**Statutes**

19 U.S.C. § 1516a(b)(1)(B)(i) ............................................................................... 21

19 U.S.C. § 1673d(c)(5).......................................................................... 33, 34, 42, 43

19 U.S.C. § 1675(a) (amended 2016) .................................................................... 33

19 U.S.C. § 1677e(a)................................................................................................ 28

19 U.S.C. § 1677e(b)(1) ........................................................................................... 28

19 U.S.C. § 3512(d) ................................................................................................ 34

19 U.S.C.§ 1677f–1(c) ...................................................................................... 35, 44

**Other Authorities**

SAA accompanying the Uruguay Round Agreements Act, H.R. Doc. No. 103–316 (1994), *as reprinted in* 1994 U.S.C.C.A.N. 4040 ...................................................................34, 35, 43

**Administrative Determinations**

*Antidumping or Countervailing Duty Order, Finding, or Suspended Investigation; Opportunity To Request Administrative Review*, 85 Fed. Reg. 69,586 (Dep't of Commerce Nov. 3, 2020)...4

*Certain Lined Paper Products From India*, 79 Fed. Reg. 26,205 (Dep't Commerce May 7, 2014) (final results of antidumping duty administrative review; 2011–2012)...............................41

*Certain Quartz Surface Products From India*, 88 Fed. Reg. 1,188 (Dep't Commerce Jan 9. 2023) (final results of antidumping duty administrative review; 2019-2021) ...................37, 39, 41

*Certain Steel Nails From the Sultanate of Oman*, 87 Fed. Reg. 78,639 (Dep't Commerce Dec. 22, 2022) (final results of antidumping duty administrative review; 2020-2021).....................41

*Initiation of Antidumping Duty and Countervailing Duty Administrative Reviews*, 86 Fed. Reg. 511 (Dep't of Commerce Jan. 6, 2021)....................................................................................5

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 103 S. Ct. 2856, 77 L. Ed. 2d 443 (1983) .......................................................................................22, 25

*Steel Concrete Reinforcing Bar From Mexico and Turkey*, 78 Fed. Reg. 60,827 (Dep't Commerce Oct. 2, 2013) (initiation of antidumping duty investigations) ...............................................39

*Steel Concrete Reinforcing Bar From Mexico*, 82 Fed. Reg. 27,233 (Dep't of Commerce June 14, 2017)(final results of antidumping duty administrative review; 2014-2015)........................4

*Steel Concrete Reinforcing Bar From Mexico,* 83 Fed. Reg. 27,754 (Dep't Commerce Jun. 14, 2018)(final results of antidumping duty administrative review; 2015-2016)......................31

*Steel Concrete Reinforcing Bar From Mexico*, 84 Fed. Reg. 35,599 (Dep't Commerce July 24, 2019)(final results of antidumping duty administrative review; 2016– 2017) ................4, 38

*Steel Concrete Reinforcing Bar from Mexico*, 85 Fed. Reg. 71,053 (Dep't Commerce Nov. 6, 2020) (final results of antidumping duty administrative review; 2017-2018) .........................31, 38

*Steel Concrete Reinforcing Bar from Mexico,* 86 Fed Reg 68,632 (Dep't of Commerce Dec. 3, 2021) ...................................................................................................................................16

*Steel Concrete Reinforcing Bar From Mexico*, 86 Fed. Reg. 50,527 (Dep't Commerce Sept. 9, 2021)(final results of antidumping duty administrative review and final determination of no shipments; 2018-2019)................................................................................................4, 31, 38

*Steel Concrete Reinforcing Bar From Mexico*, 87 Fed. Reg. 34,848 (Dep't Commerce Jun. 8, 2022)(final results of antidumping duty administrative review; 2019–2020) ............1, 18, 27

*Steel Concrete Reinforcing Bar from Mexico: Antidumping Duty Order*, 79 Fed. Reg. 65,925 (Nov. 6, 2014) ...................................................................................................................................4

**JOINT MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
GRUPO ACERERO S.A. DE C.V. AND GERDAU CORSA S.A.P.I. DE C.V.'S
MOTION FOR JUDGMENT ON THE AGENCY RECORD**

Grupo Acerero S.A. de C.V. ("Grupo Acerero") and Gerdau Corsa S.A.P.I. de C.V. ("Gerdau Corsa"),[1] in their respective roles as Consolidated Plaintiff and Plaintiff-Intervenor in the above-captioned consolidated action, respectfully submit this Joint Memorandum of Points and Authorities in Support of their Rule 56.2 Motion for Judgment on the Agency Record in accordance with Rule 56.2(c) of the Rules of this Court and this Court's scheduling order dated January 27, 2023.  For the reasons set forth below, Grupo Acerero and Gerdau Corsa respectfully request that the Court: (1) find the challenged determination of the U.S. Department of Commerce, International Trade Administration ("Commerce" or the "Department") unlawful and unsupported by substantial evidence on the record; and (2) remand the determination with instructions to issue a revised determination consistent with this Memorandum and the Court's findings.

## I.     RULE 56.2 STATEMENT

### A.     Administrative Decision Under Review

Grupo Acerero and Gerdau Corsa contest certain aspects of the final results issued by Commerce in its administrative review of the antidumping duty ("AD") duty order on steel concrete reinforcing bar from Mexico, Case No. A-201-844, for the period November 1, 2019 through October 31, 2020.  The final results were published as *Steel Concrete Reinforcing Bar From Mexico*, 87 Fed. Reg. 34,848 (Dep't Commerce Jun. 8, 2022)(final results of antidumping duty administrative review; 2019–2020)(the "*Final Results*").  This appeal also contests certain aspects of Commerce's accompanying Issues and Decision Memorandum.  Memorandum from

---

[1]     Gerdau Corsa is the successor-in-interest to Sidertul S.A. de C.V. ("Sidertul") as of December 1, 2021.  Sidertul participated in the administrative proceeding that gave rise to this appeal as a foreign producer that Commerce did not select for individual examination.

James Maeder to Lisa W. Wang, *Steel Concrete Reinforcing Bar from Mexico: Issues and Decision Memorandum for the Final Results of Antidumping Duty Administrative Review; 2019-2020*, Case No. A-201-844 (2019-20 Review) (Jun. 1, 2022) ("Final IDM").

### B.      Issues of Law and Reasons for Contesting

Grupo Acerero and Gerdau Corsa seek judgment on the agency record with respect to the following three issues:

1.      <u>Issue 1 – Application of Adverse Facts Available to Grupo Simec</u> – Whether Commerce's application of adverse facts available ("AFA") to determine the margin of dumping for Grupo Simec is supported by substantial evidence and in accordance with law.  Commerce may only apply adverse facts available if a respondent has failed to cooperate to the best of its ability.  In light of the severe effects of COVID-19 in Mexico while Simec prepared and filed its initial and supplemental questionnaire responses – including the devastating passing of three accountants who were key members of Simec's internal AD response team – Simec's imperfect responses under unforgiving deadlines reflected the best of Simec's ability.  Commerce's rationale for not providing more time to Simec to complete limited parts of its supplemental questionnaire response was grounded on false premises and improperly and unfairly limited Simec's ability to respond to the supplemental questionnaire.  Commerce abused its discretion when denying Simec's last request for extension of time, and its decision that Simec did not comply to the best of its ability is not supported by substantial evidence and is contrary to law.

2.      <u>Issue 2 – Reasonableness of the Rate Assigned to Companies Not Selected for Individual Examination</u> – Whether the *Final Results*' rate assigned to companies not selected for individual examination (including Grupo Acerero and Sidertul), is supported by substantial evidence and in accordance with law.  Here, the non-selected company rate fails to reasonably reflect potential dumping margins for non-investigated respondents, as required by the governing

statute and judicial instruction.  The statute directs Commerce to calculate an individual margin for each respondent subject to an investigation, which Commerce also follows in administrative reviews.  As an exception to this rule, Commerce may, under prescribed circumstances, limit its examination to multiple mandatory respondents and calculate a non-selected company rate based on this review.  When Commerce calculates a non-selected company rate, this rate must be reasonably reflective of the potential dumping margins of the non-selected respondents.  Here, substantial evidence does not support that the non-selected margin is reasonably reflective of the potential dumping margins of Grupo Acerero or Sidertul.  Indeed, the history of margins calculated under the Order demonstrates that the non-selected rate is far from representative.  As such, Commerce's non-selected company rate is not supported by substantial evidence and is contrary to law.

3.      <u>Issue 3 – Use of a Simple Average of the Mandatory Rates</u> – Whether Commerce's use of a simple-average of the rates assigned to mandatory respondents Grupo Simec and Deacero S.A.P.I. de C.V. ("Deacero") to determine the rate assigned to companies not selected for individual examination (Grupo Acerero and Sidertul) is supported by substantial evidence and in accordance with law.  When determining a non-selected company rate, the statute directs Commerce to calculate a "weighted average" of the dumping margins of the individually investigated respondents.  Here, Commerce disregarded this portion of the statute and applied a simple average.  Commerce's refusal to apply a weighted average is not supported by substantial evidence and is contrary to law.

**C.      Request for Court Order and Relief Sought**

Grupo Acerero and Gerdau Corsa request that: (1) this Court hold that the *Final Results* are unsupported by substantial evidence and otherwise not in accordance with law, and (2) remand

the *Final Results* with instructions to issue a new determination that is consistent with the Court's decision.

## II.     STATEMENT OF FACTS

The AD order on concrete reinforcing bar (rebar) from Mexico published in 2014. *Steel Concrete Reinforcing Bar from Mexico: Antidumping Duty Order*, 79 Fed. Reg. 65,925 (Nov. 6, 2014)("*Order*").   Commerce individually investigated Simec in three subsequent annual administrative reviews of the *Order*.  *Steel Concrete Reinforcing Bar From Mexico*, 86 Fed. Reg. 50,527, 50,528 (Dep't Commerce Sept. 9, 2021)(final results of antidumping duty administrative review and final determination of no shipments; 2018-2019) (calculating 4.93% for Simec)("*Final 2018-2019*"); *Steel Concrete Reinforcing Bar From Mexico*, 84 Fed. Reg. 35,599, 35,600 (Dep't Commerce July 24, 2019)(final results of antidumping duty administrative review; 2016– 2017) (calculating 3.65% for Simec)("*Final 2016-2017*"); *Steel Concrete Reinforcing Bar From Mexico*, 82 Fed. Reg. 27,233 (Dep't of Commerce June 14, 2017)(final results of antidumping duty administrative review; 2014-2015) (calculating a 0.00% rate for Simec) ("*Final 2014-2015*"). Each time, Simec fully cooperated to the best of its ability in the reviews such that Commerce calculated Simec's AD rate based upon the information Simec submitted.  *Id.*

On November 3, 2019, Commerce published notice of the opportunity to request a review of entries during the November 1, 2019, through October 31, 2020 period of review ("POR"). *Antidumping or Countervailing Duty Order, Finding, or Suspended Investigation; Opportunity To Request Administrative Review*, 85 Fed. Reg. 69,586, 69,587 (Dep't of Commerce Nov. 3, 2020), Appx001011-001013.

Simec and Defendant-Intervenor, RTAC, requested a review of Simec's entries, with RTAC identifying 14 separate Simec entities to be reviewed as "Grupo Simec."  *See* Simec Req. for Rev., Appx001002-001003; RTAC Req. for Rev., Appx001004-001008.

Commerce initiated the review, covering the 14 Simec companies along with three other exporters of rebar from Mexico – Deacero, Grupo Acerero, and Sidertul. *See Initiation of Antidumping Duty and Countervailing Duty Administrative Reviews*, 86 Fed. Reg. 511, 513 (Dep't of Commerce Jan. 6, 2021), Appx001040-001046. Commerce selected Simec and Deacero as mandatory respondents for individual examination. Respondent Selection Memo, at 3, Appx001042/Appx080045. Commerce issued the initial questionnaires to Simec and Deacero on February 8, 2021. Questionnaire, Appx001094-001397.

### A.  Simec Response To Section A

Section A required from each of Simec's 14 companies information about "Organization, Accounting Practices, Markets and Merchandise," including the following:

- Total sales during the POR, broken down into several categories;

- Organizational information and descriptions of how relevant production and sales units function within the corporate structure;

- The location and description of all facilities and the purpose of each;

- Legal structure, shareholders, and affiliated parties;

- Suppliers, contractors, lenders exporters, distributors, resellers, etc.;

- Significant business transactions with affiliates;

- Selling functions provided by the 14 companies in Mexico and in the United States;

- The date of sales, the sales process, and determination of ultimate customer;

- Descriptions of sales agreements, price lists, and invoicing practices;

- Sale to affiliates;

- Description of accounting and financial reporting practices;

- Description of merchandise under review, in the Companies' computer systems.

Questionnaire, Appx001251, Appx001262-001276.    The preparation of the Section A questionnaire response necessarily draws on the knowledge and experience of employees in the production, sales, legal, and accounting departments of each relevant Simec entity while most were working remotely.

Commerce gave Simec three weeks – until March 1, 2021 – to respond to Section A of the questionnaire ("AQR").  Questionnaire, Appx001250.  Simec requested two additional weeks, until March 15, 2021, to submit the AQR, explaining that it needed additional time because of the extensive amount of information requested, the complexity of Simec's operations, and difficulties working remotely due to COVID-19 protocols.    AQR EOT Req., Appx001407-001408. Commerce granted Simec a one-week extension, to March 8, 2021, AQR EOT, Appx001409, and Simec filed its Section A questionnaire response timely on March 8, 2021.  AQR, Appx.001414-003525/Appx080049-082160.

**B.  Simec Response To Section B, Section C, And Section D**

Section B requests information about "Sales in the Home Market or to a Third Country," and Section C requests information about "Sales to the United States."   Questionnaire, Appx001251.  Section B&C responses ("BCQR") required that Simec provide databases of all sales in Mexico and in the United States, with more than 50 different categories of information for each sale.  *Id.*, Appx001280-001281, Appx001307-001308.  Simec was also required to explain how some of the 50 categories did or did not apply to the sales.  *Id.*, Appx001282-001305; Appx001310-001338.  For example, Simec explained types of billing adjustments and discounts

specific to Simec's sales.  *Id.*  BCQR also required reporting of direct and indirect selling expenses on a CONNUM[2]-specific basis.  *Id.*

Simec collected data and reported revenue from sales and costs for sales, freight, customs handling data, and direct and indirect selling costs (such as the opportunity cost of holding merchandise in inventory after it is produced but before it is sold, the cost of credit given to a customer by not collecting payment right away, and the cost of packing materials and labor for each unit of merchandise sold).   BCQR, Appx003787-003970/Appx083240-083461.   Simec reported [     ] separate CONNUMs not subject to the review, and [     ] separate CONNUMs subject to the review.  BCQR Excel, Appx083457.  This reporting could be difficult, for example, collecting data and determining allocation methodologies for the per-CONNUM cost of freight when a single truck carries products from multiple CONNUMs, or the inventory carrying costs when inventory includes products from hundreds of CONNUMs for varying amounts of time at different locations, or customs brokerage fees for shipments of multiple subject and non-subject CONNUMs.

BCQR also required that Simec reconcile all sales revenues and costs from the relevant companies to the companies' annual financial reporting.  Questionnaire, Appx,001282-001283, Appx001309-001310.  Simec reconciled revenue and costs of sales in Mexico and of sales in the United States to financial reporting of five different companies – doing the work for five Section B responses and five Section C responses and reconciling them into one response.   BCQR,

---

[2]    "CONNUM" is the abbreviation for "control number" which represents a unique product based upon the product characteristics Commerce uses to categorize products, and is written as a concatenation of numbers representing each product characteristic.  For rebar, the product characteristics include type of steel, minimum specified yield strength, nominal diameter size, and form.  As an example, rebar made from stainless steel ("1"), with minimum specified yield strength of 70,000 psi ("7"), a size designation of 5 ("16"), and produced in a coil ("1") would have a CONNUM of 1-7-16-1.  Appx001284-001285, Questionnaire.

Appx003847-003853/Appx083300-083306,             Appx003970-003976/Appx083423-083429.

Further, because the POR spans two calendar years, and the financial reporting is prepared on

annual bases, Simec had to reconcile part-year financial reporting to two years of annual financial

reporting.  *Id.*  Preparation of the BCQR thus necessarily draws on the knowledge and experience

of employees involved in production, sales, logistics, and especially accounting from each of the

relevant Simec entities while most were working remotely.

The Section D response ("DQR") requests information about "Cost of Production and

Constructed Value."  Commerce defines "cost of production" as "the weighted-average control

number (CONNUM) specific cost{} of the product(s) sold by your company in the comparison

market (i.e., the home or third country market)."  Questionnaire, Appx001251, Appx001339-

001340.  Commerce defines "constructed value" as COP plus an amount for profit, with "selling,

general and administrative (SG&A) expenses and profit are computed as if the merchandise had

been sold in your comparison market" {i.e., Mexico}.  *Id*.  Constructed value must be reported

"per-unit … for each CONNUM included in your U.S. market sales listing."  *Id.*

Simec reported COP, CV, and also the "cost of manufacturing ('COM')," upon which COP

and CV are based, as required.  DQR, Appx083838-083839.  To complete CONNUM-specific

COP, CV, and COM, Simec had to extract production cost data for "scrap, ferroalloys, electricity,

natural gas, oxygen, refractories, electrodes, and labor" consumption on varied machinery,

accounting for waste and scrap, in seven different production facilities that produced different

mixes of subject and non-subject merchandise.  *Id.*, Appx083840-083841.  Simec extracted data

from four different financial accounting and cost accounting systems that used three different

accounting systems.  *Id.*, Appx083858-083859.  Preparation of the DQR thus necessarily drew on

the knowledge and experience of employees involved in production, logistics, and especially accounting from each of the relevant Simec entities while most were working remotely.

Commerce gave Simec two-and-a-half weeks after the AQR due date – until March 17, 2021 – for the BCQR and DQR. Questionnaire, Appx001250. Simec initially requested an extension of the March 17, 2021 deadline to March 31, 2021 to file its response to Sections B-D, B-D EOT Req.1, Appx003526-003527, but soon thereafter requested an additional week, to April 7, 2021, for the DQR when a COVID-19 outbreak in Mexico complicated its ability to prepare the response quicker. B-D EOT Req.2, Appx003707-003709. An accountant who was a key member of Simec's internal AD response team died of complications related to COVID-19; a second accountant, who was pregnant, was placed under more cautious COVID-19 protocols; and other response-team personnel contracted COVID-19 and were unavailable to help with the Section B-D responses. *Id.* Commerce ultimately accommodated Simec's requested dates after granting partial extensions in response to four extension requests, and Simec timely filed all parts of its BCQR and DQR. EOT Partial Grant 1, Appx003715; B-D EOT Req.3, Appx003778-003780; EOT Partial Grant 2, Appx003781; B-D EOT Req.4, Appx003783-003785; EOT Partial Grant 3, Appx003786; BCQR, Appx003787-004003/Appx083240-083461; BCQR Appx.VI, Appx004261-004265/Appx083828-083832; DQR, Appx004266-004427/Appx083833-083996; BCQR Affiliated Party Sales, Appx004710-004727/Appx084417-084434.

### C.  Simec Response To Supplemental Questionnaires

Nearly four months later, Commerce issued two supplemental questionnaires. The first on July 27, 2021, focusing on Section A (11 questions), Section B (33 questions), and Section C (30 questions), and was due three weeks later, on August 17, 2021. *See* Supp.Sec.A-C, Appx004873-004889/Appx084649-084665. The second on August 4, 2021, focusing on Section A (2 questions) and Section D (29 questions with 101 sub-parts) was due on August 11, 2021, 6 days earlier than

the Section A-C SQ.  Supp.Sec.A&D, Appx004890-004903/Appx084666-084679.  Many Section

D SQ questions required significant detail from Simec's various production and accounting

systems, for example:

- If Simec or Sigosa have included {waste re-use} credits in the reported costs, provide a schedule of the monthly quantity and value of waste generated, reintroduced in production, and sold for each facility."

- "For each category of non-prime merchandise, provide an inventory movement schedule for each plant/facility that shows the monthly quantities and values of non-prime products produced during the POR (i.e., beginning inventory, production, sales, other adjustments, and ending inventory)."

- "Demonstrate how the cost differences for each of the physical characteristics identified by Commerce were captured in the reported product-specific costs. If a physical characteristic identified by Commerce is not tracked by the company's normal cost accounting system or appropriately captured for reporting purposes, calculate the appropriate cost differences for that physical characteristic using a reasonable method based on the available company records (e.g. production records, engineering statistics). If, however, the cost for a specific physical characteristic has not been captured in the reported cost because the cost difference is insignificant between products, please explain and demonstrate why you believe the cost differences between products for that characteristic is insignificant."

Supp.Sec.A&D, Appx004893-004894, 0048900/Appx084669-084670, 0084676.

Simec assessed its resources and ability to respond in light of COVID-19 restrictions, and,

on Monday, August 9, 2021, requested a three-week extension of time for each response, to

September 1, 2021 (for Sec.A&D ("A&DSQR"), and to September 7, 2021 (for Sec.A-C ("A-

CSQR")), which would give Simec a total of 6 weeks to respond to both supplemental

questionnaires.  SQR EOT Req.1, Appx004904-004906.  Simec pointed to the extensive requests

for information in the two supplemental questionnaires and the logistical difficulties with COVID-

19 protocols restricting in-person collaboration, and the fact that all the accountants and others

also had to complete their normal jobs to keep the company running.  *Id*.  On August 10, 2021,

Commerce partially granted Simec's request for review, granting 14 additional days, to August

24, 2021, for the A-CSQR, but granting just seven additional days, to August 18, 2021, for the A&DSQR.  SQR EOT Partial Grant 1, Appx004907.

After Simec's first request was partially granted, Mexico suffered an outbreak of the COVID-19 Delta variant, which severely affected Simec's ability to respond.  SQR EOT Req.2a, Appx004908-004909; SQR EOT Req.2b, Appx004910-004913.  This outbreak lagged the U.S. outbreak that caused Commerce to extend all administrative reviews by 110 days, and caused Simec group employees to work from home, making communication and document retrieval and review very difficult.  *Id.*  Further, although Simec hired additional outside consultants, they were limited by COVID-19-related travel restrictions.  *Id.*  And Simec added a heartbreaking post-script: two accountants had died, and a third was intubated (and later passed away).  SQR EOT Req.2c, Appx004914-004915; Reconsideration Req., Appx006625-006628.  Simec requested an extension to the same date previously requested, August 31, 2021.  SQR EOT Req.2a, Appx004908-004909; SQR EOT Req.2b, Appx004910-004913.  Commerce granted the full extension requested for the A&DSQR.  SQR Partial Grant 2, Appx004916.

On Friday, August 20, 2021, Simec also sought a two-week extension, to the date it had originally asked to respond to the A-CSQR, on the same grounds, noting that Commerce had extended the preliminary results to November 30, 2021.  SQR EOT Req.3, Appx004917-004920.  On Monday, August 23, 2021, Commerce granted only a one-week extension, such that both responses were due on August 31, 2021.  SQR Partial Grant 3, Appx004921.

Simec discovered that having to replace three accountants and comply with COVID-19 travel and other protocols limiting internal and outside response teams was more difficult than it had anticipated.  The six weeks it had initially sought would not be enough time.  On Saturday, August 28, 2021, Simec filed a request (dated August 31, 2021) for an extension of time for its

responses; and, on Monday morning, August 30, filed a slightly revised version of the same request.  SQR EOT Req.4a, Appx004926-004927; SQR EOT Req.4b, Appx004928-004934. Simec cited all the previous reasons – the COVID-19 Delta variant outbreak causing difficulties with travel restrictions and the deaths of accountants – and sought an extension from August 31, 2021 to September 7, 2021 to respond to the A&DSQR – with four additional days, to September 11, 2021, to respond to questions 14, 17, 23, 26-28, and 32.  *Id*.  Simec also requested extensions of time for the A-CSQR, to September 6, 2021, with four additional days, to September 10, for questions 13-14, and 71-75.  *Id.*

RTAC opposed Simec's request for additional time.  RTAC Opp., Appx004935-004938. RTAC argued that Simec had not presented new justifications for the new request for additional time.  Ignoring the lagged timing of the COVID-19 Delta variant outbreak in Mexico, RTAC argued that COVID-19 issues did not provide good cause for additional extensions.  *Id.*  RTAC further argued that Simec was experienced because of prior participation in administrative reviews, and that the time already granted was ample, but did not address how the deaths of three experienced accountants.  *Id.*

On August 30, 2021, Commerce partially granted Simec's requests for extension for the A-CSQR, granting only 2 additional days (not the requested 7), to September 2, 2021, for the A-CSQR, with only 7 additional days (not the requested 11 days) to September 7, 2021 to answer the few specific questions.  SQR Partial Grant 4a, Appx004939.  On August 31, 2021, Commerce partially granted Simec's request for extension for the A&DSQR, extending the deadline to September 7, 2021, but did not provide any additional time to respond for Questions 14, 17, 23, 26-28, and 32.  SQR Partial Grant 4b, Appx004940.

Two days later, on September 1, 2021, Simec requested an extension to September 6, 2021, to file its A-CSQR, generally, with an extension to September 10, 2021, to file responses to various individual questions. SQR EOT Req.5, Appx004941-004943.  The same day, at 5:05 p.m., Commerce granted an extension to September 7, 2021, to the entirety of the A&DSQR, but warning Simec that future extensions were unlikely.  SQR Partial Grant 5, Appx04944.

Simec found that, despite working "as fast as possible," it needed more time to for the A&DSQR, seeking an extension from September 7 to September 14, 2021, for the reasons previously provided.  SQR EOT Req.6, Appx004945-004947.  Commerce granted only two additional days, until September 9, 2021.  SQR Partial Grant 6, Appx004953.

Similarly, for its A-CSQR, Simec found that despite working "flat out" to the point of being "sleep deprived," it would still need additional time to answer questions 70-75 of the A-CSQR. SQR EOT Req.7, Appx004954-004956.  On August 6, 2021, the day before the Section A-C and Section A&D SQs were due, Simec sought a further extension of time.  *Id.*  Simec pointed to all the COVID-19 related challenges it was struggling with – "{t}he special circumstances for needing more time are detailed in Simec's August 20, 30, and September 2 extension requests (bar codes 4154478, 4156217 and 4157395)." – Simec added that it had 800-plus invoices to manually review to identify which invoices relevant to Questions 70-75 of the A-CSQR, which had to "then be traced to selling, movement, and other expenses and other adjustments to be reported per sale." *Id.*  In light of these circumstances, Simec asked for two additional weeks – to September 20, 2021 – to respond to the six questions.  *Id*.

Commerce quietly uploaded the denial of this request onto its online docketing system, ACCESS, just before noon on September 7, 2021.  SQR EOT Denial 1, Appx004958.  Commerce asserted two bases for the denial:  (1) that Simec had "been provided six weeks to prepare and

submit their responses," and, (2) despite Simec pointing to all its COVID-19-related struggles detailed in three prior extension requests (including the deaths and incapacity of three key accountants and the need to manually review more than 800 invoices), Commerce claimed that the request "provides no detailed justification for why the preparation of responses for questions 70-75 or the window period sales requires additional time beyond the six weeks already allotted." *Compare id.*, *with* SQR EOT Req.7, Appx004954-004956.

Simec did not see the denial of its September 6, 2021 request. But less than five hours later, at 4:29 p.m., filed a submission "To answer Commerce's letter today." SQR EOT Req.8, Appx004959-004961. No prior letter from Commerce is on the record of this review; Simec was responding to an unmemorialized *ex parte* phone call from Commerce earlier in the day on September 7, 2021. In this letter answering Commerce's questions, Simec reiterated the reasons it needed additional time, and trimmed its request to just one additional week. *Id.* Among other things, Simec alluded to the more than 800 invoices it had to manually review, stating, "{t}he scrutiny of manual records is especially burdensome and with the limited availability of staff at the office of the distributors, this task is being made impossible within the given timelines." *Id.*

Commerce didn't not answer Simec's clarification letter until two days later, on September 9, 2021, when – treating Simec's letter as a separate request for extension of time – Commerce denied the request. SQR EOT Denial 2, Appx006282-006283. Commerce stated that Simec had filed too late to be considered, and that Commerce had already "provided three additional weeks for Grupo Simec ... to respond to Commerce's supplemental questionnaire covering sections A-C, and we previously denied {Simec's} request for an extension for responses to questions 70-75." *Id.* Commerce also warned that any attempt to submit responses to questions 70-75 after the deadline would be considered untimely and could be rejected. *Id.*

Simec requested a one-day extension on September 9, 2021, for the A&DSQR, which Commerce granted.   SQR EOT Req.8, Appx006284-006286; SQR EOT Partial Grant 7, Appx006287.  Simec filed the A&DSQR and A-CSQR (minus questions 71-75) timely.  A-CSQR, Appx004973-006276/Appx084691-086712;    A&DSQR,    Appx006288-006514/Appx086713-087666.

Over a month later, when Simec saw Commerce grant the other individually-investigated producer, Deacero, three extensions to October 19, 2021, equaling 29 days to file a second supplemental questionnaire response, Simec believed that Commerce would have additional time to review the information it had not been able to submit on September 7, 2021.  *See* 2SQR, Appx006589-006600; 2SQR EOT Req.1, Appx006601-006603; 2SQR EOT Grant 1, Appx006604-006605; 2SQR EOT Req.2, Appx0066006-006608; 2SQR EOT Grant 2, Appx006609-006610; 2SQR EOT Req.3, Appx006614-006616; 2SQR EOT Grant 3, Appx006617-006618.   Simec thus sought reconsideration of Commerce's denial of Simec's request for additional time to submit its answers to A-CSQR Questions 70-75, Reconsideration Req., Appx006625-006628, and attempted to submit the missing downstream sales data and some translations it discovered had "inadvertently stripped by computer operation from the documents" when it timely submitted its supplemental questionnaire responses.  AFI (Rejected), Appx006619-006624.  In its request for reconsideration and for Commerce to accept the filing, Simec reiterated the arguments it made to establish good cause for the September 6, 2021 extension of time it sought to respond to the final six questions in the A-CSQR:

- Simec was working at its maximum capacity;

- The death of three key, experience accountants, replacement by inexperienced accountants;

- The geographic spread of Simec's operations;

- Travel restrictions on outside consultants;

- Mexico was hit hard by COVID-19 Delta variant during the time the supplemental questionnaire was due; and

- The request for extension to respond to questions 70-75 was only a small portion of the information requests in the supplemental questionnaires.

Reconsideration Req., Appx006625-006628.  Commerce rejected Simec's October 18, 2021 filing as untimely filed.  SQR EOT Denial 3, Appx007108.

After denying reconsideration and rejecting Simec's October 18, 2021 filing, Commerce issued a third SQ to Deacero, on November 3, 2021, granted an extension to Deacero to respond to the third SQ, and accepted Deacero's November 10, 2021 response.  3SQ Appx007120-007122; 3SQ EOT Req., Appx007123-007125; 3SQR EOT Grant, Appx007126-007127; 3SQ, Appx007162-007199/Appx089246-089320.

### D.  Preliminary Results

In the preliminary results, Commerce found that Simec had not provided usable information, and that it had failed to cooperate with the best of its ability.  Thus, Commerce resorted to facts available, with an adverse inference ("total adverse facts available" or "total AFA").  *See Steel Concrete Reinforcing Bar from Mexico,* 86 Fed Reg. 68,632, 68,633 (Dep't of Commerce Dec. 3, 2021)( preliminary results of antidumping duty administrative review; 2019-2020)(Appx007269-007272).  Commerce's finding that Simec failed to cooperate to the best of its ability was based upon Simec's "failing to remedy errors identified by Commerce as well as failing to submit requested information within the established deadlines."   Prelim.Dec.Mem. at Appx007225.

Commerce calculated a 0% margin for Deacero and assigned a total AFA rate of 66.70% to Simec.  *See Prelim Results,* 86 Fed Reg. at 68,634, Dec. Mem. at 9 ("*Preliminary Decision Memo*")(Appx007218-007237).  Commerce explained in the *Preliminary Decision Memo* that it

had taken a simple average of Deacero and Simec's rates to assign a 33.35% dumping margin to non-reviewed respondents Grupo Acerero and Sidertul.   Prelim.Dec.Mem. Appx007227. Commerce concluded that "{t}hese are the only rates determined in this review for individual respondents and, thus, should be applied to the two companies not selected for individual examination under section 735(c)(5)(B) of the Act." *Id.*

Both Grupo Acerero and Sidertul challenged the *Preliminary Results*, arguing the simple-averaged 33.35% non-selected company rate is neither supported by substantial evidence nor in accordance with law.   Grupo Acerero Case Br., Appx007441-007461; Sidertul Case Br., Appx007519-007538/Appx090875-090894.  Sidertul argued that the preliminary margin assigned to the non-reviewed respondents does not reasonably reflect their potential margins.  Sidertul Case Br., Appx007525-007526/Appx090881-090882.   Sidertul argued that the statute is clear that Commerce is not required to assign non-investigated respondents an average of AFA and zero margins, and that the SAA indicates that such averaging is illegitimate when it results in a margin not reasonably reflective of potential dumping margins for non-investigated respondents.  *Id.* at Appx007529/Appx090885.  Sidertul also stressed that the rate calculations must be designed to accurately reflect the respondent's true dumping margin and that the administrative record contained no evidence that the 33.35 percent margin reflected the economic reality of Sidertul. *Id.*, Appx007531/Appx090887.   Sidertul argued that Commerce should correct the error by assigning the non-examined respondents the all-others rate from the final results of the most recent (2018-19) administrative review or an average of recently-calculated all-others rates under the order. *Id.* at Appx007526/Appx090882.  Sidertul contended that if Commerce does not assign the non-investigated respondents a more reasonable margin from prior reviews, at a minimum,

Commerce should calculate a weighted-average all-others margin using volume data as required by the statute. *Id.* (citing 19 U.S.C. § 1673d(c)(5)(A).

Grupo Acerero added that Commerce should rely on the prior all-others rate to calculate the non-reviewed/all-other rate in the underlying POR because this methodology reasonably reflected the economic reality of the industry.  Grupo Acerero Case Br., Appx007449-007455.  Grupo Acerero remarked that merely citing the statute and the rates determined for Deacero and Grupo Simec without addressing the economic reality of Mexican rebar exports to the United States was in error.  *Id.*, Appx 007452-007453.  According to Grupo Acerero, analyzing the economic reality is required under the statute and Federal Circuit precedent, which requires that "rate determinations for nonmandatory, cooperating separate rate respondents must . . . bear some relationship to their actual dumping margins."  *Id.* (citing *Yangzhou Bestpak*, 716 F.3d. at 1380).  Grupo Acerero pointed out that the methodology applied in the *Preliminary Results* was not reasonable because it was more than four times any rate calculated and more than six times any all-others rate applied in the last five administrative reviews.  *Id.*, Appx007453.

### E.  Final Results

On June 8, 2022, Commerce published in the Federal Register the *Final Results*.  *Final Results*, 87 Fed. Reg. 34,848 (Appx007781-007784), and accompanying *Dec. Mem.* (Appx007713-007757).  Commerce continued to use an adverse inference in selecting among facts available on the record based upon a finding that Simec had not acted to the best of its ability.  19 U.S.C. § 1677m(d).  Commerce explained that it reached this finding because Simec "did not remedy the questionnaire deficiencies within the allotted time," even though Simec had remedied most of the deficiencies.  Final Dec. Mem., Appx007739-007741.  Commerce asserted that it had "effectively grant{ed} {Simec} all the additional time it requested prior to the deadline," and

provided "unusually lengthy opportunities to respond to requests for information" in light of Simec's COVID-19 challenges, despite denying important extension requests that were timely filed. *Id.*

In response to Simec's challenge to Commerce's refusal to grant Simec's September 6 and 7 requests for additional time to provide information requested about affiliated party transactions and downstream sales, Commerce stated "the onus was on Grupo Simec to provide a rationale for the extension it requested: Grupo Simec's September 7, 2021, extension request failed to do this, instead simply containing a request for more time." *Id.*, Appx007722. Commerce explained that it rejected Simec's request "because Grupo Simec failed to comply with the basic regulatory requirement of demonstrating good cause existed for the extension." *Id.*, Appx007723. Commerce did not acknowledge Simec's reference to its struggles related to COVID-19, including the deaths of three key accountants, or Simec's explanation that it had to review manually more than 800 invoices to respond to the Section A-C SQ questions 70-75.

Commerce also explained that it denied Simec's revised extension request – filed on the due date, September 7, 2021, at 4:29 pm, because it "had granted Grupo Simec sufficient time and concluded that no additional extensions were warranted." *Id.*

Finally, Commerce provided its rationale for rejecting Simec's October 18, 2021 reconsideration request claiming that Simec "not only failed to comply with basic regulatory requirements but was also an attempt to submit untimely questionnaire responses, described as 'additional information.'" *Id.*, Appx007729.

Commerce also rejected Sidertul and Grupo Acerero's all-others' rate arguments, continuing to apply the 33.35% simple average of Deacero and Simec's rates. *Final Decision Memo* at Appx007748-00757. Commerce acknowledged its reliance on section 735(c)(5) of the

Act in calculating the rate for respondents not individually examined and that the expected method under section 735(c)(5)(B) calls for a weighted-average. *Id.*, Appx007752. Commerce concluded, however, that it was justified in calculating a simple average because volume data regarding Grupo Simec was unreliable. *Id.*, Appx007753. Commerce also indicated that it need not examine the commercial reality of non-reviewed parties if its determination is correct "mathematically and factually" and is consistent with method provided in the statute. *Id.*, Appx007754-00755. Commerce claimed that "there is no record evidence to support" non-reviewed respondents' claims that the rate assigned to them "is not reasonably reflective of their potential dumping margins during the POR." *Id.*, App007755. Commerce also rejected Sidertul's suggestion to use the non-selected companies' rate of 4.93 percent from the prior administrative review or to apply an average of the non-selected companies' rates from all prior administrative reviews, contending that neither non-selected respondent provided evidence as to why their suggested rates are "more representative than the rate applied in the *Preliminary Results.*" *Id.* Commerce faulted non-reviewed respondents for not citing "any relevant, probative evidence" indicating that the mandatory respondents' dumping behavior was "not reasonably reflective of potential dumping margins for non-examined companies during the POR." *Id.*, Appx007756. In addressing Sidertul's suggestion that it be permitted to provide information on its pricing levels to be compared to other data on the record, Commerce maintained that its practice is to calculate the non-selected respondents' dumping margin based on the mandatory respondent's margin and that such a margin is representative "unless substantial evidence shows otherwise." *Id.*

## III. ARGUMENT

### A. Standard of Review

In appeals of the final results of AD administrative reviews, this Court shall hold unlawful and remand any administrative determination by Commerce that is "not in accordance with law."

19 U.S.C. § 1516a(b)(1)(B)(i).  In reviewing whether Commerce's interpretation of the statute is in accordance with the law, the Court follows the two-step test of *Chevron U.S.A., Inc. v. Natural Res. Def. Council*, 467 U.S. 837, 842-45 (1984).  First, the Court determines "whether Congress has directly spoken to the precise question at issue."  *Id*. at 842.  If Congress's intent is clear, the Court must give effect to that unambiguously expressed intent.  *Id*. at 842-43.  "To ascertain whether Congress had an intention on the precise question at issue, {the Court} employs the 'traditional tools of statutory construction.'"  *Timex V.I., Inc. v. United States*, 157 F.3d 879, 882 (Fed. Cir. 1998) (citing *Chevron*, 467 U.S. at 843 n. 9).

Second, if the statute is silent or ambiguous with respect to the precise question, the Court must determine whether the agency's interpretation of the statute is a permissible construction. *Chevron*, 467 U.S. at 843.  The Court may defer to the agency's interpretation only if it is reasonable, procedurally sufficient, and consistent with agency policy.  *Caribbean Ispat Ltd. v. United States*, 450 F.3d 1336, 1340 (Fed. Cir. 2006) (citing *Cathedral Candle Co. v. Int'l Trade Comm'n*, 400 F.3d 1352, 1366 (Fed. Cir. 2005)).

The governing statute also provides that the Court shall hold unlawful and remand any administrative determination by Commerce that is "unsupported by substantial evidence on the record."  19 U.S.C. § 1516a(b)(1)(B)(i).  Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 477 (1951).  It must be "more than a scintilla, and must do more than create a suspicion of the existence of the fact to be established."  *NLRB v. Columbian Enameling & Stamping Co.*, 306 U.S. 292, 300 (1939).  The court "reviews the record as a whole, including any evidence that fairly detracts from the substantiality of the evidence," *Gallant Ocean (Thailand) Co. v. United States*, 602 F.3d 1319, 1323 (Fed. Cir. 2010) (internal quotation marks and citation

omitted), and determines "whether the evidence and reasonable inferences from the record support the {agency's} finding." *Daewoo Elecs. Co. v. Int'l Union of Elec., Tech., Salaried & Mach. Workers, AFL-CIO*, 6 F.3d 1511, 1520 (Fed. Cir. 1993) (internal quotation marks and citation omitted). Commerce must provide a "rational connection between the facts found and the choice made," *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168 (1962), and "examine the relevant data and articulate a satisfactory explanation for its action." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 30, 103 S. Ct. 2856, 77 L. Ed. 2d 443 (1983).

**B.     Commerce's Application of Adverse Facts Available to Grupo Simec Is Not Supported by Substantial Evidence and Is Contrary to Law**

Commerce unlawfully applied total AFA to Simec despite Simec cooperating to the best of its ability under the circumstances. Commerce's total AFA decision was preceded by its abuse of discretion denying Simec's last request for extension of time, and its unsupported decision that Simec failed to cooperate to the best of its ability. Accordingly, this Court should remand with instructions that record evidence does not support total AFA in this case.

**1.   Commerce Unlawfully Ignored Simec's Justification In Its EOT Request**

Commerce abused its discretion when denying Simec's request for extension of time to submit responses to Questions 70-75 of the Section A-C supplemental questionnaire, and when rejecting Simec's later attempt to submit the information when it saw Commerce grant multiple extensions to Deacero. These denials led to Commerce's applying total AFA to Simec. This Court should remand this case with instructions for Commerce to accept and consider Simec's response to Questions 70-75, and to issue any follow-up questions needed for remaining necessary clarifications.

Commerce has discretion in procedural matters, but this discretion must be exercised reasonably.  Commerce abuses its discretion "if the decision … rests on clearly erroneous fact findings." *In re Durance*, 891 F.3d 991, 1000 (Fed. Cir. 2018) (*citing Abrutyn v. Giovanniello*, 15 F.3d 1048, 1050-51 (Fed. Cir. 1994)).  Further, in procedural matters, this Court in *Grobest* set the evaluation to be "whether the interests of accuracy and fairness outweigh the burden {resulting from the late submission} placed on {Commerce} and the interest in finality." *Grobest & I-Mei Indus. (Vietnam) Co. v. United States*, 36 CIT 98, 122-123, 815 F. Supp. 2d 1342, 1365 (2012). Interests in finality are at their nadir before the preliminary results.  *See Timken United States Corp. v. United States*, 434 F.3d 1345, 1353 (Fed. Cir. 2006).  Should this Court find Commerce abused its discretion, this case should be remanded for Commerce accept and consider Simec's responses to questions 70-75 and other corrective information.  *See NTN Bearing Corp. v. United States*, 74 F.3d 1204, 1207 (Fed. Cir. 1995) ("a regulation which is not required by statute may, in appropriate circumstances, be waived and must be waived where failure to do so would amount to an abuse of discretion."); *see also Fischer S.A. Comercio, Industria and Agricultura v. United States*, 34 CIT 334, 346-50, 700 F. Supp. 2d 1364, 1375-77 (2010).

The context of the Court's examination of whether Commerce abused its discretion in denying Simec's September 6 and 7 requests for extensions of time, and the October 18 request for reconsideration is a request for additional time to submit responses to just six questions, nearly three months before the preliminary results, and nine months before the final results, and then the reconsideration of its decision a little more than a month later.  Commerce abused its discretion because its decision not to grant the extension was based upon clearly erroneous facts.  Commerce denied the September 6 and September 7 extension requests, and the October 18 request for reconsideration, claiming Simec did not provide any detailed justification why the additional time

was needed. *See* SQR EOT Denial 1, Appx004958; SQR EOT Denial 2, Appx006282-006283; SQR EOT Denial 3, Appx007108.  In the *Final Results*, Commerce continued to justify denying the extensions based upon the claim that "the request for the additional time provided no explanation or reason for why Grupo Simec required so much additional time for those specific questions." *Final Dec. Mem.*, Appx007722.  Commerce asserted, "the onus was on Grupo Simec to provide a rationale for the extension it requested; Grupo Simec's September 7, 2021, extension request failed to do this, instead simply containing a request for more time." *Id.*

This reasoning has no support in record evidence because Simec provided a detailed justification in its requests, referencing prior descriptions of struggles with COVID-related issues (including the deaths of three key accountants), sleep-deprived staff, and the manual review of more than 800 invoices needed to respond to questions 70 to 75.  *See* SQR EOT Req.7, Appx004954-004956; SQR EOT Req.8, Appx004959-004961; *Reconsideration Req., Appx006625-006628*.  Commerce's response to those requests, and its doubling down in the *Final Results*, establishes that Commerce failed entirely to consider the reasons Simec provided to justify its request for additional time, rendering Commerce's denial of Simec's request unsupported by substantial record evidence and contrary to law as wholly arbitrary and capricious, and an abuse of discretion, for resting on clearly erroneous facts.  *See In re Durance*, 891 F.3d at 1000; *SKF USA Inc. v. United States*, 630 F.3d 1365, 1373 (Fed. Cir. 2011) ("Under *State Farm*, factors to consider when determining whether agency action is arbitrary and capricious are: 'if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.'" (*quoting State Farm*, 463 U.S. at 43)).

Further, Commerce abused its discretion under the *Grobest* analysis. *Grobest* established that this Court's review of whether Commerce abused its discretion "is guided first by the remedial, and not punitive, purpose of the antidumping statute, and the statute's goal of determining margins "as accurately as possible," *Rhone Poulenc, Inc. v. United States*, 899 F.2d 1185, 1191 (Fed. Cir. 1990)." *See Grobest*, 36 CIT at 122-123, 815 F. Supp. 2d at 1365. The Court must weigh "'the burden imposed upon the agency by accepting the late submission,' *Usinor Sacilor v. United States*, 18 CIT 1155, 1164, 872 F. Supp. 1000, 1008 (1994), and 'the need for finality at the final results stage,' *Timken*, 434 F.3d at 1353." *Id.* Although Commerce is granted deference in setting and enforcing deadlines, "the court will review on a case-by-case basis whether the interests of accuracy and fairness outweigh the burden placed on the Department and the interest in finality." *Grobest*, 36 CIT at 122-23, 815 F. Supp. 2d at 1365.

In *Grobest*, the Court determined under the circumstances there that "the interests of fairness and accuracy outweigh{ed} the burden upon Commerce." *Id.*, 36 CIT at 125, 815 F. Supp. 2d at 1367. Those circumstances included the likely inaccuracy of the total AFA margin, the respondent's diligence responding, the timing of the respondent's filings relative to the preliminary and final results, and the likely burden on Commerce. *Id.* An evaluation of the circumstances here yields the same result.

Here, the interests in finality are at their low, and the burden on Commerce was light compared to the interests of accuracy and fairness given Simec's significant efforts cooperating to the best of its ability, and the length of time remaining before the final results were due. Initially, there can be no doubt that, had Simec been granted the time it needed to respond, the dumping margin likely to have been calculated would have been a fraction of the 66.70% margin determined on the basis of total AFA. Simec has fully cooperated in prior reviews, where Commerce

calculated rates of 0.00%, 3.65%, and 4.93%.  *See 2018-2019 Final*, 86 Fed. Reg. 50,527 (calculating 4.93% rate for Simec); *2016-2017 Final*, 84 Fed. Reg 35,599 (calculating a 3.65% rate for Simec); *2014-2015 Final*, Fed. Reg. 27,233 (calculating a 0.00% rate for Simec).  Clearly, when Simec has enough time based upon its staff's ability, Simec can submit sufficiently responsive information for Commerce to calculate rates less than one-tenth the total AFA rate. Such likely would have been the case had Commerce granted Simec the additional two weeks it sought.

Second, Simec was diligent responding to Commerce's requests for information.  Simec worked its hardest, struggled through the emotional and operational trauma of losing three colleagues and through the physical hardship of picking up the work of three key members of the internal AD response team, and found outside consultants given the lack of expertise among the surviving members of the AD response team.  Ultimately, Simec filed all its responses timely, with the exception of the response to 6 questions of the Section A-C supplemental questionnaire.  Simec timely submitted requests for extensions, providing (or incorporating by reference) full explanations why it needed additional time.  Simec asked only for the time it needed, no more, although the amount of time Simec needed only changed with additional extraordinary circumstances: the deaths of key accountants while responding to the initial questionnaire and supplemental questionnaires.  While Commerce may have granted more time than normal, these times were not normal give the COVID-19-related protocols and limitations, and especially the deaths of key personnel from complications related to COVID-19.

Third, the timing of Simec's filings relative to the preliminary and final results favored granting the extension and accepting the filings.  Had Commerce granted the seven-day extension Simec sought, Commerce would have received complete responses to its supplemental

questionnaires on September 14, 2021, more than two-and-a-half months before the December 2, 2021 *Prelim Results*, and more than 8 1/2 months before the June 8, 2022 *Final Results*.  *See Final Results*, 87 Fed. Reg. 34,848; *Prelim Results*, 86 Fed Reg. 68,632.  Even if Commerce had accepted the October 18, 2021 submission, Commerce would still have received the information about a month before Deacero submitted its own response to Commerce's November 3, 2021 third supplemental questionnaire to Deacero.

Fourth, the likely burden on Commerce to receive responses to six questions and as to window period sales, five to seven days after receiving responses to 269 other questions was comparatively insignificant.  Simec's responses to the Section A&D supplemental questionnaire, and to questions 1-69 of the Section A-C supplemental questionnaire were all filed timely.  Thus, the question of burden on Commerce can only properly consider the effect of receiving responses to questions 70 to 75 and covering window period sales of the Section A-C supplemental questionnaire.  In light of the many months remaining before the *Prelim Results* and *Final Results* would issue, and Commerce's subsequent second and third supplemental questionnaires issued to Deacero, the burden on Commerce to consider the responses to the six questions was minimal.

Under the *Grobest* analysis, "interests in accuracy and fairness outweigh the burden on Commerce; therefore, Commerce's rejection of {Simec's request for extension and} late-filed submission was an abuse of discretion" which must be remanded.  *Grobest*, 36 CIT at 125, 815 F. Supp. 2d at 1367.

### 2.   Simec Cooperated to the Best of Its Ability under the Circumstances

Under the circumstances of this case, where COVID-19-related issues prevented normal response times, and the untimely and devastating loss of life slowed Simec's ability to respond, Simec objectively cooperated to the best of its ability and should not be subject to adverse facts available.  Commerce's decision to apply AFA is not supported by substantial record evidence or

in accordance with law.  Accordingly, this court should remand Commerce's decision to apply AFA with instructions that Commerce fill any gaps in the record with neutral facts available.

Commerce must fill gaps in the record with facts available on the record.  19 U.S.C. § 1677e(a).  If Commerce "finds that an interested party has failed to cooperate by not acting to the best of its ability to comply with a request for information," Commerce may use an adverse inference when selecting among available information to fill the gaps. *See* 19 U.S.C. § 1677e(b)(1). A mere failure to respond, without more, however, does not constitute a failure to cooperate— especially where "a respondent sought to correct its deficiencies in responding to a supplemental questionnaire." *Mannesmannrohren-Werke AG & Mannesmann Pipe & Steel Corp. v. United States*, 23 CIT 826, 842 (Ct. Int'l Trade 1999).  Commerce must evaluate Simec's "abilities, efforts, and cooperation in responding to Commerce's requests for information." *Nippon Steel Corp. v. United States*, 337 F.3d 1373, 1382 (Fed. Cir. 2003).  Acting to the best of one's ability does not require perfection and instead means that the respondent must do the maximum it was able to do and "take reasonable steps to keep and maintain full and complete records documenting information that a reasonable {respondent} should anticipate being called upon to produce." *Id.*

Further, the determination to use facts available is a separate determination from the application of adverse inferences—"{e}ach determination must be made separately, and each must be explained separately." *Nippon Steel*, 337 F.3d at 1381.  Indeed, "Commerce must do more than simply restate its findings ostensibly supporting the use of neutral facts available to support the use of adverse facts available." *Pro-Team Coil Nail Enter., Inc. v. United States*, 419 F. Supp. 3d 1319, 1333 (Ct. Int'l Trade 2019).

The analysis of whether Simec cooperated to the best of its ability must begin with a recognition that this administrative review was not conducted under usual circumstances. *See,*

*e.g.*, *Ajmal Steel Tubes & Pipes Indus. LLC v. United States*, Slip Op. 21-587, 2022 Ct. Intl. Trade LEXIS 122, *13-*16 (Oct. 28, 2022) (calling "operational adjustments due to COVID-19' … extraordinary circumstances"). Commerce gave itself an extra 110 days to cope with the disruption and had an almost entirely vaccinated staff. *Id.*, 2022 Ct. Int'l Trade LEXIS 122, *5-*6. Mexico did not have the same access to vaccines that were generally considered the benchmark to allow people to travel and otherwise return to work. Further, Mexico was hit with an outbreak of the COVID-19 Delta variant in 2021. Grupo Acerero and Sidertul are unaware of any other instance of a mandatory respondent losing three accountants (or even one) who were key to preparing and supervising the preparation of questionnaire responses. Although Simec was experienced in responding to Commerce's requests for information, it lost a significant amount of that institutional knowledge with the passing of the three accountants. Thus, although Simec assigned three new accountants and hired outside consultants could not replace the lost experience.

Simec's internal AD response team worked as fast as it could, often without sufficient sleep, moving from response to response. The deaths of the key accountants while preparing the initial questionnaire responses and the supplemental questionnaire responses changed the amount of time Simec needed to submit complete questionnaire responses. That Simec was able to submit complete responses to the initial questionnaire is a tribute to the dedication and resilience of Simec's employees. That Simec was unable to provide a complete response to the Sec.A-C SQ is not surprising given the emotional and physical stress they faced. Simec's failure to provide complete responses here was not for failure to give maximum effort or for inaccurate or incomplete record keeping. Objectively, Simec was giving maximum effort. Simec simply needed more time. With more than two and a half months to go before the *Prelim Results*, and more than eight and a half months to the *Final Results*, Commerce unreasonably denied Simec's request.

In light of Simec's acting to the best of its ability under the stress of limitations related to COVID-19 and the deaths of three of its colleagues, Commerce's finding that Simec failed to act to the best of its ability must be rejected. Further, under the statute, without a finding that a respondent failed to cooperate by acting to the best of its ability, Commerce is not authorized to resort to adverse facts available. Accordingly, this Court should remand this case to Commerce to apply neutral facts available when determining Simec's AD margin.

C. **The Final Results Non-Selected Company Rate Fails to Reasonably Reflect Potential Dumping Margins for Non-Investigated Respondents**

In the *Final Results*, Commerce assigned a rate of dumping for the two non-selected cooperative respondents, Grupo Acerero and Sidertul, by calculating a simple average of the two mandatory respondents' margins. *Final Results* at 34,849-50, Appx007782-00783. The mandatory respondent rates used for this purpose included a margin of zero percent determined for Deacero based upon its individually-submitted sales and cost information, and, a rate of 66.70 percent assigned to Grupo Simec, by application of AFA to punish Grupo Simec for its alleged lack of cooperation (as discussed above). The resulting average of these two margins assigned to Grupo Acero and Sidertul was 33.35 percent. *Id*.

The rate assigned to Grupo Acerero and Sidertul is extraordinarily high and is completely out of line with rates historically calculated for cooperating respondents both before and after this review. The 33.35 percent is many multiples higher than the non-selected company rates calculated in every preceding review period conducted under the *Order*. In fact, it is more than six times larger than the highest rate ever assigned to a non-selected company in a prior review:

| 2019-2020: | 33.35 percent |
|---|---|
| 2018-2019: | 4.93 percent |
| 2017-2018: | 5.54 percent |
| 2016-2017: | 3.65 percent |
| 2015-2016: | 0.00 percent |

*See Final 2018-2019*, 86 Fed. Reg. at 50,528; *Steel Concrete Reinforcing Bar from Mexico*, 85 Fed. Reg. 71,053, 71,054 (Dep't Commerce Nov. 6, 2020)(final results of antidumping duty administrative review; 2017-2018)("*2017-2018 Final*"); *Final 2016-2017*, 84 Fed. Reg 35,600; *Steel Concrete Reinforcing Bar From Mexico,* 83 Fed. Reg. 27,754, 27,755 (Dep't Commerce Jun. 14, 2018) (final results of antidumping duty administrative review; 2015-2016).   This 33.35 percent rate is also over five times larger than the non-selected company rate of 6.35 percent that Commerce has calculated in the preliminary results of the immediately following 2020-2021 administrative review of the *Order.  Steel Concrete Reinforcing Bar From Mexico*, 87 Fed. Reg. 75,032, 75,033 (Dep't Commerce Dec. 7, 2022)(preliminary results of antidumping duty administrative review; 2020-2021).  It is also over four-and-a-half times higher than the highest rate (7.12 percent) ever calculated for an individually-investigated respondent in a prior review under the *Order.  Final 2017-2018*, 85 Fed. Reg. 71,054.

    This extraordinarily high outlier of an AD rate cannot be explained by changes in underlying sales practices or economic conditions in the relevant market.  For example, Commerce did not find, and the record does not reflect, that there were any significant changes in input costs, adverse exchange rates, or shifts in market prices that could explain such a large increase.  Indeed, the only company whose relevant costs and sales prices in the markets in question were actually investigated by Commerce demonstrated that it had no margin of dumping at all.

    The fact is that the determination of such an extraordinarily high margin of dumping is attributable to one thing, and one thing only.  Separate and distinct from the circumstances and conduct of Grupo Acerero and Sidertul, Commerce determined (wrongly in our view) that one of

the mandatory respondents, Simec, did not adequately cooperate in the review and Commerce accordingly punished Simec by applying AFA in selecting its margin.  Even though Grupo Acerero and Sidertul are not affiliated with nor responsible for Simec's conduct or participation in the review, Commerce chose to allow Simec's rate to inflate the rate for Grupo Acerero and Sidertul to a level many multiples higher than any rate ever before calculated by Commerce in a review under this order.

    This was wrong and constitutes reversible error.  As explained below, while Commerce has some discretion in determining a reasonable rate to apply to respondents not selected for individual examination, that discretion is not unbounded.  This Court and the Court of Appeals have repeatedly recognized that the accuracy of a margin of dumping is an overriding objective of the administrative review process.  *See, e.g.*, *Yangzhou Bestpak Gifts & Crafts Co., Ltd. v. United States*, 716 F.3d 1370, 1379 (Fed. Cir. 2013)("An overriding purpose of Commerce's administration of antidumping laws is to calculate dumping margins as accurately as possible.")(citation omitted); *Gallant Ocean*, 602 F.3d at 1323 (a rate must be a "reasonably accurate estimate of the respondent's actual rate") (internal quotation marks and citations omitted); *SNR Roulements v. United States*, 402 F.3d 1358, 1363 (Fed. Cir. 2005)("Antidumping laws intend to calculate antidumping duties on a fair and equitable basis") (citations omitted); *Rhone Poulenc, Inc. v. United States*, 899 F. 2d 1185, 1191 (Fed. Cir. 1990)(the "basic purpose of the statute" is to "determin{e} current margins as accurately as possible").  The allegiance to accuracy in the margin calculation applies even when Commerce is assigning adverse rates to uncooperative respondents under the AFA authority.  It applies even more so when Commerce is determining margins of dumping for cooperative respondents, where the considerations of deterrence that might otherwise weigh in favor of a higher margin are not in play.  *Albemarle Corp. & Subsidiaries v. United States*,

821 F.3d 1345, 1354 (Fed. Cir. 2016) ("{A}ccuracy and fairness must be Commerce's primary objectives in calculating a separate rate for cooperating exporters.") (citation omitted).  This Court has accordingly recognized that the margins of dumping selected by Commerce should reasonably reflect the economic circumstances and the potential dumping margins for the non-investigated exporters or producers.  *GODACO Seafood Joint Stock Co. v. United States*, 494 F. Supp. 3d 1294, 1306 (Ct. Int'l Trade 2021)("The rate selected {by Commerce} must serve the purpose of calculating dumping margins as accurately as possible.  The court concludes that Commerce's determination to apply a total AFA rate to fully cooperating Separate Rate Plaintiffs is unreasonable and unsupported by any evidence on the record.  To the contrary, the court observes that evidence on the record suggests instead that Separate Rate Plaintiffs' rate may be reasonably closer to the $0.69 per kilogram rate assigned to separate rate respondents in the prior twelfth administrative review, rather than the total AFA rate of $3.87 per kilogram from the thirteenth administrative review.")

In calculating the applicable rate for non-investigated companies in administrative reviews, Commerce generally looks to 19 U.S.C. § 1673d(c)(5), which provides instructions for calculating the all-others rate in original investigations.  *See Albemarle Corp. & Subsidiaries*, 821 F.3d at 1352 ("It is true … that 19 U.S.C. § 1673d applies on its face only to investigations, not periodic administrative reviews…. But the statutory framework contemplates that Commerce will employ the same methods for calculating a separate rate in periodic administrative reviews as it does in initial investigations.")  *See* 19 U.S.C. § 1675(a) (amended 2016) (In conducting periodic administrative reviews, Commerce is required to 'determine the dumping margin' to calculate 'the amount of any antidumping duty,' just as it must do in initial investigations).") (citation omitted).  That provision directs that "the estimated all-others rate shall be an amount equal to the weighted

average of the estimated weighted average dumping margins established for exporters and producers individually investigated, excluding any zero and *de minimis* margins, and any margins determined entirely {on the basis of AFA}." 19 U.S.C. § 1673d(c)(5)(A).  As an exception to this rule, the statute provides:

> If the estimated weighted average dumping margins established for all exporters and producers individually investigated are zero or *de minimis* margins, or are determined entirely {on the basis of AFA}, the administering authority may use any ***reasonable method*** to establish the estimated all-others rate for exporters and producers not individually investigated, including averaging the estimated weighted average dumping margins determined for the exporters and producers individually investigated.  19 U.S.C. § 1673d(c)(5)(B) (emphasis added).

The Statement of Administrative Action ("SAA") accompanying the Uruguay Round Agreements Act, which Congress deems "authoritative," offers additional guidance on that calculation.  19 U.S.C. § 3512(d).  In particular, the SAA explains:

> The expected method in such cases {where all investigated rates are zero, *de minimis*, or determined on the basis of AFA} will be to weight-average the zero and de minimis margins and margins determined pursuant to the facts available, provided that volume data is available.  However, if this method is not feasible, or ***if it results in an average that would not be reasonably reflective of potential dumping margins for non-investigated exporters or producers, Commerce may use other reasonable methods***.  SAA accompanying the Uruguay Round Agreements Act, H.R. Doc. No. 103–316 (1994), *as reprinted in* 1994 U.S.C.C.A.N. 4040, 4201 (emphasis added).

As such, the statute makes clear that Commerce is not required to assign non-investigated respondents an average of AFA and zero margins, and the SAA clearly indicates that such averaging is illegitimate where it results in a margin that would not be "***reasonably reflective of potential dumping margins***" for non-investigated respondents.  If averaging does not result in a "reasonably reflective" margin, it is not a "reasonable method," and the agency thus should assign the non-selected company rate using a different methodology.  *Id*.

In determining an alternative "reasonable method" for assigning the non-selected company margin in such circumstances, courts have emphasized that accuracy and fairness must drive the calculation of AD margins. *NTN Bearing Corp.*, 74 F.3d at 1208 ("It is the duty of {Commerce} to determine dumping margins as accurately as possible. As this court has stated, the antidumping laws are remedial not punitive.") (internal quotations and citations omitted). Commerce's rate calculations must be designed to accurately reflect the respondent's true dumping margin. *See, e.g.*, *Yangzhou Bestpak*, 716 F.3d at 1379 ("An overriding purpose of Commerce's administration of antidumping laws is to calculate dumping margins as accurately as possible.")(citation omitted).

It is particularly important for Commerce to ensure accurate and fair dumping margins when assigning a non-selected company rate given the statute's preference that Commerce individually examine each company subject to the administrative review. The statute entitles every respondent participating in an administrative review to be individually examined and assigned a company-specific margin of dumping. 19 U.S.C. § 1677f–1(c)(1). The statute offers a limited exception to this general rule in cases where there is a "large number of exporters or producers" under review. 19 U.S.C. § 1677f–1(c)(2). In such cases, Commerce may limit its examination to a "reasonable number of exporters or producers." *Id*. Interpreting this language, the U.S. Court of International Trade has observed that "limiting the number of individually examined respondents is intended to be the exceptional circumstance, not the norm." *Carpenter Tech. Corp. v. United States*, 33 CIT 1721, 1731 (Ct. Int'l Trade 2009). It has also emphasized that "the statute expresses a general preference that each exporter or producer receive its own margin." *Husteel Co. v. United States*, 98 F. Supp. 3d 1315, 1329 (Ct. Int'l Trade 2015). This preference for individual examination of all respondents underscores Commerce's obligation to ensure that non-examined respondents – assigned an average rate as an exception to the general rule preferring

individual examination of all respondents – receive fair and reasonably reflective dumping margins.

In light of these imperatives that Commerce (1) assign individual respondents their own dumping margin, except in limited circumstances, (2) employ a "reasonable method" to calculate the non-selected company rate, and (3) assign fair and accurate margins as a paramount priority, the Court of Appeals for the Federal Circuit has made clear that substantial evidence on the administrative record must show that assigned margins actually reflect the "economic reality" of the non-investigated respondents. *Yangzhou Bestpak*, 716 F.3d at 1378.  In *Yangzhou Bestpak*, like here, Commerce assigned non-investigated respondents a simple average of AFA and *de minimis* rates assigned to the two mandatory respondents using the "expected method."  This simple averaging resulted in a 123.83 percent margin for non-investigated respondents, including Bestpak.  The Federal Circuit found that Commerce lacked substantial evidence showing that this high margin reflected the economic reality of Bestpak, observing, that

> The record here is so thin that Commerce could neither have reached a valid decision nor reasonably have found evidence to support the determination that Bestpak deserves a margin that more than doubles the import's sales price.  The 123.83% rate assigned to Bestpak is far in excess of the de minimis rate assigned to the only cooperating, non-government controlled, and mandatory respondent . . . *Id*. at 1379.

The Federal Circuit also called the case "peculiar," noting: "Commerce identified only two significant exporters/producers, yet one was assigned a *de minimis* dumping margin while the other was assigned the highest possible AFA China-wide margin.  This situation undercut the reasonableness of the evidence relied upon to set the margin." *Id*. at 1380.

Almost identically, here, the administrative record contains no evidence that the 33.35-percent margin reflects the potential dumping margins or economic reality of Grupo Acerero or Sidertul.  On the contrary, this specific margin has uniquely been driven many multiples higher

than any previous non-selected company margin assigned under this *Order* solely by the application of AFA to one respondent (which, as explained above, was itself unjustified and unlawful).   Accordingly, consistent with Federal Circuit direction, Commerce should have employed a different reasonable method to assign a non-selected company dumping margin.

In this regard, the *Final Results*' reliance on *Nan Ya Plastics Corp., LTD. v. United States*, 810 F.3d 1333, 1344 (Fed. Cir. 2016) to argue that Commerce may disregard the "economic or commercial reality" of non-selected respondents is misplaced.   Final IDM at 42, Appx007754. There, the Federal Circuit explained that "a Commerce determination . . .  reflects 'commercial reality' if it is consistent with the method provided in the statute, thus in accordance with law." *Nan Ya Plastics*, 810 F.3d at 1344 (citation omitted).   *Nan Ya Plastics* does not stand for the proposition that Commerce need not assess whether the non-selected company rate is reasonably reflective of potential dumping margins, which remains a requirement in the SAA and which Commerce regularly considers when assigning a non-selected company rate.  *See Certain Quartz Surface Products From India*, 88 Fed. Reg. 1,188 (Dep't Commerce Jan 9. 2023)(final results of antidumping duty administrative review; 2019-2021), Dec.Mem. at 54-55 ("{B}ased on the history of rates for this *Order*, we determine that the 161.53 percent margin is not reasonably reflective of the non-selected companies' potential dumping margins during the POR.").   Rather, *Nan Ya Plastics* emphasizes Commerce's obligation to heed to the "statutory scheme" in determining appropriate margins.  *Nan Ya Plastics*, 810 F.3d at 1344.  *Nan Ya Plastics* thus does not absolve Commerce of its obligation to assess the reflectiveness of the non-selected company rate, which the agency failed to do in this review.

Here, and as noted above, the history of administrative reviews of this *Order* demonstrates that the 33.35-percent margin is not reasonable or reflective of potential dumping margins for non-

investigated respondents.  This rate is many multiples higher than the notably stable non-selected company rates calculated in preceding review periods: 4.93 percent (2018-2019), 5.54 percent (2017-2018), 3.65 percent (2016-17), and 0.00 percent (2015-2016).  *Final 2018-2019*, 86 Fed. Reg. at 50,528; *Final 2017-2018*, 85 Fed. Reg. 71,054; *Final 2016-2017*, 84 Fed. Reg. 35,600; *Final 2015-2016,* 83 Fed. Reg. 27,755.  The *Final Results*' aberrational margin is therefore more than four times any rate previously calculated and more than six times any non-selected company rate applied in the previous five administrative reviews.   Further confirming its lack of representativeness, this rate also far exceeds the non-selected company rate of 6.35 percent that Commerce has calculated in the preliminary results of its 2020-2021 administrative review of the *Order*.  *Prelim*, 87 Fed. Reg. 75,033.

Additionally, the margin's representativeness is inherently suspect because it is almost entirely driven by the application of AFA to one respondent who accounted for [          ] percent of entry volume during the period of review ("POR").  Respondent Selection Mem., Appx080048.  It is unreasonable and unlawful for the non-selected company AD rate – a rate that was determined by Commerce without Grupo Acerero or Sidertul being able to demonstrate an absence of dumping through their own data – to be driven by [                    ] of subject merchandise.

Finally, the 66.70 percent facts available rate was calculated by the petitioner (not an unbiased source) based on data that was nearly ten-years old.  As such, this rate (and the underlying conjecture on which petitioner based it) had no plausible relevance to the 2019-2020 review period

and corresponding pricing practices – let alone the pricing practices of the two cooperative respondents. [3]

The Court of International Trade has confirmed that the history of dumping margins assigned in review segments is relevant when assessing the reasonableness of a non-selected company rate. *See Bosun Tools Co. v. United States*, 463 F. Supp. 3d 1309, 1319 (Ct. Int'l Trade 2020) ("Commerce must either reconsider its determination or explain why following the 'expected method' is reasonable in light of evidence of any margins assigned to the separate respondents and Bosun, when individually investigated in prior reviews.").[4] Consistent with this direction, Commerce has not employed the "expected method" when the history of dumping margins calculated under an order does not reflect the potential dumping margins of non-selected companies. *Quartz From India*, 88 Fed. Reg. 1,188, Dec.Mem. at 54-55 ("{B}ased on the history of rates for this *Order*, we determine that the 161.53 percent margin is not reasonably reflective of the non-selected companies' potential dumping margins during the POR.")

The history of margins under this *Order* demonstrates that the 33.35-percent non-selected company margin is in no way reasonably reflective of the non-selected companies' potential dumping margins, and no evidence on the record suggests otherwise.  Non-selected company margins under the *Order* have been stable, fluctuating within a two-percent band over the previous

---

[3]     The petition rate was calculated using sales-specific data contemporaneous with the 2012-13 period of investigation.  *See Steel Concrete Reinforcing Bar From Mexico and Turkey*, 78 Fed. Reg. 60,827, 60,829 (Dep't Commerce Oct. 2, 2013)(initiation of antidumping duty investigations).

[4]     The Federal Circuit has likewise acknowledged the importance of examining the history of dumping margins under an order to assess the reasonableness of the all-others rate.  In a non-precedential disposition of the *Bosun* appeal, the Federal Circuit found that a "general upward trend in dumping rates over time" provided substantial evidence in favor of the imposition of a high all-others margin.  *Bosun Tools Co., Ltd. et al. v. United States et al.*, Case No. 2021-1929, CM/ECF 52 (Jan. 10, 2022), at 11-12.

three reviews and demonstrating no sustained upward trend.  As such, they show that the *Final Results*' non-selected company rate is not reasonably reflective of Grupo Acerero's or Sidertul's potential dumping margins.  In sum, Commerce's simple averaging of the AFA and *de minimis* margins is not a "reasonable method" given the facts of this proceeding and is thus contrary to the text of the governing statute.

In the *Final Results*, Commerce failed to identify any evidence in the record that supports such a large increase in the margins of dumping during the 2019-20 period as compared to the immediately preceding review period and other review periods during the life of the Order.  Indeed, the fact that Commerce calculated a *de minmis* rate for Deacero based upon submitted sales and cost data for the 2019-2020 review period severely undercuts the assumption that margins of dumping increased in this period.  Nor is there any evidence specific to the respondents supporting such a finding – there is, for example, no evidence that pricing practices or costs significantly changed during the current review period.  At a minimum, before simply assuming that Grupo Acerereo or Sidertul dumped at rates that have never previously been seen under this Order, the non-investigated respondents should have been permitted to provide information on its pricing levels that could be compared to other data on the record.  Indeed, Sidertul asked in its Case Brief for the opportunity to put such pricing data on the record, which Commerce rejected in the *Final Results*.  Final IDM at 44, Appx007756.  In doing so, Commerce unreasonably attempted to have it both ways – maintaining that no evidence disproves the reflectiveness of its non-examined respondent rate while also denying parties an ability to provide such information, which could have buttressed the reality demonstrated by the history of margins calculated under the Order.

In light of this lack of representativeness, and consistent with Commerce's overriding obligation to assign fair and accurate dumping margins and the agency's own recent practice,

Commerce could have (and should have) assigned non-investigated respondents the non-selected company rate (4.93 percent) from the most recently completed (2018-2019) administrative review, not a simple average largely driven by an AFA rate. *See, e.g.*, *Quartz From India*, 88 Fed. Reg. 1,188, Dec.Mem., at 54-55 ("{B}ased on the history of rates for this *Order*, we determine that the 161.53 percent margin is not reasonably reflective of the non-selected companies' potential dumping margins during the POR. . . . {W}e find that the most reasonable approach in assigning a rate to the non-selected companies in this instance is to pull forward the all-others rate calculated in the underlying investigation."); *Certain Steel Nails From the Sultanate of Oman*, 87 Fed. Reg. 78,639 (Dep't Commerce Dec. 22, 2022) (final results of antidumping duty administrative review; 2020-2021) ("We based the dumping margin entirely on AFA for the sole mandatory respondent . . . . Therefore, we assigned the companies not selected for examination the all-others rate applied in prior segments of this proceeding (i.e., 9.10 percent) . . . ."); *Certain Lined Paper Products From India*, 79 Fed. Reg. 26,205 (Dep't Commerce May 7, 2014) (final results of antidumping duty administrative review; 2011–2012), and accompanying Issues and Decision Memorandum at 3 ("In past reviews, the Department determined that a 'reasonable method' to use when the margins of selected mandatory respondents are zero or *de minimis* is to assign non-selected respondents the average of the most recently determined margins that are not zero, *de minimis*, or based entirely on facts available (which may be from a prior review or a new shipper review or the investigation).").[5]   Commerce could have alternatively assigned an average of the non-selected

---

[5]     Commerce argues in the Final IDM that the agency "is not permitted to pull forward rates from prior segments except under two limited circumstances: (1) 'where there is evidence that the overall market and the dumping margins have not changed from period to period'; and (2) when Commerce is selecting an AFA margin for a non-cooperating individually examined exporter." Final IDM at 43, Appx007755.  Here, like in *Quartz From India* and *Certain Steel Nails From the Sultanate of Oman*, the history of rates calculated under the Order demonstrates that a non-selected

company rates from prior administrative reviews to fulfill its obligation to assign an accurate and reflective non-selected company margin.  On remand, Commerce should apply a rate from a previous segment, as the 33.35 non-selected company rate is neither supported by substantial evidence nor in accordance with law.

### D.    Application of a Simple Average of the Mandatory Rates is Unlawful in this Case

The *Final Results*' 33.35 percent non-selected company margin is a simple average of Deacero's *de minimis* and Grupo Simec's AFA rates ((0.00 + 66.70) / 2 = 33.35).  Final IDM at 41, Appx007753.  For the reasons described above in Section III.C, use of this average is not a "reasonable method" because no evidence on the record suggests that it is reasonably reflective of Grupo Acerero or Sidertul's potential dumping margin.  Commerce should have thus assigned a non-selected company margin based on rates previously calculated under review the *Order*.

However, even if averaging the investigated respondents' rates could be construed as a "reasonable method" in this review, the calculation is further flawed because Commerce failed (at the absolute minimum) to calculate a ***weighted average*** rate as required by the statute.

Section 735(c)(5)(A) of the Tariff Act of 1930, as amended, 19 U.S.C. § 1673d(c)(5)(A), provides that "the estimated all-others rate shall be an amount equal to the ***weighted average*** of the estimated weighted average dumping margins established for exporters and producers individually investigated, excluding any zero and *de minimis* margins, and any margins determined entirely {on the basis of AFA}."  19 U.S.C. § 1673d(c)(5)(A) (emphasis added).  The statute provides an exception for instances in which all investigated margins are zero, *de minimis*, or determined on the basis of AFA, explaining that in such instances "the administering authority

---

company rate based on an average of the mandatory respondent rates is not reflective of their potential dumping margins.

may use any reasonable method to establish the estimated all-others rate for exporters and producers not individually investigated, including averaging the estimated weighted average dumping margins determined for the exporters and producers individually investigated." 19 U.S.C. § 1673d(c)(5)(B).  Notwithstanding, the requirement to "weight-average" the rates under this methodology continues to apply.  The SAA makes it clear that "{t}he expected method in such cases will be to **weight-average** the zero and *de minimis* margins and margins determined pursuant to the facts available, provided that volume data is available." SAA accompanying the Uruguay Round Agreements Act, H.R. Doc. No. 103–316 (1994), reprinted in 1994 U.S.C.C.A.N. 4040, 4201 (emphasis added).

Here, volume data was available and Commerce's use of a simple average therefore flagrantly ignored the statute and the SAA.  Commerce's respondent selection data shows that Deacero and Grupo Simec accounted for a combined [                ] kilograms of exports during the POR, with [        ] percent coming from Deacero and [        ] percent coming from Grupo Simec.  Respondent Selection Memo at Attachment, AppxAppx080048.  Taking into account this volume data – in accordance with the direction of the statute and SAA – yields a weighted average dumping margin of [        ] percent ( [        ] x 0.0 + [        ] x 66.7).  This weighted-average dumping margin is still not reasonably reflective of Grupo Acerero's or Sidertul's potential dumping margin, in light of the stable dumping trends throughout recent reviews.  Moreover, this [                ] dumping margin serves as further evidence that Commerce's use of a simple average is unlawful because it is both (a) contrary to the statute, and (b) results in a [        ] different margin result than would be obtained by following the requirements of the statute.  In other words, by failing to apply a weighted average, as mandated by the statute, Commerce's

methodology for assigning a rate to Grupo Acerero and Sidertul is doubly distorted and therefore unreasonable.

The Final IDM fails to adequately explain why Commerce considers a simple average to be a "reasonable method" or why Commerce concluded it appropriate to disregard Congress's mandate to employ a weighted-average margin, briefly calling Simec's volume data "unreliable." Final IDM at 41, Appx007753.  But, the statute directs Commerce to employ a weighted average and does not excuse the agency from attempting to fulfill this obligation in light of minor deficiencies in a mandatory respondent's questionnaire response.  Moreover, to the extent that Commerce could be concerned that calculating a more representative, weighted-average margin (as directed by the SAA) would disclose confidential information, that consideration cannot be used to override Commerce's obligation to follow the statute and to promote accuracy in the margin calculations.  Also, to the extent that issues of confidentiality may have arisen, Commerce itself is to blame for this complication by limiting its examination to just two respondents pursuant to the narrow exception granted by 19 U.S.C.§ 1677f–1(c).  That is, Commerce cannot justify the application of an unrepresentative and unreasonable non-selected company margin because of its own decision to limit its examination to just two respondents.  Commerce's conclusion that two respondents was the largest number "that can reasonably be examined" created the danger that the Department would not be able to fulfill Congress's direction to calculate a weighted-average dumping margin in light of confidentiality limitations.  Commerce may not punish the non-investigated respondents as a result of its very limited examination of producers and exporters in this review.  Also, the Courts have indicated that volume data must be unavailable or unusable for Commerce to resort to a simple average. *Bestpak*, 716 F.3d at 1378; *see also* Final IDM at 41,

Appx007753.  Here, it is not clear that merely being confidential renders such data "unusable."  If that were the case, Commerce could cite this basis in every proceeding.

In this review, Commerce should have followed the direction of the statute and SAA and calculated a weighted-average non-selected company dumping margin for the *Final Results*. Because even a weighted average would not be reasonably reflective of Grupo Acerero's or Sidertul's dumping margins, however, for the reasons explained above, the *Final Results* should have employed a non-selected company margin based on margins from the previous review or reviews.  On remand, this Court should direct Commerce to, consistent with the terms of the statute and SAA, determine a non-selected company rate that is reasonably reflective of potential dumping margins and explain how the agency is comporting with the statute's instruction to calculate a weighted average margin.

**IV.     CONCLUSION**

For the foregoing reasons, Grupo Acerero and Gerdau Corsa respectfully request that this

Court grant their Motion for Judgment on the Agency Record and remand this case to Commerce

with instructions consistent with the points set forth in this Memorandum.

Respectfully submitted,


/s/ Craig A. Lewis                                      /s/ Irene H. Chen
Craig A. Lewis                                          Irene H. Chen
Jonathan T. Stoel
Nicholas R. Sparks                                      VCL LAW LLP
                                                        1945 Old Gallows Road, Suite 630
HOGAN LOVELLS US LLP                                    Vienna, VA  22182
555 Thirteenth Street, N.W.
Washington, DC 20004-1109                               /s/ Mark B. Lehnardt
(202) 637-8613                                          Mark B. Lehnardt

*Counsel to Gerdau Corsa S.A.P.I. de C.V.*              LAW OFFICES OF DAVID L. SIMON, LLP
                                                        1025 Connecticut Ave., Suite 1000
                                                        Washington, DC  20036

                                                        *Counsel to Grupo Acerero S.A. de C.V.*


Dated: April 27, 2023

## CERTIFICATE OF COMPLIANCE

The undersigned counsel hereby certifies that the foregoing Memorandum of Points and Authorities in Support of Motion for Judgment on the Agency Record dated April 27, 2023 complies with the word-count limitation  described in the U.S. Court of International Trade Chambers Procedures.  The memorandum of law contains 13,563 words according to the word-count function of the word processing software used to prepare the memorandum.

/s/ Craig A. Lewis
Craig A. Lewis
Jonathan T. Stoel
Nicholas R. Sparks

HOGAN LOVELLS US LLP
555 Thirteenth Street, N.W.
Washington, DC 20004-1109
(202) 637-8613

*Counsel to Gerdau Corsa S.A.P.I. de C.V.*