**IN THE UNITED STATES COURT OF INTERNATIONAL TRADE**

**BEFORE:  THE HONORABLE STEPHEN A. VADEN, JUDGE**

| | |
|---|---|
| GRUPO SIMEC S.A.B. de C.V., *et al.*, | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| GERDAU CORSA, S.A.P.I. de C.V., | ) |
| | ) |
| Plaintiff-Intervenor, | ) |
| | ) |
| v. | ) |
| | ) |
| UNITED STATES, | ) |
| | ) |
| Defendant, | ) |
| | ) |
| and | ) |
| | ) |
| REBAR TRADE ACTION COALITION, | ) |
| | ) |
| Defendant-Intervenor. | ) |

**PUBLIC VERSION**

Consol. Court No. 22-00202

**Confidential Information
Denoted by [ ]**

**DEFENDANT'S RESPONSE TO PLAINTIFFS'
MOTION FOR JUDGMENT ON THE ADMINISTRATIVE RECORD**

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

PATRICIA M. McCARTHY
Director

L. MISHA PREHEIM
Assistant Director

OF COUNSEL
IAN MCINERNEY
Counsel
U.S. Department of Commerce
Office of the Chief Counsel
  for Trade Enforcement and Compliance

KARA M. WESTERCAMP
Trial Counsel
U.S. Department of Justice
Commercial Litigation Branch
P.O. Box 480
Ben Franklin Station
Washington, D.C.  20044
Tel:  (202) 305-7571

June 26, 2023

Attorneys for Defendant

# TABLE OF CONTENTS

**PAGE**

TABLE OF AUTHORITIES .................................................................... iii

STATEMENT PURSUANT TO RULE 56.2 .................................................... 2

    I.     The Administrative Determination Under Review ............................... 2

    II.    Issues Presented for Review ........................................................... 2

STATEMENT OF FACTS ....................................................................... 3

    I.     Initiation Of The Administrative Review ........................................ 3

    II.    Simec's Supplemental Questionnaire Responses .............................. 4

    III.   The Preliminary Results ................................................................ 5

    IV.   The Final Results ......................................................................... 7

SUMMARY OF THE ARGUMENT ........................................................... 8

ARGUMENT ....................................................................................... 9

    I.     Applicable Legal Framework 9 ....................................................

         A.    Standard Of Review .......................................................... 9

         B.    Application Of Facts Available With An Adverse Inference ................. 10

    II.    Commerce's Application Of Total Facts Available With An Adverse Inference To Simec Is Supported By Substantial Evidence And In Accordance With Law ..... 12

         A.    Commerce Did Not Abuse Its Discretion When It Rejected Simec's Extension Request For Responding To The A-C Supplemental Questionnaire, And Declined To Accept The October 18 Filing ............ 12

         B.    Substantial Evidence Supports Commerce's Determination To Apply Total Facts Available With An Adverse Inference ................................ 20

              1.    Substantial Evidence Supports Commerce's Determination To Apply Facts Available ................................................................ 20

                  *Home Market Sales Data* ........................................... 21

*U.S. Sales Data* ...........................................................................26

2.      Substantial Evidence Supports Commerce's Determination That An Adverse Inference Is Warranted Because Simec Failed To Cooperate To The Best Of Its Ability ...........................................30

C.      Plaintiffs' Various Arguments Contesting Commerce's Application Of Facts Available With An Adverse Inference Meritless ...........................32

D.      The Rate Commerce Selected For Simec Is In Accordance With Law ....35

III.    Commerce's Methodology To Determine The Rate For Non-Selected Companies Is Based On Substantial Evidence And In Accordance With Law .......................39

ARGUMENT .....................................................................................................................45

## <u>TABLE OF AUTHORITIES</u>

<u>CASES</u>                                                                                     <u>PAGE(S)</u>

*Albemarle Corp. & Subsidiaries v. United States,*
 821 F.3d 1345 (Fed. Cir. 2016)................................................................ 45, 46

*Ali v. Fed. Bureau of Prisons,*
 552 U.S. 214 (2008)................................................................................... 43

*ArcelorMittal USA LLC v. United States,*
 399 F. Supp. 3d 1271 (Ct. Int'l Trade 2019) ............................................ 17, 19

*BMW of North America LLC v. United States,*
 926 F.3d 1291 (Fed. Cir. 2019).............................................................. 38, 39

*Bosun Tools Co. v. United States,*
 2022 WL 94172 (Fed. Cir. Jan. 10, 2022) ...................................... 42

*Consol. Edison Co. v. NLRB,*
 305 U.S. 197 (1938).................................................................................. 10

*Consolo v. Fed. Mar. Comm'n,*
 383 U.S. 607 (1966).................................................................................. 10

*Dongtai Peak Honey Indus. Co. v. United States,*
 777 F.3d 1343 (Fed. Cir. 2015).............................................................. 17, 39

*Essar Steel Ltd. v. United States,*
 678 F.3d 1268 (Fed. Cir. 2012).................................................................. 11

*F.lli De Cecco Di Filippo Fara S. Martino S.p.A. v. United States,*
 216 F.3d 1027 (Fed. Cir. 2000).................................................................. 11

*Fujitsu Gen. Ltd. v. United States,*
 88 F.3d 1034 (Fed. Cir. 1996).................................................................... 9

*Gallant Ocean (Thailand) Co. v. United States,*
 602 F.3d 1319 (Fed. Cir. 2010).................................................................. 37

*Grobest & I-Mei Industrial (Vietnam) Co., Ltd. v. United States,*
 815 F. Supp. 2d 1342 (Ct. Int'l Trade 2012) ............................................ 18, 19

*Habas Sinai Ve Tibbi Gazlar Istihsal Endustrisi A.S. v. United States,*
 992 F.3d 1348 (Fed. Cir. 2021).............................................................. 44, 45

*Harrison v. PPG Indus., Inc.*,
    446 U.S. 578 (1980)....................................................................................... 43

*INS v. Elias-Zacarias*,
    502 U.S. 478 (1992)....................................................................................... 10

*Linyi Chengen Imp. & Exp. Co. v. United States*,
    609 F. Supp. 3d 1392 (Ct. Int'l Trade 2022) .................................................. 43

*Mukand Ltd. v. United States*,
    767 F.3d 1300 (Fed. Cir. 2014)...................................................................... 13

*Nan Ya Plastics Corp. Ltd. v. United States*,
    810 F.3d 1333 (Fed. Cir. 2016)................................................................ 11, 44

*National Nail Corp. v. United States*,
    390 F. Supp. 3d 1356 (Ct. Int'l Trade 2019) ................................................. 33

*Nat'l Knitwear & Sportswear Ass'n v. United States*,
    779 F. Supp. 1364 (1991) ............................................................................... 46

*Nippon Steel Corp. v. United States*,
    337 F.3d 1373 (Fed. Cir. 2003)............................................................... passim

*NTN Bearing Corp. v. United States*,
    74 F.3d 1204 (Fed. Cir. 1995)........................................................................ 17

*Nucor Corp. v. United States*,
    612 F. Supp. 2d 1264 (Ct. Int'l Trade 2009) ................................................. 10

*Oman Fasteners, LLC v. United States*,
    No. 22-00348, 2023 WL 2233642 (Ct. Int'l Trade Feb. 15, 2023) ................. 39

*PAM, S.p.A. v. United States*,
    582 F.3d 1336 (Fed. Cir. 2009)...................................................................... 10

*PrimeSource Bldg. Prod., Inc. v. United States*,
    581 F. Supp. 3d 1331 (Ct. Int'l Trade 2022) ........................................... 45, 46

*Pro-Team Coil Nail Enterprises, Inc. v. United States*,
    419 F. Supp. 3d 1319 (Ct. Int'l Trade 2019) ........................................... 19, 20

*QVD Food Co., Ltd. v. United States*,
    658 F.3d 1318 (Fed. Cir. 2011)...................................................................... 32

*Ozdemir Boru San. Ve Tic. Ltd. v. United States*,
    273 F. Supp. 3d 1225 (Ct. Int'l Trade 2017) ................................................. 12

*Shelter Forest International Acquisition, Inc. v. United States*,
    497 F. Supp. 3d 1388 (Ct. Int'l Trade 2021) ................................................. 16

*Solianus Inc. v. United States*,
    391 F. Supp. 3d 1331 (Ct. Int'l Trade 2019) ........................................... 41, 42

*Steel Authority of India, Ltd. v. United States,*
    149 F. Supp. 2d 921 (Ct. Int'l Trade 2001) ................................................... 33

*Tel Sanayi A.S. v. United States*,
    557 F. Supp. 3d 1348 (Ct. Int'l Trade 2022) ................................................. 16

*Timken Co. v. United States*,
    699 F. Supp. 300 (Ct. Int'l Trade 1988) ....................................................... 10

*Trinity Mfg., Inc. v. United States*,
    549 F. Supp. 3d 1370 (Ct. Int'l Trade 2021) ................................................. 15

*United States v. Eurodif S.A.*,
    555 U.S. 305 (2009) ..................................................................................... 9, 44

*United States v. Gonzales*,
    520 U.S. 1 (1997) ............................................................................... 43, 44, 46

*Universal Camera Corp. v. NLRB*,
    340 U.S. 474 (1951) ....................................................................................... 10

*Yangzhou Bestpak Gifts & Crafts Co. v. United States*,
    716 F.3d. 1370 (Fed Cir. 2013) ............................................................ 40, 41, 42

*YC Rubber Co. (N. Am.) LLC v. United States*,
    No. 2021-1489, 2022 WL 3711377 (Fed. Cir. Aug. 29, 2022) ...................... 40

## <u>STATUTES</u>

19 U.S.C. § 1673(c) ........................................................................... passim

19 U.S.C. § 1675 ........................................................................................ 40

19 U.S.C. § 1677 ............................................................................... passim

## <u>REGULATIONS</u>

19 C.F.R. § 351.102(b)(21) ................................................................................ 35

19 C.F.R. § 351.301(b) ........................................................................... 14, 20, 35

19 C.F.R. § 351.302(c) ...................................................................................... 16

19 C.F.R. § 351.302(d) ...................................................................................... 35

19 C.F.R. § 351.308(c) .......................................................................... 6, 11, 36, 37

## <u>OTHER AUTHORITIES</u>

*Extension of Time Limits Preamble*,
    78 Fed. Reg. 57,792 (Dep't of Commerce Sept. 20, 2013) ................................. 5

*Steel Concrete Reinforcing Bar From Mexico: Antidumping Duty Order*,
    79 Fed. Reg. 65,926 (Dep't of Commerce Nov. 6, 2014) .................................. 3

*Steel Concrete Reinforcing Bar From Mexico*,
    87 Fed. Reg. 34,848 (Dep't of Commerce June 8, 2022) .................................. 2

Trade Preferences Extension Act of 2015 (TPEA),
    Pub. L. No. 114-27, 129 Stat. 362 (2015) ....................................................... 36

**IN THE UNITED STATES COURT OF INTERNATIONAL TRADE**

**BEFORE:  THE HONORABLE STEPHEN A. VADEN, JUDGE**

|  |  |  |
|---|---|---|
| GRUPO SIMEC S.A.B. de C.V., *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| GERDAU CORSA, S.A.P.I. de C.V., | ) | |
| | ) | |
| Plaintiff-Intervenor, | ) | |
| | ) | |
| v. | ) | **PUBLIC VERSION** |
| | ) | |
| UNITED STATES, | ) | Consol. Court No. 22-00202 |
| | ) | |
| Defendant, | ) | **Confidential Information** |
| | ) | **Denoted by [ ]** |
| and | ) | |
| | ) | |
| REBAR TRADE ACTION COALITION, | ) | |
| | ) | |
| Defendant-Intervenor. | ) | |
| | ) | |

**DEFENDANT'S RESPONSE TO PLAINTIFFS'**
**MOTIONS FOR JUDGMENT ON THE ADMINISTRATIVE RECORD**

Pursuant to Rule 56.2 of the United States Court of International Trade, defendant, the

United States, respectfully responds to the motions for judgment on the administrative record

filed by plaintiffs, Grupo Simec S.A.B. de C.V.; Aceros Especiales Simec Tlaxcala, S.A. de

C.V.; Compania Siderurgica del Pacifico S.A. de C.V.; Fundiciones de Acero Estructurales, S.A.

de C.V.; Grupo Chant S.A.P.I. de C.V.; Operadora de Perfiles Sigosa, S.A. de C.V.; Orge S.A.

de C.V.; Perfiles Comerciales Sigosa, S.A. de C.V.; RRLC S.A.P.I. de C.V.; Siderúrgicos

Noroeste, S.A. de C.V.; Siderurgica del Occidente y Pacifico S.A. de C.V.; Simec International 6

S.A. de C.V.; Simec International, S.A. de C.V.; Simec International 7 S.A. de C.V.; and Simec

International 9 S.A. de C.V. (collectively, Simec), ECF No. 43 (Simec Br.), and consolidated

plaintiff and plaintiff-intervenor, Grupo Acerero S.A. de C.V. (Grupo Acerero) and Gerdau

Corsa S.A.P.I. de C.V. (Gerdau Corsa), ECF No. 45 (Grupo Acerero Br.), challenging the

Department of Commerce's (Commerce) final results of the 2019-2020 administrative review of

the antidumping duty order covering steel concrete reinforcing bar (rebar) from Mexico.  As

explained below, the motions should be denied because Commerce's determination is supported

by substantial evidence and is otherwise in accordance with law.

## STATEMENT PURSUANT TO RULE 56.2

### I.     The Administrative Determination Under Review

The administrative determination under review is the final results of the administrative

review of the antidumping duty order covering rebar from Mexico.  *See Steel Concrete*

*Reinforcing Bar From Mexico*, 87 Fed. Reg. 34,848 (Dep't of Commerce June 8, 2022) (final

results), Appx007781-007784, and the accompanying Issues and Decision Memorandum (IDM),

Appx007713-007757; *see also* Grupo Simec Questionnaire Deficiencies Analysis (Deficiencies

Memorandum) (Dep't of Commerce June 1, 2022), Appx007817-007841, Appx091515-091539.

The period of review is November 1, 2019, through October 31, 2020.

### II.    Issues Presented for Review

1.     Whether Commerce acted within its discretion when it denied certain of Simec's

extension requests.

2.     Whether Commerce's application of total facts available with an adverse

inference to Simec is based on substantial evidence and in accordance with law.

3.     Whether the rate Commerce selected for Simec, as total adverse facts available

with an adverse inference, is supported by substantial evidence and in accordance with law.

4.    Whether Commerce's calculation of the rate assigned to companies not selected for individual examination is supported by substantial evidence and in accordance with law.

## STATEMENT OF FACTS

**I.    Initiation Of The Administrative Review**

Commerce issued and published an antidumping duty order in the Federal Register in November 2014, covering rebar from Mexico.  *See Steel Concrete Reinforcing Bar From Mexico: Antidumping Duty Order*, 79 Fed. Reg. 65,926 (Dep't of Commerce Nov. 6, 2014) (Order).  In November 2020, petitioners filed a request for review of the Order and Commerce initiated a review on January 6, 2021.  *See* Petitioners' Request for Administrative Review, Appx001004-001008; Initiation Notice, Appx001040-001046.

In February 2021, Commerce selected Deacero S.A.P.I. de C.V. (Deacero) and Simec as mandatory respondents, reflecting their status as the two largest exporters and/or producers of rebar in Mexico.  *See* Commerce's Respondent Selection Memorandum, Appx001088-001093.  Commerce issued an initial questionnaire to both respondents that same day.  *See* Commerce's Initial Questionnaires, Appx001094-001397.  Deacero and Simec timely filed their responses.  *See* Simec's Section A Resp. (Mar. 8, 2021), Appx001414-003525; Deacero's Section A Resp. (Mar. 11, 2021), Appx003537-003694; Simec's Section B & C Resp. (Mar. 31, 2021), Appx003787-004003; Deacero's Section B & C Resp. (Mar. 31, 2021), Appx004004-004260; Simec's Appendix VI (Apr. 5, 2021), Appx004261-004265; Simec's Section D Resp. (Apr. 7, 2021), Appx004266-004427; Deacero's Section D Resp. (Apr. 8, 2021), Appx004428-004691; Simec's Section B Affiliates Sales Resp. (Apr. 12, 2021), Appx004710-004727.  However, Simec timely filed its responses only after requesting several extension requests which Commerce granted – either partially or in full – to account for what Simec asserted were

COVID-19-related delays.  In total, Commerce granted three extension requests from Simec.  *See* Commerce's Resp. to Simec's Section A Extension Request, Appx001409; Commerce's Resp. to Simec's Sections B-D Extension Request, Appx003528; Commerce's Resp. to Simec's Sections B-C and Section D Extension Requests, Appx003715.  As a result, Commerce granted Simec "between one week and four weeks of additional time" to submit all of its responses.  IDM at 7, Appx007719.

**II.**　　**Simec's Supplemental Questionnaire Responses**

Commerce issued two supplemental questionnaires to Simec regarding Sections A-C and A&D of the initial questionnaire on July 27 and August 4, 2021, respectively.  *See* Simec A-C First Supp. Questionnaire, Appx004873-004889; *see also* A&D Second Supp. Questionnaire, Appx004890-004903.  Simec also requested a series of extensions to respond to both supplemental questionnaires, which Commerce partially granted, postponing the deadlines until weeks after the original August deadlines.  *See* Commerce's Resp. to Simec's Extension Request, Appx004907.  As a result of these extensions, September 7 and September 9, were Simec's new deadlines for sections A-C and A&D of the supplemental questionnaires, respectively.  *See* Commerce's Resp. to Simec's A-C Extension Request, Appx004944; Commerce's Resp. to Simec's A&D Extension Request, Appx004953.  With respect to the A&D supplemental questionnaire, Simec timely submitted its response on September 10, but only after Commerce granted yet another one-day extension.  *See* Simec's A&D Supp. Questionnaire Resp., Appx006288-006514.

However, in the late evening on September 6, the night before the deadline, Simec submitted another extension request for the A-C supplemental questionnaire response, asking for two additional weeks to respond.  *See* Simec's A-C Supp. Questionnaire Resp. Extension

Request, Appx004954-004957.  Commerce denied this request after Simec failed to provide good cause for extending the deadline.  *See* Commerce's Denial of Simec's A-C Supp. Questionnaire Resp. Extension Request, Appx0049558.

Nonetheless, on September 7, at 4:29 p.m. Eastern Standard Time, Simec submitted yet another extension request, just a half-hour before the deadline.  *See* Simec's A-C Supp. Questionnaire Resp. Extension Request, Appx004959-004961.  Simec was on notice that "if {Commerce} is not able to notify the party requesting the extension of the disposition of the request by 5:00 p.m., then the submission would be due by the opening of business (8:30 a.m.) on the next work day."  *Extension of Time Limits Preamble*, 78 Fed. Reg. 57,792, 57,795 (Dep't of Commerce Sept. 20, 2013).  Indeed, because Commerce did not respond to Simec's extension request before 5:00 p.m. on September 7, the deadline automatically moved to 8:30 a.m. on September 8.  *See id.*  Commerce formally denied the extension request on September 9.  *See* Commerce's Resp. to Simec's Request for Extension, Appx006282-006283.

But Simec failed to timely respond to the A-C supplemental questionnaire by the automatically extended September 8 deadline.  *See* Simec's A-C Supp. Questionnaire, Appx004973-006278.  Rather, on October 18, *40 days* after the actual September 7 deadline and automatically extended September 8 8:30 a.m. deadline, Simec filed a submission containing the information Commerce had requested in the A-C supplemental questionnaire.  *See* Simec Proposed October 18 Filing, Appx006625-006628.  Commerce rejected this submission as untimely.  *See* Commerce's Denial of Simec's October 18 Filing, Appx007108-007109.

III.   **The Preliminary Results**

Commerce published the preliminary results on December 3, 2021.  *See* Commerce's Preliminary Results, Appx007207-007217; Commerce's Preliminary Results Issues and Decision

Memorandum (PDM), Appx007218-007237.  Commerce preliminarily applied facts available

with an adverse inference to Simec because of its repeated failures in responding to Commerce's

requests for information.  PDM at 4-5, Appx007221-007222.  For example, Commerce explained

that even for the information that Simec had submitted, it "continued to fail to provide

information Commerce requested, stated that various errors or discrepancies had been corrected

but had, in fact, not corrected these issues, and provided supporting documentation which

indicated that certain reported data were incorrect."  *Id.* at 5, Appx007222; *id.* at 5-7,

Appx007222-007224 (explaining the deficiencies in home market sales data, U.S. sales data, and

downstream sales data).  Commerce preliminarily determined to apply an adverse inference to

Simec because it found that Simec "has failed to cooperate by not acting to the best of its ability

in failing to remedy the errors identified by Commerce as well as failing to submit requested

information within the established deadline."  *Id.* at 8, Appx007225.

Commerce then assigned Simec a dumping margin of 66.70 percent, which is the same

margin that had been assigned to Simec during the underlying investigation.  *See id.* at 9,

Appx007226.  Also, Commerce explained that it did not need to corroborate the dumping margin

and the "rate is at a level which does not permit Grupo Simec to benefit from its lack of

cooperation in this review."  *Id.*; *see also* 19 U.S.C. § 1677e(b); 19 C.F.R. § 351.308(c).

With respect to Deacero, the other mandatory respondent, Commerce calculated a zero

rate.  *See* PDM at 10, Appx007227.  In accordance with 19 U.S.C. § 1673(d)(c)(5)(B),

Commerce preliminarily applied a simple average of Deacero's and Simec's assigned rates to

Grupo Acerero and Sidertul S.A. de C.V. (Sidertul)[1] – the only other companies with reviewable

---

[1]  According to Gerdau Corsa, it is the successor-in-interest to Sidertul as of December 1,
2021.  *See* Grupo Acerero Br. at 1 n.1.

transactions during the period of review.  *See id.*  This simple average resulted in a rate of 33.35 percent for the non-selected companies.

IV.   **The Final Results**

Commerce published its final results on June 8, 2022.  *See generally* IDM, Appx007713-007757.  In the final results, Commerce continued to apply facts available with an adverse inference.  *See id*. at 1, Appx007713.  Concurrent with the final results, Commerce also issued the public version of the Deficiencies Memorandum, detailing the significant shortcomings of Simec's submissions.  *See* Deficiencies Memorandum, Appx007817-007841.  While the majority of the Deficiencies Memo contains confidential business proprietary information[2], a broad overview of these deficiencies shows multiple categories of information suffering from inaccurately reported or missing information, including home market sales data, U.S. sales data, and cost data.  *See id.*

For example, due to clerical errors in the Control Number (CONNUM) data which Simec failed to resolve in its supplemental questionnaire response, Commerce determined that it "could not confidently conclude that Grupo Simec correctly reported its CONNUMs . . . {which} calls into question whether *any* of the data in the home market sales submission is reliable and, by extension, whether any dumping margin calculated by Commerce with this data could be considered accurate."  *Id.* at 3, Appx007819.  Other deficiencies identified by Commerce include missing or unsubstantiated warehousing expenses (USWAREHU), international freight (INTNFRU) costs, and the entered value (ENTVALUE) of goods in the United States, though

---

[2] After the Court granted our motion to correct the administrative record, the confidential version of the Deficiencies Memorandum, Appx091515-091539, was placed on the record.

Commerce highlighted more than a dozen other areas of concern.  *See generally id.*,
Appx007817-007841.

Thus, Commerce continued to apply the 66.70 percent rate to Simec that Commerce had
determined in the preliminary results.  *See* IDM at 32-35, Appx007744-007747.  Commerce also
affirmed Deacero's *de minimis* rate, and in accordance with 19 U.S.C. § 1673(d)(c)(5)(B),
applied an average of the rates assigned to Deacero and Simec to the non-selected companies–
Grupo Acerero and Sidertul – which had reviewable transactions during the period of review.
*See id.* at 40-45, Appx007752-007757.  This resulted in a final dumping margin of 33.35 percent
to the two non-selected companies.

## SUMMARY OF THE ARGUMENT

Commerce's application of facts available with an adverse inference to Simec is
supported by substantial evidence and in accordance with law.  First, although Commerce
granted several extensions of time to Simec for it to respond to the initial questionnaires and
supplemental questionnaires, Simec failed to timely submit all of the requested information or
the information submitted was deficient.  Commerce also acted within its discretion when it
denied Simec's request for a two-week extension the night before the deadline for its A-C
supplemental questionnaire response; indeed, Simec exceeded even its *own* requested two-week
extension when it attempted to file the response 40 days after the deadline.

Second, the pervasiveness of the deficiencies throughout Simec's responses supports
Commerce's application of total facts available with an adverse inference.  Simec's deficiencies
included information related to the home market sales data, U.S. sales data, and downstream
sales data, to the extent that Commerce determined that it could not trust the veracity of *any* of
Simec's information.  Relatedly, Commerce followed its practice when it assigned Simec the

66.70 percent dumping margin from the original investigation, which was the rate that Simec had previously been assigned.

Further, Commerce's calculation of the rate for the non-selected companies was based on long-standing practice and is consistent with the statute and the Statement of Administrative Action.  Statement of Administrative Action Accompanying the Uruguay Round Agreements Act, H.R. Doc. 103-316, Vol. 1 (1994) (SAA).  Pursuant to 19 U.S.C. § 1673(c)(5)(B), Commerce used "any reasonable method," which, in this case, was to use the simple average of Simec's facts available with an adverse inference margin and Deacero's zero margin.  Indeed, this simple average of the margins is a scenario expressly contemplated by the SAA.

## ARGUMENT

I.   **Applicable Legal Framework**

A.   **Standard Of Review**

In reviewing Commerce's antidumping duty determinations, "the Court of International Trade must sustain 'any determination, finding or conclusion' found by Commerce unless it is 'unsupported by substantial evidence on the record, or otherwise not in accordance with law.'" *Fujitsu Gen. Ltd. v. United States*, 88 F.3d 1034, 1038 (Fed. Cir. 1996) (quoting 19 U.S.C. § 1516a(b)(1)(B)(i)).  "The specific factual findings on which {Commerce} relies in applying its interpretation are conclusive unless unsupported by substantial evidence."  *United States v. Eurodif S.A.*, 555 U.S. 305, 316 n.6 (2009).

This Court sustains Commerce's determinations unless they are "unsupported by substantial evidence on the record, or otherwise not in accordance with law."  19 U.S.C. § 1516a(b)(1)(B)(i).  Substantial evidence is defined as "more than a mere scintilla," and "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."

*Universal Camera Corp. v. NLRB*, 340 U.S. 474, 477 (1951) (*quoting Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)); *see also PAM, S.p.A. v. United States*, 582 F.3d 1336, 1339 (Fed. Cir. 2009).  The requisite proof may be "less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent {Commerce's} finding from being supported by substantial evidence."  *Consolo v. Fed. Mar. Comm'n*, 383 U.S. 607, 620 (1966) (citation omitted).  In that vein, "{i}t is not within the Court's domain either to weigh the adequate quality or quantity of the evidence for sufficiency or to reject a finding on grounds of a differing interpretation of the record."  *Timken Co. v. United States*, 699 F. Supp. 300, 306 (Ct. Int'l Trade 1988) (citation omitted), *aff'd* 894 F.2d 385 (Fed. Cir. 1990).  Rather, when Congress has entrusted an agency to administer a statute that demands inherently fact-intensive inquiries, such as in this case, the agency's conclusions must fall only if the record contains evidence "so compelling that no reasonable factfinder" could reach the same conclusion.  *See INS v. Elias-Zacarias*, 502 U.S. 478, 483-84 (1992); *accord Nucor Corp. v. United States*, 612 F. Supp. 2d 1264, 1287 (Ct. Int'l Trade 2009).

### B.    Application Of Facts Available With An Adverse Inference

Commerce will use facts otherwise available to fill gaps in the record if (1) necessary information is not available or (2) an interested party withholds information requested by Commerce, fails to provide the information by the deadline or in the manner requested, significantly impedes the proceedings, or provides information that cannot be verified.  19 U.S.C. § 1677e(a).

If Commerce finds that a respondent has failed to cooperate by not acting "to the best of its ability to comply with a request for information," it may apply an adverse inference in its selection of facts otherwise available. 19 U.S.C. § 1677e(b).  Indeed, Commerce may apply an

adverse inference for a respondent's "failure to cooperate to the best of respondent's ability, *regardless of motivation or intent*."  *Nippon Steel Corp. v. United States*, 337 F.3d 1373, 1382-83 (Fed. Cir. 2003) (emphasis added).  A respondent fails to act to the best of its ability when it does not exert "maximum effort to provide Commerce with full and complete answers to all inquiries in an investigation."  *Id*.  Further, the standard requires that importers "conduct prompt, careful and comprehensive investigations of all relevant records that refer or relate to the imports in question to the full extent of the importers' ability to do so."  *Id*.; *see Nan Ya Plastics Corp. Ltd. v. United States*, 810 F.3d 1333, 1347 (Fed. Cir. 2016) ("Congress decided what requirements Commerce must fulfill in reaching its determinations, § 1677e(b), and we do not impose conditions not present in or suggested by the statute's text.").

"Because Commerce lacks subpoena power, Commerce's ability to apply adverse facts is an important one."  *Essar Steel Ltd. v. United States*, 678 F.3d 1268, 1276 (Fed. Cir. 2012).  Thus, "{t}he purpose of the adverse facts statute is 'to provide respondents with an incentive to cooperate' with Commerce's investigation."  *Id.* (quoting *F.lli De Cecco Di Filippo Fara S. Martino S.p.A. v. United States*, 216 F.3d 1027, 1032 (Fed. Cir. 2000)).

In selecting an adverse facts available rate, Commerce may rely on information from: (1) the petition; (2) the final determination in the investigation; (3) any previous administrative review; or (4) any other information placed on the record.  *See* 19 U.S.C. § 1677e(b); 19 C.F.R. § 351.308(c).  When selecting an adverse rate from among the possible sources, Commerce seeks to use a rate that is sufficiently adverse to effectuate the statutory purpose of inducing respondents to provide Commerce with complete and accurate information in a timely manner. *See Ozdemir Boru San. Ve Tic. Ltd. v. United States*, 273 F. Supp. 3d 1225, 1245 (Ct. Int'l Trade

2017).  This ensures "that the party does not obtain a more favorable result by failing to

cooperate than if it had cooperated fully."  SAA, 1994 U.S.C.C.A.N. at 4199.

## II.    Commerce's Application Of Total Facts Available With An Adverse Inference To Simec Is Supported By Substantial Evidence And In Accordance With Law

Commerce reasonably applied total facts available with an adverse inference to Simec for

its repeated failure to submit complete and accurate responses to the initial and supplemental

questionaries, which Commerce issued during the period of review.  Throughout this review, the

record lacked necessary and usable information under 19 U.S.C. § 1677e(a)(1).  Specifically,

Simec failed to provide home market data, U.S. sales data, and downstream sales data, despite

repeated requests by Commerce.  *See* Deficiencies Memo, Appx007817-007841, Appx091515-

091539.

To conduct its antidumping duty calculations, Commerce requires that mandatory

respondents provide accurate and reliable data for these three categories.  *See id*.  Simec's failure

to submit information, to follow settled procedures, and to meet deadlines under 19 U.S.C.

§ 1677e(a)(2)(B), despite Commerce's attempts to accommodate the respondent and grant

unusually long extensions, demonstrates that Simec did not cooperate to the best of its ability,

thereby significantly impeding this review.  Because Simec significantly impeded Commerce's

review, Commerce's decision to apply an adverse inference when selecting from the facts

available is based on substantial evidence and in accordance with law.

### A.    Commerce Did Not Abuse Its Discretion When It Rejected Simec's Extension Request For Responding To The A-C Supplemental Questionnaire, And Declined To Accept The October 18 Filing

Generally, Simec challenges Commerce's finding that its submissions were deficient

under 19 U.S.C. § 1677e(a)(1) and 19 U.S.C. § 1677e(a)(2), which permits Commerce to make

facts available determinations.  *See* 19 U.S.C. § 1677e(a).  Under 19 U.S.C. § 1677e(a)(1),

Commerce may apply facts otherwise available when necessary information is not available on the record.  Commerce's Deficiencies Memo outlines the information that is missing and necessary for Commerce to calculate an antidumping margin, including home market, U.S. sales, and downstream sales data.  *See* Deficiencies Memo, Appx007817-007841, Appx091515-091539.  Despite overwhelming evidence of its deficiencies, Simec argues without support "that the vast majority of {its} information was reliable and usable."  Simec Br. at 4.  Simec ultimately retreats to the position that if its responses were inadequate, Commerce is to blame, because the agency did not issue *additional* supplemental questionnaires and denied Simec's extension requests as well as its proposed October 18 Filing.  *See id.* at 3.  These arguments lack merit.

First, Simec argues that Commerce violated 19 U.S.C. § 1677m(d) by not issuing additional supplemental questionnaires, Simec Br. at 29-31.  But Simec received two supplemental questionnaires, which satisfies Commerce's obligation to provide respondents "to the extent practicable, . . . *an opportunity* to remedy or explain the deficiency" in their initial responses.  19 U.S.C. § 1677m(d) (emphasis added).  Importantly, Commerce shall provide the respondent "an opportunity," not "opportunities" to remedy deficient information.  *Mukand Ltd. v. United States,* 767 F.3d 1300, 1304 (Fed. Cir. 2014).  Contrary to Simec's assertion that *Mukand* stands for the proposition that Commerce must issue multiple supplemental questionnaires, *Mukand* merely restates the statutory language quoted above.  *See id.* Commerce's issuance of more than one supplemental questionnaire in any proceeding is tied to the facts of that proceeding and is *not* required by statute.  Thus, although Simec's argument hinges on the premise that had Commerce issued a *third* supplemental questionnaire, it would have corrected its responses and avoided the application of an adverse inference, *see* Simec Br. at 31, that is pure speculation and unsupported by the record.  Indeed, in the final results,

Commerce explained that "the deficiencies contained in the supplemental questionnaire responses and evaluated in the Preliminary Results were all deficiencies that arose in the initial questionnaire responses and that Grupo Simec failed to correct or explain in the supplemental questionnaire responses, despite being given an opportunity to do so."  IDM at 15, Appx007727.

Second and relatedly, Simec argues that had Commerce granted its extension request, Simec's submissions would have been useable.  Simec Br. at 38.  As an initial matter, Commerce explained in the final results that Simec "did not attempt to submit this information in accordance with the extension it requested," and instead submitted the filing twenty-nine days *after* the proposed deadline that it had originally sought and well-after the September 7 deadline established by Commerce.  IDM at 18, Appx007730.  Although Simec speculates that Commerce "accepting {its} Proposed October 18 Filing would undoubtedly have yielded more accurate dumping margins," its claim is unsupported by the record.  Simec Br. at 35.

Indeed, the deficiencies associated with Simec's Proposed October 18 Filing undermine this argument.  As Commerce explained in the final results, it "has no basis for determining how to implement corrections to the deficient data or that any such changes would resolve the discrepancies such that they would result in an accurate dumping margin."  IDM at 16, Appx007728.  Moreover, Simec submitted information in its October 18 Filing that was not merely corrective, but that instead constituted new factual information submitted after the deadline in breach of 19 C.F.R. § 351.301(b), as Commerce explained in the final results.  *See id.* at 18, Appx007730.  Simec also attempted to submit downstream sales data which was missing from its responses to the A-C supplemental questionnaire.  *See* Commerce's Denial of Simec's October 18 Filing, Appx007108-007109.  Commerce is not required to calculate what a respondent's rate would have been had it cooperated and complied with requests for information,

which, in this case, would have been the timely submission of its responses to the supplemental questionnaires.  *See* 19 U.S.C. § 1677e(b)(1)(B).

Third, Simec alleges that Commerce applied its standards inconsistently.  Simec faults Commerce for allowing Deacero, the other mandatory respondent, to submit a response to its second supplemental questionnaire on October 18, while rejecting Simec's proposed filing on the same date.  *See* Simec Br. at 25-26.  However, unlike Deacero, who cooperated fully and submitted timely responses, Commerce explained that Simec "required a significant amount of time to prepare its first supplemental questionnaire responses . . . {which reflects how} as the administrative process runs its course, the deadlines and requests for information from each respondent diverge and, as such, Commerce's deadlines for one respondent are not comparable with those of another."  IDM at 18, Appx007730.  Commerce exercises its discretion when assigning deadlines and considers the particular facts attributable to each respondent.  *See Trinity Mfg., Inc. v. United States*, 549 F. Supp. 3d 1370 (Ct. Int'l Trade 2021), *aff'd*, 2023 WL 234228 (Fed. Cir. 2023).  Similar to *Trinity*, in which the Court held that Commerce had not acted arbitrarily or capriciously by refusing to grant an extension because the respondent failed to "demonstrat{e} that Commerce granted an untimely extension request under facts analogous to those of this case," 549 F. Supp. 3d at 1379, here, Simec has failed to show that the facts underlying Deacero's conduct with Commerce are materially similar to its own, nor has it even presented an analogous case where Commerce granted an extension.  *See Trinity*, 2023 WL at *234228.

For this very same reason, Commerce is not bound by its prior fact-specific determinations to grant extensions to Deacero rather than Simec.  The cases which Simec cites do not "contemplate whether a respondent was afforded sufficient time to respond to a

questionnaire or whether Commerce had unfairly rejected a request for extension."  IDM at 13,

Appx007725.  For example, in *Shelter Forest International Acquisition, Inc. v. United States*,

497 F. Supp. 3d 1388 (Ct. Int'l Trade 2021), the Court remanded Commerce's decision to deny

an untimely submission by a voluntary respondent who had not received a 19 U.S.C. § 1677m(d)

deficiency notice during a later-developed merchandise inquiry.  Unlike *Shelter Forest*, here,

Simec is a mandatory respondent who was aware of the deficiencies submitted in its initial

questionnaire responses as part of a standard administrative review.  *See* IDM at 13,

Appx007725.

Fourth, Simec contends that Commerce's denial of its extension request was an abuse of

discretion because Commerce included a statement in its responses to Simec's extension requests

after September 1, 2021, that the agency *was unlikely to grant* future extensions.  *See* Simec Br.

at 21.  Simec's cites *Celik Halat ve Tel Sanayi A.S. v. United States*, 557 F. Supp. 3d 1348 (Ct.

Int'l Trade 2022), in which this Court held that Commerce's statement "that it *would not grant*

any further extensions of deadlines for questionnaire responses in advance of the filing deadline"

constituted an abuse of discretion.  Simec Br. at 21 (emphasis added).  But unlike *Celik Halat*,

557 F. Supp. 3d at 1360, here, Commerce was not "foreclos{ing} any future extension

whatsoever . . . even one necessitated by what Commerce might consider an 'extraordinary

circumstance' as described by 19 C.F.R. § 351.302(c)."  Simec Br. at 22.  Rather, Commerce

tempered its language and inserted the conditional term "unlikely" to signify that barring a

change to the *status quo ante*, Simec was on notice that further extensions might interfere with

Commerce's ability to enforce the timeframe provided in its regulations.  *See* IDM at 13,

Appx007725; *see, e.g.*, *ArcelorMittal USA LLC v. United States*, 399 F. Supp. 3d 1271, 1280

(Ct. Int'l Trade 2019) ("Here, Commerce set deadlines consistent with the procedures established

16

for similar circumstances and explained its rationale for rejecting {the respondent's} untimely submission."); *Dongtai Peak Honey Indus. Co. v. United States*, 777 F.3d 1343, 1352 (Fed. Cir. 2015) ("Commerce was not required to demonstrate good cause for rejecting Dongtai Peak's untimely submissions.").  Indeed, Commerce explained in the final results that its "unlikely" statement was "purposeful, as {Commerce} appreciated that, while {it} believed that the six weeks granted to Grupo Simec was sufficient time to prepare and submit its responses, certain situations may have arisen (*e.g.*, issues while filing the responses) that would have justified providing additional time."  IDM at 13, App007725.

Moreover, Commerce did not apply the *Extension of Time Limits Preamble* in a draconian manner (which allowed for a next business day 8:30 a.m. filing), nor did it run afoul of *NTN Bearing Corp. v. United States*, 74 F.3d 1204 (Fed. Cir. 1995).  Unlike in *NTN*, in which the Court held that Commerce's "refusal to consider {a respondent's} request for correction of clerical errors . . . constituted an abuse of discretion," 74 F.3d at 1208-1209, here, Simec's submission did not include corrections of a merely clerical nature.  Rather, it included new information, and failed to address deficiencies identified by Commerce in prior notices.  *See* Commerce's Denial of Simec's October 18 Filing, Appx007108-007109.

Also, despite Simec's two requests made the evening before and 30 minutes before the deadline, Simec failed to meet the automatic extension provided for in the *Extension of Time Limits Preamble*, which would have made a submission by 8:30 a.m. on September 8 timely. *See* Simec's A-C Supp. Questionnaire Resp. Extension Request, Appx004954-004957; Simec's A-C Supp. Questionnaire, Appx004973-006278; Simec's A-C Supp. Questionnaire Resp. Extension Request, Appx004959-004961.  Instead, even after Commerce had denied Simec's extension requests, rather than file an extension to file out of time (and submit good cause for

doing so), Simec chose to ultimately file the A-C supplemental questionnaire response *40 days past* the original deadline, which Commerce rejected.  *See* Simec Proposed October 18 Filing, Appx006625-006628; *see also* IDM at 18, Appx007730 ("If Grupo Simec believed that it could submit untimely-filed responses, as it attempted to do on October 18, 2021, it is notable that they did not attempt to submit this information in accordance with the extension it requested."). Moreover, as Commerce explained in the final results, Simec "never explained why the information was late nor did it attempt to show that it qualified for the information to be accepted on the basis of Commerce's regulatory provisions for extraordinary circumstances." IDM at 18-19, Appx007730-007731.  Simec offers no authority, nor are we aware of any, that supports its proposition that Commerce was required to accept the untimely filing here.

Finally, Simec argues that despite Commerce's authority to grant or deny extensions, its decision to do so in this case constituted an abuse of discretion because Commerce would have incurred a minimal burden by accepting Simec's Proposed October 18 Filing.  *See* Simec Br. at 22-25.  Simec's reliance on *Grobest & I-Mei Industrial (Vietnam) Co., Ltd. v. United States*, 815 F. Supp. 2d 1342 (Ct. Int'l Trade 2012), in support of its argument is misplaced.  In *Grobest*, the Court held that Commerce abused its discretion by denying a separate rate certification submitted 95 days after the deadline because the company had received a separate rate since the initial investigation.  *Id.* at 1365.  Specifically, the Court in *Grobest* held that the burden of reviewing a separate rate application where no significant changes were made from any of the previous separate rate applications was not great, so it was an abuse of discretion for Commerce to assign the company the Vietnam-wide rate of 25.76 percent when it should have continued to receive its 4.27 percent separate rate.  *Id*.  Unlike in *Grobest*, where the information that Commerce actually needed was minimal, Simec failed to respond to *multiple* questions in

Commerce's questionnaires and provided incomplete responses to many others.  Moreover,
Simec's Proposed October 18 Filing was filed well-after the September 7 deadline and spanned a
multitude of missing or inaccurate data and information fields.  *See* IDM at 18-19, Appx007730-
07731; *see also* Deficiencies Memorandum, Appx091515-091539.  Given the extent of the
information still outstanding from Simec's submissions, the October 18 Filing would have
imposed a significant burden on Commerce and disrupted the agency's timetable, the
enforcement of which is governed by Commerce's reasoned discretion.  *See* IDM at 18-19,
Appx007730-07731; *see also ArcelorMittal USA LLC v. United States*, 399 F. Supp. 3d 1271,
1279 (Ct. Int'l Trade 2019).

Likewise, Simec's reliance on *Pro-Team Coil Nail Enterprises, Inc. v. United States*, 419
F. Supp. 3d 1319 (Ct. Int'l Trade 2019), is also misplaced.  In *Pro-Team Coil*, the respondent
submitted its Quality and Value schedule seven days after the deadline and the Court found that
"any burden would appear to be minimal given that the Q{uality} and V{alue} Schedule
summarized information already on the record and confirmed Pro-Team's early assertion that
normal value would be based on constructed value." *Id.* at 1332.  But here, Simec submitted its
Proposed October 18 Filing *40 days after the deadline* and included data that was not easily
verifiable or that previously was not on the record.  IDM at 18-19, Appx007730-007731; *see
also* Deficiencies Memorandum, Appx091515-091539.  Simply put, Simec has failed to cite to a
case with *analogous facts* where the Court has rejected Commerce's reasoned decision not to
accept information submitted by a respondent after the deadline.

Thus, Commerce's decisions to both deny Simec's extension requests and to reject
Simec's proposed October 18 filing is supported by substantial evidence and in accordance with
law.  *See id.*; 19 C.F.R. § 351.301(b).

**B.** **Substantial Evidence Supports Commerce's Determination To Apply Total Facts Available With An Adverse Inference**

When Commerce determines that it is appropriate to apply facts otherwise available, it is also authorized to consider whether to apply an adverse inference under 19 U.S.C. § 1677e(b). To apply an adverse inference, Commerce must find that the respondent "has failed to cooperate by not acting to the best of its ability to comply with a request for information." 19 U.S.C. § 1677e(b)(1). In this case, after consideration of the evidence on the record, Commerce determined that Simec failed to cooperate to the best of its ability and applied an adverse inference in selecting from the facts otherwise available. *See* IDM at 24-29, Appx007736-007741. To wit, Commerce made repeated requests to Simec, but did not receive adequate responses about its home market sales data, U.S. sales data, and cost reporting data, which made Simec's data unusable. *See id.*; *see generally* Deficiencies Memorandum, Appx091515-091539.

**1.** **Substantial Evidence Supports Commerce's Determination To Apply Facts Available**

In the preliminary results, Commerce explained why it was necessary to resort to facts available with respect to Simec. *See* PDM at 4-7, Appx007221-007224. Not only did Commerce identify a "significant number of deficiencies," but these "deficiencies covered all aspects of Grupo Simec's responses and included issues such as failure to provide supporting documentation, unexplained calculations, and errors and discrepancies within and between the data and supporting documentation." *Id.* at 4, Appx007221. Although Commerce provided Simec an opportunity to remedy these deficiencies, Simec entirely "failed to provide any responses to the questions related to downstream sales" and its representation that certain issues had been corrected was incorrect because "various errors or discrepancies" had not, in fact, been corrected. *Id.* at 5, Appx007222.

In the final results, Commerce continued to find that there was a gap in the record based on Simec's failure to provide the requested information. *See* IDM at 24-27, Appx007736-007739.  Commerce rejected Simec's assertion that its submitted data was usable and noted that Simec "attempts to discount these deficiencies as either issues that Commerce could easily fix on its own or that are immaterial to the analysis, contending that these are not insurmountable issues and support a conclusion that Grupo Simec's data are reliable." *Id.* at 24, Appx007736.  Commerce then explained, at length, Simec's various deficiencies regarding its home market sales data and U.S. sales data in the Deficiencies Memorandum, *see* Deficiencies Memorandum, Appx091515-091539, and we address each in turn.[3]

*Home Market Sales Data*

Commerce explained that 11 separate categories of data related to home market sales data were deficient:  (1) control number; (2) minimum specified yield strength; (3) date of receipt of payment; (4) payment terms; (5) quantity adjustments; (6) delivery terms and inland freight – plant/warehouse to customer; (7) insurance and inland freight – plant/warehouse to customer; (8) credit expenses; (9) domestic inventory carrying costs; (10) packing expenses; and (11) downstream sales.  *Id.* at 2-15, Appx091516-091529.

*First*, for control numbers, Commerce explained that it is "vital" that this be reported correctly because "{f}ailure to correctly report them may result in Commerce matching the wrong sales to each other in the margin calculations and thus, returning an inaccurate dumping margin." *Id.* at 2, Appx091516.  Commerce explained, for example, that it had identified the deficiencies and discrepancies related to the minimum specified yield strength control number,

---

[3]  Although petitioners also alleged that there were deficiencies with Simec's cost data, Commerce ultimately determined that Simec's explanation about certain alleged discrepancies was sufficient.  *See* Deficiencies Memorandum at 23-24, Appx091537-091538.

but Simec "failed to provide any explanation for the discrepancy," and, as a result, Commerce could not be sure that "any of the data in the home market sales submission is reliable and, by extension, whether any dumping margin calculated by Commerce with this data could be considered accurate." *Id.* at 3, Appx091517.

*Second*, for minimum specified yield strength, Commerce pointed out that Simec had reported codes of "1" and "7," and Simec only responded that it reported the code as "4," but failed to address the discrepancy of still using "1" and "7." *Id.* Commerce rejected Simec's suggestion that Commerce could just change all of the codes to a "4" because "Commerce would also have to wade into determining how to update those calculations and the data assigned to any corresponding sales." *Id.* at 4, Appx091518. Also, "Commerce has no basis for determining whether any of the information reported in this product characteristic field is accurate and, because this affects every {control number} in the home market database, Commerce cannot conclude that the home market data in its entirety is reliable or would result in an accurate dumping margin." *Id.*

*Third*, for date of receipt of payment, Commerce explained that Simec had left some payment dates blank and even after it had requested this information to be updated in a supplemental questionnaire, Simec still had [ █ ] blank payment dates. *Id.* Commerce explained that it was important for payment dates to be accurately reported because they are "used to calculate credit expenses and credit expenses are part of the margin calculation." *Id.* Commerce also explained that this "calls into question whether there are other issues with the reported payment dates and whether this information is, in fact, accurate." *Id.* at 5, Appx091519.

*Fourth*, for payment terms, Simec inexplicably provided "a variety of new payment term codes that had not been previously reported to Commerce" in a supplemental questionnaire

response, and provided no explanation for how to clarify the codes used. *Id.* Simec also failed to explain "how it would determine which sales required re-classification" and "the fact remains that the respondent indicated that some portion of its [ ▉ ] sales had mis-reported payment terms that needed to be corrected and, in spite of stating that they had done so, it did not." *Id.* at 6, Appx091520.

*Fifth*, for quantity adjustments, in a supplemental questionnaire, Commerce had requested that Simec clarify some billing adjustments (credit notes to customers) for "[ ▉

▉ ]," but Simec only updated the name of the field in the database and "did not convert these reported values from price to quantity." *Id.* at 7, Appx091521. As a result, Commerce explained that "not only did Grupo Simec not comply with Commerce's request to remedy this deficiency, but it also means that Commerce cannot adjust the quantity of the sale for these reported changes." *Id.* Commerce cited one example where invoice 74974 "is reported to have had [ ▉ ], each with a unit price of [ ▉ ]," but none of the invoices or linked information matched that data, and the "reported sale date for this invoice was [ ▉ ] while the supporting documentation appears focused on transactions that happened in [ ▉ ]." *Id.*; *id.* at 8, Appx091522 (explaining that "Simec was asked to report the data a certain way that would have ensured the most accurate reporting necessary but failed to do so.").

*Sixth*, for delivery terms and inland freight – plant/warehouse to customer, Commerce explained that in Simec's supplemental questionnaire response, it "appeared that the terms of delivery and/or freight provided in the initial questionnaire response may not have been correctly reported because some sales reported [ ▉

] and some sales reported as [ ▉ ]." *Id.*

at 9, Appx091523.  Simec failed to explain "[ ■ ] sales in the initial data that, based on Grupo

Simec's statements should have had freight expenses but did not" as well as [ ▮ ] sales that were

allegedly free on board (without delivery expenses), but were reported as having freight

expenses.  *Id.*

Seventh, for insurance and inland freight – plant/warehouse to customer, Simec reported

conflicting amounts in its database.  For example, there was a freight expense of [ ███ ] for one

delivery, but an associated "discount inland insurance" supposedly reduced the amount of freight

incurred to [ ███ ], but Simec still reported [ ███ ] as the freight expense in its database.  *Id.*

at 10, Appx091524.  Commerce determined that Simec failed to follow its instruction to "report

the amount of freight that it was actually paying to the freight providers, not the amount that it

should have been paying to the freight providers."  *Id.* at 11, Appx091525.

Eighth, for credit expenses, although Simec represented in a supplemental questionnaire

that it had remedied certain deficiencies, Commerce determined that the same [ ██ ] sales still

had an error response, [ ████ ] and were not corrected.  *Id.*  As Commerce explained,

"{w}hile Grupo Simec has explained how it calculated credit expenses, and thus, Commerce

could attempt to replicate the credit expense calculations, this issue dovetails with the issue of

errors in the reported payment dates which is required for those calculations."  *Id.*

Ninth, for domestic inventory carrying costs, Commerce explained that the "initial

questionnaire instructed Grupo Simec to report the opportunity cost incurred from the time that

the merchandise was finished to the time it was sold," but determined that it needed additional

explanation from Simec about how it calculated these costs.  *Id.* at 12, Appx091526.  Although

given this opportunity, Simec "failed to corroborate the inventory carrying costs as requested in

the supplemental questionnaire and, thus, Commerce has no basis upon which to conclude that the inventory carrying cost data has been correctly reported." *Id.*

*Tenth*, for packing expenses, although Simec was "instructed to report the unit cost of packing and to provide a worksheet demonstrating the calculation of packing expenses," there remained discrepancies in the "supporting documentation and calculations" in the packing expense data in Simec's supplemental responses. *Id.* at 12-13, Appx091527-091528.

*Eleventh*, for downstream sales, Commerce explained that Simec failed to accurately report "sales of the foreign like product made by affiliated parties." *Id.* at 13, Appx091528. Although Simec argued in its administrative case brief that downstream sales were not needed because they "'at most' account for less than [ █ ] percent of home market sales," Commerce explained that it was "unclear" where Simec even had obtained that number, as other data demonstrated that "Simec's affiliated sales in the home market represented [ █ ] percent of total home market sales quantity{.}" *Id.* at 14, Appx091528. Commerce's initial questionnaire also instructed Simec to submit an arm's length sales analysis, and that analysis "indicated that, of [ ███████████████████████████████████████ ███████████████ ]." *Id.* Commerce rejected Simec's assertion that this data was immaterial, explaining that "Commerce does not carry out its administrative reviews by allowing parties to omit data simply because a respondent believes that the data may have a minimal effect on the outcome" because "Commerce is mandated with the responsibility of ensuring that an accurate dumping margin is calculated and that means that Commerce collects all of the information necessary for a particular situation to ensure that the data is accurate and reliable." *Id.* at 15, Appx091529. Thus, Commerce determined that as a consequence of Simec's "failure to submit responses to the downstream sales questions, Commerce has no basis upon which to

conclude that the [ ▮ ] affiliated sales reported in the downstream sales data have been accurately reported{.}"  *Id.*

<u>U.S. Sales Data</u>

Commerce explained that eight separate categories of data related to U.S. sales data were deficient:  (1) inland freight – plant/warehouse to port of exportation (2) brokerage and handling; (3) warehousing expenses; (4) international freight; (5) inventory carrying costs incurred in the United States; (6) packing expenses; (7) entry date and cancelled sales; and (8) entered value.  *Id.* at 15-23, Appx091529-091537.

*First*, for inland freight – plant/warehouse to port of exportation, Commerce explained that although Simec had been instructed to "report the cost of inland freight from the port or warehouse to the port of exportation and to include worksheets for any calculations," it failed to provide this information in its initial questionnaire response or in a supplemental questionnaire response.  *Id.* at 15, Appx091529.  Simec also "never alerted Commerce that it could not provide the data in the form or manner requested and, thus, Commerce expected that the data in the supplemental {response} would be cured of the identified deficiencies."  *Id.* at 16, Appx091530.

*Second*, for brokerage and handling, Simec reported that these expenses were incurred on a transaction-specific basis, but Commerce pointed out that many "values are identical," which Simec declined to explain or remedy.  *Id.* at 16-17, Appx091530-091531.  Commerce, thus, declined to accept Simec's rationale that the calculations were "close enough," because Commerce was unable to determine if the data were correctly reported.  *Id.* at 17, Appx091531.

*Third*, for warehousing expenses, Simec failed to "report any warehousing expenses incurred in the United States," which was unlikely because "it is clear that Grupo Simec incurs warehousing expenses in the United States{.}"  *Id.* at 18, Appx091532.  Although Commerce

provided Simec an opportunity to correct this deficiency, Simec "failed to provide any supporting documentation and explanations that were requested" and also "reported what they assert are warehousing expenses under an entirely different field," that should have otherwise been reported. *Id.* Commerce also found Simec's explanation in its administrative case brief to be not credible because it had made two conflicting statements: that all warehousing costs incurred in the United States are reported under inventory carrying costs and that it had no warehousing costs in the United States. *Id.* at 19, Appx091533.

*Fourth*, for international freight, Simec failed to remedy how these costs are calculated. *Id.* For example, although Simec reported that the amount is calculated by dividing freight invoice by tons, Commerce noted that one entry "is based on a [ ███████████████████ ████████████████████████████████████████████████ ████████ ]." *Id.* But this did not appear to make sense, as Commerce explained that "{b}ecause the expense [ ██████████ ], to the extent the [ ████████ ] shipments that the freight invoice covered had shipment quantities that were different from the one used in the sample, then the [ ████████████████████████████ ]." *Id.* at 20, Appx091534.

*Fifth*, for inventory carrying costs incurred in the United States, Commerce explained that "{b}ased on the information on the record, Commerce continues to find that it is likely that inventory carrying costs would have been incurred in the United States but, even if they were not, Grupo Simec failed to provide an explanation for the existing discrepancy on the record." *Id.* at 21, Appx091535. The discrepancy was that Simec had reported in its initial questionnaire response that it did not have any inventory carrying costs. *Id.* at 20, Appx091534.

*Sixth*, for packing expenses, Commerce determined that Simec's reported expenses were unreliable because it was "unable to determine what is the correct packing expense" as Simec reported no differences between home market and U.S. sales.  *Id.* at 21, Appx091535.

*Seventh*, for entry date and cancelled sales, Simec "failed to report entry dates for three of its U.S. sales and reported one date incorrectly," but did not remedy this deficiency in its supplemental questionnaire response.  *Id.* at 21-22, Appx091535-091536.  Simec also "clearly reported sales that did not actually take place" and "this raises the question of whether Grupo Simec reported other sales that were also cancelled."  *Id.* at 22, Appx091536.  Commerce determined that this information was not usable because "{b}y including sales that were never actually made, the margin calculations are potentially skewed and may result in an inaccurate dumping margin," because Commerce "is unable to know whether the entire universe of sales has been reported."  *Id.*

*Eighth*, for entered valued, Commerce explained the discrepancies and that "supporting documentation does not match the reported entered value."  *Id.* at 23, Appx091537.  Accurate entered value data are important because "it affects the amount of duties a party will ultimately pay."  *Id.*

As Commerce explained, "{t}aken together, Grupo Simec's multiple failures to submit or correct information on the record, as well as its continued failure to resolve various discrepancies and corroborate the sales-related information it had provided," supports Commerce's determination to apply facts available because the "information Grupo Simec provided is so incomplete, unreliable and unsupported that Commerce does not have any sales-related information that can be used as a basis for conducting a dumping analysis."  PDM at 7, Appx007224.

Moreover, in the final results, Commerce considered the various factors in 19 U.S.C. § 1677e(a)(2), that is, whether the information was submitted by the established deadline, can be verified, is not so incomplete that it cannot serve as a reliable basis for the determination, and that the information can be used without undue difficulty, and determined that it was appropriate to apply facts available. *See* IDM at 25, Appx007737. For example, although Simec had submitted some of its initial and supplemental questionnaires on a timely basis, Commerce explained that "this does not override the fact that Grupo Simec failed to submit *complete* responses in a timely fashion." *Id.* (emphasis in original). Commerce also explained that despite the opportunities Commerce had given Simec, "some of the information that Grupo Simec submitted was either not supported or, in certain instances, even conflicted with other information on the record." *Id.* The information was also incomplete and Commerce determined that Simec "failed to cure a variety of deficiencies with the data that it submitted and, in the case of downstream sales, failed to submit any responses." *Id.* These deficiencies were *Simec's* responsibility to resolve, not Commerce's, and "{g}iven the number of unresolved deficiencies as well as the fact that these deficiencies cut across a wide swath of the home market and U.S. sales data, {Commerce} f{ound}that, contrary to what Grupo Simec asserts, the data it placed on the record is incomplete and cannot easily be corrected or resolved by Commerce." *Id.* at 25-26, Appx007737-007738. Finally, Commerce explained that the information could not be used without undue difficulties because "any attempt to remedy Grupo Simec's data would require a significant amount of effort and analysis on the part of Commerce, imposing an undue burden for something that is squarely Grupo Simec's responsibility." *Id.* at 26, Appx007738.

Thus, substantial evidence supports Commerce's determination to apply total facts available because the deficiencies "cut across all aspects of Grupo Simec's responses in a variety of ways" and Simec had failed to resolve the deficiencies. *Id.*; *see also* 19 U.S.C. § 1677e(a)(2).

**2.      Substantial Evidence Supports Commerce's Determination That An Adverse Inference Is Warranted Because Simec Failed To Cooperate To The Best Of Its Ability**

In the final results, Commerce explained that Simec failed to cooperate to the best of its ability and that the "selection of a rate for Grupo Simec based on the application of {facts available with an adverse inference} is justified." IDM at 24, Appx007736; *see also* PDM at 8, Appx007225 (explaining that "Simec has failed to cooperate by not acting to the best of its ability in failing to remedy the errors identified by Commerce as well as failing to submit requested information within the established deadline.").

First, Commerce explained that a "robust discussion" of the numerous deficiencies in Simec's submissions was contained in the Deficiencies Memorandum, and "without a complete record, Commerce is unable to make adjustments to Grupo Simec's responses, nor can it determine whether certain categories of data are immaterial." IDM at 24, Appx007736. Commerce rejected Simec's contention that it was somehow Commerce's responsibility to cure Simec's deficiencies and determined that because Simec had failed to build the record, "there is no basis upon which {Commerce} can conclude that Grupo Simec's data is reliable or usable." *Id.* at 23-24, Appx007736-007737.

Second, Commerce determined that Simec failed to cooperate to the best of its ability because Commerce had given Simec "an opportunity to remedy its deficiencies" which were "so extensive that they resulted in over 200 supplemental questions." *Id.* at 27, Appx007739. Indeed, Simec represented in its supplemental questionnaire response that it "had corrected the issue, but the data was unchanged." *Id.* Commerce also found it troubling that Simec had failed

30

to submit *any* downstream sales, to the extent that it was "not a matter of a small amount of missing data that Commerce could have easily added on its own, as Grupo Simec attempts to describe." *Id.*; *id.* at 28, Appx007740 (describing Simec's data as being "riddled throughout with deficiencies").

Third, Commerce explained that its determination to apply an adverse inference was "based on an assessment of all of Grupo Simec's actions in the review, which demonstrated that the respondent failed to cooperate to the best of its ability when it did not remedy the questionnaire deficiencies within the allotted time frame, despite Commerce effectively granting the respondent all the additional time it requested prior to the deadline." *Id.* at 28, Appx007740. And Commerce also appropriately considered the challenges presented by COVID-19, having given Simec "some unusually lengthy opportunities to respond to requests for information." *Id.*

At bottom, the fact that Simec failed to resolve in its supplemental questionnaire responses "many of the same deficiencies that were flagged in its initial questionnaire response is indicative of the fact that Grupo Simec did not put forth its best effort to remedy these issues, particularly where Grupo Simec stated that it had fixed the issue when, in fact, it had not." *Id.* at 28-29, Appx007740-007741. And regardless of motivation or intent, "what matters is whether Grupo Simec was able to review its records and provide Commerce with the corrected information it requested in the timeframe that was established." *Id.* at 29, Appx007741. And Simec entirely failed to do so. Thus, Commerce's determination to apply an adverse inference is supported by substantial evidence and in accordance with law. *See id.*; 19 U.S.C. § 1677e(b)(1).

### C. Plaintiffs' Various Arguments Contesting Commerce's Application Of Facts Available With An Adverse Inference Lack Merit

Plaintiffs' various arguments contesting Commerce's application of facts available with an adverse inference to Simec are meritless, as we explain below.

First, Grupo Acerero and Gerdau Corsa primarily argue that Commerce should have given more deference to Simec and its inability to cooperate due to the ongoing COVID-19 pandemic.  Grupo Acerero Br. at 27-30.  But Commerce explained in the final results that it had acknowledged these difficulties and "made every effort to accommodate them, including granting some unusually lengthy opportunities to respond to requests for information."  IDM at 28, Appx007740; *id.* at 6-14, Appx007718-007726 (explaining the various extension requests and Commerce's responses thereto).

Second, Simec argues that Commerce should not have applied facts available, or should have applied neutral or partial facts available, and, in any event, Commerce never explained its determination to even apply facts available.  *See* Simec Br. at 27-35.  This is incorrect.  The onus to submit accurate information lies with the respondent.  *See, e.g.*, *QVD Food Co., Ltd. v. United States*, 658 F.3d 1318 (Fed. Cir. 2011) ("the burden of creating an adequate record lies with interested parties and not with Commerce").  The Court of Appeals for the Federal Circuit has held that "in the context of total facts available, Commerce can ignore all data submitted where the bulk of it is determined to be flawed and unverifiable."  *Zhejiang DunAn Hetian Metal Co. v. United States*, 658 F.3d 1318, 1348 (Fed. Cir. 2011) (citing *Steel Authority of India, Ltd. v. United States,* 149 F. Supp. 2d 921, 928-29 (Ct. Int'l Trade 2001)).

Simec also cites *National Nail Corp. v. United States*, 390 F. Supp. 3d 1356, 1375 (Ct. Int'l Trade 2019), for the proposition that "where some of the information could be used, or the deficiency was 'only with respect to a discrete category of information,' and a respondent is found not to have complied to the best of its ability, the use of 'partial adverse facts available' is directed by the statute."  Simec Br. at 35.  Although Simec characterizes its data as having a "small number of errors," that position ignores that its deficiencies were not confined to "a

discrete category of information," *id.* at 36, but rather, "cut across a wide swath of the home market and U.S. sales data," IDM at 25, Appx007737, thus distinguishing the facts of this case from *National Nail*.

Further, Commerce explained at length both in the Deficiencies Memorandum and the final results why the submitted information was not usable, and why the deficient information was important.  *See generally* Deficiencies Memorandum, Appx091515-091539; IDM at 24-29, Appx007736-007741.  Commerce also explained in the final results that it would be inappropriate to apply neutral facts available because this approach would require Commerce to "discard all the information on the record and simply replace it with one of the rates that Grupo Simec proposes, without any analysis or calculations{.}"  IDM at 27, Appx007739.  Indeed, Commerce has demonstrated throughout this proceeding that it cannot use Simec's data without incurring undue difficulties.  Even in its belated (by 40 days) October 18 Filing, Simec failed to incorporate missing information requested by Commerce.  *See id.* at 17-20, Appx007729-007732.

Third, Simec argues that it had cooperated to the best of its ability with its "near-constant" communications with Commerce.  Simec Br. at 34.  Simec cites *Nippon Steel Corp.*, 337 F.3d at 1382, which, it says, establishes that respondents should not be held to a standard of perfection, but instead should exert maximum effort when cooperating with Commerce's requests.  *Id.*  Simec alleges that it has cooperated to the best of its ability but ignores an important precondition which Grupo Acerero and Gerdau Corsa cite in their own brief – that respondents should "take reasonable steps to keep and maintain full and complete records documenting information that a reasonable {respondent} should anticipate being called upon to produce."  *Id.*  Simec admits that it "had to gather responses from 14 separate legal entities"

which "did not have common accounting or management software" such that Simec "prepare{d} fourteen separate responses to Commerce's Initial Questionnaire" before submitting "a single set of responses" and relies on its decentralized administrative structure to defend its requests for extensions and inability to submit information by the deadline. Simec Br. at 5. However, *Nippon Steel Corp.* makes clear that cooperating to the best of one's ability requires respondents to maintain a *minimum* degree of preparedness and to anticipate what Commerce will ask it to produce in subsequent reviews.

Indeed, as a respondent with prior experience "preparing questionnaire responses covering multiple affiliates and production locations . . . there is no basis for {Simec} to claim that it could not have anticipated Commerce's requests or that it was unable to provide the requested information." IDM at 23, Appx007735. Moreover, "it is not an excuse that the employee assigned to prepare a response does not know what files exist, or where they are kept, or did not think-through inadvertence, neglect, or otherwise-to look beyond the files immediately available," *Nippon Steel Corp.,* 337 F.3d at 1383, which is significant because it undermines Simec's attempt to defend its deficiencies by citing its new accountants' inexperience. *See* Simec Br. at 5.

As an experienced respondent, Simec's decision to submit a request for an extension of its A-C supplemental questionnaire response at 4:29 p.m. Eastern Standard Time, on September 7, just 31 minutes prior to the deadline, *see* Simec's A-C Supplemental Questionnaire Response Extension Request, Appx004959-004961, demonstrates Simec's lack of foresight, and a failure to put forth its maximum effort to cooperate with Commerce's deadlines. Simec also failed to provide a rationale for the extension it requested much less the good cause required by 19 C.F.R.

§ 351.302(d).  *See* Commerce's Response to Simec's Request for Extension, Appx006282-006283.

Moreover, despite Simec requesting multiple extensions of time, at no point *prior* to its extension request made approximately a half hour before the deadline did Simec indicate to Commerce that it would need an additional two full weeks to complete the supplemental questionnaire.  *See* IDM at 10, Appx007722.  Contrary to Simec's claim that it "was clearly not playing 'hide the ball'," its last-minute request for a lengthy extension illustrates its inattentiveness during this proceeding.  Simec Br. at 34; *see also Nippon Steel Corp.,* 337 F.3d at 1383-83.  Later, Simec even attempted to submit its Proposed October 18 Filing 40 days after the deadline, without observing procedure and by failing to provide a written explanation identifying the subsection of 19 C.F.R. § 351.102(b)(21), under which the information is being submitted, pursuant to 19 C.F.R. § 351.301(b).  *See* IDM at 18,  Appx007730.  Disregarding that Simec submitted this information 40 days after the deadline, its failure to satisfy basic procedural requirements – despite its compliance with such requirements in the past – underscores Simec's failure to cooperate to the best of its ability.  *See Nippon Steel Corp.,* 337 F.3d at 1383-83.

Therefore, Commerce's determination to apply an adverse inference to Simec is supported by substantial evidence and in accordance with law.  *See id*.; IDM at 24-29, Appx007736-007741.

### D.    The Rate Commerce Selected For Simec Is In Accordance With Law

Simec argues that Commerce's selection of the 66.70 percent rate from the petition is not supported by substantial evidence or in accordance with law because: (1) it was taken from the "discredited" petition filed many years ago; (2) the facts of this administrative review are distinguishable from the investigation; and (3) the rate is punitive.  Simec Br. at 36-40.  These arguments lack merit.

35

When employing an adverse inference, Commerce may rely upon information derived from the petition, the final determination from the less than fair value investigation, a previous administrative review, or any other information placed on the record.  *See* 19 U.S.C. § 1677e(b)(2); 19 C.F.R. § 351.308(c).  Commerce is allowed to apply facts available with an adverse inference to ensure cooperation, and therefore must ensure the selected rate is sufficiently adverse.  *See* SAA at 870.  Although the revisions to the statute due to the Trade Preferences Extension Act of 2015 (TPEA), Pub. L. No. 114-27, 129 Stat. 362 (2015), no longer require corroboration, Commerce's practice in reviews is to use the highest rate on the record of the proceeding which, to the extent practicable, is sufficiently adverse to ensure that the uncooperative party does not obtain a more favorable result by failing to cooperate than if it had fully cooperated.  *See* IDM at 32, Appx007744; 19 U.S.C. § 1677e(c)(2).  Commerce assigned Simec a total adverse facts available rate of 66.70 percent, which was the rate applied to Simec in the investigation.  *See* IDM at 32-35, Appx007744-007747.  Therefore, Commerce complied with the statute by assigning Simec a rate applied during a prior segment of the proceeding, and which Commerce based on an evaluation of the situation that resulted in the application of adverse inferences to the facts otherwise available.  *See id.*; 19 U.S.C. § 1677e(b)(2); 19 C.F.R. § 351.308(c).

First, Simec argues that Commerce cannot "select an unreasonably high rate having no relationship to the respondent's actual dumping margin."  Simec Br. at 36 (quoting *Gallant Ocean (Thailand) Co. v. United States*, 602 F.3d 1319, 1323 (Fed. Cir. 2010)).  Simec suggests that because its highest rate prior to the instant review was 4.93 percent, Commerce "should have selected a rate by drawing on the record of this proceeding and the five administrative reviews preceding it."  *Id.*  However, *Gallant Ocean* pre-dates the statute's 2015 amendments which

permit Commerce to apply the highest rate from any prior segment of the proceeding to a respondent. *See* 19 U.S.C. § 1677e(d)(2). Indeed, the amended statute codified Commerce's longstanding practice of selecting as adverse facts the higher of: (a) the highest dumping margin alleged in the petition; or (b) the highest calculated rate for any respondent from any segment of the proceeding. *See* PDM at 9, Appx007226.

Second, citing various cases, Simec argues that the facts of this case are distinguishable from the investigation and the "extraordinarily high rate levied against Simec cannot pass muster under those standards." Simec Br. at 37. Although Commerce must apply a margin that is appropriate based on an evaluation of the situation that resulted in the adverse inference determination, *see* 19 U.S.C. § 1677e(d)(2), it is not required to consider a respondents' intent. *See Nippon Steel Corp.*, 337 F.3d at 1382. In other words, Simec misapplies recent precedent detailing the circumstances under which Commerce is justified in considering a respondent's culpability when selecting an adverse rate. As Commerce explained in the final results, it "agree{s} that Commerce should consider the overall facts and circumstances of each case when determining a{ facts available with an adverse inference} rate," but "Commerce is obligated to evaluate the unique factual circumstances of each segment of a proceeding, and therefore, {its} determination of what {adverse inference} rate to assign Grupo Simec's actions in this review is dependent on the unique facts in this case." IDM at 32-33, Appx007744-007745. Also, the unique facts in which the order was revoked but then reinstated along with the administrative review present in *BMW of North America LLC v. United States*, 926 F.3d 1291, 1302 (Fed. Cir. 2019), are not present here. Rather, Simec was fully engaged in the review from the initiation— the review was never discontinued and re-started—and Simec was fully informed of its

submission deadlines.  *See* Simec's A-C Supp. Questionnaire Resp. Extension Request, Appx004959-004961.

While Simec argues that it provided record evidence explaining why its conduct in this administrative review is different from its conduct in the underlying investigation, Simec Br. at 38, these arguments are not convincing.  For example, although Simec highlights complications arising from the COVID-19 pandemic, Commerce accounted for these challenges throughout the review period and granted Simec's multiple extensions on that basis.  *See* IDM at 33-34, Appx007745-007746.  Nonetheless, in the investigation, Commerce concluded that Simec had failed to support its home market sales data, which is a deficiency that Simec repeated during the instant review period.  *See id.*  Commerce also explained that Simec "does not dispute any of the deficiencies that Commerce flagged in the *Preliminary Results*; instead, it now dismisses them as easily corrected by Commerce or simply information that is immaterial to the record, as if the fact that it failed to correct these deficiencies is of no matter to the review."  *Id.* at 33, Appx007745.

Moreover, Commerce explained that Simec has failed to differentiate the data-oriented facts of this case from those of the investigation where this rate was selected.  *See id.* at 34, Appx007746.  Indeed, Simec's failures during the investigation that resulted in Commerce applying the 66.70 percent rate are similar to Simec's failures during this administrative review, and the "statute does not place a limitation on {adverse inference} rates based on how long ago they were calculated or require that Commerce analyze whether an {adverse inference} rate is significantly different from those calculated in other segments of the proceeding."  *Id.*

Finally, Simec's argument that the adverse rate Commerce selected is overly punitive is unsupported.  *See* Simec Br. at 39-40.  Unlike in *Oman Fasteners, LLC v. United States*, No. 22-

00348, 2023 WL 2233642, at *8 (Ct. Int'l Trade Feb. 15, 2023), where the Court rejected

Commerce's selected adverse rate as an abuse of discretion when respondent Oman submitted

documents 16 minutes after the deadline, here, Simec failed to supply Commerce with the

missing responses to its A-C supplemental questionnaire until *40 days* after the deadline expired

and after Commerce had already denied its extension requests.  *See* IDM at 19, Appx007731.

Rather, the facts in this case are similar to *Dongtai Peak Honey Industry Co. v. United States*,

777 F.3d 1343 (Fed. Cir. 2015), in which the Federal Circuit sustained Commerce's

determination to apply an adverse rate after Commerce denied the respondent's extension request

and Dongtai filed responses *10 days* after the deadline.

Thus, Commerce's selection of a dumping margin of 66.70 percent, which is the rate that

Commerce previously assigned to Simec in the investigation, "is reasonable and is not unfairly

punitive."  IDM at 34, Appx007746.

### III.    Commerce's Methodology To Determine The Rate For Non-Selected Companies Is Based On Substantial Evidence And In Accordance With Law

Commerce's determination to assign the simple average of Deacero's and Simec's

dumping margins to non-investigated companies pursuant to 19 U.S.C. § 1673(c)(5)(B) is

supported by substantial evidence and in accordance with law.  *See* IDM at 40-45, Appx007752-

007757.  Grupo Acerero and Gerdau Corsa argue that Commerce's calculation does not

reasonably reflect the dumping margins of these companies and that the use of the simple

average is unlawful.  *See* Grupo Acerero Br. at 30-45.  These arguments are meritless.

When Commerce issues a dumping order, it is tasked with providing an individual

dumping margin for each known exporter of the subject merchandise, *see* 19 U.S.C. §§ 1675,

1677f–1(c)(1), unless it is not practicable to individually investigate each respondent.  *See* 19

U.S.C. § 1677f–1(c)(2).  By statute, in such instances, Commerce limits the individual

investigation to mandatory respondents that make up "the largest volume of exports and/or shipments of subject merchandise." *Yangzhou Bestpak Gifts & Crafts Co. v. United States*, 716 F.3d. 1370, 1372-73 (Fed Cir. 2013); *see also* 19 U.S.C. § 1677f–1(c)(2)(A)–(B); *YC Rubber Co. (N. Am.) LLC v. United States,* No. 2021-1489, 2022 WL 3711377, at *4 (Fed. Cir. Aug. 29, 2022) (holding that "Commerce must 'determine the weighted average' for {a} reasonable number {of respondents, and} "that a 'reasonable number' is generally more than one").

Commerce, accordingly, will calculate an "all others" rate for the non-selected companies. The statute provides that the all-others rate "shall be an amount equal to the weighted-average of the estimated weighted average dumping margins established for exporters and producers individually examined excluding any zero and de minimis margins, and any margins determined entirely" on the basis of the facts available. 19 U.S.C. § 1673d(c)(5)(A); *see also* SAA at 218. For those cases where the dumping margins of all the mandatory respondents are zero, *de minimis*, or calculated entirely based on facts available, Commerce "may use *any reasonable method* to establish the estimated all others rate for exporters and producers not individually investigated, including averaging the estimated weighted average dumping margins determined for the exporters and producers individually investigated." 19 U.S.C. § 1673d(c)(5)(B) (emphasis added).

The SAA provides more insight into the application of the statutory provision, as the expected method is to still conduct a weighted average of the mandatory respondents, "{h}owever, if this method is not feasible, or if it results in an average that would not be reasonably reflective of potential dumping margins for non-investigated exporters to producers, Commerce may use other reasonable methods." SAA at 218. The Federal Circuit affirmed that there is "no legal error" in using a simple average of a de minimis or zero rate and a total facts

available with an adverse inference rate assigned to two mandatory respondents to calculate the separate rate. *Yangzhou Bestpak*, 716 F.3d. at 1378. Although the court in *Yangzhou Bestpak* warned against the potential for "questionable" results, it also clarified that § 1673d(c)(5)(B) and the SAA explicitly allow Commerce to factor both de minimis and adverse inference rates into the calculation methodology. *Id.*; *see also Solianus Inc. v. United States*, 391 F. Supp. 3d 1331, 1337-38 (Ct. Int'l Trade 2019) (finding Commerce's method of calculating a simple average of three mandatory respondents – one with a *de minimis* rate and two with adverse inference rates – was permissible).

In this case, Commerce's determination complied with the statute. As a result of the large number of companies subject to the order, Commerce selected Deacero and Simec as mandatory respondents because they "account{} for the largest volume of subject merchandise that could be reasonably examined." IDM at 40, Appx007752. Commerce calculated a zero percent rate for Deacero, while Simec, as explained above, was properly assigned a facts available with an adverse inference rate of 66.70 percent. *Id.* With both the margins for the mandatory respondents at zero and based on facts available, Commerce is unable to rely on 19 U.S.C. § 1673d(c)(5)(A) to calculate the all-others rate for Grupo Acerero and Gerdau Corsa. SAA at 218 (explaining that the "exception to the general rule if the dumping margins for all of the exporters and producers that are individually investigated are determined entirely on the basis of the facts available or are zero or *de minimis*). Therefore, Commerce used the 19 U.S.C. § 1673d(c)(5)(B) exception, *i.e.*, "any reasonable method," to assign a rate to the non-selected respondents. IDM at 41, Appx007753.

In doing so, Commerce assigned a simple average of Deacero's and Simec's rates as the all-other's rate, which resulted in a 33.35 percent rate for the non-selected companies. *Id.* The

use of a simple average is permitted by the statute and is consistent with Commerce's practice. *Id.*; *see also Yangzhou Bestpak*, 716 F.3d at 1378 ("The statutory text allows Commerce to use any reasonable method to establish the estimated separate rate" (citing 19 U.S.C. § 1673d(c)(5)(B) ("{Commerce} may use any reasonable method . . . ."); SAA at 218 ("Commerce may use other reasonable methods."))); *Solianus*, 391 F. Supp. 3d at 1331; *Bosun Tools Co. v. United States*, 2022 WL 94172, at *4 (Fed. Cir. Jan. 10, 2022).

Grupo Acerero and Gerdau Corsa argue that Commerce incorrectly interpreted 19 U.S.C. § 1673d(c)(5)(B) with its "reasonable method" language, because the SAA "clearly indicates that such averaging is illegitimate where it results in a margin that would not be '*reasonably reflective of potential dumping margins*' for non-investigated respondents." Grupo Acerero Br. at 33-34 (emphasis in original). Although Grupo Acerero and Gerdau emphasize the phrase "reasonable method," they omit a key word preceding that phrase – "any." The Supreme Court has made clear on multiple occasions that the term "any" has an "expansive meaning," and when Congress includes the term in a statute it should be understood as a modifier of the language around it. *See Ali v. Fed. Bureau of Prisons*, 552 U.S. 214, 218-19 (2008) ("The phrase 'any other law enforcement officer' suggests a broad meaning"); *United States v. Gonzales*, 520 U.S. 1, 5 (1997) ("Read naturally, the word 'any' has an expansive meaning, that is, 'one or some indiscriminately of whatever kind'"); *Harrison v. PPG Indus., Inc.*, 446 U.S. 578, 589 (1980) ("the phrase, 'any other final action,' in the absence of legislative history to the contrary, must be construed to mean exactly what it says, namely, *any other* final action"). Thus, the method Commerce employs need not be the *most* reasonable method; rather, there is only a requirement that the method Commerce chooses is reasonable.

Second and relatedly, the consolidated plaintiffs assert that "averaging is illegitimate where it results in a margin that would not be 'reasonably reflective of potential dumping margins' for non-investigated respondents."  Grupo Acerero Br. at 34.  But again, the SAA states that "Commerce *may* use any other reasonable method," a permissive standard, providing deference to Commerce.  SAA at 218 (emphasis added).  Thus, the SAA imposes no requirement on Commerce to affirmatively change the method used; rather, the only requirement placed on Commerce is from the statute – that the method be *reasonable*.  *See* 19 U.S.C. § 1673d(c)(5)(B); *but see Linyi Chengen Imp. & Exp. Co. v. United States*, 609 F. Supp. 3d 1392, 1403 (Ct. Int'l Trade 2022) ("A speculative dumping margin using the average of a *de minimis* rate and an {adverse inferences} rate cannot be upheld based on weak record evidence, particularly when Commerce itself created the scarcity of evidence.").

In this case, Commerce used a reasonable method consistent with the statute in calculating the all other's rate for the non-selected companies.  *See* IDM at 40-41, Appx007752-007753.  Nonetheless, the consolidated plaintiffs continue to argue that "reasonable" entails a fairness and an accuracy component, but in so doing, create overly broad definitions of both terms.  Grupo Acerero Br. at 35.  In other words, plaintiffs' fairness component incorporates indicia of commercial or economic reality, but such a view misapplies the applicable statute and precedent.  In support, consolidated plaintiffs cite *Yangzhou Bestpak* to demonstrate that the 123.83 percent rate that was assigned to the company was not within the economic reality of the company.  *Id.* at 36.

But in *Nan Ya*, the Federal Circuit clarified the way Commerce should factor accuracy and commercial reality into its adverse facts available decisions.  810 F.3d at 1343.  The Court took a step back from cases such as *Yangzhou Bestpak* explaining that "{t}he term 'commercial

43

reality' does not appear in the statutes that Commerce administers {. . .} and the term 'accurate'

appears only once" in the form of Commerce's responsibility to verify factual information.  *Id.*

Furthermore, the Court elucidated that Commerce "need not examine the economic or

commercial reality of the parties specifically, or of the industry more generally, in some broader

sense."  *Id.* at 1344 (citing *Eurodif*, 555 U.S. at 317–18).  Therefore, the Court held that

"accurate" means that Commerce's decision was correct as a mathematical and factual matter,

and "commercial reality" means that Commerce's decision is in accordance with the statute.  *Id.*

In fact, the Court explicitly stated that "{t}he court does not use {the terms} in some broader

sense, such as to require Commerce to apply the statutory methods to determine the industry-

wide "commercial realities prevailing" during a particular time period.  *Id.*; *see also Habas Sinai*

*Ve Tibbi Gazlar Istihsal Endustrisi A.S. v. United States,* 992 F.3d 1348, 1354 (Fed. Cir. 2021)

("If accepted, Habas' arguments would have this court impose on Commerce an obligation that

is not supported by the statute, namely to use only 'facts otherwise available' that reflect the

commercial reality of the affected party or that bends to the benefit of the affected party").

Thus, contrary to consolidated plaintiffs' argument, there is no requirement that Commerce

consider the commercial or economic reality of the mandatory respondents, let alone of the non-

selected companies.  Rather, the requirement is that the method is mathematically correct

(accurate) and complies with the statute (commercial reality), which it did in this case.  *See* IDM

at 40-41, Appx007752-007753.

Third, the consolidated plaintiffs argue that the 33.35 percent rate is not reflective of

potential dumping margins for the non-selected companies.  Grupo Acerero Br. at 37-38.  They

point to rates from prior years to argue that the rate calculated in the final results was

unrepresentative and suggest that a better method would be to use the rates from the last

administrative review, or an average of the rates from the prior reviews. *See id.* However, relying on an average of different rates, or selecting a rate from a different segment of the proceeding would defy the statutory directive, which explicitly contemplates the use of an adverse inference, zero, or *de minimis* rates in calculating the rate for the non-selected companies. *See Albemarle Corp. & Subsidiaries v. United States*, 821 F.3d 1345, 1356 (Fed. Cir. 2016) ("{t}here is no basis to simply assume that the underlying facts or calculated dumping margins remain the same from period to period.").

Moreover, Commerce's practice is to calculate the rate for non-selected companies based on the mandatory respondents' margins and the SAA's allowance for Commerce to calculate a margin on the same basis. IDM at 44, Appx007756. This Court recently held that "interpreting the SAA to require Commerce to nevertheless engage in a data collection exercise with the *non-selected* respondents in order to determine their 'potential dumping margins' would be inconsistent with the language of 19 U.S.C. § 1677f-1(c) expressly permitting Commerce to 'limit{ } its examination' to the largest exporters and producers by volume." *PrimeSource Bldg. Prod., Inc. v. United States*, 581 F. Supp. 3d 1331, 1341 (Ct. Int'l Trade 2022) (emphasis added). In this case, Commerce also explained why it would be impractical to "pull forward" rates because "dumping margins have changed from period to period with respondents receiving rates between zero and 66.70 percent over the course of this proceeding." IDM at 43, Appx007755; *see id.* (explaining that there "is no record evidence" to support consolidated plaintiffs' assertion that "the rate assigned to them is not reasonably reflective of their potential dumping margins during the {period of review}").

Accordingly, consistent with Commerce's practice, it selected the exporters that account for the largest volume of subject merchandise, and neither Grupo Acerero nor Gerdau Corsa

45

expressed their desire to be voluntary respondents in the review.  *Id.* at 44, Appx007756.  Thus, even though Grupo Acerero and Gerdau Corsa claim injury via application of Simec's adverse facts available rate in their calculation, "the {Court} has explained that,'{t}he representativeness of the investigated exporters is the essential characteristic that justifies an 'all-others' rate based on a weighted average for such respondents.'" *Id.* (quoting *Albemarle*, 821 F. 3d at 1353 (*citing Nat'l Knitwear & Sportswear Ass'n v. United States*, 779 F. Supp. 1364, 1373 (1991))).  Therefore, Commerce lawfully included Simec's adverse inference rate when calculating the all-other's rate.

Finally, the consolidated plaintiffs argue that Commerce could have used a weighted average by taking the kilogram exports and attributing a percentage of them to Deacero and Simec.  Grupo Acerero Br. at 43.  However, as explained in the preceding section, Commerce did not have Simec's home market data, U.S. sales data, nor its downstream sales data on the record; therefore, Commerce would have been unable to provide a weighted average of those rates.  *See generally* Deficiencies Memorandum, Appx091515-091539.  Thus, Commerce's use of a simple average of Deacero's and Simec's rates is consistent with the statutory directive to "use any reasonable method to establish the estimated all others rate for exporters and producers not individually investigated."  19 U.S.C. § 1673d(c)(5)(B); *see* IDM at 40-41, Appx007752-007753.

## CONCLUSION

For these reasons, we respectfully request that this Court sustain the final determination and enter judgment in favor of the United States.

Respectfully submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

PATRICIA M. McCARTHY
Director

s/L. Misha Preheim
L. MISHA PREHEIM
Assistant Director

OF COUNSEL:                             s/Kara M. Westercamp
IAN MCINERNEY                           KARA M. WESTERCAMP
Counsel                                 Trial Attorney
Department of Commerce                  U.S. Department of Justice
Office of the Chief Counsel             Civil Division
  for Trade Enforcement & Compliance    Commercial Litigation Branch
                                        P.O. Box 480
                                        Ben Franklin Station
                                        Washington, D.C.  20044
                                        Tel: (202) 305-7571

June 26, 2023                           Attorneys for Defendant

47

## <u>CERTIFICATE OF COMPLIANCE</u>

      I hereby certify that the foregoing brief complies with the Rules of this Court and the Court's scheduling order in that it contains 13,620 words, including text, footnotes, and headings.

                    <u>/s/ Kara M. Westercamp</u>

**THE UNITED STATES COURT OF INTERNATIONAL TRADE**

**BEFORE:  THE HONORABLE STEPHEN A. VADEN, JUDGE**

| | |
|---|---|
| _____ ) | |
| GRUPO SIMEC S.A.B. de C.V., *et al.*, ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| GERDAU CORSA, S.A.P.I. de C.V., ) | |
| ) | |
| Plaintiff-Intervenor, ) | |
| ) | |
| v. ) | |
| ) | |
| UNITED STATES, ) | Consol. Court No. 22-00202 |
| ) | |
| Defendant, ) | |
| ) | |
| and ) | |
| ) | |
| REBAR TRADE ACTION COALITION, ) | |
| ) | |
| Defendant-Intervenor. ) | |
| _____ ) | |

## <u>ORDER</u>

Upon consideration of plaintiffs' motion for judgment upon the agency record,

defendant's response, and all other pertinent papers, it is hereby

ORDERED that plaintiffs' motion is denied; and, it is further

ORDERED that judgment is entered for the United States.


Dated:_____          _____
      New York, New York                              Judge