NON-CONFIDENTIAL VERSION

### IN THE UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| **GRUPO SIMEC S.A.B. DE C.V.;** *et al.,*<br><br>      **Plaintiffs,**<br><br>  **and**<br><br>**GRUPO ACERERO S.A. DE C.V.; GERDAU CORSA, S.A.P.I. DE C.V.,**<br><br>      **Consolidated Plaintiffs,**<br><br>  **v.**<br><br>**UNITED STATES,**<br><br>      **Defendant,**<br><br>  **and**<br><br>**REBAR TRADE ACTION COALITION,**<br><br>      **Defendant-Intervenor.** | **Before: Hon. Stephen Alexander Vaden, Judge**<br><br>**Consol. Ct. No. 22-00202**<br><br><u>**NON-CONFIDENTIAL VERSION**</u><br><br>Business Proprietary Information Removed from Pages: 29, 32 |

### <u>DEFENDANT-INTERVENOR REBAR TRADE ACTION COALTION'S RESPONSE TO MOTION FOR JUDGMENT ON THE AGENCY RECORD</u>

Alan H. Price, Esq.
John R. Shane, Esq.
Maureen E Thorson, Esq.
Jeffrey O. Frank, Esq.
Paul J. Coyle, Esq.

**WILEY REIN LLP**
**2050 M Street, NW**
**Washington, DC 20036**
**(202) 719-7000**

*Counsel to the Rebar Trade Action Coalition*

Dated: July 10, 2023

NON-CONFIDENTIAL VERSION

## <u>TABLE OF CONTENTS</u>

**Page**

I.     INTRODUCTION ....................................................................................................1

II.    STATEMENT OF FACTS ......................................................................................1

     A.    Determination of Simec's Antidumping Duty Margin .................................2

     B.    Determination of Acerero/Corsa's Antidumping Duty Margin ....................5

III.   SUMMARY OF ARGUMENT ...............................................................................6

IV.    ARGUMENT ...........................................................................................................6

     A.    Commerce Did Not Err in Determining Simec's Margin ............................6

           1.    Commerce Did Not Err in Enforcing a Deadline for the
Supplemental Sections A-C Questionnaire Response ........................... 7

           2.    Commerce Did Not Err in Applying the Facts Available ..................... 13

           3.    Commerce Appropriately Applied Adverse Inferences ........................ 17

           4.    Commerce Did Not Err in Selecting the 66.70% Margin ..................... 22

           5.    Conclusion ........................................................................................... 25

     B.    Commerce Did not Err in Determining Acerero/Corsa's Margin .........................26

           1.    Acerero/Corsa Do Not Persuade That Their Margin is
Unreasonable ....................................................................................... 27

           2.    Acerero/Corsa Fail to Persuade that Commerce Was
Required to Rely on a Weighted-Average of Deacero and Simec's
Margins ................................................................................................ 32

V.     CONCLUSION .....................................................................................................34

Consol. Ct. No. 22-00202                                         NON-CONFIDENTIAL VERSION

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Ad Hoc Shrimp Trade Action Comm. v. United States*,
  802 F.3d 1339 (Fed. Cir. 2015).................................................................20, 21

*Albemarle Corp. v. United States*,
  821 F.3d 1345 (Fed. Cir. 2016)....................................................................5, 31

*Changzhou Hawd Flooring Co. v. United States*,
  848 F.3d 1006 (Fed. Cir. 2017).......................................................................28

*Grobest & I-Mei Indus. (Vietnam) Co. v. United States*,
  815 F. Supp. 2d 1342 (Ct. Int'l Trade 2012) ............................................9, 10, 12

*Hyundai Heavy Indus., Co., Ltd. v. United States*,
  399 F. Supp. 3d 1305 (Ct. Int'l Trade 2019) ...................................................20

*Mukand, Ltd. v. United States*,
  767 F.3d 1300 (Fed. Cir. 2014)........................................................................20

*Nippon Steel Corp. v. United States*,
  337 F.3d 1373 (Fed. Cir. 2003)........................................................................18

*Pro-Team Coil Nail Enter. Inc. v. United States*,
  419 F. Supp. 3d 1319 (Ct. Int'l Trade 2019) ....................................................11

*Pro-Team Coil Nail Enter. Inc. v. United States*,
  532 F. Supp. 3d 1281 (Ct Int'l Trade 2021) ....................................................33

*PSC VSMPO–Avisma Corp. v. United States*,
  688 F.3d 751 (Fed. Cir. 2012)..........................................................................12

*Solianus Inc. v. United States*,
  391 F. Supp. 3d 1331 (Ct. Int'l Trade 2019) ...................................................33

*Celik Halat ve Tel Sanayi A.S. v. United States*,
  557 F. Supp. 3d 1348 (Ct. Int'l Trade 2022) ...............................................9, 10

*Zhejiang DunAn Hetian Metal Co. v. United States*,
  652 F.3d 1333 (Fed. Cir. 2011).......................................................................20

*Yangzhou Bestpak Gifts & Crafts Co., Ltd. v. United States*,
  716. F.3d 1370 (Fed. Cir. 2013).......................................................................29

Consol. Ct. No. 22-00202

**Statutes**

19 U.S.C. § 1673d(c)(5)(A) ...........................................................................................26

19 U.S.C. § 1673d(c)(5)(A)-(B) .......................................................................................5

19 U.S.C. § 1673d(c)(5)(B) ...........................................................................................26

19 U.S.C. § 1675(a) ..................................................................................................5, 25

19 U.S.C. § 1677b(e) .....................................................................................................7

19 U.S.C. § 1677e .............................................................................................9, 14, 18

19 U.S.C. § 1677e(d)(1)(B) ...........................................................................................23

19 U.S.C. § 1677e(d)(2) ...........................................................................................23, 24

19 U.S.C. § 1677e(d)(3) ...............................................................................................23

19 U.S.C. § 1677m(d) ...........................................................................................14, 15, 16

19 U.S.C. § 1677m(d)(1)-(3) .....................................................................................15, 16

19 U.S.C. § 1677m(e) .........................................................................................15, 16, 17

Trade Preferences Extension Act of 2015,
P.L. 114-27 Sec. 502, 129 Stat. 362, 383-84 (June 29, 2015) ..........................................23, 30

**Other Authorities**

*Certain Crystalline Silicon Photovoltaic Products from Taiwan*,
82 Fed. Reg. 31,555, 31,556 (Dep't Commerce July 7, 2017) ...............................................33

*Certain Lined Paper Products from India*,
79 Fed. Reg. 26,205 (Dep't Commerce May 7, 2014) .........................................................31

*Certain Quartz Surface Products from India*,
88 Fed. Reg. 1,188 (Dep't Commerce Jan. 9, 2023) .........................................................30

*Certain Quartz Surface Products from India and Turkey*,
85 Fed. Reg. 37,422, 37,423 (Dep't Commerce June 22, 2020) ............................................30

*Certain Steel Nails from the Sultanate of Oman*,
87 Fed. Reg. 78,639 (Dep't Commerce Dec. 22, 2022) ......................................................31

*Steel Concrete Reinforcing Bar from Mexico*,
82 Fed. Reg. 27,233 (Dep't Commerce June 14, 2017) ....................................................2, 28

**NON-CONFIDENTIAL VERSION**

*Steel Concrete Reinforcing Bar from Mexico*,
  84 Fed. Reg. 35,599 (Dep't Commerce July 24, 2019) ........................................................2

*Steel Concrete Reinforcing Bar from Mexico*,
  85 Fed. Reg. 71,053 (Dep't Commerce Nov. 6, 2020)......................................................2, 28

*Steel Concrete Reinforcing Bar from Mexico*,
  79 Fed. Reg. 22,802 (Dep't Commerce Apr. 24, 2014)..........................................................2

*Steel Concrete Reinforcing Bar from Mexico*,
  79 Fed. Reg. 54,967, 54,968 (Dep't Commerce Sept. 15, 2014)................................23, 24, 28

*Steel Concrete Reinforcing Bar from Mexico*,
  79 Fed. Reg. 65,925, 65,926 (Dep't Commerce Nov. 6, 2014)............................................27

*Steel Concrete Reinforcing Bar from Mexico*,
  83 Fed. Reg. 27,754 (Dep't Commerce June 14, 2018) ........................................................28

*Steel Concrete Reinforcing Bar from Mexico*,
  86 Fed. Reg. 50,527, 50,528 (Dep't Commerce Sept. 9, 2021)............................................28

Uruguay Round Agreements Act, Statement of Administrative Action,
  H.R. Doc. No. 103-316, vol. 1 (1994), *reprinted in* 1994 U.S.C.C.A.N. 4040................. 26, 27

## I.     INTRODUCTION

On behalf of the Rebar Trade Action Coalition ("RTAC"), we respectfully submit the following response to the Rule 56.2 motions for judgment on the agency record filed by plaintiffs Grupo Simec S.A.B. de C.V.; Aceros Especiales Simec Tlaxcala, S.A. de C.V.; Compania Siderurgica del Pacifico S.A. de C.V.; Fundiciones de Acero Estructurales, S.A. de C.V.; Grupo Chant S.A.P.I. de C.V.; Operadora de Perfiles Sigosa, S.A. de C.V.; Orge S.A. de C.V.; Perfiles Comerciales Sigosa, S.A. de C.V.; RRLC S.A.P.I. de C.V.; Siderúrgicos Noroeste, S.A. de C.V.; Siderurgica del Occidente y Pacifico S.A. de C.V.; Simec International 6 S.A. de C.V.; Simec International, S.A. de C.V.; Simec International 7 S.A. de C.V.; and Simec International 9 S.A. de C.V. (collectively, "Simec"); Grupo Acerero S.A. de C.V. ("Acerero"), and Gerdau Corsa S.A.P.I. de C.V. ("Corsa."). *See* Pl. Simec's R. 56.2 Mot. for J on the Agency Record (Apr. 26, 2023), ECF No. 43 ("Simec's Br."); Jt. Mem. Pts & Auths in Support of Acerero/Corsa's R. 56.2 Mot. for J on the Agency Record (Apr. 27, 2023), ECF No. 44 ("Acerero/Corsa's Br.").

## II.     STATEMENT OF FACTS

This action arises from the 2019-2020 administrative review of the antidumping duty order on steel concrete reinforcing bar ("rebar") from Mexico. *See* Compl. (Aug. 8, 2022), ECF No. 8 at 2 ("Compl."). The review covered four Mexican rebar producers: Simec, Acerero, Sidertul S.A. de C.V. ("Sidertul"),[1] and Deacero S.A.P.I. de C.V. ("Deacero"). Appx007783.

---

[1]     Plaintiff Corsa is the legal successor to Sidertul. *See* Consol. Pl.'s Unopposed Mot. to Intervene as a Matter of Right, Ct. No. 22-230 (Sept. 23, 2022), ECF 19 at 2.

### A. Determination of Simec's Antidumping Duty Margin

Simec requested a review of its entries during the 2019-2020 review period. Appx001002. The U.S. Department of Commerce ("Commerce") selected Simec as a mandatory[2] respondent, *id.,* as it did in the 2014-2015, 2016-2017, and 2017-2018 administrative reviews. Appx1088; *see Steel Concrete Reinforcing Bar from Mexico*, 82 Fed. Reg. 27,233 (Dep't Commerce June 14, 2017) (final results of antidumping duty admin. rev.; 2014-2015) ("14-15 Final Results"); *Steel Concrete Reinforcing Bar from Mexico*, 84 Fed. Reg. 35,599 (Dep't Commerce July 24, 2019) (final results of antidumping duty admin. rev.; 2016-2017) ("16-17 Final Results"); *Steel Concrete Reinforcing Bar from Mexico*, 85 Fed. Reg. 71,053 (Dep't Commerce Nov. 6, 2020) (final results of antidumping duty admin. rev.; 2017-2018) ("17-18 Final Results").[3] Simec also participated in the original investigation as a voluntary respondent. Preliminary Decision Memorandum accompanying *Steel Concrete Reinforcing Bar from Mexico*, 79 Fed. Reg. 22,802 (Dep't Commerce Apr. 24, 2014) (prelim. deter. of sales at less than fair value, prelim. affirm. deter. of critical circumstances, and postponement of final deter.) at 2. Thus, Simec was a seasoned respondent with significant experience in responding to Commerce's questionnaires.

Commerce issued Simec an initial set of questionnaires on February 8, 2021, the same day that the agency selected mandatory respondents. *See* Appx007218-007219. The agency identified a "significant number of deficiencies" in Simec's initial responses, resulting in more than two hundred supplemental questions spread over two supplemental questionnaires. Appx007221;

---

[2]      The word "mandatory" is typically used to describe those foreign companies subject to an administrative review that Commerce selects for individual examination. *See* discussion *infra* at 5.

[3]      Simec participated in the 2014-2015, 2016-2017, and 2017-2018 administrative reviews as a collapsed group of related corporate entities.

Appx007738; *see also* Appx007817-007818. Commerce granted Simec several extensions of time to respond to the supplemental questionnaires. Appx007817-007818.

Simec timely submitted responses to all of the questions in one of these supplemental questionnaires, but failed to timely submit responses to the portion of the second questionnaire that concerned its downstream sales. Appx007221-007222. Commerce's review of the timely-submitted portions of the second questionnaire also indicated that Grupo Simec:

> continued to fail to provide information Commerce requested, stated that various errors or discrepancies had been corrected but had, in fact, not corrected these issues, and provided supporting documentation which indicated that certain reported data were incorrect.

Appx007222.[4] Commerce described these issues, which cut across both the company's home-market and U.S. sales reporting, at length in its preliminary decision memorandum. Appx007222-007224. Commerce relied on the facts available, with adverse inferences, to determine Simec's preliminary margin because Simec failed to (1) remedy errors identified in its initial questionnaire responses despite being given the opportunity to do so, (2) submit certain information in accordance with the (extended) deadlines set by the agency. Appx007224-007225. Commerce assigned Simec the 66.70% rate that the company received in the original investigation. Appx007226.

Simec argued in its case brief that Commerce should instead assign it the 0% rate preliminarily calculated for the other mandatory respondent, Deacero. *See, e.g.*, Appx007741-007742. In the alternative, Simec argued that it should be assigned a *de minimis* margin consistent with the company's own undisclosed calculations. *See* Appx007739, Appx007746. Simec claimed

---

[4]     Nearly six weeks after the deadline to submit its complete supplemental response, Simec submitted what it characterized as "additional" responsive data. *See* Appx007729. Commerce rejected this additional data as both untimely and out of conformity with the agency's regulatory requirements for submissions of factual information. Appx007729-007730.

that adverse inferences were inappropriate, because its difficulties in responding to Commerce's questionnaires stemmed from the COVID-19 pandemic and the complexities of the Simec companies' internal organization. Appx007716-007717. It further argued that the information that Commerce preliminarily identified as missing, incomplete, or unreliable was (1) easily correctable by Commerce itself, (2) did not need correction, or (3) was immaterial or unnecessary to an accurate margin calculation. Appx007733.

Commerce continued to rely on adverse inferences in the final results. Appx007736-007741. The agency explained that "{t}he deficiencies . . . in the initial questionnaire responses were unusually extensive and spread across virtually every part of Grupo Simec's responses." Appx007720. To give Simec an opportunity to correct these widespread deficiencies, Commerce issued two supplemental questionnaires, and ultimately granted several extensions of time for Simec's responses. Appx007720, Appx007724, Appx007727. However, Simec's response to the second of the two questionnaires "left a breadth of deficiencies unresolved and did not {include} responses to a portion of the supplemental questionnaire{s}." Appx007727; Appx007732; *see also* Appx091515-091539; Appx 007817-007841. Commerce noted Simec's argument that certain data identified in the preliminary decision memorandum as missing, incomplete, or unreliable was not necessary to the agency's calculations or could be corrected by the agency itself. Appx007727-007728. However, Commerce found that it could not reliably determine how to implement corrections to Simec's data or be sure that any adjustments would accurately and appropriate resolve discrepancies. Appx007728. Moreover, without a complete record, Commerce was not in a position to reliably determine what deficient areas might be material to the margin calculation. *Id*. Commerce therefore continued to assign Simec a 66.70% margin in the final results. Appx007781; Appx007783.

Simec appeal followed. *See, e.g.*, Compl.

### B. <u>Determination of Acerero/Corsa's Antidumping Duty Margin</u>

Pursuant to 19 U.S.C. § 1675(a), after the imposition of an antidumping duty order, Commerce annually provides notice of an opportunity for interested parties to request a review of the order. *See, e.g.*, Appx001040. Where review is requested for more companies than Commerce can practicably review individually, the agency selects a subset of respondent companies for individual examination. *See, e.g.*, Appx001078-001080. It then bases the final margin for the non-examined companies on the results determined for the individually examined, "mandatory" respondents. *See* 19 U.S.C. §§ 1673d(c)(5)(A)-(B).[5]

The 2019-2020 administrative review covered four[6] Mexican producers and exporters of rebar. Commerce selected Simec and Deacero for individual examination. Appx007783; Appx1078; Appx7219. It determined the margins for the remaining two companies, Acerero and Corsa's predecessor company, Sidertul, by averaging the 0% calculated rate for Deacero with Simec's adverse rate. *See, e.g.*, Appx007227. Acerero appealed, complaining that Commerce's treatment of Simec impacted Acerero's rate, and that the determination of its rate was otherwise unreasonable and unlawful. Compl. (Aug. 26, 2022), CIT Ct No. 22-00230, ECF No. 8. Corsa is a plaintiff-intervenor in Acerero's appeal, which was consolidated with Simec's under Ct No. 22-00202. *See* Order, Ct. No. 22-00230 (Ct. Int'l Trade Oct. 26, 2022), ECF No. 34; Order, Ct. No. 22-00230 (Ct. Int'l Trade Sept. 23, 2022), ECF No. 23.

---

[5]     While the statute applies by its terms to investigations, Commerce applies it in administrative reviews as well. *Albemarle Corp. v. United States*, 821 F.3d 1345, 1352-53 (Fed. Cir. 2016).

[6]     As in the immediately preceding review, Commerce treated 15 members of the larger Simec corporate group as a single, collapsed entity. *See* Appx007218.

### III.   SUMMARY OF ARGUMENT

The Court should affirm Commerce's determination of the margins for Simec, Acerero, and Sidertul. Plaintiff parties do not persuade that Commerce erred in declining to further extend the already-extended deadline for Simec's supplemental Sections A-C questionnaire response, or in refusing to accept information germane to that questionnaire when filed six weeks after its due date. Plaintiffs likewise fail to demonstrate that Commerce erred in determining Simec's margin based on the facts available, or in employing an adverse inference to Simec in doing so. Plaintiffs' arguments that Commerce selected an inappropriate adverse margin likewise fail.

Similarly, Acerero and Corsa do not persuade that Commerce erred in determining the margin applied to Acerero and Sidertul as non-individually examined companies.

### IV.   ARGUMENT

In their opening briefs, Simec, Acerero, and Corsa argue that Commerce erred in determining Simec's margin in the challenged administrative review. *See* Simec's Br. at 18-40; Acerero/Corsa's Br. at 20-30. Acerero and Corsa further argue that their rate fails to reasonably reflect their potential dumping margins and is otherwise unlawful. Acerero/Corsa's Br. at 30-45. As explained below, these arguments are not convincing and the Court should affirm the final results of the challenged review in their entirety.

### A.   Commerce Did Not Err in Determining Simec's Margin

Simec is an experienced respondent that requested a review of its shipments for the 2019-2020 review period. Appx001002; *see also* discussion at 2, *supra*. Upon receiving Commerce's initial questionnaires – which were consistent with the questionnaires that Simec had received as a mandatory respondent in prior segments of the proceeding – Simec was given extensions of time in which to respond. Appx001409; Appx003715; Appx003781; Appx003786. Yet, it provided initial responses reflecting "unusually extensive" deficiencies that affected "virtually every part"

of the questionnaires. Appx007720, Appx007739; Appx007221-007222. To give Simec the opportunity to cure such broad-based deficiencies, Commerce was forced to issue more than 200 supplemental questions spread across two questionnaires. Appx007720, Appx007739; Appx007221-007222. The agency granted multiple extensions of time for Simec's responses, but Simec (1) failed to correct many of the deficiencies identified in the supplemental Sections A-C questionnaire, while affirming at times that it had done so, and (2) failed to timely file responses to that questionnaire's inquiries regarding Simec's downstream sales. Appx007739-007741. As Commerce noted, this left "the home market and U.S. sales data {} riddled throughout with deficiencies to such an extent that it {was} simply impossible {} to calculate an accurate dumping margin using the data submitted." Appx007740. The agency thus applied adverse inferences pursuant to 19 U.S.C. § 1677b(e) to determine Simec's Margin. Appx007741.

Simec, Acerero, and Corsa challenge the determination of Simec's margin on several grounds. *See* Simec's Br. at 18-40; Acerero/Corsa's Br. at 22-30. First, they claim that Commerce acted unlawfully in setting and enforcing a final deadline of September 7, 2021 for information responsive to the agency's supplemental Sections A-C questionnaire. Simec's Br. at 18-27; Acerero/Corsa's Br. at 22-27. Second, they argue that the agency unlawfully resorted to the facts available. Simec's Br. at 27-32. Third, they claim that Commerce unlawfully applied adverse inferences. *Id.* at 32-36; Acerero/Corsa's Br. at 27-30. Fourth, they claim that the adverse dumping margin that Commerce applied was itself unlawful. Simec's Br. at 36-40.

### 1. Commerce Did Not Err in Enforcing a Deadline for the Supplemental Sections A-C Questionnaire Response

Plaintiffs begin by arguing that Commerce acted unlawfully in setting and enforcing a final deadline of September 7, 2021 for information responsive to the agency's supplemental Sections

A-C questionnaire. *Id.* at 18-27; Acerero/Corsa's Br. at 22-27.[7] They claim that the agency's denial of Simec's request for an extension through September 20, 2021 was unreasonable. Simec's Br. at 18-22; Acerero/Corsa's Br. at 22-27. Plaintiffs Acerero and Corsa also argue that Commerce failed to adequately consider Simec's explanation as to why it needed more time. Acerero/Corsa's Br. at 22-27. Plaintiffs moreover argue that Commerce erred in rejecting certain responsive information filed on October 18, 2021. Simec's Br. at 22-27; Acerero/Corsa's Br. at 23. These arguments are unavailing.

As noted previously, although Simec was an experienced respondent that requested a review of its 2019-2020 shipments, its initial questionnaire responses reflected "unusually extensive" deficiencies. Appx007220. To allow Simec an opportunity to correct these deficiencies, Commerce issued Simec a supplemental Sections A-C questionnaire on July 27, 2021. Appx004873. Initially, Commerce allotted Simec three weeks, or until August 17, 2021 to respond. Simec repeatedly pressed for an extension of an additional three weeks, to September 7, 2021, and Commerce ultimately granted this request. Appx004904-004905; Appx004907; Appx004917-004919; Appx004921; Appx004926-Appx004927; Appx004932-004933; Appx004939; Appx004944. In so doing, Commerce noted that:

> given the amount of time already granted to prepare the responses to this questionnaire, as well as the statutory and regulatory deadlines in this case and ongoing workloads, we are unlikely to be able to accommodate any additional extensions of time for the preparation and submission of responses to this supplemental questionnaire.

---

[7]     As the Department of Justice explains in its brief, while Commerce formally granted extensions through September 7, 2021, Simec filed an additional extension request (confusingly dated September 6, 2021) just before the close of business on September 7, 2021. Def.'s Resp. to Pls' Mots. for J on the Admin. Record (June 26, 2023), ECF No. 48 at 5. Because Commerce was unable to respond to this request before the close of business, the due date for Simec's supplemental Section A-C questionnaire response rolled to 8:30 a.m. on September 8, 2021. *See id.*

Appx004944. Commerce also warned Simec that "any information submitted after the applicable deadline will be considered untimely filed and may be rejected." *Id.* The agency also noted that late filing of responsive information might require the agency to resort to the "facts available," consistent with 19 U.S.C. § 1677e. *Id.* In a filing dated September 6, 2021 (but actually filed just before the close of business on September 7, 2021), Simec nonetheless requested a further extension through September 20, which Commerce denied on September 9, 2021. Appx004954-Appx004955; Appx004958.

Plaintiffs characterize this denial as unreasonable. Relying on *Celik Halat ve Tel Sanayi A.S. v. United States*, 557 F. Supp. 3d 1348 (Ct. Int'l Trade 2022) and *Grobest & I-Mei Indus. (Vietnam) Co. v. United States*, 815 F. Supp. 2d 1342 (Ct. Int'l Trade 2012), they argue that Commerce must accept late-filed data so long as doing so would not require substantial additional work on the agency's part and would improve the accuracy of the margin calculations. Simec's Br. at 18-22; Acerero/Corsa's Br. at 22-27. Neither case is apposite.

In the proceeding underlying *Celik Halat*, Commerce rejected a respondent's initial Sections B and C responses and applied total adverse inferences on the basis that one exhibit to those responses was filed at 5:21 p.m. on the due date, rather than before 5:00 p.m. *Celik Halat*, 557 F. Supp. 3d at 1354-55, 1360. The court characterized this as "a minor incident of noncompliance with a {} filing requirement that had no appreciable effect on the antidumping duty investigation," and which did not therefore merit the application of adverse inferences. *Id*. at 1357. The circumstances here are not comparable. Here, Simec failed entirely to respond to a portion of the supplemental Sections A-C questionnaire, filed a partial response that continued to reflect many of the deficiencies identified in the initial questionnaire responses, and made no attempt to file any further information by September 20, 2021, the extended date that Simec itself had

requested. Appx007221-007222; Appx007730. Rather, it waited until October 18, 2021, nearly a month after the due date it sought, to attempt to file any additional information. Even then, the additional information was limited to translations of documents previously provided and responses to certain downstream sales questions. *See* Appx007110-007111; Appx007731. Simec accordingly failed to cure many of the deficiencies first noted in the initial questionnaire responses and which persisted in the supplemental response filed on September 7, 2021.

For its part, *Grobest* involved a "relatively simple" separate rate certification, late acceptance of which would not have required significant additional work for Commerce. *See, e.g.*, Appx007731. By contrast, given the significant deficiencies in Simec's initial responses, the supplemental Sections A-C questionnaire was "extremely extensive" and took weeks for the agency to prepare. *Id.* Simec's September 7, 2021 response to that supplemental questionnaire was plagued by many of the same errors inherent in its initial responses, and the company made no attempt to submit further information on or by the date that it had itself requested, September 20, 2021. Appx007730. These facts fatally undermine plaintiffs' argument that, given the November 30, 2021 date of the preliminary results, the agency would have been able to provide Simec with additional time in which to file its response to the supplemental questionnaire without any meaningful impact on the agency's own workload or compliance with deadlines.

Plaintiff parties likewise do not persuade that Commerce failed to give appropriate consideration to Simec's explanation for requesting additional time. Indeed, Commerce gave Simec six weeks, twice the time originally allotted, to file its questionnaire responses. *See* discussion *supra* at 2-3. Moreover, the supplemental Section A-C questionnaire solicited data that had already been requested in the agency's initial questionnaires. Appx007222. Ultimately, Simec had *seven months* (between the February 8, 2021 issuance of the initial questionnaires and the

September 7, 2021 supplemental A-C questionnaire due date) to provide this data, and still failed to file complete, timely, reliable information. Again, Simec was a practiced respondent that had filed complete, timely, and reliable responses to Commerce's questionnaires in multiple past reviews, and should have anticipated needing to do so here given its request for a review of its shipments. Commerce accordingly did not err in declining to grant Simec's request for a further two weeks' time in which to file its supplemental Sections A-C questionnaire response.

Plaintiffs also argue that Commerce erred in refusing Simec's October 18, 2021 submission of information meant to supplement its September 7, 2021 response. Simec's Br. at 22-27; Acerero/Corsa's Br. at 23. They claim that Commerce is required to accept "corrective" information filed prior to the preliminary results, and otherwise to accept information that will lead to more accurate calculations. Simec's Br. at 23-26; Acerero/Corsa's Br. at 23-25. Simec also characterizes Commerce's decision not to accept the October 18, 2021 data as arbitrary in light of the agency's treatment of Deacero, the other mandatory respondent, from which the agency accepted data through November 10, 2021. Simec's Br. at 26-27. Plaintiffs again fail to persuade.

A comparison of the facts here with those underlying *Pro-Team Coil Nail Enter. Inc. v. United States*, 419 F. Supp. 3d 1319 (Ct. Int'l Trade 2019) is instructive. There, this court remanded Commerce's application of adverse inferences based on the rejection, as untimely, of a single schedule of data that "summarized information already on the record" and confirmed assertions already made. *Id.* at 1332. Simec's October 18, 2021 filing, by contrast, contained entirely new information in the form of responses to downstream sales questions that went unanswered in the original September 7, 2021 response, as well as previously unprovided translations of documents. *See* Appx007110-007111; Appx007731. Such new, untimely data cannot reasonably be analogized to summaries of information already on the record.

Similarly, while plaintiffs point to cases such as *Grobest* and *NTN Bearing Corp.* v. *United States* for the proposition that Commerce is required to accept corrective filings, precedent does not support them here. Again, *Grobest* involved late submission of a "relatively simple" filing, while *NTN Bearing* involved correction of mere clerical errors. *NTN Bearing Corp.*, 74 F.3d 1204, 1206-09 (Fed. Cir. 1995). Rather than making a simple, corrective submission, Simec attempted to file previously requested substantive data six weeks after the deadline that Commerce had established for that data. As the courts have found, Commerce does not err in rejecting untimely filed factual data where the respondent had the opportunity to submit it timely. *PSC VSMPO–Avisma Corp. v. United States*, 688 F.3d 751, 760-62 (Fed. Cir. 2012).

Nor does Commerce's treatment of Deacero help plaintiffs here. While the agency continued to accept data from Deacero through November 10, 2021, that company was much further along in the questionnaire process. Appx007729-007730; *see also* Appx0089251-008926; Appx007167-007172 (narrative portion of Deacero's Nov. 10, 2021 submission). By contrast with the more limited issues that remained with respect to Deacero's data, the supplemental Sections A-C questionnaire covered "extremely extensive" issues cutting across Simec's sales reporting. Appx007730-007731.

Importantly, plaintiffs' goal in challenging Commerce's rejection of both Simec's October 18, 2021 filing and its request for an extension through September 20, 2021 for the supplemental Section A-C response is to disturb the agency's reliance on the facts available. Such an argument presumes that, had Commerce accepted the October 18, 2021 data or allowed an extension through September 20, 2021 for the overall supplemental Sections A-C response, there would no longer be any basis for resorting to the facts available. But as Commerce noted, it did not resort to the facts available simply because the September 7, 2021 supplemental response was missing responses to

downstream sales questions (which Simec purported to provide on October 18, 2021), or because of missing translations (likewise proffered on October 18, 2021). *See* Appx007110-007111; Appx007731. As Commerce explained, it resorted to the facts available because the timely filed portions of Simec's supplemental Sections A-C response continued to reflect many of the same deficiencies as the initial questionnaire responses. Appx007732; Appx007736-007741; Appx091515-91539; Appx007817-007841. This issue would not have been resolved by accepting the data filed on October 18, 2021. Appx007732. Nor did Simec make any attempt to file any other data – either on September 20, 2021 or October 18, 2021 – that would have cured these deficiencies. Plaintiffs' attempt to collaterally attack the facts available determination through the establishment of a final deadline for the submission of information responsive to the supplemental Section A-C questionnaire thus rings hollow.

In sum, Commerce did not err in setting and enforcing a deadline for Simec's supplemental Sections A-C questionnaire. This questionnaire was issued to allow the company to cure deficiencies in its initial questionnaire responses, and the agency ultimately granted Simec twice as long a period for filing as was originally allotted. The agency was not required to further extend the deadline or to accept responsive information that Simec attempted to submit well after its own last-requested due date. The court should leave Commerce's decisions with respect to the deadline for the supplemental Sections A-C questionnaire response undisturbed.

### 2.   Commerce Did Not Err in Applying the Facts Available

Plaintiffs next argue that Commerce erred in applying the facts available, claiming that there were insufficient gaps in Simec's reported information to justify that application. Simec's Br. at 27-32. In this regard, plaintiffs argue that any gaps in the record are the result of Commerce's failure to provide Simec with sufficient time to provide information. *Id.* at 27-29. They also argue

that Commerce failed to comply with 19 U.S.C. § 1677m(d) and thus lacked the legal authority to rely on the facts available. *Id.* at 29-32. Neither argument is compelling.

Title 19 U.S.C. § 1677e requires Commerce to determine a margin using the "facts otherwise available" wherever "necessary information is not available on the record," or an interested party withholds requested information, fails to provide it by established deadlines, provides unverifiable information, or otherwise significantly impedes a proceeding. 19 U.S.C. § 1677e. Here, plaintiffs do not appear to contest, in principle, that these conditions are met. Simec's Br. at 27-32. Rather, they argue that they were met only because Commerce unreasonably failed to provide Simec with sufficient time to respond to the supplemental Sections A-C questionnaire and/or because Commerce refused to accept the late-filed data that Simec proffered on October 18, 2021. *See id.*

As explained above, this is not the case. Even had Commerce accepted Simec's October 18, 2021 submission of responses to questions on downstream sales and certain translations, Simec's supplemental Sections A-C response would have continued to reflect many of the same deficiencies as the initial questionnaire responses. *See* Appx007110-007111; Appx007731-007732; Appx007736-007741; Appx091515-91539; Appx007817-007841. Simec made no attempt to file any other data – either on September 20, 2021 (the submission date that it had requested) or October 18, 2021 – that would have cured these deficiencies. These facts fatally undermine plaintiffs' claim that the gaps on the record exist only because Commerce failed to give Simec sufficient time to fill those gaps. Indeed, Simec had *seven months* (between the February 8, 2021 issuance of the initial questionnaires and the September 7, 2021 supplemental A-C questionnaire due date) to provide the data that remained missing as of October 18, 2021. Yet it still failed to file complete, timely, reliable information.

Plaintiffs argue that, regardless, Commerce failed to comply with 19 U.S.C. § 1677m(d), and thus lacked the authority to resort the "facts otherwise available." Title 19 U.S.C. § 1677m(d) requires Commerce to inform questionnaire respondents of deficiencies in their responses, and provide an opportunity to remedy them. 19 U.S.C. § 1677m(d). However, if having been provided with such an opportunity, the respondent provides unsatisfactory or untimely information, "then {Commerce} may, subject to subsection (e), disregard all or part of the original and subsequent responses." *Id.* For its part, 19 U.S.C. § 1677m(e) requires Commerce to use "necessary" record information that "does not meet all the applicable requirements" that the agency has established, but only where the information is (a) timely, (b) verifiable, (c) reliable, (d) the submitter has acted to the best of its ability to provide all of the information and meet all applicable requirements, and (e) the information can be used without undue difficulties. *Id.* § 1677m(e).

Simec argues that Commerce violated 19 U.S.C. § 1677m(d) because it did not notify the company of deficiencies in its September 7, 2021 supplemental Sections A-C response until the preliminary results were issued, and did not issue additional supplemental questionnaires. Simec's Br. at 30-32. Simec also argues that the statute obligated Commerce to issue the supplemental Sections A-C questionnaire more quickly than it did. *Id.* at 28-30.

Simec misunderstands the statute. By its plain terms, 19 U.S.C. § 1677m(d) requires Commerce to advise respondents of deficiencies in their *initial* questionnaire responses, and provide an opportunity to cure these. 19 U.S.C. § 1677m(d). Commerce did just that here, advising Simec of the pervasive issues cutting across its initial responses, and providing an opportunity – inclusive of multiple extensions of time – to submit corrective and explanatory information through the supplemental Sections A-C questionnaire. *See, e.g.*, Appx007221-7223; Appx007728. However, as 19 U.S.C. §§ 1677m(d)(1) – (3) state, once the agency has offered this opportunity

for correction of initial responses, the agency is permitted to disregard any unsatisfactory or untimely supplemental response – and indeed, to the extent that the supplemental information is unsatisfactory/untimely, even the initial information. *Id.* §§ 1677m(d)(1) – (3). The only exception to this is for data that is timely, verifiable, reliable, has been submitted by a respondent that has acted to the best of its ability to provide the requested data, and can be used without undue difficulty. *Id.* § 1677m(e).

As Commerce explained, while the agency gave Simec opportunity to correct and supplement its initial questionnaire responses, the supplemental data was clearly "not satisfactory" within the meaning of 19 U.S.C. § 1677m(d), because Simec failed to meaningfully address many of the questions and even introduced new discrepancies. Appx007221-007223; Appx007737-007738. While Simec argues that the new discrepancies should have independently resulted in a new supplemental questionnaire, the fact of such discrepancies only confirms the unsatisfactory nature of the company's supplemental Sections A-C response – a condition that does not require further questionnaires, but rather authorizes the agency to disregard both the initial and supplemental information. 19 U.S.C. § 1677m(d). Nor did the information contained in Simec's initial and supplemental responses meet the five prerequisites of 19 U.S.C. § 1677m(e); Appx007737-007738. Rather, these responses were so "incomplete, unreliable, and unsupported" that Commerce lacked "any sales-related information that can be used as a basis for conducting a dumping analysis." Appx007224.

As for Simec's argument that Commerce should have issued the supplemental Sections A-C questionnaire more quickly, Simec points to nothing in the statute or to any case law that imposes a specific deadline on Commerce's issuance of a supplemental questionnaire. Simec's Br. at 27-31. Rather, it cites cases that stand for the proposition that Commerce must advise respondents of

deficiencies and provide a reasonable opportunity for correction. *See id.* Here, Commerce provided Simec with notice of the deficiencies in its initial responses by issuing the supplemental Sections A-C questionnaire, and ultimately gave the company six weeks to respond. Commerce was not required to give the company further bites at the same apple. Nor was Commerce required to rely on incomplete, untimely, unreliable data submitted by a company that had not acted to the best of its ability and that could not be used without undue difficulty. *See* 19 U.S.C. § 1677m(e); *see also* Appx007737-007738.

Here, Commerce appropriately found that the statutory prerequisites for reliance on the "facts otherwise available" were met. Information necessary to the margin calculation was not on the record. Commerce informed Simec of deficiencies in its initial responses and provided six weeks for the company to cure these. It was not required to issue additional supplemental questionnaires or to rely on information that did not meet the requirements of 19 U.S.C. § 1677m(e).

### 3. Commerce Appropriately Applied Adverse Inferences

Plaintiffs next argue that Commerce erred in applying adverse inferences, and particularly "total" adverse inferences, in determining Simec's margin. Simec's Br. at 32-36; Acerero/Corsa's Br. at 27-30. They claim that Simec acted to the best of its ability to comply with Commerce's information requests. Simec's Br. at 32-35; Acerero/Corsa's Br. at 27-30. They also argue that the record gaps relate to "discrete" categories of information, such that resort to total adverse inferences is unjustified. Simec's Br. at 35-36.

As noted above, the statute requires Commerce to determine a margin using the "facts otherwise available" wherever "necessary information is not available on the record," or an interested party withholds requested information, fails to provide it by established deadlines,

provides unverifiable information, or otherwise significantly impedes a proceeding. 19 U.S.C. § 1677e. In relying on the facts available, Commerce "may use an inference that is adverse to the interests" of the party providing deficient information if the party "has failed to cooperate by not acting to the best of its ability to comply with a request for information . . . ." *Id.* § 1677e(b)(1).

The "best of its ability" standard "assumes that {respondents} are familiar with the rules and regulations" and "does {not} require findings of motivation or intent." *Nippon Steel Corp. v. United States*, 337 F.3d 1373, 1382-83 (Fed. Cir. 2003). Accordingly, a respondent may fail to meet the standard not only through "intentional conduct, such as deliberate concealment or inaccurate reporting," but through "inattentiveness, carelessness, or inadequate record keeping." *Id.* at 1382-83. The standard requires respondents to maintain the records that they reasonably should anticipate being required to provide, in such a way that they can provide them timely and completely. *Id.* In this regard, "it is presumed that respondents are familiar with their own records," and "{i}t is not an excuse that the employee assigned to prepare a response does not know what files exist, or where they are kept, or did not think – through inadvertence, neglect, or otherwise to look beyond the files immediately available." *Id.*

Consistent with the above, to appropriately apply adverse inferences, Commerce must only find that (i) "a reasonable and responsible {respondent} would have known that the requested information was required to be kept and maintained under the applicable statutes, rules, and regulations"; and (ii) that the respondent under investigation has failed to cooperate by either "failing to keep and maintain all required records, or . . . failing to put forth its maximum efforts to investigate and obtain the requested information from its records." *Id.*

Simec was an experienced respondent that had responded to questionnaires – including questionnaires covering multiple affiliates and production locations – in prior reviews. *See*

discussion *supra* at 1-2. The fact that Simec was unable to provide information of the sort that it had previously reported multiple times indicates that the company failed to keep adequate records of its sales for the 2019-2020 review period. Moreover, having requested a review of its sales for 2019-2020, Simec should reasonably have anticipated being called upon to preserve and organize those records.

Plaintiffs argue that Commerce nonetheless erred by failing to appropriately consider the reasons for which Simec sought additional time to respond to the supplemental Sections A-C questionnaires. Simec's Br. at 33-34; Acerero/Corsa's Br. at 27-30. But Commerce noted those reasons and ultimately doubled the period originally provided for Simec's supplemental response. Yet, not only did Simec fail to respond timely to all of the questions posed, its supplemental Sections A-C response continued to reflect many of the errors called out in the initial questionnaire responses. Appx007732.

Plaintiffs argue that even if Simec's overall responses were lacking in certain respects, they were not so incomplete or unreliable as to warrant more than "partial" adverse inferences. Simec's Br. at 35- 36. They argue that the agency may only employ "total" adverse inferences where all of the data that a respondent has provided is unreliable or deficient. *Id.* at 35. They claim that the agency identified only a "small" number of errors in Simec's submissions, which were limited to discrete categories of data. *Id.* at 35-36. As such, plaintiffs conclude, to the extent that any adverse inference was at all warranted, it could only be partial, and could not be used to supplant reliable data that Simec had reported. *Id.* at 36. Plaintiffs are wrong.

First, as the Court of Appeals for the Federal Circuit ("CAFC") has explained, "use of partial facts available is not appropriate when the missing information is core to the antidumping analysis and leaves little room for the substitution of partial facts without undue difficulty."

*Mukand, Ltd. v. United States*, 767 F.3d 1300, 1308 (Fed. Cir. 2014) (upholding Commerce's use of total adverse inferences where a respondent failed to break out its data by product size, preventing calculation of an accurate constructed value). Consistent with this holding, total adverse inferences are appropriate where there are persistent and pervasive deficiencies in the submitted data. *See, e.g.*, *Zhejiang DunAn Hetian Metal Co. v. United States*, 652 F.3d 1333, 1348 (Fed. Cir. 2011) (citing *Steel Auth. of India, Ltd. v. United States*, 149 F. Supp. 2d 921, 928-29 (Ct. Int'l Trade 2001)).

This does not mean that "all" of the data a respondent has reported must be deficient. Indeed, the courts have repeatedly affirmed Commerce's use of total adverse inferences in situations in which record gaps are centered on one area of reporting (*e.g.*, cost reporting, sales, corporate ownership). For example, this court has upheld the use of total adverse inferences after a respondent failed to properly report service-related revenues, which caused a distortion in the reported U.S. and home market prices. *See Hyundai Heavy Indus., Co., Ltd. v. United States*, 399 F. Supp. 3d 1305, 1313-14 (Ct. Int'l Trade 2019). The CAFC similarly affirmed reliance on total adverse inferences where a respondent failed to disclose affiliates and misrepresented its corporate structure, explaining that these deficiencies rendered the respondent's data unreliable and unusable. *See Ad Hoc Shrimp Trade Action Comm. v. United States*, 802 F.3d 1339, 1357 (Fed. Cir. 2015). The salient question is not whether all of the data is unreliable, but whether the gaps are related to "core" issues that cannot be filled without undue difficulty.

Here, while Simec argues that the gaps in the record are related to "discrete categories of information," Simec's Br. at 35, Commerce found that "the home market and U.S. sales data are riddled throughout with deficiencies to such an extent that it is simply impossible for Commerce to calculate an accurate dumping margin using the data submitted." Appx007740; *see also*

Appx0091531-091539; Appx007817-007841. Reliable sales data is indisputably core to Commerce's analysis and goes "to the heart" of the margin calculation. *Ad Hoc Shrimp,* 802 F.3d at 1357, quoting *Ad Hoc Shrimp Trade Action Comm. v. United States*, 925 F. Supp. 2d 1315, 1324 (Ct. Int'l Trade 2013). Simec's failure to provide reliable sales data justifies the agency's reliance on total, rather than partial, adverse inferences.

Finally, Simec characterizes the gaps in the record here as too "minor" to warrant the application of any adverse inference. Simec's Br. at 35-36. In support of this claim, it cherry-picks a single example – a discrepancy between its yield strength and Control Number ("CONNUM")[8] reporting for two sequence numbers in its database – and then dismissively characterizes all of the record gaps as being "of this kind." *Id.* at 36. But as the agency explained, this discrepancy is far from the only record gap. *See* Appx091517-091539; Appx007817-007841. Nor was Commerce's resort to adverse inferences rooted in this single gap; rather, it was the significant number of record gaps, and their collective effect on the agency's ability to make accurate calculations, that Commerce found to render the company's sales data unusable. *See, e.g.*, *id.*; *see also* Appx007736-007741. Further, while Simec characterizes the discrepancy in yield strength/CONNUM reporting as minor in light of the overall number of reported sequence numbers, Simec's Br. at 35-36, it ignores the fact that it (1) claimed to have corrected this issue in the supplemental questionnaire despite not having done so and (2) failed to update its database to resolve other discrepancies in its yield strength reporting, as identified in supplemental questions 27a-c. Appx084714-084715;

---

[8]     CONNUMS are a concatenation of various codes relating to the characteristics of particular product models. The CONNUMs for this case included codes mapping on to the yield strength of the rebar that respondents sold in their home and U.S. markets. Proper (and internally consistent) CONNUM and characteristics reporting is fundamental to accurate margin calculations, as Commerce uses this reporting to ensure that U.S. sales are compared with home-market sales of identical goods, or the most similar goods possible.

Appx085132; Appx004997-004998; Appx005081; *see also* Def.-Int.'s Resp. to Mot. for Prelim. Injunction against Cash Deposits (Dec. 28, 2022), ECF No. 35 at Exhibit 3 (excerpting specific information for the relevant two observations from Exhibit SQ1B-14 to Simec's September 7, 2021 supplemental Sections A-C questionnaire response, constituting Home Market Database GSMCAR20HM02).[9]

In sum, plaintiffs do not does not demonstrate that Simec acted to the best of its ability in this review. Rather, its self-evident failure to properly maintain its records, as well as its failure to submit timely or reliable information, support Commerce's conclusion that Simec did not meet the "best of its ability" standard here. Further, Commerce was not required to rely solely on "partial" adverse inferences here.

### 4. Commerce Did Not Err in Selecting the 66.70% Margin

Finally, Simec argues that, even if Commerce could reasonably rely on total adverse inferences to determine Simec's margin, it could not lawfully select the adverse margin that it did. Simec's Br. at 36-40. Simec argues that Commerce cannot simply default to the highest margin previously used in any segment of the proceeding; rather, it must "assess Simec's culpability" and adjust the adverse margin in relation to that assessment. *Id.* at 36-37. Simec further alleges that Commerce did not adequately explain or support its view that circumstances here were similar to those that led the agency to apply a 66.70% margin to Simec in the original investigation. *Id.* at 37-38. Finally, Simec argues that case law forbids Commerce from selecting an "aberrational," "uncorroborated," or "punitive" adverse rate. *Id.* at 38-40.

---

[9]      The underlying Excel file has been submitted to the Court on flash drive; it is associated with Appx085162.

In making these arguments, Simec relies primarily on case law arising from administrative proceedings that predate certain 2015 amendments to the statutory provisions for adverse inferences. *See id.* at 36-40. These amendments expressly authorized Commerce to employ, as an adverse rate, any dumping margin from a prior segment of a proceeding. 19 U.S.C. § 1677e(d)(1)(B); *see also* Sec. 502 of the Trade Preferences Extension Act of 2015, P.L. 114-27, 129 Stat. 362, 383-84 (June 29, 2015). The 66.70% rate applied to Simec here was from the original investigation; indeed, it was applied to Simec in that investigation, making it particularly appropriate in this instance. *See Steel Concrete Reinforcing Bar from Mexico*, 79 Fed. Reg. 54,967, 54,968 (Dep't Commerce Sept. 15, 2014) (final deter. of sales at less than fair value and final affirm. deter. of critical circumstances) ("*Rebar from Mexico Inv.*"). As Commerce noted, that rate was applied to Simec in the investigation under "similar circumstances," *i.e.*, because it failed in the investigation to provide accurate information to support its home market sales data. Appx007745-007746.

The 2015 amendments also gave Commerce the discretion to apply the "highest" margin from any prior segment of the proceeding. 19 U.S.C. §§ 1677e(d)(1)(B) & (d)(2). To the extent that Simec claims that Commerce failed to make an "evaluation . . .of the situation" giving rise to the need for adverse inferences, pursuant to 19 U.S.C. § 1677e(d)(2), the amended statute clarifies that Commerce is under no requirement to select an adverse rate that reflects a respondent's supposed "commercial reality" or the rate that it would have likely received had it cooperated. 19 U.S.C. § 1677e(d)(3). Moreover, Commerce explained its evaluation of the situation, which included Simec's position as an experienced respondent and its attempted submission of information well beyond deadlines. Appx007744-007746.

Simec argues that Commerce failed to adequately explain or support its view that circumstances here were similar to those that led the agency to apply a 66.70% margin to Simec in the original investigation. Simec's Br. at 38. However, Commerce explained that it viewed the circumstances here as similar to those of the investigation because Simec failed to provide reliable sales data in both segments of the proceeding. Appx007744-007755; *see also* Issues and Decision Memorandum accompanying *Rebar from Mexico Inv.* at 3, 19-23. And while Simec claims that the two proceedings are dissimilar, in that COVID-19 did not exist at the time of the original investigation and accordingly had no impact on Simec's behavior at the time, Commerce also acknowledged that explained its evaluation of the situation underlying this specific segment of the proceeding. Appx007744-007746.

Finally, Simec relies on *Oman Fasteners LLC v. United States*, Ct. No. 22-00348, slip op. 23-17 (Ct Int'l Trade Feb. 15, 2023) ("Slip Op. 23-17) to argue that Commerce cannot justify selection of the highest available adverse rate simply to "induce cooperation." Simec's Br. at 39-40. In the proceeding underlying that case, Commerce rejected a respondent's supplemental questionnaire response after the company filed a portion of that response sixteen minutes late; the agency then applied a 154.33% adverse rate. Slip Op. 23-17 at 5-10. The Court found that Commerce abused its discretion in refusing a retroactive extension of time, in applying an adverse rate, and in selecting the 154.33% margin. *Id.* at 13. In rejecting the 154.33% margin, the Court noted that a late filing did not explain that selected rate, particularly given that the highest margin previously applied to the respondent was 4.22%, in the original investigation. *Id.* at 23 n.12. The court found Commerce's actions so egregious that it enjoined the collection of cash deposits. *Id.* at 38-39.

The circumstances here are far different. Commerce did not apply total inferences based on an after-hours filing, on the due date, of a single exhibit from a questionnaire response. It applied such inferences based on Simec's failure to provide complete and reliable information despite being given the opportunity to correct its initial, flawed data. Appx007745. The agency also evaluated the situation, consistent with 19 U.S.C. § 1677e(d)(2), and explained why that evaluation supported assignment of the 66.70% rate, which was also assigned to Simec in the original investigation. Appx007744-007755. And while Simec moved this court for an injunction against cash deposits, that motion was denied. *Grupo Simec S.A.B. de C.V. et al. v. United States*, Ct. No. 22-00202, slip op. 23-00022 (Ct Int'l Trade Feb. 24, 2023) at 23-24.

The Court should affirm Commerce's selection of the 66.70% adverse rate. Commerce was statutorily authorized to select this rate; it also explained why it chose that rate in light of the "situation" that led it to apply adverse inferences.

## 5. Conclusion

The Court should affirm Commerce's determination of Simec's margin. Commerce reasonably and appropriately resorted to total adverse inferences after Simec submitted sales data that reflected pervasive deficiencies. Prior to deciding to employ adverse inferences, Commerce notified the company of these deficiencies and provided it with a reasonable opportunity for correction. Commerce was not obliged to provide the company with further time to cure these deficiencies, or with separate and additional opportunities to do so. Further, the adverse rate that Commerce selected was well within its statutory authority, and was adequately supported and explained.

Consol. Ct. No. 22-00202                                    NON-CONFIDENTIAL VERSION

### B. Commerce Did not Err in Determining Acerero/Corsa's Margin

Pursuant to 19 U.S.C. § 1675(a), after the imposition of an antidumping duty order, Commerce annually publishes notice of an opportunity for interested parties to request a review of the order. *See, e.g.*, Appx001040. Where interested parties request a review of more companies than Commerce can practicably review individually, the agency selects a subset of respondent companies as "mandatory" respondents that will be subject to individual examination. *See, e.g.*, Appx001078-001080. It then determines the margin for the non-individually examined companies by averaging the mandatory respondents' margins, excluding margins that are zero, *de minimis*, or entirely based on the facts available. *See* 19 U.S.C. § 1673d(c)(5)(A); *see also* n.5, *supra*. Where the mandatory respondents' margins are all zero, *de minimis*, or based on the facts available, the agency may use "any reasonable method" to determine the non-individually examined companies' margin. 19 U.S.C. § 1673d(c)(5)(B). That said, the "expected method" in such cases is for Commerce to average the mandatory respondents' zero, *de minimis*, and facts-available margins. *See* Statement of Administrative Action accompanying the Uruguay Round Agreements Act, H.R. Doc. No. 103-316, vol. 1, at 873 (1994), *reprinted in* 1994 U.S.C.C.A.N. 4040, 4201 ("SAA").

Here, after determining zero and facts available margins for the two mandatory respondents, Commerce averaged those margins to determine the margin for Acerero and Sidertul. *See, e.g.*, Appx007227. Acerero and Sidertul's successor, Corsa, challenge the averaged margin on three grounds. First, they argue that Commerce erred in determining Simec's margin, echoing Simec's own arguments on this issue. Acerero/Corsa's Br. at 22-30. Next, they argue that the expected method produced unreasonable results in this case. *Id.* at 30-42. Finally, they argue that Commerce unlawfully based their margin on a simple average, rather than a weighted average, of the mandatory respondents' margins. *Id.* at 42-45.

RTAC has addressed Acerero/Corsa's first argument above in Section IV.A. As detailed below, their other claims are equally unpersuasive.

### 1.   Acerero/Corsa Do Not Persuade That Their Margin is Unreasonable

Commerce calculated a 33.35% margin for Acerero and Sidertul, by averaging the 0% margin calculated for Deacero with the 66.70% margin assigned to Simec. *See, e.g.*, Appx007227; Acerero/Corsa's Br. at 30. Acerero and Corsa argue that this margin is "extraordinarily high" in comparison with margins assigned to non-individually examined companies in prior reviews of the order. Acerero/Corsa's Br. at 30-31, 37-40. As such, Acerero and Corsa claim that their margin is not "reasonably reflective of potential dumping margins for non-investigated exporters or producers" and thus unlawful. *Id.* at 34, quoting SAA, H.R. Doc. No. 103-316 (1994), reprinted in 1994 U.S.C.C.A.N. 4040, 4201. They argue that the courts have rejected similarly calculated margins in the past, where those margins failed to reflect the economic reality of non-individually examined companies. *Id.* at 35-37. They claim that the 33.35% margin reflects outdated and unrepresentative data, and that no affirmative evidence demonstrates its relevance to Acerero and Sidertul. *Id.* at 38-40. They accordingly conclude that, rather than assign Acerero and Sidertul the 33.35% margin, Commerce should have assigned them the 4.93% margin determined for non-examined companies in the immediately preceding administrative review. *Id.* at 41-42.

These claims are unpersuasive. In arguing that the 33.35% margin is inherently unreasonable, Acerero and Corsa fail to properly recognize the history of the order. As an initial matter, the margins for non-individually examined companies have increased irregularly across the life of the order, rising from zero in the 2015-2016 review to 4.93% in the review immediately preceding the one at bar. *See, e.g.*, *id.* at 30-31. Further, Acerero itself received a 66.70% margin as an individually examined respondent in the original investigation. *Steel Concrete Reinforcing*

*Bar from Mexico*, 79 Fed. Reg. 65,925, 65,926 (Dep't Commerce Nov. 6, 2014) (antidumping duty order). Although not previously individually examined, Sidertul was subject to the 20.58% rate determined for Deacero in the original investigation. *Id.* The 33.35% margin is therefore not obviously or inherently unreasonable in comparison with margins previously applied to non-individually examined respondents generally or to Acerero and Sidertul in particular.

Acerero and Corsa nonetheless complain there is no affirmative record evidence connecting the 33.35% margin to Acerero/Sidertul's commercial experience during the review period. Acerero/Corsa's Br. at 36. But the trade remedy statute presumes that the individually examined respondents – including those receiving facts-available margins – are "representative of all exporters." *Changzhou Hawd Flooring Co. v. United States*, 848 F.3d 1006, 1012 (Fed. Cir. 2017) (quoting *Albemarle Corp.*, 821 F.3d at 1353). Indeed, "{t}he representativeness of the investigated exporters is the essential characteristic that justifies an 'all others' rate . . . .'" *Id.* (quoting *Nat'l Knitwear & Sportswear Ass'n v. United States*, 779 F. Supp. 1364, 1373-74 (Ct. Int'l Trade 1991)). As such, to carry their argument, Acerero and Corsa must demonstrate that substantial record evidence rebuts the statutory presumption of representativeness. In other words, they must point to record data showing Simec and Deacero are unrepresentative, despite being the two largest exporters during the review period and having been selected for individual examination in multiple prior segments of the proceeding. Appx080047-080048; *Rebar from Mexico Inv.* (both Deacero and Simec individually examined, along with Acerero); AR 14-15 Final Results at 27,234 (both Deacero and Simec individually examined); *Steel Concrete Reinforcing Bar from Mexico*, 83 Fed. Reg. 27,754 (Dep't Commerce June 14, 2018) (final results of antidumping duty admin. rev.; 2015-2016 (Deacero individually examined; Grupo Simec not subject to review); AR 16-17 at 35,600 (both Deacero and Simec individually examined); AR 17-18 Final Results at 71,054

(both Deacero and Simec individually examined); *Steel Concrete Reinforcing Bar from Mexico*, 86 Fed. Reg. 50,527, 50,528 (Dep't Commerce Sept. 9, 2021) (final results of antidumping duty admin. rev. and final deter. of no shipments; 2018-2019).

Rather than claim to have met this burden, Acerero and Corsa argue that Commerce prevented them from doing so. Acerero/Corsa's Br. at 40. In particular, they argue that Commerce should have provided Acerero and Sidertul with an opportunity to place evidence on the record to demonstrate Simec's unrepresentativeness. *Id.* They do not claim, however, that either company made an attempt to file such evidence, or even asked for the opportunity to do prior to filing their case briefs, which were submitted more than two months after the companies were preliminarily assigned the 33.35% margin. *See id.*; *see also* Appx007756.

Acero and Corsa argue that the 33.35% margin was "almost entirely driven" by Simec's adverse rate, while complaining that Simec accounted for only a [          ] of 2019-2020 imports shipped by Mexican companies subject to the review. Acerero/Corsa's Br. at 38. But the simple average of two values cannot be said, as a matter of logic, to be "almost entirely driven" by one of them. Further, as even Acerero and Corsa acknowledge, Simec accounted for [      ] of relevant shipments. *Id.* This is [             ] as to rebut the statutory presumption of representativeness, particularly when Simec [

]. Appx080048; Appx001093.[10]

Relying on *Yangzhou Bestpak Gifts & Crafts Co., Ltd. v. United States*, Acerero and Corsa argue that the rate assigned to non-individually examined companies must reflect those companies' "economic reality." Acerero/Corsa's Br. at 36. But *Yangzhou Bestpak* involved a nonmarket

---

[10]    To the extent that Acerero and Corsa challenge Commerce's use of a simple, rather than weighted, average in determining their margin, RTAC responds to that challenge in Section IV.B.2, below.

economy proceeding, in which one of the mandatory respondents was found to be government-controlled. *Yangzhou Bestpak*, 716. F.3d 1370 (Fed. Cir. 2013). The CAFC held that while it was reasonable in principle for Commerce to assign a simple average of the mandatory respondents' margins to non-individually examined companies, the presumption of government control could not be reasonably applied to non-individually examined companies that had shown freedom from government control. *Id.* at 1378-79. The review at bar, of course, does not involve a non-market economy, and Commerce did not find that Simec was government-controlled. Rather, Simec received an adverse, facts-available margin because it did not provide timely, usable sales data or respond fully to Commerce's requests for explanation and correction of obvious data discrepancies. This situation simply does not implicate the issues identified in *Yangzhou Bestpak*.

Acerero and Corsa argue that the adverse margin assigned to Simec was too old to reasonably be incorporated into the non-individually examined companies' margin. Acerero/Corsa's Br. at 38-39. But Congress amended the Tariff Act in 2015 specifically to permit Commerce to rely on margins from any segment of a proceeding as adverse margins, without signaling that the change should in any way impact Commerce's use of the "expected method." *See* Sec. 502 of the Trade Preferences Extension Act of 2015, P.L. 114-27 (June 29, 2015), 129 Stat. 362, 383-84. Commerce's selection of a statutorily authorized facts-available rate for Simec does not render the non-individually examined companies' rate unreasonable.

Finally, Acerero and Corsa argue that in certain proceedings that post-date the administrative decision at bar, Commerce found that averaging the mandatory respondents' margins would produce unreasonable results. Acerero/Corsa's Br. at 38-39, 41. Putting to one side the fact that Commerce could not here have taken into account determinations it was yet to make, those decisions are not apposite. For example, in its December 2022 determination concerning

Indian quartz surface products, Commerce noted that averaging the mandatory respondents' margins resulted in a margin of 161.53%, more than 31 times the highest rate previously determined for any company in the proceeding. Issues and Decision Memorandum accompanying *Certain Quartz Surface Products from India*, 88 Fed. Reg. 1,188 (Dep't Commerce Jan. 9, 2023) (final results of antidumping duty admin. rev.; 2019-2021) at 54; *see also Certain Quartz Surface Products from India and Turkey*, 85 Fed. Reg. 37,422, 37,423 (Dep't Commerce June 22, 2020) (antidumping duty orders) (showing margins ranging from 2.67 – 5.15%). Here, the situation is much different. The 33.35% margin is lower than the highest rate previously determined; it is even lower than the highest rate previously assigned to Acerero, and is not excessive even in comparison with the highest calculated rate ever determined in the proceeding (20.58%), which has previously been applied to Sidertul.

With respect to the 2020-2021 review of the order on nails from Oman, Commerce pulled forward the 9.10% "all others" margin determined in the 2015 investigation rather than assign the sole mandatory respondent's 154.33% rate to non-individually examined companies. *See, e.g.*, *Certain Steel Nails from the Sultanate of Oman*, 87 Fed. Reg. 78,639 (Dep't Commerce Dec. 22, 2022) (final results of antidumping duty admin. rev.; 2020-2021). Commerce did not explain, however, why it was pulling forward the investigation rate; nor do Acerero and Corsa ask for the 20.58% "all others" margin from the investigation to be applied to them here.

Acerero and Corsa also cite the 2011-2012 administrative review of the antidumping duty order on lined paper products, in which Commerce brought forward a prior rate rather than assign the sole mandatory respondent's *de minimis* margin to non-individually examined companies. Acerero/Corsa's Br. at 41. That review, however, was concluded before *Albemarle* clarified that the default method in situations in which the mandatory respondents all receive zero, *de minimis*,

or facts available margins is to average those margins. Issues and Decision Memorandum accompanying *Certain Lined Paper Products from India*, 79 Fed. Reg. 26,205 (Dep't Commerce May 7, 2014) (final results of antidumping duty admin. rev.; 2011-2012) at 3.

In sum, Acerero and Corsa do not persuade that Commerce erred in determining the margin for Acerero and Sidertul by averaging the mandatory respondents' margins. The statute and SAA call for such averaging and the courts have upheld it. Further, Acerero and Corsa do not persuade that the resulting margin was unreasonable here.

### 2. Acerero/Corsa Fail to Persuade that Commerce Was Required to Rely on a Weighted-Average of Deacero and Simec's Margins

While Acerero and Corsa's primary goal is abandonment of any margin that relies, even in part, on Simec's facts-available rate, they secondarily argue that the expected method calls for the agency to calculate a weighted average of the mandatory respondents' margins. Acerero/Corsa's Br. at 42-45. They argue that weight averaging of Deacero and Simec's would have produced a margin of [          ], rather than the 33.35% margin that resulted from simple averaging. *Id.* at 43. While Commerce explained that weighted averaging was inappropriate due to the overall unreliability of Simec's reporting, Acerero and Corsa argue that "minor deficiencies" in Simec's questionnaire responses do not excuse the agency from full compliance with the expected method. *Id.* at 44. They also argue that, to the extent that Commerce was concerned that weight averaging would disclose Deacero and Simec's confidential information, any such concerns resulted from the agency's failure to select more than two companies for individual examination. *Id.* at 44-45.

Acerero/Corsa do not persuade that Commerce erred in basing the non-individually examined companies' margin on a simple average. First, as Commerce indicated in its final decision memorandum, it typically bases its weighted averages on the respondents' reported U.S. sales data. Appx007753. But Simec's U.S. sales reporting was riven with errors, leaving the agency

without reliable data. *Id.* These errors are not "minor deficiencies," as Acerero and Corsa characterize them. *See* discussion *supra* at 17-22. Commerce therefore reasonably declined to rely on Simec's reported sales data to calculate a weighted average of Simec and Deacero's margins.

Further, to the extent that Acerero and Corsa imply that Commerce could have relied on the U.S. Customs data used for respondent selection to calculate such an average, Acerero/Corsa's Br. at 43, Commerce explained that the record lacked public volume information for Simec. Appx007753. That explanation applies equally to Simec's reported sales data and the Customs data. *Id.*; *see also* Appx001086-001087; Appx080048; Appx001093. While Acerero and Corsa claim that any confidentiality issues result from Commerce's selection of only two respondents for individual examination, Acerero/Corsa's Br. at 43, they do not dispute that a confidentiality issue exists. As Commerce has previously explained, it relies solely on public information to determine the margins for non-selected companies in cases with two individually examined respondents. *See Certain Crystalline Silicon Photovoltaic Products from Taiwan*, 82 Fed. Reg. 31,555, 31,556 (Dep't Commerce July 7, 2017) (final results of antidumping duty admin. rev.; 2014-2016); *see also Solianus Inc. v. United States*, 391 F. Supp. 3d 1331, 1337-38 (Ct. Int'l Trade 2019) (finding reasonable Commerce's reliance on a simple average of individually examined respondents' margins). And to the extent that this court has previously questioned Commerce's non-reliance on Customs data in situations involving more than two mandatory respondents, this case involves only two. *See Pro-Team Coil Nail Enter. Inc. v. United States*, 532 F. Supp. 3d 1281, 1291, 1293-94 (Ct Int'l Trade 2021). Finally, neither Acerero nor Sidertul advocated to be individually examined themselves, or even asked to be treated as voluntary respondents. Acerero/Corsa fail to persuade that CBP was required to rely on unreliable data, or to reveal other

companies/entities' confidential data simply because it would benefit companies that were not selected for individual examination and did not seek such examination.

**V.**    **CONCLUSION**

For the reasons detailed above, this Court should affirm Commerce's determination of the margins for Simec, Acerero, and Sidertul.

Respectfully submitted,

*/s/ John R. Shane*
Alan H. Price, Esq.
John R. Shane, Esq.
Maureen E Thorson, Esq.
Jeffrey O. Frank, Esq.
Paul J. Coyle, Esq.

**WILEY REIN LLP**
2050 M Street, NW
Washington, DC 20036
(202) 719-7000

*Counsel to the Rebar Trade Action Coalition*

Dated: July 10, 2023

CERTIFICATE OF COMPLIANCE

Pursuant to Chamber Procedure 2(B)(l), the undersigned certifies that this brief complies with the word limitation requirement. The word count for Response to Motion for Judgment on the Agency Record, as computed by Wiley Rein LLP's word processing system (Microsoft Word 2019), is 10,064 words.


*/s/ John R. Shane*
(Signature of Attorney)

John R. Shane
(Name of Attorney)

Rebar Trade Action Coalition
(Representative Of)

July 10, 2023
(Date)