UNITED STATES COURT OF INTERNATIONAL TRADE
NEW YORK, NEW YORK

BEFORE:  THE HONORABLE STEPHEN A. VADEN, JUDGE

| | |
|---|---|
| GRUPO ACERERO S.A. de C.V., GRUPO SIMEC S.A.B. de C.V., et al., <br><br>         Plaintiffs, <br><br>     and <br><br> GERDAU CORSA, S.A.P.I. de C.V., <br><br>         Plaintiff-Intervenor, <br><br>     v. <br><br> UNITED STATES, <br><br>         Defendant, <br><br>     and <br><br> REBAR TRADE ACTION COALITION, <br><br>         Defendant-Intervenor. | Consol. Court No. 22-00202 |

<u>REPLY BRIEF OF</u>
<u>GRUPO ACERERO S.A. DE C.V. AND GERDAU CORSA S.A.P.I. DE C.V.</u>

Craig A. Lewis
Jonathan T. Stoel
Nicholas R. Sparks
HOGAN LOVELLS US LLP
555 Thirteenth Street, N.W.
Washington, DC 20004-1109

*Counsel to Gerdau Corsa S.A.P.I. de C.V.*

Dated: August 9, 2023

Irene H. Chen
VCL LAW LLP
1945 Old Gallows Road, Suite 630
Vienna, VA  22182

Mark B. Lehnardt
LAW OFFICES OF DAVID L. SIMON, LLP
1025 Connecticut Ave., Suite 1000
Washington, DC  20036

*Counsel to Grupo Acerero S.A. de C.V.*

TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................................ ii

ARGUMENT ............................................................................................................1

    I.     COMMERCE ABUSED ITS DISCRETION WHEN IT REJECTED SIMEC'S EXTENSION REQUEST AND REFUSED TO ACCEPT ITS OCTOBER 18, 2021 SUBMISSION ...............................................................................4

    II.    THE FINAL RESULTS NON-SELECTED COMPANY RATE FAILS TO REASONABLY REFLECT POTENTIAL DUMPING MARGINS FOR NON-INVESTIGATED RESPONDENTS ..................................................12

          A.    The Rate Assigned to Grupo Acerero and Sidertul Does Not Reasonably Reflect the Dumping Margins of These Companies ................................ 12

          B.    Application of a Simple Average of the Mandatory Respondent Rates Is Unlawful in This Case ............................................................ 21

CONCLUSION ......................................................................................................24

# TABLE OF AUTHORITIES

**Cases**

*Albemarle Corp. & Subsidiaries v. United States*, 821 F.3d 1345 (Fed. Cir. 2016).................. 14

*Changzhou Hawd Flooring Co. v. United States*, 848 F.3d 1006 (Fed. Cir. 2017).................... 19

*Gallant Ocean (Thailand) Co., v. United States*, 602 F.3d 1319 (Fed.Cir.2010) ....................... 14

*GODACO Seafood Joint Stock Co. v. United States*, 494 F. Supp. 3d 1294 (Ct. Int'l Trade 2021) ................................................................................................................. 15

*Grobest & I-Mei Indus. (Vietnam) Co. v. United States*, 36 CIT 98, 815 F. Supp. 2d 1342 (2012) ............................................................................................................... 6, 7, 8

*Motor Vehicle Mfrs. Ass'n v. State Farm Mutual Automobile Ins. Co.*, 463 U.S. 29 (1983) ...................................................................................................................................... 11

*Nan Ya Plastics Corp. v. United States*, 810 F.3d 1333 (Fed. Cir. 2016)............................ 15, 17

*Nippon Steel Corp. v. United States*, 337 F. 3d 1373 (Fed. Cir. 2003)....................................... 11

*PrimeSource Bldg. Prod., Inc. v. United States*, 581 F. Supp. 3d 1331 (Ct. Int'l Trade 2022) ................................................................................................................................... 18

*Rhone Poulenc, Inc. v. United States*, 899 F.2d 1185 (Fed.Cir.1990) ....................................... 15

*SKF USA v. United States*, 630 F.3d 1365 (Fed. Cir. 2011) ........................................................ 11

*SNR Roulements v. United States*, 402 F.3d 1358 (Fed.Cir.2005)............................................... 14

*Timken United States Corp. v. United States*, 434 F.3d 1345 (Fed. Cir. 2006) ............................ 7

*Yangzhou Bestpak Gifts & Crafts Co., Ltd. v. United States*, 716 F.3d 1370 (Fed. Cir. 2013) ......................................................................................................................... 14

**Statutes**

19 U.S.C. § 1673d(c)(5)(A) ................................................................................................... 3, 21

19 U.S.C. § 1673d(c)(5)(B) ................................................................................................. 12, 15

**Other Authorities**

*Statement of Administrative Action accompanying the Uruguay Round Agreements Act*, H.R. Doc. No. 103-316, vol. 1 (1994), reprinted in 1994 U.S.C.C.A.N. 4040 ........................................................................ 14, 16

**Regulations**

19 C.F.R. § 351.304(c)(1) ..................................................................... 23

**Administrative Determinations**

*Certain Activated Carbon From the People's Republic of China; 2010-2011; Final Results of Antidumping Duty Administrative Review*, 77 Fed. Reg. 67,337 (Dep't Commerce, Nov. 9, 2012) ........................................... 21

*Certain Quartz Surface Products From India: Final Results of Antidumping Duty Administrative Review; 2019-2021*, 88 Fed. Reg. 1,188 (Dep't Commerce Jan 9. 2023) ...................................................................... 17

*Certain Steel Nails From the Sultanate of Oman: Final Results of Antidumping Duty Administrative Review; 2020-2021*, 87 Fed. Reg. 78,639 (Dep't Commerce Dec. 22, 2022) .............................................. 18

*Diamond Sawblades and Parts Thereof From the People's Republic of China: Preliminary Results of Antidumping Duty Administrative Review; 2011-2012*, 78 Fed. Reg. 77,098 (Dep't Commerce Dec. 20, 2013) ......................... 23

*Steel Concrete Reinforcing Bar From Mexico: Amended Final Results of Antidumping Duty Administrative Review; 2020-2021*, 88 Fed. Reg. 48,792 (Dep't Commerce Jul. 28, 2023) .............................................. 19

*Steel Concrete Reinforcing Bar from Mexico: Final Determination of Sales at Less Than Fair Value and Final Affirmative Determination of Critical Circumstances*, 79 Fed. Reg. 54,967 (Dep't Commerce Sep. 15, 2014) .......................... 13, 19

*Steel Concrete Reinforcing Bar From Mexico: Final Results of Antidumping Duty Administrative Review; 2020-2021*, 88 Fed. Reg. 37,849 (Dep't of Commerce Jun. 9, 2023) ...................................................................... 22

*Steel Concrete Reinforcing Bar from Mexico: Preliminary Determination of Sales at Less Than Fair Value, Preliminary Affirmative Determination of Critical Circumstances, and Postponement of Final Determination*, 79 Fed. Reg. 22,802 (Dep't Commerce Apr. 24, 2014) ........................................... 13, 19

*Steel Concrete Reinforcing Bar from Mexico: Preliminary Results of Antidumping Duty Administrative Review; 2019-2020*, 86 Fed Reg. 68,632 (Dep't of Commerce Dec. 3, 2021) ............................................................................................. 8

Grupo Acerero S.A. de C.V. ("Grupo Acerero") and Gerdau Corsa S.A.P.I. de C.V. ("Gerdau Corsa") 1/ in their respective roles as Consolidated Plaintiff and Plaintiff-Intervenor in the above-captioned consolidated action, respectfully submit this reply to the briefs in opposition filed by Defendant, the United States, ("Defendant" or "Commerce") and Defendant-Intervenors, Rebar Trade Action Coalition ("RTAC"), contesting Commerce's final results of the 2019-2020 administrative review of the antidumping duty order concerning steel concrete reinforcing bar ("rebar") from Mexico. Grupo Acerero and Gerdau Corsa respectfully request that this Court grant the Motion for Judgment on the Agency Record and remand this case to Commerce with instructions consistent with the points set forth herein.

## ARGUMENT

Commerce's application of facts available with an adverse inference ("AFA") to Grupo Simec S.A.B. de C.V. ("Simec") is not supported by substantial evidence or in accordance with law.  Commerce abused its discretion by denying Simec's extension requests to submit its responses to Questions 70-75 of its Supplemental Sections A& C questionnaire and by refusing to accept the October 18, 2021 submission, when the co-mandatory respondent, Deacero, was granted multiple extensions for a second supplemental questionnaire response.  The primary basis for Simec's need for extensions of time was simple and universal, although with uneven application: the way Covid-19 raged in Mexico and among Simec's ranks, preventing easy access to information and people, preventing outside consultants from reaching Simec offices to provide efficient assistance, and tragically taking the lives of three Simec accountants who were key to preparing the response.  Commerce claims it provided all reasonable extensions, but was

---

1/      Gerdau Corsa is the successor in interest to respondent Sidertul S.A. de C.V. ("Sidertul"). Any reference in this brief to Gerdau Corsa refers to Sidertul.

unforgiving when Simec had to replace its institutional knowledge with neophytes to U.S. antidumping law and when Simec's attempt to bring in experienced consultants was thwarted by Mexico's Covid-19 travel policies.  Commerce denied extensions despite the timing – two-and-one-half months before the due date of the preliminary results, and eight-and-one-half months before the due date of the final results.  Commerce could have provided some additional time for Simec to respond to its supplemental questionnaires, but chose not to.  In light of the disruptive and devastating effects of Covid-19, and the early timing of the requests – long before finality was a concern – Commerce's failure to grant the requested extensions (or accept late filings) was an abuse of discretion.  The Court should remand the case back to Commerce to provide Simec an opportunity to submit the responses and to calculate Simec's antidumping duty rate.

Even if this Court were to uphold Commerce's application of AFA to Simec despite these serious and harmful errors, Commerce nevertheless further erred in applying the average of Simec's extraordinarily large AFA rate and the zero rate calculated for Deacero S.A. de C.V. ("Deacero") to Grupo Acerero and Gerdau Corsa as respondents not individually investigated. Grupo Acerero and Gerdau Corsa were both undisputedly cooperative respondents that participated fully in the review.  Thus, considerations of "deterrence" had no place in Commerce's determination of rates for these cooperative respondents and the goal of accuracy should have been the paramount consideration for Commerce.

The average rate of 33.35% is extraordinarily high and is mostly driven by the  66.70% AFA rate that was applied to Simec for deterrent purposes in response to perceived lack of cooperation.  The 66.70% rate assigned to Simec is the highest margin asserted in the original antidumping petition filed nearly a decade ago based on unverified partisan estimates.  As applied to Grupo Acerero and Gerdau Corsa, the 33.35% rate is therefore both inaccurate and

fails to reasonably reflect margins of dumping for Grupo Acerero and Gerdau Corsa.  Indeed, the 33.35% rate is *more than six times higher* than the highest calculated rate assigned to any respondent in an administrative review conducted over the life of the antidumping order.

None of the Government's and Defendant-Intervenor's arguments adequately addresses these deficiencies but they instead argue, in effect, that Commerce may select any rate it chooses in this circumstance as a matter of "discretion."  That is not the law.  Consistent with prior practice and rulings from this Court, Commerce must apply margins of dumping to cooperative respondents that are accurate and reasonably reflect the economic reality of those respondents.  Nothing in the record even remotely supports an increase in the average margins by more than six-fold during the period of review; to the contrary, the only rate actually calculated on the basis of period-specific company data was the zero rate calculated for Deacero.  In order to comply with the law, Commerce should be instructed to carry forward a rate from the most recent administrative review.

Finally, Commerce erred by calculating a simple average of the Simec and Deacero rates.  The statute, 1673d(c)(5)(A), unambiguously requires Commerce to calculate a "weighted average" of the rates determined for the mandatory respondents.  Commerce has failed to identify any valid justification for failing to do so in this case.  Any concerns regarding confidentiality of data could easily have been addressed by using publicly ranged data as provided for in Commerce's regulations and as Commerce did in the immediately following review.

I.    **COMMERCE ABUSED ITS DISCRETION WHEN IT REJECTED SIMEC'S EXTENSION REQUEST AND REFUSED TO ACCEPT ITS OCTOBER 18, 2021 SUBMISSION**

Commerce abused its discretion when it rejected Simec's reasonable and fully justified request for additional time to respond to Questions 70-75 of the Supplemental Section A-C questionnaire and refused to accept Simec's October 18, 2021 submission.  *Pl.Int.Br*. at 22-27. Commerce claims that the Deficiencies Memo 2/ provides evidence of Simec's questionnaire deficiencies, but Commerce's actions in refusing to grant the extensions caused the record to be incomplete.  Had Commerce granted the extensions Simec requested, Simec would have had sufficient time to file full and complete responses to the Supplemental Sections A-D questionnaire and Supplemental Sections A-C questionnaire and to file timely responses to Questions 70-75 of the Supplemental Section A-C questionnaire.

The facts, and how they changed due to Covid-19 issues, are key to seeing Commerce's abuse of discretion.  Simec timely filed a request for a three-week extension of time to September 1, 2021, and September 7, 2021 (a total of six weeks), to respond to the two supplemental questionnaires, explaining the difficulties it was having preparing responses to Commerce's requests for information.  *See Pl.Int.Br.* at 10 (*citing* SQR EOT Req.1, Appx004904-004906).  Commerce granted only a one-week extension.  *Id.*  Then circumstances changed dramatically with Mexico's Covid-19 outbreak.  The impact of Covid-19 and Mexican policies imposed in response to Covid-19 prevented travel in Mexico, made access to information and people more difficult, tragically took the lives of three key Simec accountants, and prevented outside consultants from traveling to Simec offices in Mexico.  *See Pl.Int.Br.* at

---

2/ Grupo Simec Questionnaire Deficiencies Analysis ("Deficiencies Memo"), Appx091515-091538.

10-11.  On top of that, some of the information requested by Commerce required manual review of over 800 invoices.  Pl.Int.Br. at 13-14 (*citing* SQR EOT Req.7, Appx004954-004956). Simec's assessment of its own abilities *before* the Covid-19 outbreak led it to ask for extensions to September 1, 2021, and September 7, 2021, respectively for the two supplemental questionnaires.  *After* the outbreak made work magnitudes more difficult, Commerce justified refusing Simec's last extension requests – seeking until September 20, 2023, for the last six questions (just two additional weeks beyond the *pre-outbreak* requests for extensions to September 1 and September 7) – and finding Simec *post-oubreak* failed to participate to the best of its ability based on Simec's own *pre-outbreak assessment*.  *Compare* SQR EOT Denial 2, Appx006282-006283 (stating that Commerce had already "provided three additional weeks for Grupo Simec ... to respond to Commerce's supplemental questionnaire covering sections A-C, and we previously denied {Simec's} request for an extension for responses to questions 70-75"), *and* Issues & Decisions Memorandum ("IDM") at 13, App007725 (stating, Commerce "believed that the six weeks granted to Grupo Simec was sufficient time to prepare and submit its responses"), *with* IDM at 28, Appx007740 (explaining, "the respondent failed to cooperate to the best of its ability when it did not remedy the questionnaire deficiencies within the allotted time frame, *despite Commerce effectively granting the respondent all the additional time it requested prior to the deadline*" (emphasis added)).

Although Commerce claims it "made every effort to accommodate {Simec}, including granting some unusually lengthy opportunities to respond to requests for information," Def.Br. at 32, Commerce did not acknowledge the effect of losing key accountants and Mexican Covid-19 travel restrictions, and ignored Simec's plea for more time in light of employees working flat out to the point of being sleep deprived. Appx004954-004956. In the end, Simec pleaded the time it

needed given the difficulties due to Covid-19 travel restrictions and manual review of more than 800 invoices. Commerce, however, unreasonably refused to accommodate the extraordinary and severe effects of Covid-19 and Covid-19 policies in Mexico on Simec's ability to respond on the shortened timeline imposed by Commerce.

When Simec saw Commerce grant an additional 29 days to fellow-respondent, Deacero, Simec believed Commerce may have reconsidered the amount of time it had to review Simec's responses, and submitted the missing responses, with some clerical corrections to other information, on October 18, 2021.  *See* Pl.Int.Br. at 15 (citing admin. record).  In its letter requesting that Commerce reconsider the denial of requests for additional time and to accept the submission, Simec reiterated how Covid-19 affected its ability to respond:  Simec's remaining staff was working at maximum capacity, overcoming the deaths of three key accountants and Mexican Covid-19 policies imposing travel restrictions, the geographic spread of its operations, and the minimal extension request limited to just six questions.  Pl.Int.Br. at 15-16.  Commerce rejected Simec's request.

Commerce's rejection of Simec's September 2021 requests for additional time and Simec's October 18, 2021, submission failed the reasonableness test this Court set forth in *Grobest* – "whether the interests of accuracy and fairness outweigh the burden {of extending a deadline or accepting a late filing} placed on {Commerce} and the interest in finality."  Pl.Int.Br. at 23-27 (*citing Grobest & I-Mei Indus. (Vietnam) Co. v. United States*, 36 CIT 98, 122-123, 815 F. Supp. 2d 1342, 1365 (2012)).  To evaluate the balance between fairness and accuracy versus the burden on Commerce and interests in finality, *Grobest* instructs looking to (1) the likely inaccuracy of the total AFA margin, (2) the respondent's diligence responding, (3) the timing of the respondent's filing relative to the preliminary and final results (for interests in finality), and

(4) the likely burden on Commerce.  Pl.Int.Br. at 25 (*citing Grobest*, 36 CIT at 125, 815 F. Supp.

2d at 1367).  Commerce does not contest the applicability of the *Grobest* test; Commerce merely

points to the different factual circumstances in *Grobest*.  Def.Br. at 18-19.

In *Grobest*, this Court found Commerce abused its discretion for failing to accept and

review a separate rate certification ("SRC") filed by Amanda Foods 95 days after the deadline,

because the burden was slight compared to the 20 percentage point difference in likely (4.27%)

versus AFA (25.76%) margins, and considerations for finality at shortly before the pre-

preliminary results:

> (1) the margin assigned to Amanda Foods was likely inaccurate
> and disproportionate; (2) Amanda Foods was diligent in correcting
> its submission; (3) Amanda Foods' submission was early enough
> in the proceeding to minimize concerns for finality; and (4) the
> burden on Commerce in considering the late-filed SRC would
> likely be minimal given that only one SRC was filed late, the late-
> filed SRC appears to maintain the status quo, and no follow-up was
> conducted with regard to other separate-rate requests.

*Grobest*, 36 CIT at 125, 815 F. Supp. 2d at 1367.

As in *Grobest*, this Court should find Commerce abused its discretion.  Here, there is

even more significant inaccuracy of the AFA margin, with a 60 percentage point difference in

likely-margin (0.00% to 4.93%) to AFA margin (66.70%) – triple the difference in *Grobest*.

Pl.Int.Br. at 25-26.  Simec's diligence, especially in light of Covid-19 imposed travel restrictions

and the death of key accountants from complications from Covid-19, was superlative.  *Id.* at 26.

Meanwhile, interests in finality were at their low two-and-a-half months before the scheduled

preliminary results of the review (and eight-and-a-half months before the final results of the

review) when Simec requested extensions of time.  *Id.* at 23 (*citing Timken United States Corp.*

*v. United States*, 434 F.3d 1345, 1353 (Fed. Cir. 2006), 26-27.  Even the October 18, 2021, filing

seeking reconsideration was still six weeks before the preliminary results: interests in finality

were still low.  *See Steel Concrete Reinforcing Bar from Mexico: Preliminary Results of Antidumping Duty Administrative Review; 2019-2020*, 86 Fed Reg. 68,632, 68,633 (Dep't of Commerce Dec. 3, 2021).

Commerce appears to concede that the total AFA margin was significantly inaccurate, that interests in finality were at their low, and that Simec was diligent in responding:  the only aspect of the *Grobest* test Commerce contests is the burden on Commerce.  *See* Def.Br. at 18-19.  The Court in *Grobest* acknowledged "that consideration of an SRC may require further inquiry and investigation of the respondent by Commerce."  *Grobest*, 36 CIT at 124, 815 F. Supp. 2d at 1367.  Commerce now argues that the burden on Commerce in *Grobest* was not significant because the information needed by Commerce was "minimal" compared to the information needed here:  "Simec failed to respond to multiple questions in Commerce's questionnaires and provided incomplete responses to many others."  Def.Br. at 18-19.  But the Court in *Grobest* did not assume the burden there was minimal; the Court conducted its analysis assuming further investigation would be needed.  *See Grobest*, 36 CIT at 124-25, 815 F. Supp. 2d at 1367 ("Furthermore, the court is not convinced that if further investigation of Amanda Foods' SRC were necessary, the burden on Commerce would be sufficient to outweigh the interests in fairness and accuracy.").  In *Grobest*, even assuming further investigation were needed, the likely inaccurate and disproportionate AFA margin, the diligence of Amanda Foods, and the time before the preliminary results outweighed the burden the Court assumed Commerce would carry with further investigation of the SRC.  Here, the result should be the same given the more significantly inaccurate AFA margin, the diligence of Simec in the context of Covid-19 issues and tragedies, and the timing before the preliminary results.

In seeking to excuse its abuse of discretion, Commerce justifies rejecting Simec's October 18 filing based upon Simec having missed the deadline for submitting the information. Def.Br. at 14, 16-18.  But this was the purpose of the October 18 filing – to provide the full context and ask Commerce to reconsider its earlier denial of  the extension requested and accept the filing and to accept the information that Simec ran out of time to submit with its supplemental questionnaire responses.  *See Reconsideration Req*., Appx006625-006628.  By arguing only that the October 18 filing contained new factual information and was submitted after the deadline, Commerce ignored what the request was actually about (explaining the circumstances justifying acceptance of the response), demonstrating that Commerce failed to consider an important aspect of the problem.

Commerce further points out in its brief that in the *Final Results*, Commerce claimed that Simec "never explained why the information was late nor did it attempt to show that it qualified for the information to be accepted on the basis of Commerce's regulatory provisions for extraordinary circumstances." Def.Br. at 18 (citing IDM at 18-19) APPX007730-007731.  But Simec did address these points in its request for reconsideration.  Simec understood from Commerce's denial of its extension requests in September 2021 that Commerce had "foreclosed the possibility of any further extensions regardless of the circumstances," and thus was an abuse of discretion.  *See* Simec Br. at 9, 18-22.  Simec noted in its letter that "Commerce said don't expect further extensions. So we are doing so."  SQR EOT Req.7, Appx004954-004956.  The extensions Commerce granted to Deacero signaled to Simec that it had been wrong understanding that there was no further possibility of submitting its responses.  *Reconsideration Req*., Appx006625-006628.

Commerce also complains that accepting the October 18, 2021 submission "would have imposed a significant burden on Commerce and disrupted the agency's timetable, the enforcement of which is governed by Commerce's reasoned decision." Def.Br. at 19.  That information could have been on the record sooner had Commerce not denied Simec's earlier, timely-filed extension requests.

Commerce wrongly claims in the *Final Results* that "Grupo Simec elected to ignore Commerce's established supplemental questionnaire deadlines and then later attempted to submit the information that it failed to submit in a timely manner." IDM at 20.  The record is clear that Simec did not ignore Commerce's deadlines; it filed extension requests to move the deadlines because – despite cooperating to the best of its ability in the challenging Covid-19 environment – Simec needed more time for filing.  Appx004954-004956  Commerce unreasonably denied those timely-filed requests, and seems to justify that action by blaming Simec's business organization. Commerce argues that Simec failed the standard of "tak{ing} reasonable steps to keep and maintain full and complete records … {and to} anticipate being called upon to produce {them}." Def.Br. at 33.  Commerce argues that Simec was not prepared, and that Simec "admits" that it was not prepared when it explained the complexity of its organization structure as a reason for needing more time.  *Id.* at 33-34; Simec Br. at 5.  Rather than conceding unpreparedness, Simec was explaining why it needed additional time.

Commerce points to Simec's prior experience in administrative reviews, arguing that "there is no basis for {Simec} to claim that it could not have anticipated Commerce's requests or that it was unable to provide the requested information." Def.Br. at 34 (*citing* IDM at 23, Appx007735).  This argument betrays Commerce's ignorance of the Covid-19-related issues that did not exist in prior reviews, demonstrating that Commerce failed to consider an important

aspect of the problem. *Motor Vehicle Mfrs. Ass'n v. State Farm Mutual Automobile Ins. Co.*, 463 U.S. 29, 43 (1983)("an agency rule would be arbitrary and capricious if the agency has . . . entirely failed to consider an important aspect of the problem"); *See also, e.g.*, *SKF USA v. United States*, 630 F.3d 1365, 1374 (Fed. Cir. 2011)(Commerce "has an 'obligation' to address important factors raised by comments from petitioners and respondents").

Further, Commerce criticizes Simec for claiming in the wake of the deaths of three key accountants to complications from Covid-19, and the corresponding loss of institutional knowledge, that surviving employees were unfamiliar with Commerce's requirements for responses to its requests for information.  Def.Br. at 34 (*citing Nippon Steel Corp. v. United States*, 337 F. 3d 1373, 1383 (Fed. Cir. 2003)).  Commerce argues that *Nippon Steel Corp.* "undermines Simec's attempts to defend its deficiencies by citing its new accountants' inexperience."  Def.Br. at 34.  But this is exactly the issue Commerce ignores:  Simec could not have anticipated the deaths of key personnel or Mexican Covid-19 policies restricting travel.  Commerce gave itself 110 days to deal with the unexpected disruption of Covid-19 in the United States, but when the same disruption hit Simec in difficult and tragic ways, Commerce decided that Simec's efforts, "demonstrate{} Simec's lack of foresight, and a failure to put forth its maximum effort to cooperate with Commerce's deadlines."  Def.Br. at 34 Commerce cites its explanation in the *Final Results* that Simec "failed to cure a variety of deficiencies" and "in the case of downstream sales, failed to submit any responses." Def.Br. at 29 (citing IDM at 25). But it was Commerce that foreclosed Simec's opportunity to complete the record and correct deficiencies by denying its extension requests. Commerce's abuse of discretion in denying the extension requests renders its decision to apply AFA unsupported by substantial evidence.

There is no question that Simec had the ability to provide complete and accurate responses to Commerce's requests for information.  There is also no question that Simec was grappling with the same unprecedented circumstances that caused Commerce to give itself 110 extra days.  Commerce did not extend that same accommodation to Simec despite Simec providing complete information to Commerce regarding its circumstances and its ability to provide responses within the time Commerce imposed.  Under *Grobest*, and in light of the Covid-19-related difficulties and tragedies, Commerce abused its discretion by denying Simec's requests for additional time and rejecting Simec's October 18 filing.  This Court should reverse and remand that determination with instructions to accept Simec's data.

## II.   THE FINAL RESULTS NON-SELECTED COMPANY RATE FAILS TO REASONABLY REFLECT POTENTIAL DUMPING MARGINS FOR NON-INVESTIGATED RESPONDENTS

Commerce's determination to assign the simple average of Deacero's and Simec's dumping margins to the companies not individually investigated is not supported by substantial evidence and is contrary to law because the resulting rate does not reasonably reflect the potential dumping margins for non-examined respondents subject to the review and because Commerce, contrary to statute, failed to calculate a weighted-average of the two rates.  On either or both grounds, this determination should be remanded for reconsideration by Commerce.

### A.   The Rate Assigned to Grupo Acerero and Sidertul Does Not Reasonably Reflect the Dumping Margins of These Companies

Commerce assigned a dumping margin for Grupo Acerero and Sidertul by applying the "expected method" under 19 U.S.C. § 1673d(c)(5)(B), calculating a simple average of the two mandatory respondents' final margins.  *Final Results* at 34,849-50, Appx007782-00783.  These mandatory respondent rates included Deacero's zero percent margin, calculated on the basis of Deacero's actual sales and cost data for the period of review, and Grupo Simec's 66.70 percent

rate, assigned on the basis of "total adverse facts available" and reflecting the highest rate included in the original antidumping duty petition filed by the domestic interested parties nearly a decade earlier, in September 2013 (i.e., not based on actual data reported by any Mexican producer). *See Steel Concrete Reinforcing Bar from Mexico: Preliminary Determination of Sales at Less Than Fair Value, Preliminary Affirmative Determination of Critical Circumstances, and Postponement of Final Determination*, 79 Fed. Reg. 22,802 (Dep't Commerce Apr. 24, 2014), IDM, WESTLAW 79 ITADOC 22802; *Steel Concrete Reinforcing Bar from Mexico: Final Determination of Sales at Less Than Fair Value and Final Affirmative Determination of Critical Circumstances*, 79 Fed. Reg. 54,967 (Dep't Commerce Sep. 15, 2014). The resulting simple average of this calculated rate was 33.35 percent. *Id.* This simple average rate, mathematically driven by Simec's AFA rate, is extraordinarily high relative to rates historically calculated for cooperating respondents both before and after this review. Indeed, the 33.35 percent margin is more than six times larger than the highest calculated rate ever assigned to a non-selected company in a prior administrative review.

This extraordinary six-fold increase in the margins for companies not individually examined was imposed notwithstanding the absence of any record evidence that economic conditions during the 2019-20 administrative review had deteriorated relative to conditions in prior reviews where lower rates consistently prevailed, notwithstanding the fact that the only individually investigated company with a rate calculated on the basis of actual period-specific data, Deacero, was able to sell its rebar in the market during this period at completely non-dumped prices, and notwithstanding that the companies not individually investigated had cooperated fully in the administrative proceeding.

As Commerce concedes in its Response Brief, Commerce's discretion in determining a rate to apply to respondents not individually investigated in these circumstances is not unbounded. The "expected method" of simply averaging the mandatory respondent rates may not be applied where it is "not feasible, or if it results in an average that would not be reasonably reflective of potential dumping margins for non-investigated exporters or producers." *See* Def.Br. at 40 (citing *Statement of Administrative Action accompanying the Uruguay Round Agreements Act*, H.R. Doc. No. 103-316, vol. 1, at 873 (1994), reprinted in 1994 U.S.C.C.A.N. 4040, 4201 ("*SAA*")). Similarly, Commerce concedes that the Court of Appeals for the Federal Circuit in *Yangzhou Bestpak Gifts & Crafts Co., Ltd. v. United States*, 716 F.3d 1370, 1379 (Fed. Cir. 2013), "warned against the potential for 'questionable' results" in applying the "expected method. Id. at 41 (citing *Yangzhou Bestpak*, 716 F.3d. at 1378. This is so because the accuracy of the dumping margin is an overriding objective of the administrative review process. *See, Yangzhou Bestpak*, 716 F.3d. at 1379. This focus on accuracy applies even where Commerce is assigning adverse rates to uncooperative respondents under the AFA provision of the statue (where Commerce is allowed to consider deterrence as a factor). *See Albemarle Corp. & Subsidiaries v. United States*, 821 F.3d 1345, 1354 (Fed. Cir. 2016) ("Finally, as our cases have explained, accuracy and fairness must be Commerce's primary objectives in calculating a separate rate for cooperating exporters.")(citing *Bestpak*, 716 F.3d at 1379 ("An overriding purpose of Commerce's administration of antidumping laws is to calculate dumping margins as accurately as possible."); *Gallant Ocean (Thailand) Co., v. United States*, 602 F.3d 1319, 1323 (Fed.Cir.2010) (a rate must be a "reasonably accurate estimate of the respondent's actual rate") (internal quotation marks and citations omitted); *SNR Roulements v. United States*, 402 F.3d 1358, 1363 (Fed.Cir.2005) ("Antidumping laws intend to calculate antidumping duties on a fair

and equitable basis."); *Rhone Poulenc, Inc. v. United States*, 899 F.2d 1185, 1191 (Fed.Cir.1990) (the "basic purpose of the statute" is to "determin[e] current margins as accurately as possible"); *Nan Ya Plastics Corp. v. United States*, 810 F.3d 1333, 1344–45 (Fed. Cir. 2016)(accuracy represents a "reliable guidepost[ ] for Commerce's determinations," and a determination is "accurate" if it is "supported by substantial evidence").

As a result, this Court has properly held that margins selected by Commerce for non-investigated companies should reasonably reflect the economic circumstances and the potential dumping margins for the non-investigated exporters or producers.  For example, in *GODACO Seafood Joint Stock Co. v. United States*, 494 F. Supp. 3d 1294 (Ct. Int'l Trade 2021), this Court in similar circumstances found that Commerce bears the burden to demonstrate that its application of the "any reasonable method" exception in 19 U.S.C. § 1673d(c)(5)(B) is reasonable, finding that "{t}he rate selected must serve the purpose of calculating dumping margins as accurately as possible."  494 F. Supp. 3d at 1306.  In that case, the court ultimately concluded that Commerce's determination to apply a $3.87 per kilogram total AFA rate (derived from a rate calculated five years earlier) to fully cooperating separate rate respondents, was "unreasonable and unsupported by any evidence on the record" as compared to a $0.69 per kilogram rate assigned to separate rate respondents in the immediately preceding administrative review.  *Id.* (the difference between the historical and AFA rates in that case was a factor of four times, as compared to a factor of six times in this case.).

The foregoing notwithstanding, the Government and RTAC continue to defend Commerce's application of the extraordinary 33.35 percent margin to Grupo Acerero and Sidertul, even though that rate is completely out of line with historical rates calculated in prior

administrative reviews and is based on biased 3/ calculations submitted in a petition that is now nearly a decade old.  Commerce begins by emphasizing the statute's use of the term "***any*** reasonable method" (emphasis added) when dictating how Commerce should calculate non-investigated rates in the face of entirely zero or AFA mandatory respondent rates.  Def.Br. at 42.  The Government focuses on the term "*any*," suggesting that this language grants Commerce effectively unbridled discretion in selecting a rate to be applied to non-investigated respondents.  In doing so, however, the Government neglects the key modifier – "reasonable" – which, unlike the term "any," precedes "method" in both the statute and the SAA.  *Compare* "{T}he administering authority may use *any reasonable method* . . . ." with "Commerce may use other *reasonable methods*" (emphasis added).  Here, Commerce's simple averaging method was not "reasonable" in its application because it results in a rate that is so clearly unrepresentative of the potential dumping margins of non-examined respondents, as demonstrated, *inter alia*, by the consistent history of margins calculated under the *Order*, and Commerce made no attempt to support the accuracy of the non-selected rate based on record evidence in this review.

The Government next argues that 33.35 percent rate is reasonable because it was calculated pursuant to the statute's "expected method" and should thus be considered presumptively representative of the potential dumping margins of Grupo Acerero and Sidertul.  Def.Br. at 44-45.  Commerce argues that Grupo Acerero and Sidertul misapply the statute by asserting that the "fairness component incorporates indicia of commercial or economic reality."  Def.Br., at 43.  Citing *Nan Ya Plastics*, Commerce asserts that the agency need not examine the

---

3/      We reasonably characterize the 66.70% Petition rates as "biased" because the Petition margin calculations were unilaterally derived by the domestic interested parties without any data input from respondents and for purposes of initiating the investigation, and where the statutory objective of "accuracy" is clearly not a consideration, let alone a priority.

economic or commercial reality of the parties or industry "in some broader sense."  Def.Br. at 44

(citing *Nan-Ya Plastics*, 810 F.3d at 1344).  Commerce suggests that the requirement for

"accuracy" is met simply if the "the method is mathematically correct" (presumably, that

Commerce added the two rates and divided by two) and that the requirement that the rate reflect

"commercial reality" is met if the rate "complies with the statute."  Def.Br. at 44.

It is not that simple.  As discussed across a wide spectrum of cases reviewing application

of the rates to uninvestigated companies, the requirement for "accuracy" is not focused simply

on mathematical mechanics but is concerned more broadly with whether the margins accurately

reflect the commercial reality of the respondents at issue.  There is simply no way to understand

the reasoning in cases like *GODACO Seafood* by applying such a cramped definition of

accuracy.  Undoubtedly the $3.87 per kilogram AFA rate rejected by the Court in that case was

also "mathematically correct."  The problem with the rate – i.e., the "inaccuracy" of that rate --

was that it was completely out of line with any prior calculated rates for cooperative respondents

under the order.  *GODACO Seafood,* 494 F. Supp. 3d at 1306. *See, also, Certain Quartz Surface*

*Products From India: Final Results of Antidumping Duty Administrative Review; 2019-2021*, 88

Fed. Reg. 1,188 (Dep't Commerce Jan 9. 2023), IDM at 54-55 ("{B}ased on the history of rates

for this *Order*, we determine that the 161.53 percent margin is not ***reasonably reflective*** of the

non-selected companies' potential dumping margins during the POR.") (emphasis added).

Properly considered, *Nan Ya Plastics* emphasizes Commerce's obligation to observe the

"statutory scheme" in determining appropriate margins.  *Nan Ya Plastics*, 810 F.3d at 1344.

Here, the statutory scheme mandates that Commerce employ a "reasonable" method in

determining the non-selected respondent rate.  For this reason, like in *Quartz Surface Products*

*from India* (employing a pull-forward rate rather than averaging zero and AFA rates) and *Certain*

*Steel Nails From the Sultanate of Oman* (employing a pull-forward rate rather than an AFA rate), Commerce must occasionally adopt a method other than an average of zero and AFA rates to arrive at a reasonable non-examined respondent rate.  *See* Pl.Int.Br. at 41; *Certain Quartz Surface Products From India,* 88 Fed. Reg. 1,188; *Certain Steel Nails From the Sultanate of Oman: Final Results of Antidumping Duty Administrative Review; 2020-2021*, 87 Fed. Reg. 78,639 (Dep't Commerce Dec. 22, 2022).

The Government's reliance on *PrimeSource Bldg. Prod., Inc. v. United States*, 581 F. Supp. 3d 1331, 1341 (Ct. Int'l Trade 2022), to argue for the reasonableness of the 33.35 percent rate is equally unavailing and actually supports Plaintiffs' position. Def.Br. at 45.  There, this Court confirmed that a history of stable rates calculated under an order can undermine the reasonableness of a non-examined rate calculated using the "expected method" of incorporating AFA rates.  The court upheld Commerce's use of the expected method after examining the history of rates calculated under the order and finding that "the rates fluctuated significantly from review to review and, thus, that looking to past reviews for evidence of current dumping lacks a logical foundation."  Here, in contrast, the 33.35 percent rate wildly diverges from a history of *stable* margins calculated pursuant to the *Order* that have consistently varied within a relatively narrow band:

| | |
|---|---|
| 2020-2021: | 5.93 percent 4/ |
| 2019-2020: | 33.35 percent |
| 2018-2019: | 4.93 percent |
| 2017-2018: | 5.54 percent |
| 2016-2017: | 3.65 percent |
| 2015-2016: | 0.00 percent |

Consistent with *PrimeSource Bldg. Prod.*, therefore, the history of margins calculated pursuant to the *Order* demonstrates that the 33.35 percent margin is not possibly reflective of Grupo Acerero's or Sidertul's potential dumping margins. Application of this margin to cooperative companies not individually examined is thus neither reasonable nor lawful.

For this reason as well, RTAC's reliance on *Changzhou Hawd Flooring Co. v. United States*, 848 F.3d 1006 (Fed. Cir. 2017), to argue that Commerce could not have deviated from the "expected method" is also unavailing. RTAC Br. at 28. Here, substantial evidence, particularly the history of *calculated* rates, demonstrates that the 33.35 percent rate is not representative of Grupo Acerero and Sidertul's potential dumping margins. Calculated rates (i.e., rates determined on the basis of actual period-specific sales and cost data) are inherently more representative of actual behavior than AFA rates which are not based on any investigated actual sales activity and incorporate a deterrent component. *See, e.g., Albemarle*, 821 F.3d at 1357. As noted above, the 66.70 percent AFA rate used in this review was the highest rate asserted in the original petition nearly a decade ago – a rate that was neither calculated, nor accurate. *See Prelim. Determination*, 79 Fed. Reg. 22,802, IDM, WESTLAW 79 ITADOC 22802; *Final Determination*, 79 Fed. Reg. 54,967.

---

4/     *Steel Concrete Reinforcing Bar From Mexico: Amended Final Results of Antidumping Duty Administrative Review; 2020-2021*, 88 Fed. Reg. 48,792 (Dep't Commerce Jul. 28, 2023).

In its Response Brief, RTAC nevertheless contends that Grupo Acerero and Gerdau Corsa "fail to properly recognize the history of the order" and ask the Court to recognize that non-examined respondent margins "have increased irregularly across the life of the order." RTAC Br. at 27.  However, as noted above, the rates calculated in prior reviews have actually varied within a very narrow band, and the 33.35 percent rate is plainly a dramatic (six-fold) departure from all other rates calculated during reviews of the Order.  RTAC seems to suggest that a change from **3.65** to **5.54** and from **5.54** to **4.93** is comparable in scale to a change from **4.93** to **33.35**.

RTAC next points out that Grupo Acerero, as an individually-investigated company was previously subject to the 66.7 percent AFA rate in the original investigation and that the investigation "all-others" rate was likewise 20.58 percent.  RTAC Br. at 27-28.  However, Grupo Acerero's investigation rate was not calculated based on Grupo Acerero's actual sales activities in the investigation period but was based on application of total AFA, using the highest rate from the Petition and Sidertul did not participate in the original investigation.  *See Prelim Determination*, 79 Fed. Reg. 22,802, IDM, WESTLAW 79 ITADOC 22802; *Final Determination*, 79 Fed. Reg. 54,967.  The fact remains that there has ***never*** been a calculated rate anywhere near 66.7 percent in the life of the Order; even  Deacero's 20.58 percent investigation rate from nearly a decade ago is less than one third of the AFA rate and is itself out of line with all subsequently calculated rates.  *Id*.  RTAC's references – from a 2014 Final Determination – are thus not probative of the representativeness of the 33.35 percent rate assigned in this review.

In summary, Commerce's application of a simple average of the zero calculated rate for Deacero and the nearly decade old adverse facts available rate assigned to Simec is not supported by substantial evidence and is contrary to law.  Absent more, Commerce's application of a rate

that is on the order of six times higher than the rates historically calculated for any cooperating

respondents in a previous administrative review is neither reasonable nor accurate.  This decision

should be remanded to Commerce with instructions to pull forward a prior calculated rate,

consistent with prior administrative practice and judicial precedent upholding the same.

> **B.     Application of a Simple Average of the Mandatory Respondent Rates Is Unlawful in This Case**

The *Final Results*' 33.35 percent margin is also separately unlawful because it is not the

result of a *weighted average* rate as required by the statute.  The governing statute, 19 U.S.C. §

1673d(c)(5)(A), unambiguously provides that "the estimated all-others rate shall be an amount

equal to the *weighted average* of the estimated weighted average dumping margins established

for exporters and producers individually investigated, excluding any zero and *de minimis*

margins, and any margins determined entirely {on the basis of AFA}."  (emphasis added).

Here, in spite of this statutory directive, the Government responds in a single paragraph

asserting simply that Commerce did not have "Simec's home market data, U.S. sales data, nor its

downstream sales data on the record."  Def.Br. at 46.  As an initial matter, it is not clear why

home market and downstream sales data is relevant to this calculation as the agency's practice is

to weight the average based on relative volumes of *U.S. sales*.  *Certain Activated Carbon From

the People's Republic of China; 2010-2011; Final Results of Antidumping Duty Administrative

Review*, 77 Fed. Reg. 67,337 (Dep't Commerce, Nov. 9, 2012), IDM, Cmt. II ("For the final

results, the Department will continue to follow its normal practice and use the ranged, publicly

available U.S. sales quantities from the mandatory respondents with positive antidumping

margins to calculate a weighted-average margin for the Separate Rate Respondents.")

As regards the availability of relevant U.S. sales data, Commerce placed detailed

Customs import data on the record of the investigation and found that data sufficiently reliable to

use for selecting mandatory respondents.  Respondent Selection Memo at Attachment, AppxAppx080048.  Grupo Acerero and Gerdau Corsa demonstrated further in their Opening Brief how Commerce could have easily used this data to observe its statutory obligation to calculate a weighted average margin, which would be substantially lower than the 33.35 percent rate.  Acerero and Sidertul Br. at 43.  In their Response Briefs, neither the Government nor RTAC has explained why such customs data should be considered unreliable.

Although not asserted as an argument by the Government, RTAC seeks refuge in the confidentiality of such data, arguing that heeding its statutory mandate to calculate a weighted average would have forced Commerce to divulge confidential information.  RTAC Br. at 33.  Neither RTAC nor the Government explains, however, why it was not possible for Commerce to accommodate any confidentiality concerns while complying with the statutory mandate.  Commerce regularly calculates a weighted average dumping margin for non-examined respondents after examining two mandatory respondents, as the agency did in the segment immediately following the instant review.  *Steel Concrete Reinforcing Bar From Mexico: Final Results of Antidumping Duty Administrative Review; 2020-2021*, 88 Fed. Reg. 37,849 (Dep't of Commerce Jun. 9, 2023) ("Commerce is assigning the weighted average of the dumping margins calculated for the two respondents as the rate for those companies not selected for individual examination.").  To the extent the agency claims it does not have ranged public data that can be used to calculate a weighted average here, Commerce's own regulations direct it to require ranged data in public versions of data submissions and there is nothing in the statute or the agency's regulations that would preclude Commerce from ranging the data itself.  *See* 19 C.F.R. § 351.304(c)(1)("Generally, numerical data will be considered adequately {publicly} summarized if grouped or presented in terms of indices or figures within 10 percent of the actual

figure.").  *See also Diamond Sawblades and Parts Thereof From the People's Republic of China: Preliminary Results of Antidumping Duty Administrative Review; 2011-2012*, 78 Fed. Reg. 77,098 (Dep't Commerce Dec. 20, 2013)("In order to strike a balance between our duty to safeguard parties' business-proprietary information and our attempt to adhere to the guidance set forth in section 735(c)(5)(A) of the Act, we calculated a weighted-average margin for non-selected respondents using the publicly available, ranged total U.S. sales values of the selected respondents, compared the resulting public, weighted-average margin to the simple average of the antidumping duty margins, and used the amount which is closer to the actual weighted-average margin of the selected respondents as the margin for the non-selected respondents.")

On remand, Commerce could therefore use customs volume data and/or use ranged data to follow its statutory mandate and calculate a weighted-average dumping margin for non-examined respondents in this proceeding.  Commerce's argument that it cannot apply either methodology to comply with the statute is not supported by substantial evidence.

**CONCLUSION**

For the foregoing reasons, Grupo Acerero and Gerdau Corsa respectfully request that this Court grant their Motion for Judgment on the Agency Record and remand this case to Commerce with instructions consistent with the points set forth in their Memorandum in Support of their Motion for Judgment on the Agency Record and this Reply Brief.

Respectfully submitted,

/s/ Craig A. Lewis
Craig A. Lewis
Jonathan T. Stoel
Nicholas R. Sparks

HOGAN LOVELLS US LLP
555 Thirteenth Street, N.W.
Washington, DC 20004-1109
(202) 637-8613

*Counsel to Gerdau Corsa S.A.P.I. de C.V.*

/s/ Irene H. Chen
Irene H. Chen

VCL LAW LLP
1945 Old Gallows Road, Suite 630
Vienna, VA  22182

/s/ Mark B. Lehnardt
Mark B. Lehnardt

LAW OFFICES OF DAVID L. SIMON, LLP
1025 Connecticut Ave., Suite 1000
Washington, DC  20036

*Counsel to Grupo Acerero S.A. de C.V.*

Dated: August 9, 2023

**CERTIFICATE OF COMPLIANCE**

The undersigned counsel hereby certifies that the foregoing Reply Brief dated August 9, 2023 complies with the word-count limitation described in the U.S. Court of International Trade Chambers Procedures.  The memorandum of law contains **6,972** words according to the word-count function of the word processing software used to prepare the memorandum.