A-201-844
Remand
Slip Op. 24-52
POR: 11/01/2019 - 10/31/2020
**Public Document**
E&C/OIII: CD

***Grupo Acecero S.A. de C.V., Grupo Simec S.A.B. de C.V. v. United States,***
**Consol. Court No. 22-00202, Slip Op. 24-52 (CIT April 25, 2024)**
**Steel Concrete Reinforcing Bar from Mexico**

**FINAL RESULTS OF REDETERMINATION**
**PURSUANT TO COURT REMAND**

## I.    SUMMARY

The U.S. Department of Commerce (Commerce) prepared these final results of

redetermination pursuant to the remand holding and order of the U.S. Court of International

Trade (the Court) issued on April 25, 2024.[1]  These final results of redetermination concern

Commerce's final results of the review of the antidumping duty (AD) order on steel concrete

reinforcing bar (rebar) from Mexico covering the period of review (POR) November 1, 2019,

through October 31, 2020.[2]  The Court remanded the *Final Results*, holding that Commerce had

abused its discretion in denying Grupo Simec's[3] September 8, 2021 extension request, which

resulted in the application of adverse facts available (AFA) to Grupo Simec.[4]  On remand, the

Court ordered Commerce to:  (1) reopen the record of the administrative review to accept Grupo

Simec's October 18, 2021, filing, and to request other information as needed; (2) conduct a new

---

[1] *See Grupo Acecero S.A. de C.V., Grupo Simec S.A.B. de C.V. v. United States*, Consol. Court No. 22-00202, Slip Op. 24-52 (CIT April 25, 2024) (*Grupo Simec v. United States*) (*Remand Holding and Order*).
[2] *See Steel Concrete Reinforcing Bar from Mexico:  Final Results of Antidumping Duty Administrative Review; 2019–2020*, 87 FR 34848 (June 8, 2022) (*Final Results*), and accompanying Issues and Decision Memorandum (IDM).
[3] Commerce has previously collapsed the following entities into a single entity, collectively, Grupo Simec:  Grupo Simec S.A.B. de C.V. (Simec, as in individual entity); Aceros Especiales Simec Tlaxcala, S.A. de C.V.; Compania Siderurgica del Pacifico S.A. de C.V.; Fundiciones de Acero Estructurales, S.A. de C.V.; Grupo Chant S.A.P.I. de C.V.; Operadora de Perfiles Sigosa, S.A. de C.V. (Sigosa); Orge S.A. de C.V.; Perfiles Comerciales Sigosa, S.A. de C.V.; RRLC S.A.P.I. de C.V.; Siderúrgicos Noroeste, S.A. de C.V.; Siderurgica del Occidente y Pacifico S.A. de C.V.; Simec International 6 S.A. de C.V.; Simec International, S.A. de C.V.; Simec International 7 S.A. de C.V.; and Simec International 9 S.A. de C.V.  *See, e.g.*, *Steel Concrete Reinforcing Bar from Mexico:  Final Results of Antidumping Duty Administrative Review and Final Determination of No Shipments; 2018-2019*, 86 FR 50527, 50528 (September 9, 2021).
[4] *See Remand Holding and Order* at 35-37; *see also Final Results*, 87 FR at 34849, and IDM at Comments 4 and 5.

analysis to determine if the application of AFA is warranted; and (3) re-analyze the non-selected company rate and make any needed adjustments.[5]

In light of the Court's holding and order, Commerce reopened the record[6] to allow Grupo Simec to submit its October 18, 2021, filing[7] and sought additional information because the re-submitted filing and new information submitted by Grupo Simec contained deficiencies.[8] Grupo Simec's additional submissions rectified the deficiencies Commerce noted to the extent that Commerce has calculated a weighted-average dumping margin for Grupo Simec. Therefore, on remand, Commerce finds that there are no gaps in the record or that Grupo Simec otherwise failed to cooperate to the best of its ability such that the application of AFA would be warranted. As a result of these changes, the weighted-average dumping margin for Grupo Simec was 0.00 percent in the draft results of redetermination.[9] Additionally, because the rate for non-selected companies was based, in part, on Grupo Simec's weighted-average dumping margin, Commerce re-analyzed and adjusted the weighted-average dumping margin for non-selected companies in accordance with the Court's holding and order. As a result, the weighted-average dumping margin for Grupo Acerero S.A. de C.V. and Sidertul S.A. de C.V. was 0.00 percent in the draft results of redetermination.[10] Commerce has since received and analyzed timely comments submitted by interested parties on the draft results of redetermination, and for these final results of redetermination determines that no changes are warranted. As a result, the weighted-average dumping margin for Grupo Simec continues to be 0.00 percent, and the weighted-average

---

[5] *See Remand Holding and Order* at 36-37.
[6] *See* Commerce's Letter, "Request for Information per Court Order," dated May 28, 2024 (Remand Request for Information).
[7] *See, e.g.*, Grupo Simec's Letter, "Re-submission of additional factual information on Cost Allocation Methodology," dated June 4, 2024 (Cost Resubmission).
[8] *See* Commerce's Letters, "Supplemental Questionnaire," dated July 23, 2024; and "Second Supplemental Questionnaire," dated September 16, 2024.
[9] *See* Memorandum, "Grupo Simec Draft Remand Analysis Memorandum," dated October 24, 2024 (Draft Remand Analysis Memorandum).
[10] Because the weighted-average dumping margins of the two mandatory respondents are both zero, on remand, and consistent with the guidance in section 735(c)(5)(B) of the Tariff Act of 1930, as amended (the Act), Commerce has calculated a zero rate for companies not selected for individual review.

dumping margin for Grupo Acerero S.A. de C.V. and Sidertul S.A. de C.V. also continues to be 0.00 percent.

Because certain weighted-average dumping margins are different from those in the *Final Results*, we intend to issue a *Timken* notice with the amended final determination should the Court sustain these final results of redetermination.[11]

## II.    BACKGROUND

On September 4, 2013, the Rebar Trade Action Coalition and its individual members (the petitioner) filed with Commerce, an AD petition concerning imports of rebar from Mexico.[12]  On November 6, 2014, following an affirmative final determination, Commerce published the *Order* in the *Federal Register*.[13]  On November 3, 2020, Commerce published a notice of opportunity to request an administrative review of the *Order*, and received timely requests for review of, *inter alia*, Grupo Simec.[14]  On January 17, 2021, Commerce initiated the administrative review underlying the instant case.[15]  On February 8, 2021, Commerce selected Grupo Simec as one of the mandatory respondents and issued it the initial questionnaire.[16]  Throughout the course of the administrative review, Grupo Simec requested and received several extensions to submit responses to the initial questionnaire and supplemental questionnaires.

---

[11] *See Timken Co. v. United States*, 893 F.2d 337, 341 (Fed. Cir. 1990) ("If the CIT (or this court) renders a decision which is not in harmony with Commerce's determination, then Commerce must publish notice of the decision within ten days of issuance."); *see also Diamond Sawblades Manufacturers Coalition v. United States*, 626 F.3d 1374, 1381 (Fed. Cir. 2010).

[12] *See* Petitioner's Letter, "Petition for the Imposition of Antidumping and Countervailing Duties:  Steel Concrete Reinforcing Bar from Mexico and the Republic of Turkey," dated September 4, 2013.

[13] *See Steel Concrete Reinforcing Bar from Mexico:  Antidumping Duty Order*, 79 FR 65925 (November 6, 2014) (*Order*).

[14] *See, e.g.*, Petitioner's Letter, "Request for Administrative Review," dated November 30, 2020; *see also* Grupo Simec's Letter, "Request for Administrative Review," dated November 30, 2020.

[15] *See Initiation of Antidumping Duty and Countervailing Duty Administrative Reviews*, 85 FR 3014 (January 17, 2020).

[16] *See* Memorandum, "Respondent Selection," dated February 8, 2021; *see also* Commerce's Letter, "Initial Questionnaire," dated February 8, 2021.

Throughout March and April of 2021, Grupo Simec timely filed its responses to the initial questionnaire,[17] albeit after requesting four separate extensions,[18] which Commerce granted either partially or in full.[19]  Finding a significant number of deficiencies in the initial questionnaire responses, Commerce issued two supplemental questionnaires, providing Grupo Simec an opportunity to remedy these deficiencies.[20]  Grupo Simec also requested a series of extensions to respond to both of these supplemental questionnaires, which Commerce again granted in part or in full.[21]  On September 9, 2021, Commerce denied Grupo Simec's final extension request to submit portions of its response to Commerce's First Supplemental Questionnaire still outstanding.[22]  On October 18, 2021, Grupo Simec filed a submission containing information Commerce had requested in the sections A-C supplemental questionnaire,[23] which Commerce rejected as untimely.[24]  Given that Grupo Simec had not provided sufficient and timely responses to the supplemental questionnaires, in the *Preliminary Results*, Commerce preliminarily found that Grupo Simec's initial and supplemental

---

[17] *See* Grupo Simec's Letters, "Extension Request," dated March 8, 2021 (AQR); "Steel Concrete Reinforcing Bar from Mexico," dated March 31, 2021; "Steel Concrete Reinforcing Bar from Mexico," dated April 7, 2021; and "Steel Concrete Reinforcing Bar from Mexico," dated April 12, 2021.

[18] *See* Grupo Simec's Letters, "Extension Request," dated February 23, 2021; "Extension Request," dated March 8, 2021; "Extension Request," dated March 19, 2021; "Extension Request," dated March 26, 2021; and "Extension Request," dated March 31, 2021.

[19] *See* Commerce's Letters, "Extension of Time for Grupo Simec's Section A Questionnaire Response," dated February 23, 2021; "Extension of Time for Grupo Simec's Sections B-D Questionnaire Responses," dated March 8, 2021; "Extension of Time for Grupo Simec's Sections B-D Questionnaire Responses," dated March 22, 2021; "Extension of Time for Grupo Simec's Sections D Questionnaire Response," dated March 26, 2021; and "Extension of Time for Part of Grupo Simec's Initial Questionnaire Response," dated March 31, 2021.

[20] *See* Commerce's Letters, "First Supplemental Questionnaire," dated July 27, 2021 (First Supplemental Questionnaire); and "Antidumping Duty Administrative Review of Steel Concrete Reinforcing Bar from Mexico," dated August 4, 2021.

[21] *See, e.g.*, Grupo Simec's Letter, "Steel Concrete Reinforcing Bar from Mexico," dated August 9, 2021; *see also* Commerce's Letter, "Extension of Time for Grupo Simec's Supplemental Questionnaire Responses," dated August 10, 2021.

[22] *See* Commerce's Letter, "Response to Request for Extension of Time for Grupo Simec's Supplemental Questionnaire Responses," dated September 9, 2021.

[23] *See* Grupo Simec's Letter, "Steel Concrete Reinforcing Bar from Mexico," dated October 18, 2021.  This letter is Grupo Simec's request for Commerce to accept the information it filed earlier that day; the submissions containing that information were removed from the record, *see* Memorandum, "Rejection and Removal of Submissions," dated October 19, 2021.

[24] *See* Memorandum, "Rejection of Untimely Filed Information," dated October 19, 2021.

questionnaire responses continued to be deficient and that the application of AFA was warranted.[25]

On June 8, 2022, Commerce published the *Final Results*,[26] and, concurrently with the accompanying IDM, issued the Deficiencies Memorandum to address deficiencies identified in Grupo Simec's responses.[27] As discussed in the *Final Results*, Commerce found that the application of AFA, pursuant to sections 776(a) and (b) of the Act, was warranted in determining Grupo Simec's dumping margin and assigned a dumping margin of 66.70 percent.[28] Additionally, Commerce assigned the companies not selected for individual examination a dumping margin equal to the simple average of the dumping margins for Deacero S.A.P.I. de C.V. (Deacero), the other mandatory respondent, and Grupo Simec, consistent with the guidance in section 735(c)(5)(B) of the Act.[29]

On appeal, Grupo Simec challenged Commerce's *Final Results* arguing that Commerce abused its discretion in not granting Grupo Simec's various extension requests, in refusing to accept the October 18, 2021, filing, and in applying total AFA to Grupo Simec.[30] In its April 25, 2024, holding, the Court remanded the *Final Results* to reopen the record and determine if the application of facts available or AFA to Grupo Simec are warranted.[31]

On May 2, 2024, Group Simec requested to submit "revised Section A-C and Section A-D supplemental questionnaire responses, the information previously submitted to Commerce by

---

[25] *See Steel Concrete Reinforcing Bar from Mexico: Preliminary Results of Antidumping Duty Administrative Review; 2019–2020*, 86 FR 68632 (December 3, 2021), and accompanying Preliminary Decision Memorandum at 4-8.
[26] *See Final Results*, 87 FR at 34848, and accompanying IDM.
[27] *See* Memorandum, "Grupo Simec Questionnaire Deficiencies Analysis," dated June 1, 2022 (Deficiencies Memorandum); *see also Remand Holding and Order* at 19, n. 6 ("Commerce initially failed to place its Deficiencies Memo on the record because 'a case analyst unfamiliar with the administrative review was covering for the assigned case analyst, who was on leave, and inadvertently failed to file the public and confidential versions of the Deficiencies Memorandum ….' The Court took briefing on the issue and ultimately allowed Commerce to supplement the administrative record with the confidential Deficiencies Memo.") (internal citations omitted).
[28] *See Final Results*, 87 FR at 34849; *see also Final Results* IDM at Comments 4 and 5.
[29] *See Final Results*, 87 FR at 34849.
[30] *See, generally, Grupo Simec v. United States*, Consol. Court No. 22-00202, ECF No. 43 (CIT April 25, 2024).
[31] *See Remand Holding and Order* at 35-37.

{Grupo Simec} on October 18, 2021, and any other information responsive to Commerce's Deficiencies Memorandum."[32]  On May 3 and 7, 2024, Gerdau Corsa S.A.P.I. de C.V. (Gerdau Corsa) and Grupo Acerero S.A. de C.V. (Grupo Acerero) (collectively, Gerdau Corsa and Grupo Acerero) and the Rebar Trade Action Coalition (RTAC) filed comments in support of and opposition to Grupo Simec's Filing Request, respectively.[33]  On May 28, 2024, Commerce issued a request for information, which granted Grupo Simec's Filing Request.[34]  On June 4, 2024, Grupo Simec filed certain information as resubmissions from the underlying administrative review.[35]  On June 18, 2024, Grupo Simec filed additional information to supplement the record of the underlying administrative review.[36]  Between July 24 and September 16, 2024, we issued supplemental questionnaires to Grupo Simec, with timely responses filed between August 16 and September 17, 2024.[37]

## III.    SCOPE OF THE *ORDER*

The scope of this *Order* covers steel concrete reinforcing bar imported in either straight length or coil form (rebar) regardless of metallurgy, length, diameter, or grade.  The subject merchandise is classifiable in the Harmonized Tariff Schedule of the United States (HTSUS) primarily under item numbers 7213.10.0000, 7214.20.0000, and 7228.30.8010.

The subject merchandise may also enter under other HTSUS numbers including 7215.90.1000, 7215.90.5000, 7221.00.0017, 7221.00.0018, 7221.00.0030, 7221.00.0045,

---

[32] *See* Grupo Simec's Letter, "Grupo Acerero et. al v. United States, Slip Op. 24-52 at 2 (Ct. Int'l Trade April 25, 2024)," dated May 2, 2024 (Grupo Simec's Filing Request).

[33] *See* Gerdau Corsa and Group Acerero's Letter, "Letter in Support of Grupo Simec," dated May 3, 2024; *see also* RTAC's Letter, "Response to May 2, 2024 and May 3, 2024 Letters Filed on Behalf of Grupo Simec, Gerdau Corsa S.A.P.I. de C.V., and Grupo Acerero S.A. de C.V.," dated May 7, 2024.

[34] *See* Remand Request for Information.

[35] *See* Grupo Simec's Letter, "Re-Submission of additional factual information regarding downstream affiliates sales," dated June 4, 2024; Cost Resubmission; and Grupo Simec's Letter, "Refiling of translated exhibits pertaining to supplemental questionnaire response of Section ABC due to technical error," dated June 4, 2024.

[36] *See* Grupo Simec's Letters, "Submission of Other Information Responsive to Commerce's Request for Information," dated June 18, 2024; and "Submission of Other Information related to Downstream Sales (Question 11) responsive to Commerce's Request for Information," dated June 18, 2024.

[37] *See* Grupo Simec's Letters, "Submission of Remand Slip Op. 24-52 Supplemental Questionnaire Response," dated August 16, 2024 (Remand SQR); and "Submission of Remand Slip Op. 24-52 Second Supplemental Questionnaire Response," dated September 17, 2024 (Remand 2SQR).

7222.11.0001, 7222.11.0057, 7222.11.0059, 7222.30.0001, 7227.20.0080, 7227.90.6085, 7228.20.1000, and 7228.60.6000. Specifically excluded are plain rounds (*i.e.*, non-deformed or smooth rebar). Also excluded from the scope is deformed steel wire meeting ASTM A1064/A1064M with no bar markings (*e.g.*, mill mark, size or grade) and without being subject to an elongation test. HTSUS numbers are provided for convenience and customs purposes; however, the written description of the scope remains dispositive.

On June 8, 2020, Commerce determined that, effective October 18, 2019, otherwise straight rebar bent on one or both ends (hooked rebar) from Mexico that is produced and/or exported by Deacero was circumventing the *Order*. Specifically, Commerce determined that Deacero's shipments to the United States of such rebar constitute merchandise altered in form or appearance in such minor respects that it should be included within the scope of the *Order*.[38]

## IV.    COMPANIES NOT SELECTED FOR INDIVIDUAL EXAMINATION

In the underlying review, there were two companies for which a review was requested but were not selected for individual review and did not demonstrate that they had no shipments during the POR.

The Act and Commerce's regulations do not address the establishment of a weighted-average dumping margin to be applied to individual companies not selected for individual examination when Commerce limits its examination in an administrative review pursuant to section 777A(c)(2) of the Act. Generally, Commerce looks to section 735(c)(5) of the Act, which provides instructions for calculating the estimated weighted-average dumping margin for all other producers and exporters, *i.e.*, the all-others rate, in an investigation, for guidance when calculating the weighted-average dumping margin for companies which were not selected for individual examination in an administrative review. Pursuant to section 735(c)(5)(A) of the Act,

---

[38] *See Steel Concrete Reinforcing Bar from Mexico:  Final Affirmative Determination of Circumvention of the Antidumping Duty Order*, 85 FR 34705 (June 6, 2020).

the all-others rate shall be an amount equal to the weighted average of the estimated weighted average dumping margins established for exporters or producers individually examined, excluding rates that are zero, *de minimis*, or based entirely on facts available under section 776 of the Act.[39]

In the underlying review, we calculated a weighted-average dumping margin of zero for Deacero. In the instant final results of redetermination, we have calculated a weighted-average dumping margin of zero for Grupo Simec, and we have not calculated any margins which are not zero, *de minimis,* or based entirely on facts available. Therefore, in accordance with section 735(c)(5)(B) of the Act, we are applying to the two companies not selected for individual examination a margin of zero percent.

## V.    DISCUSSION OF METHODOLOGY

### A.  Date of Sale

Section 351.401(i) of Commerce's regulations states that, "{i}n identifying the date of sale of the subject merchandise or foreign like product, the Secretary normally will use the date of invoice, as recorded in the exporter or producer's records kept in the ordinary course of business." The regulation provides further that Commerce may use a date other than the date of invoice if Commerce is satisfied that a different date better reflects the date on which the exporter or producer establishes the material terms of sale.[40] Commerce has a longstanding practice of finding that, where the shipment date precedes the invoice date, the shipment date better reflects the date on which the material terms of sale are established.[41]

---

[39] *See Ball Bearings and Parts Thereof from France, Germany, Italy, Japan, and the United Kingdom:  Final Results of Antidumping Duty Administrative Reviews, Final Results of Changed-Circumstances Review, and Revocation of an Order in Part*, 75 FR 53661, 53663 (September 1, 2010), and accompanying IDM at Comment 1.

[40] *See* 19 CFR 351.401(i); *see also Allied Tube & Conduit Corp. v. United States*, 132 F. Supp. 2d 1087, 1090 (CIT 2001) (quoting 19 CFR 351.401(i)).

[41] *See, e.g.*, *Notice of Final Determination of Sales at Less Than Fair Value and Negative Final Determination of Critical Circumstances:  Certain Frozen and Canned Warmwater Shrimp from Thailand*, 69 FR 76918 (December 23, 2004), and accompanying IDM at Comment 10; *see also Notice of Final Determination of Sales at Less than Fair Value:  Structural Steel Beams from Germany*, 67 FR 35497 (May 20, 2002), and accompanying IDM at Comment 2.

For its home market and U.S. sales, Grupo Simec reported that it used the invoice date as its date of sale because it is the point in time at which all material terms, such as price, quantity, and delivery terms of sale have been agreed upon.[42]  Based on this information, we find that the invoice date is the most appropriate date of sale for Grupo Simec's home market and U.S. sales.

### B. Comparisons to Normal Value (NV)

Pursuant to section 773(a) of the Act and 19 CFR 351.414(c)(1) and (d), to determine whether Grupo Simec's sales of rebar from Mexico to the United States were made at less than NV, Commerce compared the constructed export price (CEP) to the NV as described in the "Constructed Export Price" and "Normal Value" section of this memorandum.

### 1.  Determination of Comparison Method

Pursuant to 19 CFR 351.414(c)(1), Commerce calculates weighted-average dumping margins by comparing weighted-average NV to weighted-average export price (EP) or CEP (*i.e.*, the average-to-average (A-to-A) method) unless Commerce determines that another method is appropriate.  In a less-than-fair-value (LTFV) investigation, Commerce examines whether to compare weighted-average NVs with EPs or CEPs of individual sales (*i.e.*, the average-to-transaction (A-to-T) method) as an alternative comparison method using an analysis consistent with section 777A(d)(1)(B) of the Act.  Although section 777A(d)(1)(B) of the Act does not strictly govern Commerce's examination of this question in the context of an administrative review, Commerce nevertheless finds that the issue arising under 19 CFR 351.414(c)(1) in administrative reviews is, in fact, analogous to the issue in an LTFV investigation.[43]

---

[42] *See* Grupo Simec's Letter, "Steel Concrete Reinforcing Bar from Mexico," dated March 31, 2021, at 15 and C-13 to C-14; *see also* Remand SQR at 25.

[43] *See Ball Bearings and Parts Thereof from France, Germany, and Italy:  Final Results of Antidumping Duty Administrative Reviews:  2010-2011*, 77 FR 73415 (December 10, 2012), and accompanying IDM, at Comment 1; *see also Apex Frozen Foods Private Ltd. v. United States*, 37 F. Supp. 3d 1286 (CIT 2014), *aff'd* 862 F. 3d 1322 (Fed. Cir. 2017) (*Apex*); and *JBF RAK LLC v. United States*, 790 F. 3d 1358, 1363-65 (Fed. Cir. 2015) ("{t}he fact that the statute is silent with regard to administrative reviews does not preclude Commerce from filling gaps in the statute to properly calculate and assign antidumping duties") (citations omitted).

In numerous investigations and reviews, Commerce has applied a "differential pricing" analysis for determining whether application of the A-to-T method is appropriate in a particular situation consistent with 19 CFR 315.414(c)(1) and section 777A(d)(1)(B) of the Act.[44] Commerce finds that the differential pricing analysis is instructive for purposes of examining whether to apply an alternative comparison method in these final results of redetermination. Commerce will continue to evaluate its approach in this area based on comments received in this remand and the application of the differential pricing analysis on a case-by-case, and on Commerce's additional experience with addressing the potential masking of dumping that can occur when Commerce uses the A-to-A method in calculating a respondent's weighted-average dumping margin.

The differential pricing analysis examines whether there exists a pattern of prices for comparable merchandise that differ significantly among purchasers, regions, or time periods. The analysis evaluates all U.S. sales by purchaser, region, and time period to determine whether a pattern of prices that differ significantly exists. If such a pattern is found, then the differential pricing analysis evaluates whether such differences can be taken into account when using the A-to-A method to calculate the weighted-average dumping margin. The analysis incorporates default group definitions for purchasers, regions, time periods, and comparable merchandise. Purchasers are based on the reported consolidated customer codes. Regions are defined using the reported destination code (*i.e.*, ZIP code or state code) and are grouped into regions based upon standard definitions published by the U.S. Census Bureau. Time periods are defined by the quarter within the POR based upon the reported date of sale. For purposes of analyzing sales transactions by purchaser, region, and time period, comparable merchandise is defined using the

---

[44] *See, e.g.*, *Xanthan Gum from the People's Republic of China: Final Determination of Sales at Less Than Fair Value*, 78 FR 33351 (June 4, 2013); *see also Steel Concrete Reinforcing Bar from Mexico: Final Determination of Sales at Less Than Fair Value and Final Affirmative Determination of Critical Circumstances*, 79 FR 54967 (September 15, 2014); and *Welded Line Pipe from the Republic of Turkey: Final Determination of Sales at Less Than Fair Value*, 80 FR 61362 (October 13, 2015).

product control number and all characteristics of the U.S. sales, other than producer, region, and time period, that Commerce uses in making comparisons between EP or CEP and NV for the individual dumping margins.

In the first stage of the differential pricing analysis used here, the "Cohen's *d* test" is applied. The Cohen's *d* coefficient is a generally recognized statistical measure of the extent of the difference between the mean (*i.e.*, weighted-average price) of a test group and the mean (*i.e.*, weighted-average price) of a comparison group. First, for comparable merchandise, the Cohen's *d* coefficient is calculated when the test and comparison groups of data for a particular purchaser, region, or time period each have at least two observations, and when the sales quantity for the comparison group accounts for at least five percent of the total sales quantity of the comparable merchandise. Then, the Cohen's *d* coefficient is used to evaluate the extent to which the prices to the particular purchaser, region, or time period differ significantly from the prices of all other sales of comparable merchandise. The extent of these differences can be quantified by one of three fixed thresholds defined by the Cohen's *d* test: small, medium, or large (0.2, 0.5, and 0.8, respectively). Of these thresholds, the large threshold provides the strongest indication that there is a significant difference between the mean of the test and comparison groups, while the small threshold provides the weakest indication that such a difference exists. For this analysis, the difference is considered significant, and the sales in the test group are found to pass the Cohen's *d* test, if the calculated Cohen's *d* coefficient is equal to or exceeds the large (*i.e.*, 0.8) threshold.

Next, the "ratio test" assesses the extent of the significant price differences for all sales as measured by the Cohen's *d* test. If the value of sales to purchasers, regions, and time periods that pass the Cohen's *d* test account for 66 percent or more of the value of total sales, then the identified pattern of prices that differ significantly supports the consideration of the application of the A-to-T method to all sales as an alternative to the A-to-A method. If the value of sales to purchasers, regions, and time periods that pass the Cohen's *d* test accounts for more than 33

percent and less than 66 percent of the value of total sales, then the results support consideration of the application of an A-to-T method to those sales identified as passing the Cohen's *d* test as an alternative to the A-to-A method, and application of the A-to-A method to those sales identified as not passing the Cohen's *d* test. If 33 percent or less of the value of total sales passes the Cohen's *d* test, then the results of the Cohen's *d* test do not support consideration of an alternative to the A-to-A method.

If both tests in the first stage (*i.e.*, the Cohen's *d* test and the ratio test) demonstrate the existence of a pattern of prices that differ significantly such that an alternative comparison method should be considered, then in the second stage of the differential pricing analysis, Commerce examines whether using only the A-to-A method can appropriately account for such differences. In considering this question, Commerce tests whether using an alternative comparison method, based on the results of the Cohen's *d* and ratio tests described above, yields a meaningful difference in the weighted-average dumping margin as compared to that resulting from the use of the A-to-A method only. If the difference between the two calculations is meaningful, then this demonstrates that the A-to-A method cannot account for differences such as those observed in this analysis, and, therefore, an alternative comparison method would be appropriate. A difference in the weighted-average dumping margins is considered meaningful if: (1) there is a 25 percent relative change in the weighted-average dumping margins between the A-to-A method and the appropriate alternative method where both rates are above the *de minimis* threshold; or (2) the resulting weighted-average dumping margins between the A-to-A method and the appropriate alternative method move across the *de minimis* threshold.

2.  Results of the Differential Pricing Analysis

For Grupo Simec, based on the results of the differential pricing analysis, we find that 65.66 percent of the value of U.S. sales pass the Cohen's *d* test and confirms the existence of a pattern of prices that differ significantly among purchasers, regions, or time periods. Further, we

determine for these final results of redetermination that there is no meaningful difference between the weighted-average dumping margin calculated using the A-to-A method and the weighted-average dumping margin calculated using an alternative comparison method based on applying the A-to-T method to those U.S. sales which passed the Cohen's *d* test and the A-to-A method to those sales which did not pass the Cohen's *d* test. Thus, for these final results of redetermination, we are applying the A-to-A method for all U.S. sales to calculate the weighted-average dumping margin for Grupo Simec.[45]

### C.  Product Comparisons

For the purposes of determining an appropriate NV based on home market prices for comparison to the U.S. sale prices, in accordance with section 771(16) of the Act, we considered all products sold in the home market as described in the "Scope of the *Order*" section above that were in the ordinary course of trade. To identify identical or similar merchandise, we matched foreign like products to the products sold in the United States based on physical characteristics. In order of importance, these physical characteristics are:  (1) type of steel; (2) minimum specified yield strength; (3) size designation; and (4) form.

### D.  Constructed Export Price

Pursuant to section 772(b) of the Act, the CEP is "the price at which the subject merchandise is first sold (or agreed to be sold) in the United States before or after the date of importation by or for the account of the producer or exporter of such merchandise or by a seller affiliated with the producer or exporter, to a purchaser not affiliated with the producer or exporter," as adjusted under sections 772(c) and (d) of the Act. In accordance with section 772(b) of the Act, we used CEP for Grupo Simec's U.S. sales of subject merchandise because

---

[45] For further discussion, *see* the Draft Remand Analysis Memorandum at section titled "Application of Differential Pricing Analysis."

the sales were made after the date of importation by Grupo Simec to unaffiliated purchasers in the United States.

For reported CEP sales, we calculated CEP based on delivered prices to unaffiliated purchasers in the United States. We also made deductions from the U.S. sales price for movement expenses in accordance with section 772(c)(2) of the Act. These adjustments included, where applicable, inland freight from plant to seaport, domestic brokerage and handling expenses, international freight, U.S. customs duties, U.S. brokerage and handling expenses, and U.S. warehousing expenses.

In accordance with section 772(d)(1) of the Act and 19 CFR 351.402(b), we deducted, where applicable, those selling expenses associated with economic activities occurring in the United States, including credit expenses, indirect selling expenses, and inventory carrying costs incurred in the United States. In addition, we deducted an amount for CEP profit in accordance with sections 772(d)(3) and 772(f) of the Act.

### E. Normal Value

#### 1. Home Market Viability

Pursuant to section 773(a)(1) of the Act and 19 CFR 351.404, in order to determine whether there was a sufficient volume of sales of rebar in the home market to serve as a viable basis for calculating NV (*i.e.*, the aggregate volume of home market sales of the foreign like product is five percent or more of the aggregate volume of U.S. sales of subject merchandise), we compared the volume of Grupo Simec's home market sales of the foreign like product to the volume of its U.S. sales of the subject merchandise.[46] Based on this comparison, we determine that Grupo Simec had a viable home market during the POR.

---

[46] *See* AQR, at 3; *see also* Remand 2SQR at Exhibits REMSQR-53 and REMSQR-53.1.

2.  Level of Trade

In accordance with section 773(a)(1)(B) of the Act and, to the extent practicable, we determine NV based on sales in the comparison market at the same level of trade (LOT) as the EP or CEP.  Pursuant to 19 CFR 351.412(c)(1)(iii), the LOT for NV is based on the starting price of the sales in the comparison market or, when NV is based on CV, the starting price of the sales from which we derive selling, general and administrative expenses, and profit.

To determine if NV sales are at a different LOT than EP sales, we examine stages in the marketing process and selling functions along the chain of distribution between the producer and the unaffiliated customer.[47]  If the comparison market sales are at a different LOT and the difference affects price comparability, as manifested in a pattern of consistent price differences between the sales on which NV is based and comparison market sales at the LOT of the export transaction, we make an LOT adjustment to NV under section 773(a)(7)(A) of the Act.

Grupo Simec identified two channels of distribution in the home market:  sales by Simec (channel 1) and sales by Sigosa (channel 2).[48]  According to Grupo Simec, it performed the following selling functions for sales to all home market customers:  sales forecasting; strategic or economic planning; personnel training; distributor or dealer training; procurement or sourcing services; packing; and inventory management.  Grupo Simec reported that it performed sales promotion; provided sales personnel; provided sales and marketing support; order input or processing; and provided rebates in channel 1.  For channel 2, it provided engineering services; technical assistance; and post-sale warehousing.

According to 19 CFR 351.412(c)(2), Commerce will determine that sales are made at different LOTs if they are made at different marketing stages (or their equivalent).  Substantial differences in selling activities are a necessary, but not sufficient, condition for determining that

---

[47] *See* 19 CFR 351.412(c)(2).
[48] *See* AQR at 14-19 and Exhibit A-8.

there is a difference in the stage of marketing. Commerce's LOT analysis takes into account qualitative factors, such as the significance of the activities themselves and the extent to which the activities are performed, as well as quantitative factors. In this case, the majority of selling activities are conducted across both reported channels of distribution. As a result, we find no substantial differences in the selling activities performed to make home market sales in channels 1 and 2. Grupo Simec stated that a quantitative analysis of its selling functions with respect to levels of trade was not applicable because "Simec and Sigosa are not claiming any level-of-trade adjustment" in response to Commerce's request.[49]

With respect to the U.S. market, Grupo Simec reported that it made sales through two channels of distribution: sales by Grupo Simec, for which it performed the same selling functions as channel 1 in the home market; and sales by Sigosa, for which it performed the same selling function as channel 2. Comporting with our analysis for the home market we find that sales to the U.S. market during the POR were made at the same LOT.

Finally, we compared the U.S. LOT to the home market LOT and find that the selling functions performed for the U.S. and home market customers do not differ significantly. Additionally, Grupo Simec did not claim an LOT adjustment. Therefore, Commerce finds that sales to the home market during the POR were made at the same LOT as sales to the United States, and, thus, an LOT adjustment is not warranted.

### 3. Affiliated Party Transactions and Arm's-Length Test

Commerce may calculate NV based on a sale to an affiliated party only if it is satisfied that the price to the affiliated party is comparable to the price at which sales are made to parties not affiliated with the exporter or producer, *i.e.*, the sales were made at arm's-length prices.[50] Under section 773(a)(5) of the Act, Commerce has considerable discretion in deciding whether

---

[49] *Id*. at 18.
[50] *See* 19 CFR 351.403(c).

to include affiliated party sales when calculating NV.[51]  Commerce excludes home market sale prices to affiliated customers that are not made at arm's-length prices from our margin analysis because Commerce considers them to be outside the ordinary course of trade.  Consistent with 19 CFR 351.403(c) and (d) and our practice, Commerce may calculate NV based on sale prices to affiliates if satisfied that the transactions were made at arm's length.[52]

During the POR, Grupo Simec made sales of rebar in Mexico to affiliated parties, as defined in section 771(33) of the Act.  Consequently, we tested these sales to ensure that Grupo Simec made such sales at arm's-length prices in accordance with 19 CFR 351.403(c).  To test whether Grupo Simec made sales to affiliated parties at arm's-length prices, we compared the unit prices of sales to affiliated and unaffiliated customers net of all direct selling expenses and packing.  Pursuant to 19 CFR 351.403(c) and in accordance with Commerce's practice, where the price to an affiliated party was, on average, within a range of 98 to 102 percent of the price of the same or comparable merchandise sold to the unaffiliated parties at the same LOT, we determine that the sale prices made to the affiliated party were at arm's length.[53]

Because Grupo Simec reported sales to affiliates in the comparison market, we tested to see if those sales were made at arm's-length prices.  In the event that home market sales to affiliates were not at arm's-length prices, we disregarded these sale prices for purposes of calculating weighted-average monthly NVs and, where applicable, incorporated downstream sales into our analysis instead.[54]

---

[51] See Antidumping Proceedings:  Affiliated Party Sales in the Ordinary Course of Trade, 67 FR 69186 (November 15, 2002).
[52] See China Steel Corp. v. United States, 264 F. Supp. 2d 1339, 1365 (CIT 2003); see also China Steel Corp. v. United States, 306 F. Supp. 2d 1291 (CIT 2004) (citing Light-Walled Rectangular Pipe and Tube from Mexico: Preliminary Results and Partial Rescission of Antidumping Duty Administrative Review, 76 FR 55352, 55355 (September 7, 2011)).
[53] See Antidumping Proceedings:  Affiliated Party Sales in the Ordinary Course of Trade, 67 FR 69186, 69187 (November 15, 2002).
[54] See Draft Remand Analysis Memorandum.

For Grupo Simec, we find that certain affiliated sales were not made at arm's length and, as such, were disregarded. Because Grupo Simec reported that affiliated sales exceeded five percent of home market sales, we have included the reported downstream sales of those affiliated sales for the calculation of NV.

    4.   Cost of Production Analysis

In accordance with section 773(b)(2)(A)(ii) of the Act, Commerce requested cost of production (COP) information from Grupo Simec to determine if there were reasonable grounds to believe or suspect that sales of the foreign like product had been made at prices less than the COP of the foreign like product.

    a.   Calculation of COP

In accordance with section 773(b)(3) of the Act, we calculated COP based on the sum of costs of materials and fabrication for the foreign like product, plus amounts for general and administrative (G&A) expenses and financial expenses. For Grupo Simec, we relied on the COP data submitted by the respondent. We made adjustments to Grupo Simec's costs by applying the transactions disregarded rule to its purchases of certain inputs through affiliates.[55]

    b.   Test of Comparison Market Sales Prices

On a product-specific basis, pursuant to section 773(b) of the Act, we compared the adjusted weighted-average COPs to the comparison market sale prices of the foreign like product, in order to determine whether the sales prices were below the COPs. For purposes of this comparison, we used COP exclusive of selling and packing expenses. The sale prices were exclusive of any applicable billing adjustments, discounts and rebates, movement charges, actual direct and indirect selling expenses, and packing expenses, where appropriate.

---

[55] *Id.*

c. Results of the COP Test

In determining whether to disregard home market sales made at prices below the COP, we examined, in accordance with sections 773(b)(1)(A) and (B) of the Act, whether: (1) within an extended period of time, such sales were made in substantial quantities; and (2) such sales were made at prices which permitted the recovery of all costs within a reasonable period of time in the normal course of trade. In accordance with sections 773(b)(2)(B) and (C) of the Act, where less than 20 percent of the respondent's comparison market sales of a given product are at prices less than the COP, we do not disregard the below-cost sales of that product because we determine that in such instances the below-cost sales were not made within an extended period of time and in "substantial quantities." Where 20 percent or more of a respondent's sales of a given product are at prices less than the COP, we disregard the below-cost sales because: (1) they were made within an extended period of time in "substantial quantities," in accordance with sections 773(b)(2)(B) and (C) of the Act; and (2) based on our comparison of prices to the weighted-average COPs for the POR, they were at prices which would not permit the recovery of all costs within a reasonable period of time, in accordance with section 773(b)(2)(D) of the Act. Where we find that more than 20 percent of a company's home market sales for a given product were made at prices less than the COP and, in addition, such sales did not provide for the recovery of costs within a reasonable period of time, we excluded these sale prices as outside the ordinary course of trade, and used the remaining sale prices, if any, as the basis for determining NV, in accordance with section 773(b)(1) of the Act.

For Grupo Simec, the cost test indicated that, for home market sales of certain products, more than 20 percent were sold at prices below costs within an extended period of time and were at prices which would not permit the recovery of all costs within a reasonable period of time.[56] Thus, in accordance with section 773(b)(1) of the Act, we disregarded these below-cost sales as

---

[56] *Id.*

outside of the ordinary course of trade in our analysis of each company's home market sale prices, and used the remaining home market sale prices to determine NV.

     5.   Calculation of NV Based on Comparison Market Prices

We calculated NV for Grupo Simec based on the reported packed, ex-factory or delivered prices to home market customers. We made adjustments, where appropriate, to Grupo Simec's starting price for billing adjustments, and early payment discounts in accordance with 19 CFR 351.401(c). We also made deductions from the starting price, where appropriate, for certain movement expenses (*i.e.*, inland freight), pursuant to section 773(a)(6)(B)(ii) of the Act. Pursuant to section 773(a)(6)(C)(iii) of the Act and 19 CFR 351.410(b), we made, where appropriate, circumstance-of-sale adjustments (*i.e.*, credit). We added U.S. packing costs and deducted comparison market packing costs, in accordance with sections 773(a)(6)(A) and (B)(i) of the Act.[57]

When comparing U.S. sale prices with an NV based on comparison market sale prices of similar, but not identical, merchandise, we also made an adjustment based on the physical differences in the merchandise in accordance with section 773(a)(6)(C)(ii) of the Act and 19 CFR 351.411. We based this adjustment on the difference in the variable cost of manufacturing of the foreign like product and that of the subject merchandise.[58]

## VI.   CURRENCY CONVERSION

We made currency conversions into U.S. dollars in accordance with section 773A(a) of the Act and 19 CFR 351.415, based on the exchange rates in effect on the dates of the U.S. sales as certified by the Federal Reserve Bank.

---

[57] *Id*.
[58] *See* 19 CFR 351.411(b).

## VII.    INTERESTED PARTY COMMENTS

We released the Draft Results to interested parties on October 24, 2024.[59]  We received

comments from the petitioner,[60] Grupo Simec,[61] Gerdau Corsa,[62] and Grupo Acerero.[63]  We

summarize and address these arguments, in turn.

**Comment 1:  Whether Commerce Exceeded the Scope of the Remand**

*Petitioner's Comments*

The following is a verbatim summary of the comments submitted by the petitioner (internal
citations omitted).  For further details, *see* Petitioner's Comments at 3-5.

> {Commerce} exceeded the scope of the U.S. Court of International Trade's ("CIT"
> or "court") remand instructions by opening the record to allow Simec to place
> information on the record beyond the October 18 data.  The court's remand hinged
> on {Commerce's} refusal to accept the October 18 data – not other information
> Simec submitted during the course of the administrative review – and the court's
> remand instructions accordingly instructed {Commerce} to allow Simec to file the
> October 18 data, and only after reviewing that data was {Commerce} authorized to
> issue supplemental questions regarding that submission.  Furthermore, granting
> Simec's request to open the record beyond the October 18 submission and
> automatically extending the deadline to submit responses on remand was not only
> inappropriate given the scope of the court's remand instructions, but sets a troubling
> precedent by allowing respondents to dictate the timeline for filing responses and
> providing respondents multiple opportunities to correct, supplement, and amend
> prior-submitted data.
>
> RTAC also requests that {Commerce} indicate that it reopened the record on
> remand under protest.  {Commerce} was well within its authority to deny Simec's
> extension requests and reject the October 18 data that Simec submitted 40 days
> after the filing deadline.

**Commerce's Position:**  We disagree with the petitioner that Commerce exceeded the scope of

the *Remand Holding and Order* and find that Commerce's request for information and

---

[59] *See* Draft Results of Redetermination Pursuant to Court Remand, *Grupo Simec v. United States*, Consol. Court No. 22-00202, Slip Op. 24-52, dated October 24, 2024 (Draft Remand).
[60] *See* Petitioner's Letter, "Comments on Draft Results of Redetermination Pursuant to Court Remand," dated November 5, 2024 (Petitioner's Comments).
[61] *See* Grupo Simec's Letter, "Plaintiff's Comments to Draft Results of Redetermination Pursuant to Court Remand in Grupo Acecero S.A. de C. V., Grupo Simec S.A.B. de C. V. vs United States, Consol. Court No. 22-00202, Slip OP 24-52 (CIT April 25, 2024)," dated November 5, 2024 (Grupo Simec's Comments).
[62] *See* Gerdau Corsa's Letter, "Comments on Draft Remand Results," dated November 5, 2024 (Gerdau Corsa's Comments).
[63] *See* Grupo Acerero's Letter, "Letter in Support of Grupo Simec," dated November 5, 2024 (Grupo Acerero's Comments).

supplemental questionnaires, on remand, were within the scope of the *Remand Holding and Order*. In the *Remand Holding and Order*, the Court held that

> Commerce's use of facts available, drawing of adverse inferences, and use of a simple average to determine the non-examined company rate all flow from Commerce's unjustified decision to reject Simec's final extension request. Because Commerce's final determination may change after it accepts Simec's data, it would be inappropriate for the Court to decide Plaintiffs' remaining claims. *On remand, Commerce should analyze the information in Simec's October 18 Filing and any additional information it may request in its discretion to calculate (1) a new dumping margin for Simec and (2) a new non-selected company rate.*[64]

In the end, the Court ordered Commerce to do the following on remand:

> ORDERED that Commerce shall reopen the record and accept the information Simec proffered on October 18, 2021. Commerce, in its discretion, may request any other information it may need after reviewing the October 18 data;
>
> ORDERED that Commerce shall conduct a new analysis to determine if facts available or adverse inferences are warranted;
>
> ORDERED that Commerce shall reanalyze the non-selected company rate and make any needed adjustments . . .[65]

The petitioner's primary argument is that while the Court instructed Commerce that it "may request any other information it may need after reviewing the October 18 data," the "{C}ourt's remand order hinged on Simec's October 18, 2024 {sic} submission," and "did not order the agency to request or accept additional information."[66]

That claim is incorrect. The Court explicitly ordered Commerce to reopen the record and gave Commerce discretionary authority to request "any other information it may need" at two separate points in the *Remand Holding and Order*.[67] Therefore, Commerce's request for "any other information that {Grupo Simec} believes that will cure deficiencies on the record of this administrative review,"[68] was fully consistent with the Court's remand order.[69]

---

[64] *See Remand Holding and Order* at 24-25 (emphasis added).
[65] *Id.* at 36-37.
[66] *See* Petitioner's Comments at 3.
[67] *See Remand Holding and Order* at 24-25, 36.
[68] *See* Remand Request for Information at 1.
[69] *See Remand Holding and Order* at 24-25, 36.

In reconsidering its determination and analysis on remand, Commerce was aware to some extent what information it would need from Grupo Simec for that determination and analysis, as outlined in the Deficiencies Memorandum.[70]  As a result, Commerce's request for information could and did anticipate deficiencies, specifically the answers to two supplemental questionnaires issued during the underlying proceeding, and Commerce requested revised answers to these supplemental questionnaires at the same time it requested to receive the October 18, 2021 filing.[71]  The *Remand Holding and Order* directed Commerce to "calculate:  (1) a new dumping margin for Simec; and (2) a new non-selected company rate."[72]  Accordingly, Commerce reopened the record and requested Grupo Simec to file:  (1) the October 18, 2021, submission; (2) revised supplemental questionnaire responses to the Section A-C and Sections A&D supplemental questionnaires; and (3) any other information that Grupo Simec believed would cure deficiencies in their reporting during the administrative review.[73]

The petitioner's claim that Commerce was required to initially limit its request only to the October 18 data is therefore simply inconsistent with the Court's holding.  Indeed, the Court expressly gave Commerce the discretionary authority to request any other information it needed.[74]  Accordingly, we disagree with the petitioner's argument in this regard and continue to determine that Commerce's requests for information on remand were fully consistent with the Court's *Remand Holding and Order*.

With respect to the petitioner's secondary argument, and reliance on *Dongtai Peak Honey*,[75] that Commerce inappropriately "permitted Simec to control the remand proceedings"

---

[70] *See generally* Deficiencies Memorandum.
[71] *See* Remand Request for Information at 1 ("Commerce is granting Simec's request to not just file the October 18, 2021 submission, but to also file revised supplemental questionnaire responses and any other information that it believes that will cure deficiencies on the record of this administrative review.").
[72] *Id.* at 24-25.
[73] *See* Remand Request for Information at 1.
[74] *Id.* at 36-37.
[75] *See* Petitioner's Comments at 4 (citing *Dongtai Peak Honey Indus. v. United States*, 777 F.3d 1343, 1352 (Fed. Cir. 2015) (*Dongtai Peak Honey*)).

by issuing supplemental questionnaires to Grupo Simec and granting extensions for responses, we find that claim meritless. The facts of this case are distinguishable from *Dongtai Peak Honey* because unlike in *Dongtai Peak Honey* where the respondent failed to submit *timely* extension requests, all of Grupo Simec's extension requests in the underlying administrative segment were timely, so the issue in this case was not whether Grupo Simec had good cause to file an *untimely* extension request, but rather whether there was good cause to grant a *timely* extension request, an important distinction and the subject of the present litigation.[76] Moreover, the present proceeding is the *remand proceeding*, and not an administrative review. Accordingly, the situation is different in that Commerce must comply with the Court's express order.

Even still, the Court's *Remand Holding and Order* gave Commerce discretion to ask for the information that Commerce deemed necessary to calculate a margin for Grupo Simec. The *Remand Holding and Order*, however, was silent as to any deadlines other than when the final results of redetermination were due to the Court. Indeed, as the petitioner points out, it is within Commerce's discretion to set and enforce deadlines.[77] Therefore, Commerce's issuance of remand supplemental questionnaires and Commerce's grants of extensions for responses to those questionnaires were consistent with the Court's *Remand Holding and Order* and within Commerce's general discretion to set and enforce deadlines.

Underscoring the petitioner's argument on this point is a concern that Commerce's path in this remand will "create an unnecessary, problematic, and unsupportable precedent for future proceedings;"[78] however, Commerce determines that such a concern is unfounded. As the Court reasoned in the *Remand Holding and Order*, "{t}he record reflects that Simec faced uniquely severe fallout from COVID-19. Indeed, Commerce conceded at oral argument that it was

---

[76] *See Remand Holding and Order* at 24-25.
[77] *See* Petitioner's Comments at 4.
[78] *Id.*

unaware of any other COVID-era respondent that experienced the level of hardship Simec did."[79]

Moreover, Commerce is not bound by its prior decisions, and each determination is made on

specific facts of the record before Commerce.[80]

Finally, with respect to the petitioner's request that Commerce should issue this remand

redetermination under protest,[81] Commerce has determined that there is no need to issue this

remand redetermination under protest.

**Comment 2:  Whether Commerce Should Alter Its Draft Results Due to Alleged Minor
Errors that Do Not Impact Its Conclusions**

*Grupo Simec's Comments*

The following is a verbatim summary of the comments submitted by Grupo Simec (internal
citations omitted and emphasis in original).  For further details, *see* Grupo Simec's Comments at
2.

> Grupo Simec is in complete agreement with the conclusion reached in the Draft
> Results.  Our analysis of the Draft Results, accompanying documentation and SAS
> files revealed only very minor errors in the calculations made by Commerce, none
> of which impact the conclusions reached.  In fact, these minor calculation errors
> only further reinforce the ultimate conclusion reached, since correction of these
> errors will underline increase the *negative* margin calculated by Commerce.

*Gerdau Corsa's Comments*

Gerdau Corsa submitted comments without providing an executive summary, but incorporated
by reference Grupo Simec's comments, *see* Gerdau Corsa's Comments at 2.

*Grupo Acerero's Comments*

Grupo Acerero submitted a letter in lieu of comments expressing support for Grupo Simec's
comments and urging Commerce to make no changes to the draft results of redetermination, *see*
Grupo Acerero's Comments at 1.

**Commerce's Position:**  For these final results of redetermination, Commerce determines that it

is inappropriate to make changes to the calculation of Grupo Simec's margin in the draft results

---

[79] *See Remand Holding and Order* at 26.
[80] *See Corus Staal BV v. United States*, 502 F.3d 1370, 1380 ("Commerce is not bound to adhere to the approach it
employs if a sufficiently persuasive showing is made that the approach is flawed in general or in its application to
particular cases.").
[81] *See* Petitioner's Comments at 5.

of redetermination.  Grupo Simec, along with Grupo Acerero and Gerdau Corsa, alleged that Commerce made the following errors:

> 1. Commerce did not calculate the home market net price for Simec's downstream sales.  As a result, these sales were deemed "below cost" and removed from the calculation.
>
> 2. Commerce did not limit its comparison of home market to U.S. sales to only prime products.  Accordingly, some non-prime home market sales could have been matched to U.S. sales, artificially distorting downward the home market prices with sales of secondary or "non-prime" products.
>
> 3. Commerce did not merge cost data into U.S. sales by prime and manufacturer. This failure to merge the cost data caused multiple costs to merge into the U.S. sales data, creating three additional sales.[82]

Commerce determines that these summaries of alleged errors are not specific enough for Commerce to determine if there are errors and, if there are errors, how to correct those errors. This is because Grupo Simec did not identify in its comments where in Commerce's analysis or programming changes should be made.  With respect to Simec's downstream sales, Grupo Simec did not specify which sales were removed from the calculation, where it observed that this was the case, or how the net price calculation was not applied to said sales.[83]

Additionally, we note that Grupo Simec did not submit a prime variable in its U.S. databases.[84]  Grupo Simec suggested that non-prime sales *could* have matched to U.S. sales, but did provide any examples or evidence that this scenario applies to the draft results.

Finally, Grupo Simec alleged that three sales were created from the merging of multiple costs, but did not identify these sales or where they existed on the record for Commerce to scrutinize.  Furthermore, Grupo Simec did not provide a U.S. prime variable, yet Grupo Simec argued that Commerce was required to merge cost data into U.S. sales by prime and manufacturer.  Without the reported prime variable, such analysis would be impossible.  In

---

[82] Grupo Simec's Comments at 2.
[83] *Id*.
[84] *See* Grupo Simec's Letter, "Submission of Remand Slip Op. 24-52 Supplemental Questionnaire Response," dated August 16, 2024, at Exhibits GSMCAR20US04 and SGSAAR20US04.

addition, with respect to the manufacturing variable, Commerce included Grupo Simec's

manufacturer variable, PRODPLU, in that program, but Grupo Simec did not indicate what part

of the margin program Commerce should alter to address their concern.  In fact, Grupo Simec

did not specify how this variable, or any other indicator of manufacturer, should have been used

to address the alleged error, did not identify what Commerce should change in its programming

to address such an alleged error, and did not provide alternate programming language to address

its expressed concerns.[85]

In addition, Grupo Simec provided no citation to prior administrative determinations or

court cases to support its argument that there were errors or inconsistencies with Commerce's

practice in Commerce's calculations on remand.  Grupo Simec did not reference discussions of

methodology or any other portion of the draft results; the Draft Remand Analysis Memorandum;

the attachments to said memorandum, which include the logs and outputs of the comparison

market and margin calculation SAS programs; or the actual programs and supporting macros.[86]

Therefore, for these final results of redetermination, Commerce determines that there is

insufficient information on the record to support Grupo Simec's claims that there were errors in

Commerce's calculations on remand and we find that it would be inappropriate to make changes

to the margin calculation pursuant to those claims in the draft results of redetermination.

## VIII.    FINAL RESULTS OF REDETERMINATION

Consistent with the Court's remand holding and order, Commerce has reopened the

record and analyzed Grupo Simec's submissions placed on the record of this remand proceeding.

Grupo Simec has addressed previous gaps in the record information as outlined in the

Deficiencies Memorandum, allowing Commerce to calculate a margin for Grupo Simec and

making it inappropriate for Commerce apply AFA.  Therefore, we have calculated Grupo

---

[85] *See* Draft Remand Analysis Memorandum at 8; *see also* Grupo Simec's Comments at 2.
[86] *See generally Remand Holding and Order*; *see also* Draft Remand Analysis Memorandum generally and at Attachments 1-4; and the programing submitted to the record in ACCESS barcode 4654866-01 through 4654866-04.

Simec's weighted-average dumping margin according to the analysis described above. As a result, Grupo Simec's weighted-average dumping margin is 0.00 percent.[87] In addition, because of the change in Grupo Simec's calculated margin, the non-selected companies' rate has also changed. As a result, the two companies not selected for individual examination, Grupo Acerero S.A. de C.V. and Sidertul S.A. de C.V., are each assigned a weighted-average dumping margin of 0.00 percent in accordance with section 735(c)(5)(B) of the Act.

| Producer/Exporter | Estimated Weighted-Average Dumping Margin (percent) |
|---|---|
| Grupo Simec (Grupo Simec S.A.B. de C.V., Aceros Especiales Simec Tlaxcala, S.A. de C.V.; Compania Siderurgica del Pacifico S.A. de C.V.; Fundiciones de Acero Estructurales, S.A. de C.V.; Grupo Chant S.A.P.I. de C.V.; Operadora de Perfiles Sigosa, S.A. de C.V.; Orge S.A. de C.V.; Perfiles Comerciales Sigosa, S.A. de C.V.; RRLC S.A.P.I. de C.V.; Sideru´rgicos Noroeste, S.A. de C.V.; Siderurgica del Occidente y Pacifico S.A. de C.V.; Simec International 6 S.A. de C.V.; Simec International, S.A. de C.V.; Simec International 7 S.A. de C.V.; and Simec International 9 S.A. de C.V.) | 0.00 |
| Grupo Acerero S.A. de C.V. | 0.00 |
| Sidertul S.A. de C.V. | 0.00 |

If Commerce's final results of redetermination are sustained by the Court, Commerce intends to publish a *Timken*[88] notice with the amended final results in the *Federal Register* and issue appropriate customs instructions to U.S. Customs and Border Protection, consistent with the discussion above.

11/21/2024

X _Elouaradia_

Signed by: ABDELALI ELOUARADIA

Abdelali Elouaradia,
Deputy Assistant Secretary
 for Enforcement and Compliance

---

[87] *See* Draft Remand Analysis Memorandum.
[88] *See Timken*, 893 F.2d at 341; *see also Diamond Sawblades*, 626 F.3d at 1381.